**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| SUSANNAH WARNER KIPKE, et al. | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-01293-GLR |
| | ) | |
| WES MOORE, in his official capacity | ) | Memorandum in Support of Motion |
| as Governor of Maryland, et al. | ) | for Preliminary Injunction |
| | ) | |
| *Defendants.* | ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION**

Respectfully submitted,

/s/ *John Parker Sweeney*
John Parker Sweeney (Bar No. 08761)
James W. Porter, III (Bar No. 19416)
Marc A. Nardone (Bar No. 18811)
Connor M. Blair (Bar No. 20985)
Bradley Arant Boult Cummings LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
Phone: 202-393-7150
Facsimile: 202-347-1684
jsweeney@bradley.com

Dated: July 3, 2023                    Counsel for Plaintiffs

## TABLE OF CONTENTS

Table of Authorities ............................................................................................................ iii

Introduction.........................................................................................................................1

Procedural History ..............................................................................................................2

The Carry Bans ...................................................................................................................2

The Plaintiffs......................................................................................................................4

    I.  Susannah Kipke ...................................................................................................4

    II.  MSRPA and its members .....................................................................................5

Standard of Review.............................................................................................................8

Argument ............................................................................................................................9

I.      Plaintiffs are likely to succeed on the merits of their Second Amendment and First
      Amendment Claims. ..............................................................................................9

    A.     The Carry Bans likely violate the Second Amendment. ...........................................9

        1.     *Bruen* clarified the standard for applying the Second Amendment: when the
              Second Amendment's plain text covers the conduct at issue, the government
              must demonstrate that its regulations are consistent with the Nation's
              historical tradition of firearm regulation....................................................9

        2.     The Second Amendment's plain text covers the conduct at issue: carrying a
              firearm outside the home for self-defense. ..............................................10

        3.     The Carry Bans are inconsistent with the Nation's historical tradition of
              firearm regulation...................................................................................10

           i.     *Bruen* set forth the precise ways in which the government may
                 demonstrate that its regulations are consistent with the Nation's
                 historical tradition of firearm regulation.......................................10

           ii.    Defendants cannot demonstrate that the Carry Bans are consistent
                 with the Nation's historical tradition of firearm regulation. ..........13

               a.     Bars and Restaurants.......................................................14

                b.     Public Parks ...................................................................15

                c.     Public Transportation......................................................17

                d.     Stadiums, Racetracks, Amusement Parks, and Casinos ....19

                e.     Museums........................................................................20

                 f.     Public Demonstrations.....................................................21

                g.     Healthcare Facilities........................................................22

                 h.     School Grounds...............................................................23

                i.     Government Buildings......................................................24

i

           j.      Private Property ............................................................25

     B.    SB1's compelled speech provision likely violates the First Amendment ..............27

II.    The Carry Bans' violations of Plaintiffs' constitutional rights cause irreparable harm. ....29

III.   The other factors weigh in favor of a preliminary injunction. ...........................................29

IV.   This Court should waive the injunction security requirement. ...........................................30

Conclusion ...........................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
  No. 21-476, 2023 WL 4277208 (U.S. June 30, 2023) ............................................................27

*Antonyuk v. Hochul*,
  No. 1:22-CV-0986 (GTS/CFH), 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022) ............ *passim*

*Billups v. City of Charleston*,
  961 F.3d 673 (4th Cir. 2020) .................................................................................................28

*Bridgeville Rifle & Pistol Club, Ltd. v. Small*,
  176 A.3d 632 (Del. 2017) ......................................................................................................17

*Christian v. Nigrelli*,
  No. 22-CV-695 (JLS), 2022 WL 17100631 (W.D.N.Y. Nov. 22, 2022) ....................14, 15, 26

*Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n of N.Y.*,
  447 U.S. 530 (1980) ...............................................................................................................28

*Cox v. City of Charleston*,
  416 F.3d 281 (4th Cir. 2005) ...................................................................................................8

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ..................................................................................................... *passim*

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir. 2011) .................................................................................................29

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,
  174 F.3d 411 (4th Cir. 1999) .................................................................................................30

*Kreimer v. Bureau of Police*,
  958 F.2d 1242 (3d Cir. 1992) .................................................................................................21

*Koons v. Platkin*,
  No. 22-7464 (RMB/AMD), 2023 WL 3478604 (D.N.J. May 16, 2023) ........................ *passim*

*Legend Night Club v. Miller*,
  637 F.3d 291 (4th Cir. 2011) .................................................................................................29

*McCullen v. Coakley*,
  561 U.S. 742 (2010) ...............................................................................................................29

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010)......................................................................................13

*Moore v. Madigan,*
    702 F.3d 933 (7th Cir. 2012) ........................................................................13

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra,*
    138 S. Ct. 2361 (2018)..................................................................................27

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    142 S. Ct. 2111 (2022)........................................................................... *passim*

*Novotny, et al. v. Moore, et al.,*
    No. 1:23-cv-01295-GLR.................................................................................2

*Pashby v. Delia,*
    709 F.3d 307 (4th Cir. 2013) ........................................................................30

*People v. Chairez,*
    104 N.E.3d 1158 (Ill. 2018)..........................................................................17

*Renna v. Bonta,*
    No. 20-cv-2190-DMS-DEB, 2023 WL 2846937 (S.D. Cal. Apr. 3, 2023) ..........30

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,*
    487 U.S. 781 (1988).......................................................................................27

*Roe v. Dep't of Def.,*
    947 F.3d 207 (4th Cir. 2020) ......................................................................8, 29

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
    141 S. Ct. 63, 67 (2020)................................................................................29

*Ross v. Meese,*
    818 F.2d 1132 (4th Cir. 1987) ......................................................................29

*Schall v. Martin,*
    467 U.S. 253 (1984).......................................................................................28

*Simmons v. United States,*
    390 U.S. 377 (1968).......................................................................................21

*Solomon v. Cook Cnty. Bd. of Comm'rs,*
    559 F. Supp. 3d 675 (N.D. Ill. 2021) ...........................................................17

*Stuart v. Camnitz,*
    774 F.3d 238 (4th Cir. 2014) ........................................................................27

*Watchtower Bible, Tract Society of N.Y., Inc. v. Village of Stratton*,
    536 U.S. 150 (2002)............................................................................................28

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)................................................................................................8

**Statutes**

2 Rev. & Ann. Code of Iowa, tit. XXIV, ch. 148, § 1, pg. 940 (1880)........................................18

An Act to Prevent Persons in this Commonwealth from Wearing Concealed
    Arms, Except in Certain Cases, 1813 Ky. Acts 100, ch. 89, § 1 ............................................18

An Act to Prevent the Wearing of Dangerous and Unlawful Weapons, 1821 Tenn.
    Pub. Acts 15–16, ch. XIII ................................................................................18

An Act to Prohibit the Wearing of Concealed Weapons, 1819 Ind. Acts 39, ch.
    XXIII, § 1 ................................................................................................18

Md. Code Ann., Crim. Law § 4-102 ........................................................................4, 23

Md. Code Ann., Crim. Law § 4-208 ........................................................................4, 21

Md. Code Ann., Crim. Law § 4-111 ........................................................................*passim*

Md. Code Ann., Crim. Law § 6-402 ........................................................................28

Md. Code Ann., Crim. Law § 6-403 ........................................................................28

Md. Code Ann., Crim. Law § 6-411 ........................................................................2, 3, 25, 26

Md. Code Ann., Transp. § 7-705 ..........................................................................3, 17, 18

**Regulations**

COMAR 04.05.01.01 ......................................................................................4

COMAR 04.05.01.03 ......................................................................................4, 24

COMAR 08.01.07.14 ......................................................................................3, 15, 16

COMAR 08.07.01.04 ......................................................................................3, 15, 16

COMAR 08.07.06.04 ......................................................................................3, 15, 16

COMAR 11.04.07.01 ......................................................................................4, 15, 16

COMAR 11.04.07.12 ......................................................................................4, 15, 16

COMAR 14.25.01.01 ..............................................................................................4

COMAR 36.03.10.48 ..........................................................................................4, 19

**Other Authorities**

3 WILLIAM HAND BROWNE, ARCHIVES OF MARYLAND: PROCEEDINGS OF THE
    COUNCIL OF MARYLAND 1636–1667 (Baltimore, Md. Hist. Soc'y 1885). ............................22

9 DAVID J. MCCORD, STATUTES AT LARGE OF SOUTH CAROLINA (1841) ....................................17

*A Museum of Art and Culture,*
    Peabody Essex Museum, https://bit.ly/439jDtl.........................................................20

Amy Hetzner, *Comment, Where Angels Tread: Gun-Free School Zone Laws and*
    *an Individual Right to Bear Arms,*
    95 MARQ. L. REV. 359 (2011). ...............................................................................24

*About Us,*
    Charleston Museum, https://bit.ly/3MPYhMB.........................................................20

*About Us,*
    Maryland State Rifle & Pistol Association, https://www.msrpa.org/about-us/ ........................5

Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-*
    *Century Boston, New York, and Philadelphia,*
    40 LANDSCAPE J. 1 (2021)....................................................................................16

"AT THE INSTANCE OF BENJAMIN FRANKLIN": A BRIEF HISTORY OF THE LIBRARY
    COMPANY OF PHILADELPHIA (2015)...........................................................................20

*Bellevue History,*
    NYC Health + Hospitals, https://bit.ly/4240MiB .....................................................23

CHRISTINE SISMONDO, AMERICA WALKS INTO A BAR: A SPIRITED HISTORY OF
    TAVERNS AND SALOONS, SPEAKEASIES AND GROG SHOPS (2011) ..............................14, 15, 26

David B. Kopel, *Pretend "Gun-Free" School Zones: A Deadly Legal Fiction,*
    42 CONN. L. REV. 515 (2009).................................................................................24

*Gillian Spraggs, Robbery in English Society and Culture – a Historical Survey,*
    Outlaws and Highwaymen,
    https://www.outlawsandhighwaymen.com/history.htm.........................................................18

Ian Ayres, *et al., Guests with Guns: Public Support for "No Carry" Defaults on*
    *Private Land,*
    48 J. L. MED. & ETHICS 183 (2020)..........................................................................26

*Indian Springs State Park History*,
Georgia Dep't of Nat. Res., https://tinyurl.com/mr3ybahu ................................... 15

KENNETH LAWING PENEGAR, THE POLITICAL TRIAL OF BENJAMIN FRANKLIN: A
PRELUDE TO THE AMERICAN REVOLUTION (2011) ................................. 16

NICHOLAS JOHNSON, *ET AL.*, FIREARMS LAW AND THE SECOND AMENDMENT:
REGULATION, RIGHTS, AND POLICY (3d ed. 2021) ................................. 16

Oliver W. Holmes, *The Stage-Coach Business In The Hudson Valley*,
12 Q.J. N.Y. STATE HIST. ASS'N 231 (1931) .......................................... 17

P. Holland & M. Patterson, *Eighteenth Century Theatre, in* THE OXFORD
ILLUSTRATED HISTORY OF THEATRE (2001). ......................................... 19

*Press Release, Wes Moore, Governor of Maryland, Governor Moore Signs
Legislation To Build a Brighter Future for Maryland's Children Through
Education and Keeping Families Safe*,
https://tinyurl.com/5nd5268a .................................................................... 13

*Resolution of October 20, 1774*, § 8, 1 J. Cont'l Cong. 1774–1789 (1904) ................................. 19

*Stagecoach Travel*,
The Henry Ford Museum of American Innovation,
https://www.thehenryford.org/collections-and-research/digital-
collections/expert-sets/11773/ .................................................................... 17

U.S. Dep't of Interior, *Compendium of the Seventh Census* (1854). ........................................... 20

Vaughn Scribner, *Drunks and democrats*,
Aeon (Nov. 23, 2020), https://aeon.co/essays/taverns-and-the-complicated-
birth-of-early-american-civil-society ................................................................. 14, 15

## Introduction

Through 2023 Senate Bill 1 ("SB1") and various other laws and regulations, Maryland bans ordinary Americans who possess a handgun carry permit from carrying a handgun outside the home for self-defense in the places often frequented by these citizens in their routine lives. These bans (the "Carry Bans") effectively eliminate the fundamental right to bear arms and must be struck.

The Carry Bans burden conduct protected by the Second Amendment's plain text and are inconsistent with the Nation's historical tradition of firearm regulation. They defy *New York State Rifle & Pistol Ass n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), which made clear that ordinary Americans have the right to be armed for self-defense when they leave their homes. *Bruen* and *District of Columbia v. Heller*, 554 U.S. 570 (2008), suggested that historically there are at most only a few sensitive places where the State might be able to justify a ban on carrying a firearm: legislative assemblies, polling places, courthouses, and school buildings. Plaintiffs do not challenge Defendants' ban on permit holders carrying a handgun in those places. But because the Carry Bans prevent ordinary, law-abiding carry permit holders from going armed in many places throughout the state over and above the sensitive places identified in *Bruen* and *Heller*, Maryland's Carry Bans plainly violate the Second Amendment.

Plaintiffs are suffering or will soon suffer irreparable harm because the Carry Bans violate the First, Second, and Fourteenth Amendments. No public interest can justify the denial of immediate relief from the Carry Bans' enforceability. Plaintiffs respectfully request this Court to enter a preliminary injunction barring enforcement of these unconstitutional laws.

## Procedural History

Plaintiffs filed their Complaint on May 16, 2023, bringing a facial challenge to the Carry Bans as unconstitutional under the First, Second, and Fourteenth Amendments. Defendants have

moved the Court to consolidate this case with *Novotny, et al. v. Moore, et al.*, No. 1:23-cv-01295-GLR, but that consolidation has not yet occurred. While the plaintiffs in *Novotny* challenge some of the Carry Bans, the challenge brought in *Novotny* is narrower than the issues presented here.

Currently pending before the Court are: (1) Plaintiffs' motion for a preliminary injunction; (2) Plaintiffs' motion for summary judgment (filed contemporaneously with this Motion); and (3) the *Novotny* plaintiffs' motion for a preliminary injunction. The provisions of law challenged in this Motion include all of those challenged by the *Novotny* plaintiffs in their motion for preliminary injunction and more. Plaintiffs' motion for summary judgment and motion for preliminary injunction raise the same challenges to the Carry Bans.

As Plaintiffs explain in their summary judgment briefing, this Court should grant summary judgment to Plaintiffs, enter a permanent injunction, and deny as moot all pending motions for preliminary injunction. Should the Court not wish to decide Plaintiffs' motion for summary judgment, the Court should enter a preliminary injunction barring enforcement of the Carry Bans.

**The Carry Bans**

Maryland requires its ordinary citizens to obtain a handgun carry permit before carrying a handgun outside the home for self-defense. Maryland places numerous restrictions on where carry permit holders may carry a firearm outside the home for self-defense. SB1 adds Sections 6-411 and 4-111 to the Criminal Law Article of the Maryland Code. Plaintiffs challenge the following Section 4-111's bans: (1) on the grounds of a private primary or secondary school;[1] (2) in a health care facility; (3) in a building or part of a building owned or leased by state or local government;[2] (4) in a location licensed to sell or dispense alcohol for on-site consumption; (5) in a stadium; (6)

---

[1] Plaintiffs do not challenge Section 4-111 to the extent it bans carrying a firearm **inside** private school buildings.

[2] Plaintiffs do not challenge this ban to the extent it bans carrying a firearm inside legislative assemblies, courthouses, polling places, and school buildings.

in a museum; (7) in a racetrack; (8) in an amusement park; and (9) in a video lottery facility. Md. Code Ann., Crim. Law § 4-111(a)(2), (4) & (8). Carrying a handgun in these locations is a misdemeanor, subject to imprisonment and a fine. *Id*. § 4-111(f).

Section 6-411 bans carry permit holders from carrying a handgun in any privately owned property that is open to the public—including, for example, houses of worship, grocery stores, gas stations, convenient stores, and gyms—"unless the owner or the owner's agent has posted a clear and conspicuous sign indicating that it is permissible to wear, carry, or transport a firearm on the property" or the carry permit holder has otherwise obtained "express permission." Md. Code Ann., Crim. Law § 6-411(a)(6) & (d).[3] Carrying a handgun without express permission in private property open to the public is a misdemeanor, subject to imprisonment and a fine. *Id*. § 6-411(e).

Plaintiffs also challenge Maryland's existing bans on carry permit holders from carrying a handgun for self-defense:

- In state parks, state forests, and Chesapeake Forest Lands. COMAR 08.07.06.04 (state parks), 08.07.01.04 (state forests) & 08.01.07.14 (Chesapeake Forest Lands).

- On public transit owned or controlled by the Maryland Mass Transit Administration or operated by a private company under contract to the Administration. Md. Code Ann., Transp. § 7-705(b)(6).[4]

- At welcome centers, rest areas, scenic overlooks, roadside picnic areas, and other public use areas within interstate and State highway rights-of-way. COMAR

---

[3] Plaintiffs do not challenge Section 6-411(c), which bans carry permit holders from carrying a handgun inside any "dwelling."

[4] This ban applies to (1) commuter and local bus transit services in the Baltimore area, (2) the Metro Subway services in Baltimore area, (3) Light Rail services in Baltimore, (4) weekday MARC commuter train services between Baltimore and Washington, D.C., and (5) passenger railroad services on MARC commuter trains that travel through Frederick and Montgomery Counties, Maryland, with stops in Maryland.

11.04.07.12; COMAR 11.04.07.01.

- On the grounds of public school property.[5] Md. Code Ann., Crim. Law § 4-102(b).

- On property of state public buildings, improvements, grounds, and multiservice centers under the jurisdiction of the Department of General Services.[6] COMAR 04.05.01.01 & 04.05.01.03.

- In the Camden Yards Sports Complex. COMAR 14.25.01.01(B)(14) & 14.25.02.06.

- In a video lottery facility. COMAR 36.03.10.48.

- At a demonstration in a public place (or in a vehicle that is within 1,000 feet of a demonstration in a public place) after being ordered by a law enforcement officer not to carry a handgun in that location. Md. Code Ann., Crim. Law § 4-208(b)(2).

## The Plaintiffs

### I. Susannah Kipke

Mrs. Kipke is an ordinary Maryland citizen who holds a handgun carry permit. Kipke Decl., at ¶¶ 2–5 (attached as Exhibit 1). She has been, is being, and will continue to be injured by the Carry Bans. She frequently carries her handgun in public and intends to continue carrying her handgun to protect herself and her family, including her three young children, where it is permissible to do so. The places she frequents that are covered by the Carry Bans include: the grounds of public and private primary schools (but not in the school buildings themselves) to pick up and drop off her children from various activities held at those schools; museums, including the Chesapeake Bay Maritime Museum in St. Michaels and the Fire Museum of Maryland in

---

[5] Plaintiffs do not challenge Section 4-102(b) to the extent it bans carrying a firearm **inside** public school buildings.

[6] Plaintiffs do not challenge this ban to the extent it bans carrying a firearm **inside** legislative assemblies, courthouses, polling places, and school buildings.

Lutherville; the Anne Arundel County Public Library to check out books; stadiums, including Prince George's Stadium for Bowie Baysox games; amusement parks, including Six Flags America in Bowie; state parks and forests to hike and camp with her family; the Chesapeake House Travel Plaza on I-95 rest area in Aberdeen; the Camden Yards Sports Complex; and various privately owned buildings otherwise open to the public that she visits at least weekly, including: her church; grocery store; pharmacy; gas station; and bowling alley. *Id.* ¶ 6. She participates in a public demonstration each February on Lawyers Mall in Annapolis with the Maryland Families for Safe Birth. *Id.* ¶ 7. She intends to carry her handgun for self-defense in locations covered by the Carry Bans but cannot (or will not be able to after SB1 takes effect) because of her credible fear of arrest and prosecution. *Id.* ¶ 8.

## II.  MSRPA and its members

Maryland State Rifle and Pistol Association, Inc. ("MSRPA") is an association affiliated with the NRA that is organized to defend the rights of ordinary Maryland citizens to keep and bear arms. *See About Us*, Maryland State Rifle & Pistol Association, https://www.msrpa.org/about-us/ (last visited July 3, 2023). MSRPA advocates on behalf of itself and its individual members. *Id.* These members include Gabriel Dinkins, Michael Fryar, John Hurley, and Jonathan Smith, each of whom has been, is being, and will continue to be injured by the Carry Bans.

Gabriel Dinkins is an ordinary, law-abiding carry permit holder and MSRPA member. Dinkins Decl., at ¶ 2–6 (attached as Exhibit 2). He is a Maryland State Police certified firearms instructor and is certified to teach the training courses required to obtain a Handgun Qualification License and carry permit. *Id.* ¶ 4. He frequently carries his handgun in public and intends to continue carrying his handgun to protect himself and his family where it is permissible to do so. The places he frequents include: Regency Furniture Stadium in Waldorf for the annual July Fourth celebration and for Southern Maryland Blue Crabs games; various privately owned buildings

otherwise open to the public, including: his church, grocery store, pharmacy, and bank; amusement parks, including Six Flags America in Bowie; rest areas when he and his family take road trips; the grounds of public schools (but not in the school buildings themselves) to pick up his children from school; and the MGM National Harbor Hotel & Casino video lottery facility in Oxon Hill. *Id*. ¶ 7. He intends to carry his handgun for self-defense in these locations but cannot (or will not be able to after SB1 takes effect) because of his credible fear of arrest and prosecution. *Id*.

Michael Fryar is an ordinary, law-abiding carry permit holder and MSRPA member. Fryar Decl., at 1 (attached as Exhibit 3). Mr. Fryar was an active duty Connecticut Army National Guardsman from 2007–2013, working as a member of the combat military police. He was moved to inactive reserves in 2013 and served in that role until 2015, when he was honorably discharged by the US Army. *Id*. Mr. Fryar frequently carries his handgun in public and intends to continue carrying his handgun to protect himself and his family where it is permissible to do so. The places he frequents include his church, gas station, Seneca Creek State Park, and the weekday MARC commuter train service between Baltimore and Washington, D.C., which he uses several times a month to commute to work in Washington D.C. *Id*. at 1–2. He intends to carry his handgun for self-defense in these locations but cannot (or will not be able to after SB1 takes effect) because of his credible fear of arrest and prosecution. *Id*.

John Hurley is an ordinary, law-abiding carry permit holder and MSRPA member. Hurley Decl., at ¶¶ 2–8 (attached as Exhibit 4). He is a retired Airport Fire Department firefighter at Baltimore/Washington International Thurgood Marshall Airport ("BWI"). *Id*. ¶ 4. He is currently a volunteer firefighter with the Ridgely Volunteer Fire Company and also President of the Town Commission for the Town of Ridgely. *Id*. ¶ 5. Mr. Hurley frequently carries his handgun in public and intends to continue carrying his handgun to protect himself where it is permissible to do so.

6

The places he frequents include: the Roland E. Powell Convention Center in Ocean City for various annual conferences that he attends as President of the Town Commission; his church, grocery store, pharmacy, and bank; and Tuckahoe State Park. *Id*. ¶ 9. In his role as a volunteer firefighter, he visits at least annually Ridgley Elementary for the "If I Were Mayor" event. *Id*. At this event, he would carry his handgun on the grounds of the school but not in the school building itself. *Id*. Also in his role as a volunteer firefighter, he frequents the Emergency Department at the University of Maryland Shore Medical Center at Easton to deliver patients. *Id*. He intends to carry his handgun for self-defense in these locations but cannot (or will not be able to after SB1 takes effect) because of his credible fear of arrest and prosecution. *Id*.

Jonathan Smith is an ordinary, law-abiding carry permit holder and MSRPA member. Smith Decl., at ¶¶ 2–6 (attached as Exhibit 5). He is a certified NRA pistol instructor and is certified by the Maryland State Police to teach the training courses required to obtain a carry permit and Handgun Qualification License. *Id*. ¶ 4. He is also a certified NRA range safety officer and has achieved the level of expert in the NRA Marksmanship Qualification Program. He is a former Assistant State Attorney who now owns and manages a law firm, Smith Law Firm, LLC. *Id*. ¶ 5. His law offices are within a private office building that is open to the public. *Id*. The Maryland State Police granted him a carry permit in 2021. *Id*. ¶ 7.

Mr. Smith also holds a non-resident carry permit in Florida. *Id*. ¶ 8. He routinely travels to Florida, lawfully flying with his firearm into and out of BWI. *Id*. ¶¶ 8–9. Mr. Smith also frequents his law offices and his bank. *Id*. ¶ 9. Mr. Hurley frequently carries his handgun in public and intends to continue carrying his handgun to protect himself and his family where it is permissible to do so. He intends to carry his handgun for self-defense in these locations but cannot (or will not be able to after SB1 takes effect) because of his credible fear of arrest and prosecution. *Id*.

Mr. Smith allows carry permit holders, including existing clients, prospective clients, and their family members, to carry a firearm into his law offices. *Id*. ¶ 10. He does not currently post a conspicuous sign indicating that it is permissible to wear, carry, or transport a firearm into his law offices; nor does he provide express permission to individuals to carry a firearm into his law offices. *Id*. ¶ 11. After October 1, 2023, he intends to allow carry permit holders to carry a firearm into his law offices and but for his credible fear of prosecution would not post a conspicuous sign indicating that it is permissible to wear, carry, or transport a firearm in his law offices or provide express permission to individuals to carry a firearm into his law offices.  *Id*. He does not wish to engage in the speech compelled by SB1. *Id*.

Mrs. Kipke and these MSRPA members dine at restaurants that are licensed to sell or dispense alcohol for on-site consumption, where they do not consume alcohol but still wish to dine. Kipke Decl., at ¶ 6 ; Dinkins Decl., at ¶ 7; Fryar Decl., at 2; Hurley Decl., at ¶ 9. They intend to carry their handguns for self-defense at these restaurants but cannot do so after SB1 takes effect because of their credible fear of arrest and prosecution. *Id*.

### Standard of Review

To obtain a preliminary injunction, Plaintiffs must establish: (1) that they are "likely to succeed on the merits," (2) that they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tip in [their] favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When the State is the party opposing preliminary relief, the last two factors merge. *Roe v. Dep't of Def.*, 947 F.3d 207, 230 (4th Cir. 2020). Defendants have the burden to establish the constitutionality of the laws they enforce. *E.g., Bruen*, 142 S. Ct. at 2129–30; *Cox v. City of Charleston*, 416 F.3d 281, 284 (4th Cir. 2005) ("An ordinance that requires individuals or groups to obtain a permit before engaging in protected speech is a prior restraint on speech. . . . As a prior restraint, the Ordinance

is laden with a heavy presumption against its constitutional validity, . . . and the City bears the burden of proving its constitutionality.") (internal quotation omitted).

**Argument**

I. **Plaintiffs are likely to succeed on the merits of their Second Amendment and First Amendment claims.**

   A. **The Carry Bans likely violate the Second Amendment.**

      1. ***Bruen* clarified the standard for applying the Second Amendment: when the Second Amendment's plain text covers the conduct at issue, the government must demonstrate that its regulations are consistent with the Nation's historical tradition of firearm regulation.**

"[T]he standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2129–30.

Under *Bruen*, the first question the Court must ask when analyzing the Carry Bans is whether the Second Amendment's plain text covers the right to "bear arms" outside the home for self-defense. *See id*. at 2126, 2130. If the answer to that question is yes (and it plainly is), the second question the Court must ask is whether the Carry Bans are consistent with the Nation's historical tradition of firearm regulation. Defendants have the burden to "affirmatively prove that [their] firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. at 2127. If Defendants cannot do so (which they plainly cannot), then the inquiry is over and the Carry Bans are invalid.

9

2.      **The Second Amendment's plain text covers the conduct at issue: carrying a firearm outside the home for self-defense.**

*Bruen* has already determined that the Second Amendment's plain text covers Plaintiffs' proposed course of conduct: "[t]he Second Amendment's plain text thus presumptively guarantees petitioners . . . a right to 'bear' arms in public for self-defense." 142 S. Ct. at 2135.

"Nothing in the Second Amendment's text draws a home/public distinction . . . ." *Id*. at 2134. Nor does anything in the text distinguish among locations outside the home. *See id*. The text does not delineate where outside the home ordinary Americans may carry. It covers the right to bear arms "in case of confrontation," "for offensive or defensive action in a case of conflict with another person" anywhere outside the home. *Id*. (quoting *Heller*, 554 U.S. at 584, 592). Just as it "would make little sense" to distinguish between keeping arms in "the home" and bearing them outside the home, *id*. at 2134–35, it makes no sense to distinguish among "confrontation[s] [that] can surely take place" outside the home, for instance, in a state park, on public transit, at a demonstration, at a restaurant, or "on a sidewalk in a rough neighborhood," *see id*. at 2135 (quotation and citation omitted).

3.      **The Carry Bans are inconsistent with the Nation's historical tradition of firearm regulation.**

*i.*      ***Bruen* set forth the precise ways in which the government may demonstrate that its regulations are consistent with the Nation's historical tradition of firearm regulation.**

*Bruen* contemplates two, alternative historical inquiries. First, when the historical inquiry is straightforward, as it is here, Defendants must provide historical regulations that are "distinctly similar" to the challenged law. Alternatively, when the historical inquiry is nuanced, such as when analyzing regulations that address problems that "were unimaginable at the Founding," Defendants may analogize the challenged law to "relevantly similar" historical regulations. In either

10

circumstance, Defendants must identify "well-established and representative historical" regulations from the Founding Era.

Usually the required historical "inquiry will be fairly straightforward," requiring Defendants to provide historical regulations that are "distinctly similar" to the challenged law. 142 S. Ct. at 2131. "For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id*.; *see also Heller*, 554 U.S. at 631–33 (holding that no Founding Era regulation that limited handgun possession was distinctly similar to the District of Columbia ban because none banned handgun possession as broadly and carried the same criminal penalties as the District of Columbia ban).

*Heller* and *Bruen* "exemplifie[d] this kind of straightforward historical inquiry." *Bruen*, 142 S. Ct. at 2131. Both examined laws enacted to remedy centuries-old problems. *Id*. (quoting *Heller*, 554 U.S. at 631). Both found that those laws lacked a distinctly similar historical tradition of regulation. *Id*. at 2132; *Heller*, 554 U.S. at 631–33. Both struck those laws as unconstitutional. *Bruen*, 142 S. Ct. at 2156; *Heller*, 554 U.S. at 635–36. This straightforward analysis is dispositive unless the challenged law "implicat[es] unprecedented societal concerns or dramatic technological changes." *Id*. at 2132.

The historical inquiry in cases involving an unprecedented societal concern or a dramatic technological change—neither of which are implicated by the Carry Bans—"may require a more nuanced approach." *Id*. In those instances, the "historical inquiry that courts must conduct will often involve reasoning by analogy," through the "relevantly similar" analysis. *Id*. To be relevantly

similar, the historical and challenged laws must burden the same right in the same manner (how the right is burdened) and for the same reasons (why the right is burdened). *Id*.

Under either the fairly straightforward or the more nuanced historical inquiry, the historical regulations Defendants identify must be "well-established and representative." *Id*. at 2133. Historical "outlier" requirements of a few jurisdictions or of territorial governments must be disregarded. *Bruen*, 142 S. Ct. at 2133, 2147 n.22, 2153 & 2155–56; *id*. at 2155 (rejecting regulations applying to only a small percent of the American population); *see also Koons v. Platkin*, No. 22-7464 (RMB/AMD), 2023 WL 3478604, at \*78, \*85 (D.N.J. May 16, 2023) (holding that regulations covering ten to fifteen percent of the American population are insufficient). *Bruen* also categorically rejected reliance on laws enacted in the Territories, including "Arizona, Idaho, New Mexico, Oklahoma," 142 S. Ct. at 2154, holding that such laws "are most unlikely to reflect 'the origins and continuing significance of the Second Amendment' and we do not consider them 'instructive.'" *Id*. (quoting *Heller*, 554 U.S. at 614).

These "well-established and representative" historical regulations must be from the Founding Era, which is the most probative era when determining whether a state law violates the Second Amendment. *See id*. at 2137 (Reconstruction Era sources "do not provide as much insight into [the] original meaning as earlier sources." (quoting *Heller*, 554 U.S. at 614)).

*Bruen*, which involved a state law, made clear "that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." 142 S. Ct. at 2137 (collecting cases). The Supreme Court has "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id*. Regardless, "the public understanding of the right to keep and bear arms

in both 1791 and 1868 was, *for all relevant purposes*, the same with respect to public carry." *Id*. at 2138 (emphasis added). The scope of the right in Second Amendment claims is the dispositive issue: Defendants must "show that the pre-existing right codified in the Second Amendment, and made applicable to the States through the Fourteenth, does not protect petitioners' proposed course of conduct." *Id*. at 2135.

*Bruen*'s caution to lower courts to "guard against giving postenactment history more weight than it can rightly bear," *id*. at 2136, is consistent with the Supreme Court's similar caution in *Heller*: post-Civil War discussions of the right to keep and bear arms should be discounted because they "took place 75 years after the ratification of the Second Amendment, [and they therefore] do not provide as much insight into its original meaning as earlier sources." *Heller*, 554 U.S. at 614. *Heller* relied on Reconstruction Era sources to confirm what the Founding Era sources had already established. *Id.* at 605–10. *McDonald v. City of Chicago*, 561 U.S. 742 (2010), which also involved a state law, confirmed that "1791, the year the Second Amendment was ratified [is] the critical year for determining the amendment's historical meaning." *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012) (citing *McDonald*, 561 U.S. 742, 765 & n.14 (2010)).

> ii.    **Defendants cannot demonstrate that the Carry Bans are consistent with the Nation's historical tradition of firearm regulation.**

As in *Heller* and *Bruen*, the constitutionality of the Carry Bans presents a straightforward historical analysis. The Carry Bans concern the same alleged centuries-old societal problem at issue in both *Heller* and *Bruen*: violence involving the use of a handgun, primarily in urban areas. *See, e.g.*, Press Release, Wes Moore, Governor of Maryland, *Governor Moore Signs Legislation To Build a Brighter Future for Maryland's Children Through Education and Keeping Families Safe* (May 16, 2023), https://tinyurl.com/5nd5268a (Maryland Lieutenant Governor Aruna Miller

remarked that SB1 "will keep Marylanders, particularly children, safe from gun violence"); *see also Christian v. Nigrelli*, No. 22-CV-695 (JLS), 2022 WL 17100631, at *8 (W.D.N.Y. Nov. 22, 2022) (holding that New York's Concealed Carry Improvement Act, which is similar to the Carry Bans, "concerns the same alleged societal problem addressed in *Heller*: 'handgun violence,' primarily in 'urban area[s].'"). The Founders could have adopted bans like the Carry Bans but did not. There were no distinctly similar historical regulations addressing that alleged problem. The straightforward historical analysis confirms the unconstitutionality of the Carry Bans. The Carry Bans do not implicate unprecedented societal concerns or dramatic technological changes. Regardless, the Carry Bans fail even the more nuanced historical inquiry because they lack well-established and representative, relevantly similar historical analogues.

### a.      Bars and Restaurants

Maryland bans handgun carry at all locations licensed to sell or dispense alcohol for on-site consumption. Md. Code Ann., Crim. Law § 4-111(a)(8)(i); *id.* 4-111(e). "Taverns, inns, public houses, 'tippling houses,' 'victualing houses,' or 'ordinaries'" existed at the time of the Founding. *Antonyuk v. Hochul*, No. 1:22-CV-0986 (GTS/CFH), 2022 WL 16744700, at *74 (N.D.N.Y. Nov. 7, 2022). Firearm violence in bars and restaurants pre-dates the Founding. *See, e.g.*, CHRISTINE SISMONDO, AMERICA WALKS INTO A BAR: A SPIRITED HISTORY OF TAVERNS AND SALOONS, SPEAKEASIES AND GROG SHOPS 16 (2011) ("[T]oward the close of the seventeenth century, Nathaniel Saltonstall of Haverhill would complain . . . that taverns were plagued with 'pernicious loitering'  and the foolish 'firing and shooting off of guns.'") (attached as Exhibit 6); *see also* Vaughn Scribner, *Drunks and democrats*, Aeon (Nov. 23, 2020), https://aeon.co/essays/taverns-and-the-complicated-birth-of-early-american-civil-society ("By 1775, however, sporadic rioting and violence in and around taverns transitioned into outright war when a group of 'minute men'

14

gathered at the Buckman Tavern in Lexington, Massachusetts on 19 April 1775, just before murdering more than 70 British troops."); *id.* ("Unlicensed taverns bred their fair share of crime and disorder, as fights, murder, black market trading, prostitution and blasphemy regularly issued from their doors.").

But the Founding Era had no bans on carrying a firearm in these locations. There is no historical tradition sufficient to justify Section 4-111(a)(8)(i). *Antonyuk*, 2022 WL 16744700, at *74 (collecting sources). This is true even though taverns were heavily regulated during the Founding Era: "In all states" during the Founding Era, "tavern legislation was involved and constantly changing." SISMONDO, *supra*, at 15; *id.* ("In Virginia after 1638, there was more law on the books regarding the licensing of taverns than there was on 'roads, land titles, care of the poor and general law and order.'"). For these reasons, similar laws have been held likely to be unconstitutional. *Koons*, 2023 WL 3478604, at *86–87; *Antonyuk*, 2022 WL 16744700, at *72.[7]

### b.    Public Parks

Maryland bans handgun carry in state parks, state forests, Chesapeake Forest Lands, and highway rest areas. COMAR 08.07.06.04, 08.07.01.04, 08.01.07.14, 11.04.07.01 & 11.04.07.12. Public parks long predate the Founding. *See Koons*, 2023 WL 3478604 at *83 (listing various public parks that pre-dated the Founding). These public parks were precursors to the state parks and forests that came into existence in the early 19th century, *see, e.g.*, *Indian Springs State Park History*, Georgia Dep't of Nat. Res., https://tinyurl.com/mr3ybahu (last visited July 3, 2023), and rest areas, which are akin to small public parks for highway drivers, long-existed and proliferated beginning in the 1950s with the interstate highway system, *see Rest Area History*, Rest Area

---

[7] The preliminary injunctions in *Christian*, *Antonyuk*, and *Koons* have each been appealed. The preliminary injunctions in each case have been partially or completely stayed pending the appeals.

History.Org, https://tinyurl.com/2h78mtur (last visited July 3, 2023). Historically, public parks were used for militia purposes (i.e., not gun-free zones) and "for informal socializing and recreation" including "[s]trolling," "[h]orse- and carriage-riding," "sports," "entertainment," and "raucous celebrations." *See* Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 Landscape J. 1, 3–6 (2021). Firearm violence at public parks pre-dates the Founding. *See id.* at 13 (colonial Americans "were very familiar with parks, especially London's royal parks, because many of them and their families were originally Londoners and the local newspapers were full of stories of celebrations, *murders*, *robberies*, new fashions, and exploits that occurred in them." (emphasis added)); Kenneth Lawing Penegar, The Political Trial of Benjamin Franklin: A Prelude to the American Revolution 21–25 (2011) (discussing a 1773 duel at London's Hyde Park) (attached as Exhibit 7).

But the Founding Era had no distinctly similar bans on carrying a firearm in public parks. There is no historical tradition sufficient to justify COMAR 08.07.06.04, 08.07.01.04, 08.01.07.14, 11.04.07.01 & 11.04.07.12. For these reasons, courts have held that bans on carrying a firearm in public parks are likely to be unconstitutional. *See Koons*, 2023 WL 3478604, at *83 ("Despite the existence of such common lands since the colonial period, the State has failed to come forward with any laws from the 18th century that prohibited firearms in areas that today would be considered parks."); *Antonyuk*, 2022 WL 16744700, at *64 (rejecting historical ordinances that "prohibit[ed] the carrying of firearms (1) where people are assembled for educational or literary purposes, or (2) to a lesser extent, when people frequent an outdoor location for purpose of recreation or amusement (or travel through such a location), especially when there are children present").

16

Even prior to *Bruen*, courts held that the Second Amendment prevents the government from banning firearms at state parks and forests. *See, e.g.*, *Solomon v. Cook Cnty. Bd. of Comm rs*, 559 F. Supp. 3d 675, 692–96 (N.D. Ill. 2021) (finding a forest preserve district was not a sensitive place); *People v. Chairez*, 104 N.E.3d 1158, 1176–77 (Ill. 2018) (holding that an Illinois statute that banned the possession of a firearm within 1000 feet of a public park violated the Second Amendment); *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 658–59 (Del. 2017) (holding that state parks and forests were not "sensitive places" and that a ban on firearms in these places was unconstitutional under Delaware's version of the Second Amendment).

### c.        Public Transportation

Maryland bans handgun carry on public transit. Md. Code Ann., Transp. § 7-705(b)(6)). Public transportation existed at the time of the Founding. Passengers shared stagecoaches on journeys throughout the colonies before the Revolution and in the states after it. *See, e.g.*, Oliver W. Holmes, *The Stage-Coach Business In The Hudson Valley*, 12 Q.J. N.Y. STATE HIST. ASS'N 231, 231–33 (1931) ("Staging had developed somewhat in the colonies before the Revolution, especially around Boston and Philadelphia."); *see also Stagecoach Travel*, The Henry Ford Museum of American Innovation, https://www.thehenryford.org/collections-and-research/digital-collections/expert-sets/11773/ (last visited July 3, 2023) ("The stagecoach was the major vehicle for overland group transport until railroads began to dominate in the 1850s."). Ferries and riverboats were commonplace during the Founding Era. For example, South Carolina established a "public ferry" as early as 1725 and mandated "free" "ferriage" for "all persons under arms in times of alarms and expresses." 9 DAVID J. MCCORD, STATUTES AT LARGE OF SOUTH CAROLINA 60–61 (1841) (attached as Exhibit 8). Firearm violence on public transportation pre-dates the Founding. *See* Gillian Spraggs, *Robbery in English Society and Culture – a Historical Survey*,

17

Outlaws and Highwaymen, https://www.outlawsandhighwaymen.com/history.htm (last modified August 28, 2007). Firearms were commonly carried on public transportation in early America. Blunderbusses, for instance, were carried on stagecoaches. *See* NICHOLAS JOHNSON, *ET AL.*, FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 2195 (3d ed. 2021) ("Stagecoach guards and travelers carried blunderbusses, or other short guns, such as traveling or coaching carbines, or (most often) a pair of ordinary pistols.") (attached as Exhibit 9).

But the Founding Era had no bans on carrying a firearm on public transportation. When a few states began to enact post-Founding restrictions on carrying handguns, they exempted travelers from these regulations. *See, e.g.*, An Act to Prevent Persons in this Commonwealth from Wearing Concealed Arms, Except in Certain Cases, 1813 Ky. Acts 100, ch. 89, § 1 ("[A]ny person in this Commonwealth, who shall hereafter wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless when traveling on a journey, shall be fined . . . .") (attached as Exhibit 10); An Act to Prohibit the Wearing of Concealed Weapons, 1819 Ind. Acts 39, ch. XXIII, § 1 ("That any person wearing any dirk, pistol, sword in cane, or any other unlawful weapon, concealed, shall be deemed guilty of a misdemeanor . . . [p]rovided however, that this act shall not be so construed as to affect travelers.") (attached as Exhibit 11); An Act to Prevent the Wearing of Dangerous and Unlawful Weapons, 1821 Tenn. Pub. Acts 15–16, ch. XIII (exempting "any person that may be on a journey to any place of out his county or state") (attached as Exhibit 12).

There is no historical tradition sufficient to justify Section 7-705(b)(6). There is no historical law banning firearms on public transportation. *Koons* 2023 WL 3478604, at *92; *Antonyuk*, 2022 WL 16744700 at *66 & n.109 (noting that the law of earlier generations was more protective of the self-defense rights of those traveling or on the move, not less so); *cf.* 2 Rev. & Ann. Code of Iowa, tit. XXIV, ch. 148, § 1, pg. 940 (1880) (codifying 1876 enactment that barred

individuals from shooting "at any railroad train, cars, or locomotive engine," so "to punish interference with, and injury to the property of railroad companies") (attached as <u>Exhibit 13</u>). For these reasons, courts have held that similar bans are likely to be unconstitutional. *See Koons*, 2023 WL 3478604, at *91–92 (enjoining pending an evidentiary hearing New Jersey's ban on carrying a firearm in "transportation hubs" and flying with a firearm in a checked bag); *Antonyuk*, 2022 WL 16744700, at *71 (enjoining New York's ban on carrying a firearm in buses, vans, and airports).

### d. Stadiums, Racetracks, Amusement Parks, and Casinos

Maryland bans handgun carry at certain designated entertainment venues. Md. Code Ann., Crim. Law § 4-111(a)(8)(ii), (v) & (vi); *id.* § 4-111(e); COMAR 36.03.10.48; COMAR 14.25.02.06. Entertainment facilities at which people gathered existed at the time of the Founding. Theaters, for instance, were a staple of life in the Founding Era. The first theater in what became America opened in Williamsburg in 1716, followed soon by Philadelphia (1724), Charleston (1736), and New York (in the 1730s); theater companies toured "up and down the East coast" "establishing and converting theatres" in the towns they visited. P. Holland & M. Patterson, *Eighteenth Century Theatre*, *in* THE OXFORD ILLUSTRATED HISTORY OF THEATRE 295 (2001). Gaming houses and wagering on horses were also well known to the American colonists. *See* G. Robert Blakey, *Gaming, Lotteries, and Wagering: The Pre-Revolutionary Roots of the Law of Gambling*, 16 RUTGERS L.J. 211, 232–65 (1985) (detailing regulation of gambling in Colonial America).

But the Founding Era had no bans on carrying a firearm in entertainment facilities. There is no historical tradition sufficient to justify Section 4-111(a)(8)(ii), (v) & (vi), COMAR 36.03.10.48, or COMAR 14.25.02.06. For instance, despite heavy regulation of gambling, *see* Blakey, *supra*, at 232–65; *Resolution of October 20, 1774*, § 8, 1 J. Cont'l Cong. 1774–1789 at 78

(1904) (attached as <u>Exhibit 14</u>), there is "no firearm law from states that allowed gambling that restricted firearms at gambling establishments," *Koons*, 2023 WL 3478604, at \*88; *see also id.* at \*87–88 (rejecting as not historically analogous Virginia and North Carolina laws codifying the common law offense of "affray" or going armed "to the terror of the people"—variants of England's Statute of Northampton—and Georgia, Tennessee, Texas, Missouri laws, and a New Orleans ordinance, that did not encompass entertainment facilities or did not demonstrate a well-established and representative history of doing so). For these reasons, *Koons* held that New Jersey's bans on carrying a handgun in a "theater, stadium, museum, arena, racetrack or other place where performances, concerts, exhibits, games or contests are held" and "casinos" are likely to be unconstitutional. *See id.* at \*88–89. *Antonyuk* held the same for New York's ban on carrying a handgun in theaters, conference centers, and banquet halls. 2022 WL 16744700, at \*74–75.

### e.    Museums

Maryland bans handgun carry in museums. Md. Code Ann., Crim. Law § 4-111(a)(8)(iii); *id.* § 4-111(e). Museums and similar institutions such as libraries pre-date the Founding. Benjamin Franklin founded America's first lending library in Philadelphia in 1731. "AT THE INSTANCE OF BENJAMIN FRANKLIN": A BRIEF HISTORY OF THE LIBRARY COMPANY OF PHILADELPHIA 5 (2015) (attached as <u>Exhibit 15</u>). By 1850, the Census reported 1,217 public libraries in the United States. *See* U.S. Dep't of Interior, *Compendium of the Seventh Census* at 159 (1854) (attached as <u>Exhibit 16</u>). The Charleston Museum was founded in 1773. *About Us*, Charleston Museum, https://bit.ly/3MPYhMB (last visited July 3, 2023). The Peabody Essex Museum in Salem, Massachusetts, was founded in 1799. *A Museum of Art and Culture*, Peabody Essex Museum, https://bit.ly/439jDtl (last visited July 3, 2023).

20

But the Founding Era had no bans on carrying a firearm in museums or similar institutions such as libraries. There is no historical tradition sufficient to justify Section 4-111(a)(8)(iii). *Koons* held that New Jersey's ban on "public libraries and museums" is likely to be unconstitutional. 2023 WL 3478604, at *86 (rejecting as not well-established and representative various state, Territory, and city laws from the late 19th century that banned firearms at, among other places, "place[s] where persons are assembled for educational, literary or scientific purposes").

The First Amendment guarantees "the positive right of public access to information and ideas" at places like museums and libraries. *Kreimer v. Bureau of Police*, 958 F.2d 1242, 1255 (3d Cir. 1992). To exercise their First Amendment rights, Section 4-111(a)(8)(iii) requires carry permit holders to waive their Second Amendment rights, a trade-off forbidden by the Constitution. *Simmons v. United States*, 390 U.S. 377, 393–94 (1968).

### f.      Public Demonstrations

Maryland bans handgun carry at public demonstrations if a law enforcement officer chooses to ban carry. Md. Code Ann., Crim. Law § 4-208(b)(2). Demonstrations in public places were commonplace at the Founding. Violence at these demonstrations was also common: "The colonial generation recognized that citizens attending public gatherings exposed themselves to violent attack. . . . [H]istory reveals that the more crowded the gathering, the greater the risk of attack." *Koons*, 2023 WL 3478604, at *73. But the colonial generation did not ban carrying a firearm at public demonstrations. To the contrary, "[t]o abate that risk, American colonists obligated their citizenry to arm themselves for protection." *Id*. "[T]he historical evidence demonstrates that six out of the thirteen original colonies required their citizens to go armed when attending religious services or public assemblies." *Id*. (citing *Heller*, 554 U.S. at 601) (observing that "[m]any colonial statutes required individual arms bearing for public-safety reasons")).

21

Maryland, for instance, required that "[n]oe man able to bear arms to goe to church or Chapell or any considerable distance from home without fixed gunn and 1 Charge at least of powder and Shott." 3 WILLIAM HAND BROWNE, ARCHIVES OF MARYLAND: PROCEEDINGS OF THE COUNCIL OF MARYLAND 1636–1667 103 (Baltimore, Md. Hist. Soc'y 1885) (attached as Exhibit 17).

There is no evidence that the colonies reversed course once they became states. *See Koons*, 2023 WL 3478604, at *74–77 (rejecting as insufficient a few mid- to late-19th century state and Territory laws that generally made it unlawful to carry firearms at churches, schools, ballrooms, election precincts, or public assemblies); *Antonyuk*, 2022 WL 16744700, at *75–78 (same). For these reasons, courts have held similar bans are likely to be unconstitutional. *See Koons*, 2023 WL 3478604, at *80 (enjoining New Jersey's ban on carrying a handgun at public gatherings, demonstrations, and events requiring a government permit); *Antonyuk*, 2022 WL 16744700, at *74–78 (enjoining New York's ban on carrying a handgun at "any gathering of individuals to collectively express their constitutional rights to protest or assemble").

This ban is also unconstitutional because it vests law enforcement with unbridled discretion to determine who, when, and where carry permit holders may carry a handgun at public demonstrations, in direct violation of *Bruen*'s holding that the exercise of a fundamental right cannot depend upon a State agent's "appraisal of facts, the exercise of judgment, and the formation of an opinion." 142 S. Ct. at 2138 n.9 (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 305 (1940)). Carry permit holders should not have to choose between exercising their First Amendment right to assembly and their Second Amendment right to carry a handgun in public for self-defense.

### g.    Healthcare Facilities

Maryland bans handgun carry at hospitals and others healthcare facilities. Md. Code Ann., Crim. Law § 4-111(a)(2)(iii); *id.* § 4-111(c). "Hospitals and medical care facilities existed before

and after this Nation's founding." *Koons*, 2023 WL 3478604, at *93. Bellevue Hospital in New York "is America's oldest operating hospital," and it opened in New York City in 1736. *Bellevue History*, NYC Health + Hospitals, https://bit.ly/4240MiB (last visited July 3, 2023). Pennsylvania Hospital opened in 1751. *Koons*, 2023 WL 3468604 at *93. Weill Cornell Medical Center opened as New York Hospital in 1791. *Id*. "Up north, Massachusetts opened the Boston Medical Dispensary in 1796—today Tufts Medical Center—and then the Massachusetts General Hospital in 1811." *Id*.

But the Founding Era had no bans on carrying a firearm in hospitals. There is no historical tradition sufficient to justify Section 4-111(a)(2)(iii): there are "no laws from the 18th or 19th centuries that banned firearms at hospitals . . . or other medical facilities." *Koons*, 2023 WL 3478604, at *93 (citing *Antonyuk*, 2022 WL 16744700, at *60) (noting that "the medical profession existed in 18th and 19th century America; and certainly gun violence existed in 18th and 19th century America" and finding the government (and the court) could not discover any laws barring firearms in places such as "almshouses, hospitals, and physician's offices"). For these reasons, courts have held that similar bans are likely to be unconstitutional. *See id*. at *93 (enjoining New Jersey's ban on carrying a handgun into medical offices and ambulatory care centers); *Antonyuk*, 2022 WL 16744700, at *60 (enjoining New York's ban on carrying a handgun into "'any location providing health, behavioral health, or chemical dependance care or services' (except to places to which the public or a substantial group of persons have not been granted access)").

### h.    School Grounds

Maryland bans handgun carry on the grounds as well as inside the buildings of pre-schools, primary schools, and secondary schools. Md. Code Ann., Crim. Law § 4-111(a)(2)(i) & (ii); *id.* § 4-111(c); *id.* § 4-102(b). Plaintiffs challenge Maryland's ban on carrying a handgun on school

23

grounds, including in a car while in the pick-up, drop-off lines, and in the school parking lot. Plaintiffs do not challenge Maryland's ban on carrying a handgun **inside** a school building.

There is simply no historical tradition of banning ordinary American adults from carrying a handgun on school grounds. "During most of America's history, there were no particular restrictions on the possession of firearms on school property." David B. Kopel, *Pretend "Gun-Free" School Zones: A Deadly Legal Fiction*, 42 CONN. L. REV. 515, 518 (2009). Students, even, were not prohibited from carrying their firearms to school. *Id*. Justice Scalia, who authored *Heller*, carried a rifle on the subway on his way to school for use as a member of his school's rifle team. *Id*. It is not until "recent decades [that] many legislatures and school administrators have banned the possession of firearms on school property." *Id*. "Gun Free School Zone" laws—banning firearms within a certain number of feet of school property—were first enacted in the 1990s. Amy Hetzner, *Where Angels Tread: Gun-Free School Zone Laws and an Individual Right to Bear Arms*, 95 MARQ. L. REV. 359, 360 (2011). Maryland's ban on carrying a handgun on school grounds is not consistent with the Nation's historical tradition of firearm regulation and must be stricken.

### i.    Government Buildings

Maryland bans handgun carry in any and all government buildings. Md. Code Ann., Crim. Law § 4-111(a)(4)(i); *id.* § 4-111(d); COMAR 04.05.01.03. Plaintiffs do not contest Maryland's ability to ban handguns **inside** legislative assemblies, polling places, courthouses, and school buildings where *Bruen* and *Heller* suggested a ban on handgun carry would be presumptively lawful. But *Bruen* and *Heller* do not suggest that the State can ban carrying in every building owned or leased by the government where the public is allowed, including buildings open to and serving the public such as the motor vehicle administration.

24

Defendants must justify each of their Carry Bans, including each of its bans on carrying in each type of government building, with history and tradition. *Bruen* does not exempt government buildings from the required standard for applying the Second Amendment. 142 S. Ct. at 2133 (noting that firearm bans in "government buildings" may be constitutional so long as they are sufficiently justified by a historical tradition); *Heller*, 554 U.S. at 626 (same). There is no historical tradition of states prohibiting handgun carry in all buildings owned or run by the government. *Koons*, 2023 WL 3478604, at *54 (collecting case law). If that were the historical tradition, then *Bruen* would not have singled out "legislative assemblies" and "courthouses" as among the "relatively few" sensitive places where firearms may be prohibited, 142 S. Ct. at 2133, as those places are all government buildings. "[T]o the extent that a dispute arises concerning a prohibition at a particular government building, resolution will turn on whether analogies to historical regulations can justify the challenged law." *Koons*, 2023 WL 3478604, at *55; *id*. ("Whether the sensitive-place designations survive depends on whether the State can meet its burden of demonstrating a historical tradition that is well-established and representative as to such government buildings.").

Defendants cannot justify their bans on carrying a handgun in designated governments buildings such as rest areas, museums, public transit and airports, stadiums, or entertainment facilities. *See supra*. Defendants cannot justify the blanket ban on carry in all government buildings.

### j.      Private Property

Maryland bans handgun carry on private property open to the public unless expressly permitted by the owner. Md. Code Ann., Crim. Law § 6-411(d). Section 6-411(d)'s ban includes the places most often frequented by ordinary, law-abiding carry permit holders: businesses, houses

of worship, hotels, grocery stores, pharmacies, malls, cemeteries, sports and entertainment venues, and so on. "These are places that people, exercising their rights, frequent every day when they move around outside their homes. The exclusion here makes all of these places presumptively off limits, backed up by the threat of prison." *Christian*, 2022 WL 17100631, at \*9.

Section 6-411(d) is not consistent with the American tradition that presumptively allows carrying a firearm on private property open to the public. On private property open to the public, "the public has the implied consent to enter, unless such consent is conditioned or subsequently revoked by the property owner (e.g., 'no trespassing' or 'no guns allowed signage')." *Koons*, 2023 WL 3478604, at \*58. "The scope of the right codified in the Second Amendment demonstrates that this society—this nation—has historically had" a default rule that "generally permitted" "carrying on private property . . . absent the owner's prohibition." *Christian*, 2022 WL 17100631 at \*9. As of 2020, "no state ha[d] adopted generalized 'no carry' defaults for retail establishments." Ian Ayres, *et al.*, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J. L. MED. & ETHICS 183, 184 (2020).

Firearm violence on private property open to the public pre-dates the Founding. *See, e.g.*, SISMONDO, *supra*, 15–16, 70–71 (discussing acts of firearm violence in pre-Founding taverns). But the Founding Era had no distinctly similar ban to Section 4-111(d). There is no historical tradition sufficient to justify Section 4-111(d): "the Nation's historical traditions have not countenanced such an incursion into the right to keep and bear arms across all varieties of private property spread across the land." *Christian*, 2022 WL 17100631, at \*9. For these reasons, similar laws have been uniformly held likely to be unconstitutional. *Id*. at \*7–9 (citing *Antonyuk*, 2022 WL 16744700, at \*81 (rejecting anti-poaching laws on private property not open to the public);

*Koons*, 2023 WL 3478604, at \*56–68 (same, noting that these laws did not carry criminal penalties, and rejecting three Reconstruction Era laws as "outliers").

### B.  SB1's compelled speech provision likely violates the First Amendment.

Maryland's ban on handgun carry on private property absent express permission violates the First Amendment as well at the Second. "The First Amendment not only protects against prohibitions of speech, but also against regulations that compel speech." *Stuart v. Camnitz*, 774 F.3d 238, 245 (4th Cir. 2014). "Since all speech inherently involves choices of what to say and what to leave unsaid, one important manifestation of the principle of free speech is that one who chooses to speak may also decide what not to say." *Id*. (quotation omitted). SB1 strikes at the heart of that principle. Under it, permit holders cannot enter private property absent a sign allowing carry or other express permission. Property owners are commanded to affirmatively invite carry permit holders onto their property—even if they wish to allow those individuals to enter their property without making a statement. That cannot stand under the First Amendment. *See 303 Creative LLC v. Elenis*, No. 21-476, 2023 WL 4277208, at \*8 (U.S. June 30, 2023) ("Nor does it matter whether the government seeks to compel a person to speak its message when he would prefer to remain silent or to force an individual to include other ideas with his own speech that he would prefer not to include. All that offends the First Amendment just the same." (citations omitted)).

SB1's compelled speech provision is a content-based requirement. "Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech. We therefore consider the Act as a content-based regulation of speech." *Riley v. Nat l Fed n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988) (citation omitted). Content-based laws "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Nat l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (quotation omitted). SB1 mandates property owners affirmatively to state that they

allow carry permit holders to bring their firearms onto the property. This is speech they would not otherwise make, and it is therefore compelled speech. *See* Smith Decl., at ¶ 11.

SB1's compelled speech is not necessary to ensure property owners enjoy the full right to control the use of their property because property owners already enjoy the full right to control the use of their property. Md. Code Ann., Crim. Law §§ 6-402 & 6-403(a). That interest relies impermissibly on the "[m]ere speculation of harm," which is not compelling. *See Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm n of N.Y.*, 447 U.S. 530, 543 (1980). But even if this interest were compelling, SB1 is not the least-restrictive means of advancing that interest because property owners are readily able to ban or limit the carrying of firearms in or on their property if they wish. Maryland's trespass statute requires that property owners put individuals on notice that they may be trespassing. Md. Code Ann., Crim. Law § 6-403(a). These means are less restrictive than SB1's compelled speech provision. In any event, Defendants cannot show that the State has taken any "serious[]" steps "to address the problem with less intrusive tools readily available to it." *See Billups v. City of Charleston*, 961 F.3d 673, 688, 690 (4th Cir. 2020).

SB1's compelled speech does not further a compelling state interest "in protecting the community from crime." *See Schall v. Martin*, 467 U.S. 253, 264 (1984) (analyzing due process challenge to New York law permitting pretrial detention of juveniles under certain circumstances). But there is no "special crime problem" that the compelled speech provision would address. *Watchtower Bible, Tract Society of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 169 (2002) (rejecting effort to rely on crime prevention in part because the government did not identify evidence of a problem related to the challenged law). In any event, SB1's compelled speech provision fails strict scrutiny because of the other, readily available means to pursue this interest.

Even if SB1's compelled speech provision were viewpoint neutral, it is subject to and fails intermediate scrutiny. *Stuart*, 774 F.3d at 250 (applying intermediate to a law compelling speech). To survive intermediate scrutiny, Defendants must "demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests." *McCullen v. Coakley*, 573 U.S. 464, 495 (2014)). SB1's compelled speech provision fails intermediate scrutiny because Maryland's trespass statute allows property owners to enjoy the full right to control the use of their property without burdening the property owners' First Amendment rights.

## II. The Carry Bans' violations of Plaintiffs' constitutional rights cause irreparable harm.

The Fourth Circuit has held that "the denial of a constitutional right, if denial is established, constitutes irreparable harm for purposes of equitable jurisdiction." *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987). The Supreme Court recently confirmed that the loss of First Amendment freedoms, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (Free Exercise Clause). Deprivations of fundamental freedoms engrained in the Second Amendment—which "protects similarly intangible and unquantifiable interests"—are equally "irreparable and having no adequate remedy at law." *Ezell v. City of Chicago*, 651 F.3d 684, 699–700 (7th Cir. 2011) (holding violation of Second Amendment rights constitutes irreparable harm).

## III. The other factors weigh in favor of a preliminary injunction.

The balancing of equities and public interest analyses merge because the State is the party opposing relief. *Roe*, 947 F.3d at 230. These factors weigh strongly in favor of Plaintiffs here. The State's anticipated reliance on its interest in preventing gun violence does not justify neglect of the Constitution nor excuse its failure to advance those policy goals by constitutional means. At bottom, "the State of Maryland is in no way harmed by issuance of an injunction that prevents the

state from enforcing unconstitutional restrictions" and, likewise, "upholding constitutional rights is in the public interest." *Legend Night Club*, 637 F.3d at 302–03 (First Amendment).

**IV. This Court should waive the injunction security requirement.**

This Court should waive the security requirement set forth in Federal Rule of Civil Procedure 65(c). *See Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013) (authorizing waiver). Enjoining the State's unconstitutional laws—yet to be implemented—will impose no financial harm on the State and the risk of any other harm is "remote." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999). Other courts likewise have waived the security requirement in constitutional challenges to state firearms laws, *i.e.*, "public interest litigation." *Renna v. Bonta*, No. 20-cv-2190-DMS-DEB, 2023 WL 2846937, at *15 (S.D. Cal. Apr. 3, 2023); *see also* ECF No. 125, *Koons v. Platkin*, No. 1:22-cv-07464-RMB-AMD (D.N.J. May 16, 2023). This is such a case, and this Court should waive the security requirement.

**Conclusion**

For the foregoing reasons, Plaintiffs respectfully request the Court enter a preliminary injunction barring Defendants from enforcing the Carry Bans.

Respectfully submitted,

/s/ *John Parker Sweeney*
John Parker Sweeney (Bar No. 08761)
James W. Porter, III (Bar No. 19416)
Marc A. Nardone (Bar No. 18811)
Connor M. Blair (Bar No. 20985)
Bradley Arant Boult Cummings LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
Phone: 202-393-7150
Facsimile: 202-347-1684
jsweeney@bradley.com

Dated: July 3, 2023                              Counsel for Plaintiffs

### INDEX OF EXHIBITS

| Exhibit Number | Exhibit Title | Related Pages |
|:---:|:---:|:---:|
| 1 | Declaration of Susannah Kipke | 4–5, 8 |
| 2 | Declaration of Gabriel Dinkins | 5–6, 8 |
| 3 | Declaration of Michael Fryar | 6, 8 |
| 4 | Declaration of John Hurley | 6–8 |
| 5 | Johnathan Smith | 7–8, 28 |
| 6 | Christine Sismondo, American Walks into a Bar | 14–15, 26 |
| 7 | Kenneth Lawing Penegar, The Political Trial of Benjamin Franklin | 16 |
| 8 | 9 David J. McCord, Statutes At Large of South Carolina (1841) | 17 |
| 9 | Nicholas Johnson, Firearms Law and the Second Amendment (2021) | 18 |
| 10 | 1813 Kentucky Act | 18 |
| 11 | 1819 Indiana Act | 18 |
| 12 | 1821 Tennessee Act | 18 |
| 13 | 1880 Iowa Law | 18–19 |
| 14 | *Resolution of October 20, 1774*, 1 J. Cont'l Cong. 1774–1789 (1904) | 19–20 |
| 15 | "At the Instance of Benjamin Franklin": A Brief History of the Library Company of Philadelphia (2015) | 20 |
| 16 | U.S. Dep't of Interior, *Compendium of the Seventh Census* (1854) | 20 |
| 17 | 3 William Hand Browne, Archives of Maryland: Proceedings of the Council of Maryland 1636–1667 (Baltimore, Md. Hist. Soc'y 1885) | 22 |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd day of July, 2023, the foregoing was served, via electronic delivery to Defendants' counsel via CM/ECF system which will forward copies to Counsel of Record.

Respectfully submitted,

/s/ *John Parker Sweeney*
John Parker Sweeney (Bar No. 08761)
