IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SUSANNAH WARNER KIPKE, ET AL.,        *

        *Plaintiffs*,            *

            v.                     *    No. 1:23-cv-01293-GLR

WES MOORE, ET AL.,              *

        *Defendants*.          *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**DEFENDANTS' CONSOLIDATED MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, OPPOSITION TO THE KIPKE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND OPPOSITION TO THE KIPKE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

ANTHONY G. BROWN
Attorney General of Maryland

ROBERT A. SCOTT
Federal Bar No. 24613
RYAN R. DIETRICH
Federal Bar No. 27945
JAMES N. LEWIS
Federal Bar No. 30220
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
rscott@oag.state.md.us
410-576-7055

July 28, 2023          Attorneys for Defendants

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................ 1

STATUTORY BACKGROUND ...................................................................................... 1

Maryland's Current Public Carry Permitting Scheme ............................................. 1

The Permit Application Process ....................................................................... 2

Restrictions on Public Carry .......................................................................... 4

The Supreme Court Announces its Decision in Bruen ............................................. 5

The General Assembly Enacts Firearms Legislation During the 2023 Legislative Session. ........................................................................................ 6

House Bill 824:  Amendments to the Permitting Process ............................. 6

Senate Bill 1:  Additional Restrictions on Where Firearms May be Carried ........................................................................................................ 10

Permits Limited to Concealed Carry ................................................ 10

Restrictions on Statutorily-Defined Locations ................................. 10

The Private Building Consent Rule ............................................................ 13

PROCEDURAL BACKGROUND ................................................................................ 14

Plaintiffs' Lawsuit ................................................................................................. 14

Plaintiffs File a Motion for Preliminary Injunction and Motion for Summary Judgment ............................................................................................................... 16

This Court Consolidates this Case with Another Pending Lawsuit Challenging Firearms Restrictions at Various Locations ...................................... 17

STANDARDS OF REVIEW ......................................................................................... 17

ARGUMENT ................................................................................................................. 18

I.    THE SUPREME COURT IN BRUEN CLARIFIES THE STANDARD TO BE APPLIED TO CHALLENGES UNDER THE SECOND AMENDMENT. ........................................... 18

II.   EVEN IF CARRYING A FIREARM IN SENSITIVE PLACES BURDENS CONDUCT PROTECTED BY THE SECOND AMENDMENT, THERE IS A ROBUST HISTORICAL TRADITION OF PROHIBITING FIREARMS IN VARIOUS LOCATIONS BASED ON THEIR PARTICULAR CHARACTERISTICS. ................................................................. 20

      A.    Because Sensitive Places are Presumptively Constitutional under Bruen, Plaintiffs Bear the Burden to Demonstrate that Carrying Firearms in These Locations Falls Within the Conduct Protected by the Second Amendment. ............................................................................... 20

      B.    Even if Plaintiffs Have Met Their Initial Burden, There is a Robust Historical Tradition of Limiting Firearms in Various Types of Locations. ................................................................................................. 22

            1.    Bruen Permits Significant Flexibility in Determining Whether a Particular Location is a "Sensitive Place." ................................... 23

            2.    Limiting Firearms in Certain Locations Has a Rich American Tradition that Was Inherited from Its English Forebears. .............. 26

            3.    The History and Tradition of Restrictions on Sensitive Places Yields Several Applicable Principles. .............................................. 30

III.  RESTRICTIONS ON FIREARMS ON GOVERNMENT-OWNED PROPERTY DO NOT IMPLICATE THE SECOND AMENDMENT WHERE THE GOVERNMENT IS ACTING IN ITS PROPRIETARY CAPACITY OR AS A MARKET PARTICIPANT. ......................... 32

IV.   PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE THEY FAIL TO SHOW EITHER THAT THEY ARE LIKELY TO SUCCEED ON THE MERITS OR THAT THEY ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW. .................................................. 38

      A.    The Challenged Locational Restrictions Are All Either Sensitive Places that Fall Outside of the Second Amendment or Otherwise Supported by this Nation's Historical Tradition of Firearm Regulation. .............................................................................................. 39

            1.    Health Care Facilities ...................................................................... 40

            2.    Museums .......................................................................................... 42

            3.    Stadiums, Amusement Parks, Racetracks, Casinos ........................ 43

4.      Locations Licensed to Sell or Dispense Alcohol for On-Site Consumption ..................................................................... 44

5.      Any Transit Vehicle or Transit Facility Owned or Controlled by the Maryland Transit Administration ........................................... 46

6.      State Parks and Forests ........................................................ 50

7.      A State Highway Rest Area ............................................... 55

8.      Government Buildings and Property Under the Jurisdiction of the Department of General Services ................................................. 56

9.      School Grounds .................................................................. 61

10.     Public Demonstrations ....................................................... 64

B.      Even if Plaintiffs Have Standing, the Private Building Consent Rule Fails to Implicate Conduct Covered by the Second Amendment, and in Any Event is Supported by Historical Tradition. .................................. 66

1.      Plaintiffs Lack Standing Because They Have Not Sustained an Injury, and Any Purported Injuries They Might Sustain are Neither Traceable to the Actions of the State nor Redressable by this Court. ..................................................................... 67

2.      The Text of the Second Amendment Does Not Cover the Plaintiffs' Conduct Because the Second Amendment does not Bestow the Right to Carry Arms into Another's Building Absent Consent. ............................................................. 70

3.      Even if this Court Concludes that the Text of the Second Amendment Covers Plaintiffs' Conduct, the Private Building Consent Rule is Consistent with the Nation's History and Tradition of Firearm Regulations. ................................................. 75

C.      Plaintiffs' First Amendment Claim in Count Two Fails as a Matter of Law Because Plaintiffs Lack Standing, the Challenged Portion of Senate Bill 1 Does Not Regulate Speech and, Even if it Did, It Survives the Applicable Level of Scrutiny. .............................................. 78

1.      Plaintiffs Lack Standing to Bring a First Amendment Challenge. ......................................................................... 79

2.      The Private Building Consent Rule Does Not Implicate the First Amendment. ............................................................................ 79

3.      Even if the Private Building Consent Rule Implicates the First Amendment, It is Nonetheless Constitutional Because it Achieves a Significant Government Interest. .................................. 82

V.      THE PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION SHOULD BE DENIED BECAUSE THE BALANCE OF THE EQUITIES FAVORS THE STATE. ............. 83

VI.     THE STATE IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE REMAINING CLAIMS ............................................................................ 85

A.      Defendants Are Entitled to Judgment as a Matter of Law as to Plaintiffs' Challenge to the Requirements to Obtain a Public Carry Permit. ...................................................................................... 86

1.      Plaintiffs Lack Standing to Challenge the Permitting Requirements. .................................................................. 86

2.      Plaintiffs' Challenge to "Objective" Requirements Fails as a Matter of Law. ...................................................... 88

3.      Plaintiffs' Challenge to "Subjective" Requirements Fails as a Matter of Law. ...................................................... 89

a. Challenge Under the Second Amendment ............................... 90

b. Challenge under Void for Vagueness ...................................... 94

B.      Plaintiffs' Equal Protection Challenge to the Public Carry Permit Scheme Fails as a Matter of Law. .............................................. 97

CONCLUSION ...................................................................................... 100

INDEX OF EXHIBITS ............................................................................ 102

## INTRODUCTION

In 2010, the Supreme Court in *McDonald v. City of Chicago* assured the States that, consistent with historical tradition, "experimentation with reasonable firearms regulations," including "solutions to social problems that suit local needs and values," could "continue under the Second Amendment." 561 U.S. 742, 785 (2010). Maryland has done just that. The prohibitions challenged in this case are not only reasonable restrictions on only a limited set of locations, but are all supported by a rich historical tradition that stretches from the Founding, through the Reconstruction era, and beyond. Because the people of Maryland have the authority—and indeed the responsibility—to enact the laws that they believe best serve the public safety, plaintiffs' counter-historical assault on these laws should be rejected. Accordingly, plaintiffs' motions for preliminary injunction and summary judgment should be denied, and defendants' motion for summary judgment should be granted.

## STATUTORY BACKGROUND

**Maryland's Current Public Carry Permitting Scheme**

Like most states, Maryland has a permitting system that allows the public carrying of handguns by certain individuals. Although, as set forth below, this permitting scheme will be amended by the laws challenged in this case, an overview of the current licensing process is necessary to provide proper context to the extent of those changes.

Maryland law generally prohibits the wearing, carrying, or transporting of a handgun. Md. Code Ann., Crim. Law § 4-203 (LexisNexis 2021). This prohibition is subject to several exceptions, including for law enforcement personnel, for individuals on their own residential or business premises, and several other exceptions that relate to transport incidental to some

other purpose (i.e., to a place of sale or repair, between a home and business, to a target shoot, and for hunting).  Crim. Law § 4-203(b).   For purposes here, the most notable exception to the general prohibition is for individuals who have been issued a handgun carry permit under Title 5, Subtitle 3 of the Public Safety Article.  Crim. Law § 4-203(b)(2); Md. Code Ann., Pub. Safety § 5-303 (LexisNexis 2018) ("A person shall have a permit issued under this subtitle before the person carries, wears, or transports a handgun.").

### The Permit Application Process

Citizens may apply to the Maryland State Police for a public carry permit by submitting an application along with a $75 application fee.  Pub. Safety § 5-304(b)(2)(i).  To be eligible to receive a permit, an applicant must meet several requirements.  First, the applicant must be "an adult."  *Id*. § 5-306(a)(1).  Next, the applicant must not have been convicted of certain criminal offenses, including (1) a felony or a misdemeanor for which a sentence of imprisonment of more than one year has been imposed; or (2) a crime involving the possession, use, or distribution of a controlled dangerous substance.  *Id*. § 5-306(a)(2)-(3).  The applicant also must not be an alcoholic, addict, or habitual user of a controlled dangerous substance.  *Id*. § 5-306(a)(4).   Moreover, an applicant may be denied a permit if, after an investigation, the Secretary of the Maryland State Police (the "Secretary") finds that the applicant has "exhibited a propensity for violence or instability that may reasonably render the person's possession of a handgun a danger to the person or to another." *Id*. § 5-306(a)(6)(i).

An applicant also must successfully complete a firearms training course.  *Id*. § 5-306(a)(5).  This course, which must be approved by the Secretary, includes a minimum of 16 hours of instruction by a qualified handgun instructor, with classroom instruction on (1) State firearm law, (2) home firearm safety, (3) and handgun mechanisms and operation.  *Id*. § 5-

306(a)(5); COMAR 29.03.02.05(C).   The class must also include a component that demonstrates the applicant's proficiency and use of the firearm.  Pub. Safety § 5-306(a)(5)(iii); *see* COMAR 29.03.02.05(C)(4) (requiring a live-fire shooting component in which an applicant must achieve a qualifying score).   Maryland law exempts from the training requirements active and retired law enforcement officers, as well as active and retired members of the military.[1]  Pub. Safety § 5-306(b).

 If an applicant meets the eligibility requirements, the Secretary must issue the applicant a permit "within a reasonable time."  Pub. Safety § 5-306(a).  If an applicant is denied a permit, the applicant may seek informal review by the Secretary.  *Id*. § 5-311.  If the Secretary sustains the denial (or, in any event, if 90 days has passed without decision since the submission of the application), the applicant may seek review before the Office of the Administrative Hearings ("OAH").  *Id*. § 5-312(a). Within 60 days of receipt of a request for review, OAH must conduct a de novo hearing (at which witness and other testimony may be provided).  *Id*. § 5-312(b)(1).  OAH then has 90 days to issue a decision on the matter.  *Id*. § 5-312(b)(2).  An unsuccessful applicant may then seek further review in the circuit court.  *Id*. § 5-312(b)(3).

A permit expires on the last day of the holder's birth month following two years after the date the permit is issued.  *Id*. § 5-309(a).  Permits may thereafter be renewed every three

---

[1] The current statutory scheme provides that the Secretary may issue a handgun carry permit only if the applicant "has good and substantial reason to wear, carry, or transport a handgun, such as a finding that the permit is necessary as a reasonable precaution against apprehended danger."  Id. § 5-306(a)(6)(ii).  The Appellate Court of Maryland had interpreted this "good and substantial reason" requirement to require an applicant to show more than simply a desire to carry a handgun for self-defense.  *See Scherr v. Handgun Permit Rev. Bd*., 163 Md. App. 417, 437 (2005).  As discussed below, the "good and substantial reason" standard has since been deemed unconstitutional, *In re Rounds*, 255 Md. App. 205, 212 (2022), and therefore is no longer being applied to public carry permit applicants.  As noted below, the General Assembly deleted this language from the statutory scheme when it passed House Bill 824 earlier this year.

years.  *Id*. § 5-309(b).  To be eligible for renewal, a permit holder must (1) pay a $50 renewal fee, (2) receive eight hours of instruction by a qualified handgun instructor, and (3) meet all of the background eligibility requirements necessary to obtain an initial permit.  *Id*. §§ 5-304(b)(2)(ii); 5-306(a)(5)(1)(ii); 5-309(b).

### Restrictions on Public Carry

Besides the restrictions on *who* is eligible for a public carry permit, Maryland statutes and regulations currently contain several provisions that set forth limitations on *where* handguns (and other firearms) may be carried—even with a valid public carry permit.  Restrictions set forth in the Maryland code include:

- Public school property.  Crim. Law § 4-102.

- Public demonstration: An individual may not possess a firearm at a demonstration in a public place or have a firearm in their vehicle within 1,000 of the demonstration.  This provision, however, applies only after (1) the individual has been advised by a law enforcement officer that a demonstration is occurring at the public place, and (2) the individual has been ordered by the law enforcement officer to leave the area of the demonstration until the individual disposes of the firearm.  Crim. Law § 4-208.

- Public transit:  An individual may not carry or possess a "concealed weapon[]" in any transit vehicle or transit facility owned or controlled by the Maryland Transit Administration ("MTA").  Transp. § 7-705(b)(6).  The MTA "operates public mass transit systems through[out] the State of Maryland, including buses, a subway, light rail system and commuter trains."  (Declaration of Thomas Randall, Director of Treasury for MTA, ¶ 3, attached as Exhibit 6.)

- Legislative buildings: An individual may not carry a firearm in a building where: (1) the Senate or the House has a chamber; (2) a member, officer, or employee of the General Assembly has an official office; or (3) a committee of the General Assembly, the Senate, or the House has an office.  Md. Code Ann., State Gov't § 2-1702(e) (LexisNexis 2021).

Restrictions set forth in the Code of Maryland Regulations (COMAR) include:

- Certain state buildings and grounds.  An individual may not carry firearms on "state public buildings, improvements, grounds, and multiservice centers under the jurisdiction of the Department of General Services."  COMAR 04.05.01.01; 04.05.01.03.

- State parks, state forests, and Chesapeake Forest Lands (with exceptions for target shooting and hunting where approved).  COMAR 08.01.07.14; 08.07.01.04; 08.07.06.04.

- On the grounds of a facility under the jurisdiction of the Maryland Racing Commission.  COMAR 09.10.03.03(A)(10).

- A highway rest area.  This restriction, however, applies only to the "display or discharge" of a firearm.  COMAR 11.04.07.12.

- The Camden Yards Sports Complex (which includes Oriole Park at Camden Yards, the Ravens' Stadium, and the various buildings surrounding them).  COMAR 14.25.01.01; 14.25.02.06.

- A "State museum," which is defined to include "any property operated as a museum by the Department [of Planning] or a unit within the Department."  COMAR 34.04.08.02; 34.04.08.04.

- Casinos:  An individual may not possess a firearm in a "video lottery facility," which is defined by State Gov't § 9-1A-01 as "(1) a facility at which players play video lottery terminals and table games under this subtitle; and (2) a casino for the purposes of the federal Bank Secrecy Act of 1970 and its related regulations").  COMAR 36.03.01.02(B)(6); 36.03.10.48.

Maryland regulations also prohibit a public carry permit holder from carrying a handgun while under the influence of alcohol or drugs.  COMAR 29.03.02.02.

**The Supreme Court Announces its Decision in *Bruen***

As discussed more fully below, in June 2022 the United States Supreme Court decided *New York State Rifle and Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022).  In *Bruen*, the Supreme Court struck down as unconstitutional New York's public carry permit scheme to the extent that it required an applicant to show "proper cause" for carrying a handgun publicly.  Because New York's "proper cause" standard was similar to Maryland's "good and substantial

reason" standard in that it required an applicant to "demonstrate a special need for self-protection distinguishable from that of the general community," the *Bruen* decision called into question that aspect of Maryland's public carry permit scheme.   In fact, soon after *Bruen* was decided, the Appellate Court of Maryland concluded that it was compelled by *Bruen* to hold Maryland's "good and substantial reason" standard unconstitutional as well.   *In re Rounds*, 255 Md. App. 205, 212 (2022).

### The General Assembly Enacts Firearms Legislation During the 2023 Legislative Session.

In the wake of *Bruen* and *Rounds*, the General Assembly enacted two laws that set forth additional provisions relating to Maryland's public carry permit scheme.   As discussed below, these laws made minor changes to the permitting process but also expanded and clarified the areas in which firearms may not be carried regardless of whether an individual possesses a public carry permit.

### House Bill 824:  Amendments to the Permitting Process[2]

On May 16, 2023, Governor Moore signed House Bill 824 into law.  Pertinent to this case, House Bill 824 amended and strengthened the State's public carry permitting system.[3]

First, in direct response to *Bruen* and *Rounds*, House Bill 824 deletes language that restricts public carry permits to only those individuals who have been found to have "good and

---

[2] A copy of House Bill 824 is attached as Exhibit 106.

[3] House Bill 824 also amended the provision of the Maryland Code setting forth the categories of individuals who are prohibited generally from possessing a "regulated firearm" (a term that includes a handgun), adding those individuals who are on supervised probation after having been convicted of (1) a crime punishable by imprisonment for one year or more, (2) certain offenses relating to driving while impaired by drugs or alcohol, or (3) violating certain protective orders.  2023 Md. Laws ch. 651 (to be codified at Pub. Safety § 5-133(b)(3)).

6

substantial reason" to carry a handgun publicly.  2023 Md. Laws ch. 651 (amending Pub. Safety § 5-306).  In its place, House Bill 824 inserts a catch-all requirement stating that, in order to be eligible for a public carry permit, an individual must "not otherwise [be] prohibited by State or federal law from purchasing or possessing a firearm."  2023 Md. Laws ch. 651 (to be codified at Pub. Safety § 5-306(a)(10)(ii)).

In addition to this general language, House Bill 824 amends the specific categories of individual who are ineligible for a public carry permit so as to essentially correspond with those categories of individuals who are prohibited from possessing a "regulated firearm" (a term that includes handguns and "assault weapons").  House Bill 824 thus increases the minimum age to 21 (with exceptions for members of the military), and renders ineligible those individuals who (1) are on supervised probation for certain offenses, (2) suffer from a mental disorder and have a history of violent behavior, (3) have been involuntarily admitted to a mental hospital for more than 30 days, and (4) are currently subject to certain protective orders, an extreme risk protective order, or any other court order that prohibits the possession of firearms.  2023 Md. Laws ch. 651 (to be codified at Pub. Safety § 5-306(a)); *compare* Pub. Safety § 5-133(b) (setting forth the categories of individuals prohibited from possessing a regulated firearm).  House Bill 824 also provides that an individual will be ineligible for a public carry permit if they are convicted of a violation of § 4-104 of the Criminal Law Article, which prohibits the unsafe storage of a firearm where a child could gain access.  2023 Md. Laws ch. 651 (to be codified at Pub. Safety § 5-306(d)).

House Bill 824 increases the maximum application fee for an initial public carry permit from $75 to $125, and increases the renewal fee from $50 to $75.  2023 Md. Laws ch. 651 (to be codified at Pub. Safety § 5-304(b)(2)).

House Bill 824 also expands the material that must be covered during the training that is required to obtain a permit.[4]  House Bill 824 clarifies that the classroom instruction must cover both federal and state firearm laws, and specifically references laws relating to: (1) self defense, (2) defense of others, (3) defense of property, (4) the safe storage of firearms, (5) the circumstances under which an individual becomes prohibited from possessing a firearm (and how one disposes of their firearm should that become the case), (6) the requirements for reporting the loss or theft of a firearm, (7) the types of firearms and accessories that are banned (or require a special permit), (8) straw purchases, (9) the parameters of the private building consent rule discussed below, and (10) the locations where an individual is prohibited from possessing a firearm regardless of whether they possess a public carry permit.  2023 Md. Laws ch. 651 (to be codified at Pub. Safety § 5-306(a-1)(2)).  Moreover, in addition to home firearm safety and handgun mechanics and operations (which are part of the current statute and regulations), House Bill 824 adds to the required curriculum instruction on: (1) conflict de-escalation and resolution, (2) anger management, and (3) suicide prevention.  Finally, House Bill 824 clarifies the requirement under current law that the training contain "a firearms qualification component that demonstrates the applicant's proficiency and use of the firearm" so that the training must now include "a firearm qualification component that includes live-fire shooting exercise on a firing range and requires the applicant to demonstrate: (i) safe handling of a handgun, and (ii) shooting proficiency with a handgun."  2023 Md. Laws ch. 651 (to be codified at Pub. Safety § 5-306(a-1)(3)); *see* COMAR 29.03.02.05(C)(4) (setting forth

---

[4] Although House Bill 824 adds various subjects to the required curriculum, the law does not change the number of hours of training that an applicant must complete.

the existing requirement that applicant complete a live-fire shooting component in which they must achieve a qualifying score).

Whereas current law merely *authorizes* the State Police to revoke a public carry permit where it is determined that the permit holder does not meet the statutory qualifications set forth in Public Safety § 5-306, House Bill 824 now *mandates* revocation in such circumstances. 2023 Md. Laws ch. 651 (to be codified at Pub. Safety § 5-310(a)).  The State Police retain the discretionary authority under current law to revoke a public carry permit where it has been determined that the permit holder has violated Public Safety § 5-308, which requires a permit holder be in possession of their permit whenever they are carrying a handgun.  2023 Md. Laws ch. 651 (to be codified at Pub. Safety § 5-310(b)).

House Bill 824 also strengthens the due process protections for the review of a denial or revocation of a public carry permit.  House Bill 824 adds a statutory requirement that, if the State Police denies or revokes a public carry permit, it must provide "written notice" that includes "a detailed explanation of the reason or reasons" for the action.  2023 Md. Laws ch. 651 (to be codified at Pub. Safety § 5-311(a)).  House Bill 824 also amends current law to clarify that OAH shall issue a "written" finding of facts and decision.  2023 Md. Laws ch. 651 (amending Pub. Safety § 5-312(b)(2)).

Finally, House Bill 824 provides that any amendments to the public carry permitting scheme are to be applied prospectively so as to affect only those applications (both initial and renewal) submitted after October 1, 2023.  In other words, "[t]he provisions of [House Bill 824 are not to] be construed to affect the requirements to maintain a permit to wear, carry, or transport a handgun that was issued by the Secretary of the State Police before the effective date of this Act until the permit is subject to renewal."  2023 Md. Laws ch. 651, § 2.

### Senate Bill 1:  Additional Restrictions on Where Firearms May be Carried[5]

On the same day that House Bill 824 was signed into law, Governor Moore also signed Senate Bill 1 into law.  Senate Bill 1 enacted several provisions relating to restrictions on how and where an individual may possess a firearm, even if they otherwise possess a public carry permit.

### Permits Limited to Concealed Carry

Under current law, there is no restriction generally on the manner in which a handgun may be carried by an individual who possesses a public carry permit.   Senate Bill 1 changes that.  It provides that, subject to certain exceptions,[6] a person who carries a handgun pursuant to a public carry permit must keep the handgun concealed under or within an article of the person's clothing or within an enclosed case.  2023 Md. Laws ch. 680 (to be codified at Pub. Safety § 5-307(c)).

### Restrictions on Statutorily-Defined Locations

Senate Bill 1 identifies three categories of statutorily-defined locations where an individual is prohibited from carrying a firearm:  (1) an "area for children and vulnerable individuals," (2) a "government or public infrastructure area," and (3) a "special purpose area."[7]  2023 Md. Laws ch. 680 (to be codified at Crim. Law § 4-111(c)-(e)).

---

[5] A copy of Senate Bill 1 is attached as Exhibit 2.

[6] The exceptions generally mirror the exceptions to the general prohibition on wearing and carrying a handgun under Criminal Law § 4-203, including for certain law enforcement personnel and individuals carrying a handgun on their own property.  2023 Md. Laws ch. 680 (to be codified at Pub. Safety § 5-307).

[7] An individual who violates this prohibition is subject to imprisonment not exceeding one year and/or a fine not exceeding $1,000.  2023 Md. Laws ch. 680 (to be codified at Crim. Law § 4-111(f)).

An "area for children and vulnerable individuals" relates generally to daycare facilities, private schools, and medical facilities.  It is statutorily defined as: (1) "a preschool or prekindergarten facility or the grounds of the facility," (2) "a private primary or secondary school or the grounds of the school,"[8] and (3) "a health care facility," which is defined to include hospitals, ambulatory surgical centers, and facilities that are "organized primarily to help in the rehabilitation of disabled individuals."[9]  2023 Md. Laws ch. 680 (to be codified at Crim. Law § 4-111(a)(2)).

A "government or public infrastructure area" relates generally to government buildings, buildings on college and university campuses, polling places, and power plants.  It is statutorily defined as: "(i) a building or any part of a building owned or leased by a unit of State or local government; (ii) a building of a public or private institution of higher education, as defined in §10-101 of the Education Article; (iii) a location that is currently being used as a polling place in accordance with [the Election Law Article]"; (iv) an electric plant or electric storage facility . . .; (v) a gas plant . . .; or (vi) a nuclear power plant facility.  2023 Md. Laws ch. 680 (to be codified at Crim. Law § 4-111(a)(4)).  Although an individual is prohibited generally from carrying a firearm in a "government or public infrastructure area," Senate Bill 1 provides that, for the subcategory of buildings owned or leased by the government, there must be displayed "a clear and conspicuous sign at the main entrance" to a government building stating that the

---

[8] As discussed above, firearms (and other weapons) are currently prohibited on *public* school property.  Crim. Law § 4-102(b).

[9] To define "a health care facility," Senate Bill 1 references the definitions provided in §§ 15-10b-01(g)(1), (2), (3), and (4) of the Insurance Article.

carrying of firearms is prohibited.  2023 Md. Laws ch. 680 (to be codified at Crim. Law § 4-111(d)(2)).

A "special purpose area" relates generally to certain places where the public gathers for entertainment, educational, or other collective social pursuits.  It is statutorily defined as "(i) a location licensed to sell or dispense alcohol or cannabis for on-site consumption; (ii) a stadium; (iii) a museum; (iv) an amusement park; (v) a racetrack; or (vi) a video lottery facility[10]."  2023 Md. Laws ch. 680 (to be codified at Crim. Law § 4-111(a)(8)).

These prohibitions are subject to certain exemptions, most notably for active law enforcement personnel.  2023 Md. Laws ch. 680 (to be codified at Crim. Law § 4-111(b)(1), (2), (5), (6)).  Senate Bill 1 also provides exemptions for retired law enforcement, but with certain restrictions.[11]  2023 Md. Laws ch. 680 (to be codified at Crim. Law § 4-111(b)(8)).  Moreover, Senate Bill 1 exempts the owner or lessee of a (non-governmental) location and any person expressly authorized to provide security at the location.   2023 Md. Laws ch. 680 (to be codified at Crim. Law § 4-111(a)(9)).  Finally, Senate Bill 1 provides an exemption for a firearm that is carried or transported in a motor vehicle, so long as the firearm is either carried by an individual with a valid public carry permit or is locked in a container.[12]  2023 Md. Laws ch. 680 (to be codified at Crim. Law § 4-111(b)(11)).

---

[10] As noted earlier, a "video lottery facility" is essentially synonymous with a casino.  State Gov't § 9-1A-01.

[11] For example, a retired law enforcement officer may carry a firearm publicly in these locations only if they possess a public carry permit (or are otherwise authorized to carry a firearm publicly) and carry the firearm in a concealed manner.  2023 Md. Laws ch. 680 (to be codified at Crim. Law § 4-111(b)(8)).

[12] Senate Bill 1 also contains a few other exemptions, including for (1) military personnel (while on duty), (2) employees of armored car companies, and (3) hunting, target shooting, and other shooting activity that is done with the permission of the person or governmental unit that

### The Private Building Consent Rule

Senate Bill 1 enacts a provision that prohibits individuals from entering buildings on private property while carrying a firearm without first obtaining permission to do so.  The manner in which permission may be expressed or obtained depends on whether the building at issue is a dwelling.

Senate Bill 1 provides that an individual carrying a firearm "may not enter or trespass in the dwelling of another unless the owner or the owner's agent has given express permission, either to the person or to the public generally, to wear, carry, or transport a firearm inside the dwelling."  2023 Md. Laws ch. 680 (to be codified at Crim. Law § 6-411(c)).

With regard to all other private buildings, an individual carrying a firearm may not enter or trespass at such a building unless the owner or the owner's agent (1) "has posted a clear and conspicuous sign indicating that it is permissible to" carry a firearm in the building, or (2) "has given the person express permission" to carry a firearm in the building.  2023 Md. Laws ch. 680 (to be codified at Crim. Law § 6-411(d)).

It is important to note that these provisions affect only buildings, and not the land adjacent to the buildings.  Indeed, Senate Bill 1 defines a "dwelling" as "a *building* or part of a *building* that provides living or sleeping facilities for one or more individuals."[13]  2023 Md. Laws ch. 680 (to be codified at Crim. Law § 6-411(a)(2)(i)) (emphasis added).  Likewise, although Senate Bill 1 prohibits carrying a firearm onto "property" without the owner's

---

owns, leases, or controls the location.  2023 Md. Laws ch. 680 (to be codified at Crim. Law § 4-111(b)(3), (4), (7), (10)).

[13] Senate Bill 1 excludes from the definition of dwelling the common areas of condominiums and multifamily facilities.  2023 Md. Laws ch. 680 (to be codified at Crim. Law § 6-411(a)(2)(ii)).

permission, the law defines "property" as simply "a building," and expressly excludes "the land adjacent to a building."  2023 Md. Laws ch. 680 (to be codified at Crim. Law § 6-411(a)(6)).

Similar to the prohibition on carrying a firearm at statutorily-defined locations, Senate Bill 1 contains exemptions for active (but not retired) law enforcement officers and on-duty military personnel.  2023 Md. Laws ch. 680 (to be codified at Crim. Law § 6-411(b)).  Senate Bill 1 also provides an exemption for those portions of buildings that are subject to a public easement.  2023 Md. Laws ch. 680 (to be codified at Crim. Law § 6-411(b)(5)).

## PROCEDURAL BACKGROUND

### Plaintiffs' Lawsuit

On the same day that House Bill 824 and Senate Bill 1 were signed into law, Susannah Warner Kipke, an individual who possesses a public carry permit, and Maryland State Rifle and Pistol Association, a firearms advocacy group, filed this lawsuit challenging various provisions of Maryland's firearms laws.  As detailed below, the Kipke plaintiffs assert a widespread challenge to a number of Maryland's firearm laws, under both the Second Amendment and other constitutional theories.

In Count One, plaintiffs challenge many of the locational restrictions that both currently exist and were enacted in Senate Bill 1.  Claiming that these restrictions "burden conduct protected by the plain text of the Second Amendment and are not consistent with this Nation's historical tradition of firearm regulation," plaintiffs challenge restrictions to carrying a handgun in the following locations: (1) state parks and forests, (2) state highway rest areas, (3) transit facilities and vehicles owned or controlled by the MTA, (4) public school property (but

not the school buildings), (5) the grounds of a preschool or private primary or secondary school (but not the buildings associated with those facilities), (6) property under the jurisdiction of the Department of General Services, (7) property operated as a museum by the Department of Planning or a unit within the Department of Planning, (8) the grounds of a facility under the jurisdiction of the Maryland Racing Commission, (9) the Camden Yards Sports Complex, (10) health care facilities, (11) buildings owned or leased by a unit of state or local government (but not legislative assemblies, courthouses, or polling places), (12) locations licensed to sell or dispense alcohol or cannabis for on-site consumption, (13) stadiums, (14) museums, (15) amusement parks, (16) racetracks, (17) casinos, and (18) at a demonstration in a public place (and/or in a vehicle within 1,000 feet of a demonstration in a public place).  (ECF 1, ¶ 50.) Plaintiffs also challenge the private building consent rule, but not with respect to dwellings. (ECF 1, ¶ 50); *see also* (ECF 1, ¶ 29.a.) (noting that the law as it relates to "the separately defined 'Dwelling,' . . . is not at issue in this lawsuit").  Finally, although Count One asserts that "Maryland's objective and subjective requirements to obtain a carry permit burden conduct protected by the plain text of the Second Amendment and are not consistent with this Nation's historical tradition of firearm regulation" (ECF 1, ¶ 49), plaintiffs do not state with any particularity which requirements are being referenced in this paragraph.

In Count Two, the Kipke plaintiffs challenge the private building consent rule (but, again, not with respect to dwellings) on First Amendment grounds.  Plaintiffs allege that requiring private building owners—should they wish to allow firearms in their building—to post a sign on their building (or otherwise provide express permission) indicating that preference impermissibly compels the speech of those building owners.  (ECF 1, ¶¶ 54-56.)

15

In Count Three, the Kipke plaintiffs challenge the requirement, set forth in existing law, that an applicant for a public carry permit not have "exhibited a propensity for violence or instability that may reasonably render the person's possession of a handgun a danger to the person or to another." (ECF 1, ¶ 57-61.) Plaintiffs allege that this standard is "impermissibly vague," and thus void for vagueness under the Due Process Clause of the Fourteenth Amendment. (ECF 1, ¶ 60.) Count Three also claims that the propensity for violence standard "impermissibly empower[s] state officials with discretion that burdens conduct protected by" the Second Amendment. (ECF 1, ¶ 61.)

In Count Four, the Kipke plaintiffs challenge certain exemptions to the public carry permitting scheme on Equal Protection grounds. Specifically, plaintiffs allege that the scheme unconstitutionally exempts retired law enforcement officers from (1) the training requirements to obtain a public carry permit, and (2) prohibitions on the carrying of a firearm in the otherwise-restricted locations identified in Senate Bill 1. (ECF 1, ¶ 62-68.)

On June 30, 2023, defendants filed an answer. (ECF 11.)

**Plaintiffs File a Motion for Preliminary Injunction and Motion for Summary Judgment**

On July 3, 2023, the Kipke plaintiffs filed a motion for preliminary injunction (ECF 12) and a motion for summary judgment (ECF 13). These motions, though relating to separate procedural vehicles, are substantively identical. In these motions, however, plaintiffs do not seek relief with respect to all of the counts set forth in their complaint. Instead, plaintiffs' motions relate only to Count One (to the extent it encompasses a Second Amendment

challenge to locational restrictions) and Count Two (First Amendment challenge to private building consent rule).[14]

### This Court Consolidates this Case with Another Pending Lawsuit Challenging Firearms Restrictions at Various Locations

On the same day that the Kipke plaintiffs filed their lawsuit, a separate lawsuit was filed by different plaintiffs (three individual plaintiffs who each possess public carry permits and three firearms advocacy groups) relating to restrictions on where firearms may be carried even with a public carry permit. *Novotny v. Moore*, Case No. 1:23-cv-01295-GLR (D. Md. 2023). The *Novotny* lawsuit, however, presents a challenge that is more limited in scope than the instant case, as it challenges restrictions on only a subset of the locations challenged here. Currently pending before this Court is the *Novotny* plaintiffs' motion for preliminary injunction, as well as defendants' motion to dismiss the *Novotny* complaint.

On May 31, 2023, defendants filed a motion to consolidate this case with the *Novotny* lawsuit. (ECF 8.) On July 13, 2023, this Court granted the motion, designating this case as the lead case. (ECF 15.)

### STANDARDS OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "facts must be viewed in the light most favorable to the non-moving party," but "only if there is a 'genuine' dispute as to those

---

[14] In contrast, defendants seek summary judgment as to all counts in the complaint, including those relating to the permit carry process encompassed in Count One, the Due Process challenge to the "propensity for violence" standard in Count Three, and the Equal Protection challenge to exemptions for retired law enforcement officers in Count Four.

facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007).  A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

A preliminary injunction is an "extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008).  Preliminary injunctive relief "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Dewhurst v. Century Aluminum Co*., 649 F.3d 287, 290 (4th Cir. 2011) (citation omitted).  To obtain a preliminary injunction, a plaintiff must demonstrate "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Wudi Indus. (Shanghai) Co. v. Wong*, 70 F.4th 183, 196 (4th Cir. 2023) (citation omitted).

## ARGUMENT

### I.   THE SUPREME COURT IN *BRUEN* CLARIFIES THE STANDARD TO BE APPLIED TO CHALLENGES UNDER THE SECOND AMENDMENT.

As discussed above, in June 2022 the United States Supreme Court decided *New York State Rifle and Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), which struck down the "proper cause" aspect of New York's public carry permit scheme.  In doing so, the *Bruen* majority rejected the two-step interest-balancing framework previously used by nearly all federal courts of appeal to evaluate Second Amendment challenges.  Instead, the Supreme Court clarified that if "the Second Amendment's plain text covers an individual's conduct," then the government seeking to regulate that conduct "must demonstrate that the regulation is

consistent with this Nation's historical tradition of firearm regulation." *Id*. at 2126; *see also id*. at 2129.

   *Bruen* recognized the necessity and constitutionality of modern firearm regulation, explicitly endorsing at least two types of restrictions. First, the Court announced that "nothing in [its] analysis" was meant to undermine the constitutionality of licensing regimes that require applicants to "undergo a background check or pass a firearms safety course" and "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id*. at 2138 n.9 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)); *see also id*. at 2161-62 (Kavanaugh, J., concurring). Second, the Court "assume[d] it settled" that certain locations are "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Id*. at 2133. The opinion endorsed such "longstanding" bans in schools, legislative assemblies, polling places, and courthouses, while recognizing that this list was *non-exhaustive* and "that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id*. (emphasis in original).

   *Bruen* acknowledged that the application of the restated Second Amendment standard would require further development in the lower courts. For example, as it did in *Heller*, the Court declined to "undertake an exhaustive historical analysis of the full scope of the Second Amendment." *Id*. at 2134 (quotation and ellipsis omitted). And although *Bruen* instructed that the historical inquiry required in Second Amendment cases "will often involve reasoning by analogy," it similarly declined to "provide an exhaustive survey of the features that render regulations relevantly similar," except to identify "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 2132-33. As the Court recognized, in some cases, historical analogies will be "relatively simple to draw,"

19

while "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id*. at 2132.

*Bruen* also cautioned that its standard was not intended to be a "regulatory straightjacket" and made clear that governments were not required to identify "historical twin[s]" or "dead ringer[s]" to support modern regulations. *Id*. at 2133. The Court recognized that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868," and further underscored that "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id*. at 2132. Accordingly, when "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations." *Id*. at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 636).

**II.    EVEN IF CARRYING A FIREARM IN SENSITIVE PLACES BURDENS CONDUCT PROTECTED BY THE SECOND AMENDMENT, THERE IS A ROBUST HISTORICAL TRADITION OF PROHIBITING FIREARMS IN VARIOUS LOCATIONS BASED ON THEIR PARTICULAR CHARACTERISTICS.**

The Kipke plaintiffs' lawsuit relates to a variety of "sensitive places" restrictions that they claim violate the Second Amendment. As explained below, plaintiffs' claims lack merit because the challenged restrictions are consistent with our Nation's historical tradition of firearms regulation.

### A.    Because Sensitive Places are Presumptively Constitutional under *Bruen*, Plaintiffs Bear the Burden to Demonstrate that Carrying Firearms in These Locations Falls Within the Conduct Protected by the Second Amendment.

*Bruen* expressly recognized that the Second Amendment protects the right to carry a firearm outside of the home. The Court, however, went no further, characterizing the right as only a "general right to publicly carry." 142 S. Ct. at 2135. And acknowledging the limitations

on this "general right," the Court "assume[d] it settled" that there are certain "sensitive places" where the carrying of firearms may be prohibited consistent with the Second Amendment. *Id.* at 2133. Indeed, the Supreme Court has repeatedly explained that "laws forbidding the carrying of firearms in sensitive places" are "presumptively lawful" and outside the "scope of the Second Amendment." *Heller*, 554 U.S. at 626-27 & n.26; *McDonald v. City of Chicago*, 561 U.S. 742, 786-87 (2010).

As "presumptively lawful" regulations, plaintiffs bear the burden of demonstrating that the prohibitions at the specific locations challenged in this case implicate conduct that falls within the scope of the Second Amendment. In other words, plaintiffs must affirmatively establish that the Second Amendment confers a right to carry firearms into such places as health care facilities, school grounds, museums, government buildings, bars, public transit, and state parks and forests. *See, e.g.*, *National Ass'n for Gun Rights, Inc. v. City of San Jose*, 618 F. Supp. 3d 901, 914 (N.D. Cal. 2022) (noting that a plaintiff bears the initial burden to demonstrate that the "conduct at issue is covered by the text of the Second Amendment"). Yet, in their complaint, plaintiffs simply assert that the locational restrictions at issue here violate the Second Amendment. This type of hit-and-run pleading is insufficient.[15]

---

[15] This approach is consistent with other constitutional claims. First Amendment plaintiffs must prove that a regulation burdens "speech" or other protected activities before the State bears the burden of justifying its regulation. *See, e.g.*, *Kennedy v. Bremerton*, 142 S. Ct. 2407, 2421-22 (2022); *Fields v. City of Tulsa*, 753 F.3d 1000, 1009 (10th Cir. 2014). Fourth Amendment plaintiffs making an "unreasonable seizure" claim must first show that a seizure occurred within the meaning of the Constitution. *Burg v. Gosselin*, 591 F.3d 95, 97 (2d Cir. 2010). And Equal Protection plaintiffs must make a threshold showing that state action treated similarly situated people differently. *Caswell v. Calderon*, 363 F.3d 832, 837-38 (9th Cir. 2004). Here, plaintiffs must make a similar predicate showing that their conduct is covered by the plain text of the Second Amendment, just as they would for other constitutional claims.

Plaintiffs also fail to recognize that, unlike the First and Fourteenth Amendments, which prohibit laws "*abridging* the freedom of speech" or that "*abridge* the privileges or immunities of citizens," the Second Amendment uses a different term: "[T]he right of the people to keep and bear Arms, shall not be *infringed*." U.S. Const. amend II (emphasis added). As historian Saul Cornell notes, the terms "abridge" and "infringe" had different meanings to the Founding generation. (Declaration of Professor Saul Cornell, ¶ 30, attached as Exhibit 3.) Whereas the Framers understood the term "abridge" to mean "reduce," thereby prohibiting any diminishment of the rights that the First Amendment protected, the Framers understood that the term "infringement" meant to "violate" or "destroy." (Cornell Decl., Ex. 3 at ¶ 30.) Under this framework, "[m]embers of the Founding generation would have understood that the legislature could regulate the *conduct* protected by the Second Amendment and comparable state arms bearing provisions as long as such regulations did not negate the underlying *right*." (Cornell Decl., Ex. 3 at ¶ 30.) Regulations that merely restrict the public carrying of firearms in certain locations thereby do not on their face implicate the text of the Second Amendment.[16]

## B. Even if Plaintiffs Have Met Their Initial Burden, There is a Robust Historical Tradition of Limiting Firearms in Various Types of Locations.

Even if plaintiffs can overcome their burden to establish that their proposed conduct falls within the scope of the Second Amendment, their claims nonetheless fail because

---

[16] The nature of the challenge here—relating to the ability to carry publicly only in certain locations—is in contrast to both *Heller* and *Bruen*, where the Court invalidated restrictions that completely (or in essence) destroyed either the right to own a handgun or carry outside of the home. *See United States v. Marique*, __ F. Supp. 3d __, No. 8:21-po-2263-AAQ, 2022 WL 17822443, at *7 (D. Md. Dec. 20, 2022) (concluding that restrictions on government property did not implicate the Second Amendment because, unlike in *Heller* and *Bruen*, such restrictions are not "total bans on firearms").

Maryland's restrictions are all consistent with the Nation's historical tradition of limiting firearms at various types of locations.

### 1. *Bruen* Permits Significant Flexibility in Determining Whether a Particular Location is a "Sensitive Place."

Although *Bruen* identified only a few examples of what qualifies as a "sensitive place," the Supreme Court made clear that its list was not exhaustive, and its overall analysis set forth several principles that should further guide this Court's determination in this case. First, because the Supreme Court has already made the threshold determination that the Second Amendment embodies a general tradition of limiting firearms at some places, relatively few analogues will be necessary to establish the constitutionality of sensitive-place restrictions. The Supreme Court illustrated this principle when, in concluding that the constitutionality of firearm bans in schools, government buildings, polling places, courthouses and legislative assemblies was "settled," it acknowledged that the available historical record contained "relatively few" examples of such restrictions. *Bruen*, 142 S. Ct. at 2133; *see Maryland Shall Issue, Inc. v. Montgomery County*, __ F. Supp. 3d __, No. 21-1736-TDC, 2023 WL 4373260, at *15 (D. Md. July 6, 2023) ("Indeed, the Supreme Court has acknowledged that certain locations are properly construed as 'sensitive places' . . . based on only a limited number of historical examples"); (Declaration of Patrick Charles, ¶10, attached as Exhibit 4 (examining the sources relied upon by the *Bruen* Court)).

Second, the Court made clear that its list of sensitive places in *Bruen* was not intended to be comprehensive, and that the Court expressly contemplated that the historical record would reveal "*new* and analogous" sensitive places that are "constitutionally permissible." 142 S. Ct. at 2133 (emphasis in original).

Third, when searching the historical record, it is appropriate to consider evidence from both the Founding era as well as the era around when the Fourteenth Amendment was ratified. *See Maryland Shall Issue*, 2023 WL 4373260, at *8 ("Upon consideration of this issue, the Court concludes that historical sources from the time period of the ratification of the Fourteenth Amendment are equally if not more probative of the scope of the Second Amendment's right to bear arms as applied to the states by the Fourteenth Amendment."). Because the people's adoption of the Fourteenth Amendment is the mechanism through which the Second Amendment right is applied to the States, declining to consider the prevailing attitudes of that era would be to disregard the fundamental focus underlying a scope-of-rights analysis: "the scope they were understood to have *when the people adopted them*." *Bruen*, 142 S. Ct. at 2136 (emphasis in original; citation omitted). It is thus not surprising that every court of appeals to consider the issue has held that historical evidence from the Reconstruction era is critical to understanding the scope of the right. *See, e.g.*, *National Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1322 (11th Cir. 2023), *vacated pending rehr'g en banc*, 2023 WL 4542153 (11th Cir. July 14, 2023) ("[T]he understanding of the Second Amendment right that ought to control in this case—where a State law is at issue—is the one shared by the people who adopted 'the Fourteenth Amendment, not the Second.'"); *Gould v. Morgan*, 907 F. 3d 659, 669 (1st Cir. 2018); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011). This is especially pertinent in the context of the sensitive place doctrine, given that "[i]t was not until the mid-to-late nineteenth century that state and local governments within the United States began enacting express, location specific armed carriage restrictions." (Charles Decl., Ex. 4 at ¶ 15); (Charles Decl., Ex. 4 at ¶ 18 (explaining the concept of "firearms localism")).

Finally, building on that principle, *Bruen* teaches that an important factor in whether the historical record will support an analogous modern restriction is whether a historical regulation faced contemporaneous challenges to its constitutionality.  In other words, "where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation" of the ambiguities inherent in the Second Amendment.  *Bruen*, 142 S. Ct. at 2137 (citation omitted).  *Bruen* applied these principles in striking down aspects of New York's public carry scheme.  There, although the Court was faced with several statutes and case law from the Reconstruction era that purported to show a tradition of limiting public carry permits to only those individuals who showed a need to carry, the Court nonetheless discounted these statutes and case law because, in its view, they were inconsistent with an earlier-established historical tradition of public carry.  *Id.* at 2155; *Maryland Shall Issue*, 2023 WL 4373260, at *16 (noting that the *Bruen* Court's "criticism of the limited number of statutes presented and of territorial statutes was based in part on its conclusion that the proffered examples were countered by the weight of historical evidence").  *Bruen* thus ratifies the principle that, where a historical tradition does not conflict with an earlier-established tradition, and that historical tradition stands without contemporaneous challenge, that will be prima facie evidence that a similar modern restriction is consistent with the Second Amendment.  142 S. Ct. at 2133 (noting that restrictions at certain sensitive places were constitutional because the Court was "aware of no disputes regarding the lawfulness of such prohibitions").

### 2.    Limiting Firearms in Certain Locations Has a Rich American Tradition that Was Inherited from Its English Forebears.

"For nearly five centuries in England, from the late thirteenth century through the late eighteenth century, what constituted a 'sensitive place' in which arms bearing could be regulated and restricted was rather broad.  It encompassed densely populated areas, as well as areas where people regularly congregated for lawful purposes or conducted commerce." (Charles Decl., Ex. 4 at ¶ 11.)  This foundational history is most notably embodied in the 1328 Statute of Northampton, which prohibited Englishmen from bringing "force in affray of the peace, nor [going] nor rid[ing] armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers[.]"  (Charles Decl., Ex. 4 at ¶ 11 (noting restrictions in 1351 and 1419 that prohibited "go[ing] armed" in London).)   Although these restrictions were "relatively silent" as to specific locations, "[t]his is because English restrictions on going armed in 'sensitive places' were worded quite broadly, and therefore there was no need for the law to carve out individual locations."  (Charles Decl., Ex. 4 at ¶ 12.)

Historical evidence "unequivocally" demonstrates "that armed carriage restrictions and the English common law against 'going armed' in urban and densely populated locations indeed made their way into the American Colonies and subsequent United States."  (Charles Decl., Ex. 4 at ¶ 14.)  In fact, around the time of the Founding, two jurisdictions—Virginia and North Carolina—expressly enacted or retained their own versions of the Statute of Northampton.  (Ex. 12 (Virginia, 1786)); (Ex. 13 (North Carolina, 1792)).  *See Bruen*, 142 S. Ct. at 2136 (noting that "[a] long, unbroken line of common-law precedent stretching from Bracton to Blackstone" will demonstrate a relevant historical tradition).

26

"It was not until the mid-to-late nineteenth century that state and local governments within the United States began enacting express, location specific armed carriage restrictions." (Charles Decl., Ex. 4 at ¶ 15); (*see also* Cornell Decl., Ex. 3 at ¶ 43 (describing laws from Louisiana (1831) and New Mexico (1852) restricting weapons at "ball rooms"). These "Reconstruction era laws did not represent a new constitutional principle different than the common law restrictions that existed for centuries, but an application of the same legal principles to new circumstances brought about by changes in firearms technology, consumer behavior, and the demographic changes associated with greater urbanization." (Cornell Decl., Ex. 3 at ¶ 45.) One exemplar is an 1870 law from Texas that prohibited going armed:

> into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, . . . or to any other place where people may be assembled to muster or perform any other public duty, or any other public assembly[.]

(Ex. 17.) Around this same time, several other States enacted specific locational restrictions on firearms:

- Tennessee (1869): "any election in this State, . . . any fair, race course, or other public assembly of the people" (Ex. 14).

- Georgia (1870): "any court of justice, or any election ground or precinct, or any place of public worship, or any other public gathering in this State" (Ex. 16).

- Missouri (1874): "any church or place [of worship], any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose [other than militia mustering] (Ex. 18).

- Arizona (1889): "any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering, or to any election precinct . . ., or to any other place where people may be assembled to minister or to perform any other public duty, or to any other public assembly" (Ex. 19).

- Oklahoma (1890): "any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly" (Ex. 20).

- Idaho (1901): "any public assemblage" (Ex. 21).

- Montana (1903): "any church or religious assembly, any school room or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball room, social party, or social gathering, or to any election . . ., or to any other place where people may be assembled to perform any public duty, or at any public assembly" (Ex. 22).

(*See also* Charles Decl., Ex. 4 at ¶¶ 15-17 (chronicling state laws).)

In addition to these state laws, there were a large number of local ordinances that restricted the carrying of firearms in specific locations.  As historian Patrick Charles explains, "[t]he reason that so many localities enacted these ordinances was the prevalence of the legal concept of 'firearms localism'—this concept being a preference among state and local lawmakers to regulate firearms and deadly weapons more strictly at the local rather than state level."  (Charles Decl., Ex. 4 at ¶ 18.)  Similar to the state statutes set forth above, these ordinances, such as ones enacted in Columbia, Missouri and Stockton, Kansas, contain restrictions in specific areas such as places "where people have assembled for educational,

literary or social purposes" and, more generally, at "any other public assemblage of persons met for any lawful purpose[.]"  (Ex. 23 (Columbia, Mo.).); (Charles Decl., Ex. 4 at ¶¶ 18-19.) Moreover, consistent with the concept of firearms localism, many local jurisdictions enacted ordinances that restricted the carrying of firearms in "corporate" or "incorporate" areas. (Charles Decl., Ex. 4 at ¶ 20.)  These ordinances, which would have restricted wholesale the carrying of firearms within the entire municipality, thus would have effectuated (and rendered unnecessary) any and all of the specific restrictions enacted by the other jurisdictions.  (*See* Charles Decl., Ex. 4 at ¶¶ 20-21 (setting forth ordinances from local jurisdictions in North Carolina (1882), Louisiana (1874), Pennsylvania (1873), Utah (1893), Nebraska (1889), and modern-day South Dakota (1882).)

It is significant that there is no evidence that any of these sensitive-place restrictions were ever found to be unconstitutional.  Indeed, the opposite is true.  (*See* Charles Decl., Ex. 4 at ¶ 23 n.31 (citing, *e.g.*, *Hill v. State*, 53 Ga. 472 (1974); *State v. Shelby*, 90 Mo. 302 (1886); *Owens v. State*, 3 Tex. App. 404 (1878).)  And these cases not only show that these restrictions passed legal muster, but the language set forth in the opinions provides a revealing window into the prevailing attitudes of the very same people who made the decision to submit their state police powers to the limitations of the Second Amendment:

> We confess that it appears to us little short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together.

*English v. State*, 35 Tex. 473, 478-79 (1871); *see also Andrews v. State*, 50 Tenn. 165, 182 (1871) ("[A] man may well be prohibited from carrying his arms to church, or other public assemblage, as the carrying them to such places is not an appropriate use of them."); *Hill*, 53

Ga. at 476 ("[T]he bearing of arms of any sort [at concerts] is an eye-sore to good citizens, offensive to peaceable people, an indication of a want of a proper respect for the majesty of the laws, and a marked breach of good manners.").

### 3. The History and Tradition of Restrictions on Sensitive Places Yields Several Applicable Principles.

From the history detailed above, several general principles can be distilled regarding the types of locations that have historically been considered sensitive places at which firearms may be regulated.

First, the personal exercise of Second Amendment rights should yield when necessary to protect the exercise of other fundamental rights, such as the exercise of religious or political rights. *See* Darrell Miller, *Constitutional Conflict and Sensitive Places*, 28 Wm. & Mary Bill Rts. J. 459, 466 (2019) (asserting that certain places "are sensitive because they are the locus of the production of other kinds of public goods protected by other kinds of constitutional rights, and that the protection of the character of these types of institutions justifies limits on private firearms.").[17]

Second, the sensitive places doctrine furthers the important interest in protecting places where vulnerable or impaired people might ordinarily be present. *See United States v. Class*,

---

[17] Plaintiffs appear to invoke the "unconstitutional conditions" doctrine in arguing that an individual cannot be forced to waive their Second Amendment rights to exercise certain other rights. For example, plaintiffs allege that because they have a purported "'positive right of public access to information and ideas' at places like museums and libraries," plaintiffs cannot be prevented from exercising their Second Amendment rights at those locations. (ECF 13-1 at 20.) Even if such a "positive right" exists, plaintiffs' claim fails because the general Second Amendment right to carry publicly does not extend to the locations at issue here. Hence, plaintiffs' Second Amendment rights are not implicated. Indeed, plaintiffs readily admit that they can be forced to relinquish any right they have to carry a firearm if they wish to enter a polling place to exercise their fundamental right to vote.

930 F.3d 460, 465 (D.C. Cir. 2019) (noting that some "places are 'sensitive' for purposes of the Second Amendment because of 'the people found there'").  This explains why the Supreme Court used "schools" as an undisputed category notwithstanding the paucity of Founding era evidence of relevant governmental restrictions.  *Bruen*, 142 S. Ct. at 2133.  Recognizing this principle, several courts have concluded that places are sensitive based on the presence of children.  *See, e.g., Zaitzeff v. City of Seattle*, 484 P.3d 470, 479 (Wash. App. 2021) (noting that sensitive places are implicated by "public safety concerns" regarding children); *DiGiacinto v. Rector & Visitors of George Mason Univ*., 704 S.E.2d 365, 370 (Va. 2011) (concluding that "GMU is a 'sensitive place'" because it "is a school" with many students "under the age of 18," including "elementary and high school students" in the summer).  This facet of the doctrine is based on the notion that these groups—which includes not only children but the physically or mentally ill, the elderly, and intoxicated individuals—may not be physically, intellectually, or emotionally capable of defending themselves with a firearm, or may lack the judgment necessary to do so in a way that does not endanger others.  *See, e.g.*, *United States v. Masciandaro*, 648 F. Supp. 2d 779, 791 (E.D. Va. 2009), *aff'd*, 638 F.3d 458 (4th Cir. 2011) (noting that schools may be classified as sensitive places because "possessing firearms in such places risks harm to great numbers of defenseless people").

Third, one thread that stretches throughout nearly all historically sensitive places is a tradition of prohibiting firearms in crowded locations.  Whether it is the Statute of Northampton's restrictions at fairs and markets, or the various states' restrictions at places of "public assembly," the rationale for these restrictions does not require much elaboration.  With crowds come an inherent risk of disorder, and inserting firearms into such circumstances adds yet another layer of potential chaos and social breakdown.  These restrictions thus reflect the

31

fact that the use (or threatened use) of firearms in such crowded locations, even in legitimate self-defense, is not only impractical, but poses deadly risks to everyone present.

Finally, despite plaintiffs' assertions otherwise, the application of the sensitive place doctrine does not depend upon whether a restriction is consistent with some purported "tradition of the government providing comprehensive security."   (ECF 24-1 at 26-27.) Plaintiffs simply get the history wrong.  As Professor Cornell explains, there were no places in the Founding era that provided such comprehensive security.  (Cornell Decl., Ex. 3 at ¶ 42.) And plaintiffs have no answer for why the Supreme Court would have identified schools as a paradigmatic sensitive place, given that there is no evidence that schools were subjected to such security at any relevant time period.  Simply stated, whether a location is a "sensitive place" does not depend on some perceived "need" for security.  *See Class*, 930 F.3d at 465 (concluding that "the 'level of threat' posed" does not determine which "places are 'sensitive' for purposes of the Second Amendment," and applies to locations even where "the risk of crime may be no different than in any other publicly accessible building").

III.   **RESTRICTIONS ON FIREARMS ON GOVERNMENT-OWNED PROPERTY DO NOT IMPLICATE THE SECOND AMENDMENT WHERE THE GOVERNMENT IS ACTING IN ITS PROPRIETARY CAPACITY OR AS A MARKET PARTICIPANT.**

As discussed above, a Second Amendment challenge must fail where the plaintiff cannot show that a particular law or action burdens conduct covered by the Second Amendment.  *See Bruen*, 142 S. Ct. at 2126 (stating that if the "regulated conduct falls beyond the Amendment's original scope, 'then the analysis can stop there'").  As plaintiffs concede, the Second Amendment does not confer a right to carry firearms onto the property of another against that property's owner's wishes.  (ECF 13-1 at 27.)  This is because the Second Amendment, which codified a pre-existing right, must be interpreted in light of the background

principles that existed at the time of its adoption.  Relevant here, and as discussed more fully below in Section IV.B., the ability of a property owner to exercise exclusive dominion and control over their land, including the ability to expel trespassers, is a fundamental aspect of Anglo-American (and Maryland) law that formed the backdrop of the canvas upon which the Second Amendment was written.  (Cornell Decl., Ex. 3 at ¶¶ 35-41); *see also GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1262 (11th Cir. 2012), *cert. denied*, 568 U.S. 1088 (2013) ("An individual's right to bear arms . . ., whatever its full scope, certainly must be limited by the equally fundamental right of a private property owner to exercise exclusive dominion and control over its land."); *Silbert v. Ramsey*, 301 Md. 96, 101 (1984) ("The common law right to exclude can be traced from English common law.").

These principles are in all relevant aspects applicable to locations, including those challenged in this case, that are owned or operated by a governmental entity.[18]  Courts have consistently recognized that "the government, 'no less than a private owner of property,' retains the 'power to preserve the property under its control for the use to which it is lawfully dedicated.'"  *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1885 (2018) (quoting *Adderley v. Florida*, 385 U.S. 39, 47 (1966)); *see also Camfield v. United States*, 167 U.S. 518, 524 (1897) ("[T]he government has, with respect to its own lands, the rights of an ordinary proprietor, . . . and may deal with such lands precisely as a private individual may deal with

---

[18] Although the government's fundamental ability to exercise control over its own property does not implicate the Second Amendment, a conclusion that a government-as-proprietor is entitled to regulate firearms on its property is nonetheless entirely consistent with *Bruen*'s command to look to history and tradition.  Stated simply, to the same extent that history at the time of the Founding supports a private property owner's authority to regulate firearms on their property when engaged in a particular pursuit (i.e., operating a hotel), so too does the historical tradition support the government's authority when engaged in the same kind of pursuit.

his [similarly situated] property."); *Bonidy v. U.S. Postal Service*, 790 F.3d 1121, 1126 (10th Cir. 2015) ("As a government-owned business acting as a proprietor rather than as a sovereign, the USPS has broad discretion to govern its business operations according to the rules it deems appropriate."); *cf. Greer v. Spock*, 424 U.S. 828, 836 (1976) (rejecting the "principle that whenever members of the public are permitted freely to visit a place owned or operated by the Government, then that place becomes a 'public forum'").[19]

The government's ability to control its internal operations is especially strong where the government acts in a capacity as proprietor or market participant rather than its traditional sovereign or regulatory capacity.[20]  Under this doctrine, when the government provides a good or service for consumption in the private marketplace, the government will not be subject to

---

[19] These principles are consistent with the authority granted to the federal government, through the Property Clause of the United States Constitution, which provides that "the Congress shall have Power to . . . make all needful Rules and Regulations respecting . . . Property belonging to the United States[.]"  U.S. Const. art IV, § 3, cl. 2; *see United States v. Masciandaro*, 638 F.3d 458, 473 (4th Cir. 2011) (in upholding conviction for possession of a handgun on federal park property, noting that "[t]he government, after all, is invested with 'plenary power' to protect the public from danger on federal lands under the Property Clause"); *United States v. Dorosan*, 350 Fed. App'x 874, 875 (5th Cir. 2009) (citing the Property Clause to support the court's position that firearms could constitutionally be prohibited on the grounds of a post office).

[20] In contrast to government endeavors that have clear analogs in the private sector, the government's ability to manage its property free from ordinary constitutional restrictions may be at its ebb when government property has been dedicated to a traditionally public function, such as sidewalks, streets, and other public thoroughfares.  *See Marsh v. Alabama*, 326 U.S. 501, 506 (1946) (holding that a privately-run "company town" could not prohibit solicitation on its sidewalks because, by opening its sidewalks and roads to the public, it was performing "essentially a public function"); *see also Heffron v. International Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 651 (1981) (observing that a public street serves "a necessary conduit in the daily affairs of a locality's citizens").  As the quintessential "public" space, the government may therefore be required to affirmatively justify a restriction on the public carrying of firearms on roads and sidewalks.  *See Class*, 930 F.3d at 464 (concluding that a restriction on carrying a handgun in a parking lot was constitutional based on the fact that the lot was in close proximity to the Capitol, and therefore fell within the "sensitive places" doctrine).

the ordinary constitutional restrictions that would otherwise bind it when acting in a regulatory capacity. *See Reeves, Inc. v. Stake*, 447 U.S. 429, 437 (1980) ("There is no indication of a constitutional plan to limit the ability of the States themselves to operate freely in the free market."); *Building and Const. Trades Council v. Associated Builders & Contractors*, 507 U.S. 218, 227 (1993) ("Our decisions in this area support the distinction between government as regulator and government as proprietor."); *cf. Enquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 598 (2008) ("[T]here is a crucial difference, with respect to constitutional analysis, between the government exercising 'the power to regulate or license, as lawmaker,' and the government acting 'as proprietor, to manage [its] internal operation." (citation omitted)). This doctrine recognizes that, although "state proprietary activities may be, and often are, burdened with the same restrictions imposed on private market participants," "[e]venhandedness suggests that, when acting as proprietors, States should similarly share existing freedoms from federal constraints[.]" *Reeves*, 447 U.S. at 439; *see id*. at 436 (stating that the constitutional distinction "between States as market participants and States as market regulators makes good sense and sound law").

In other words, when a government entity acts as an ordinary market participant, it acts on the same plane as a private actor. Thus, a state-owned concrete plant will not be subject to the restraints of the Commerce Clause, and may restrict—just as any other private operator in that market—its sales to only in-state customers. *Id*. at 440. Or a government that chooses to operate a mass transit system may decide—just like a private transit service—which types of advertising it will allow on its vehicles. *Lehman v. City of Shaker Heights*, 418 U.S. 298, 304 (1974). Or a city that wishes to decorate a public park may choose which monuments it will

35

accept for display from private donors without running afoul of the First Amendment.[21]

*Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009).

Courts applying these principles have thus concluded that governments may, without

running afoul of the Second Amendment, prohibit the possession of firearms on government

---

[21] Although cases applying the First Amendment provide helpful guidance, the State acknowledges that there is some tension between First Amendment forum analysis and the general principle that the government has the same authority to conduct its affairs on its own property as a private property owner. *See United States v. Kokinda*, 497 U.S. 720, 725-26 (1990) ("The Government, even when acting in its proprietary capacity, does not enjoy absolute freedom from First Amendment constraints, as does a private business[.]"). Thus, although *Lehman* instructs that a publicly-owned transit system may pick and choose which types of advertisements to accept, "any speech restrictions must still be 'reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.'" *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 198 (4th Cir. 2022) (quoting *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983)).

But putting aside the fact that viewpoint- and content-discrimination principles simply do not translate to the Second Amendment context, there is another, more foundational reason why the restrictions inherent in the First Amendment context do not similarly limit the government's ability to regulate firearms on its own property. Although the First Amendment protects *individual* rights to speech, the Supreme Court has recognized that it serves a more *collective* purpose: preserving "the foundation of free government by free men." *Marsh v. Alabama*, 326 U.S. 501, 509 (1946); *see also 303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2311 (2023) ("By allowing all views to flourish, the framers understood, we may test and improve our own thinking both as individuals and as a Nation."); *Mills v. Alabama*, 384 U.S. 214, 219 (1966) (noting that First Amendment freedoms are "the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free"). This underlying collective purpose thus restrains government, in the context of speech, from acting with the same absolute control as a private property owner. But unlike individual speech, which inherently serves the collective purpose of preserving ordered liberty, an individual's exercise of their Second Amendment right to carry publicly (at least outside of the militia context) for *self*-defense serves only to further the perceived security interests *of that individual*. *See Heller*, 554 U.S. at 611 (noting that the Second Amendment serves two distinct purposes: a collective safeguard against the elimination of the militia so as to restrain government overreach, and an "*individual* right unconnected to militia service" (emphasis added)); *see also* Joyce Malcolm, *To Keep and Bear Arms* 1 (1994) (noting that the English Bill of Rights, the predecessor to the Second Amendment, "transform[ed]" the "duty to have arms" for the collective security of the state "into a right" of individual self-defense). In other words, because individuals who wish to carry a firearm onto government property are seeking only to vindicate their personal security concerns, there is no underlying foundational principles that override (or otherwise must be balanced against) the exclusive dominion and control that inheres in the government in its role as property owner.

property.  *See Class*, 930 F.3d at 464 ("[A]s the owner of the Maryland Avenue lot, the government—like private property owners—has the power to regulate conduct on its property," including with respect to weapons); *Bonidy*, 790 F.3d at 1126-27; *United States v. Dorosan*, 350  Fed. App'x 874, 875 (5th Cir. 2009) (concluding that the government's "restrictions on guns stemmed from its [valid] constitutional authority as the property owner").

A conclusion to the contrary would result in absurd consequences that would defy logic, common sense, and the "[e]venhandedness" that is the foundation of the market participant doctrine.  *Reeves*, 447 U.S. at 439; *see also Building and Const. Trades Council*, 507 U.S. at 231 (stating that, where government "pursues its purely proprietary interests," it may act "where analogous private conduct would be permitted"); *Camfield*, 167 U.S. at 524 (stating that a government "may deal with [its farmland] precisely as a private individual may deal with his farming property").  Indeed, if the State may not regulate firearms on the grounds of its publicly-owned stadiums, it would mean that weapons could be prohibited at a Washington Commanders game at the privately-owned FedEx Field, but not at a Baltimore Ravens game at publicly-owned Ravens stadium.[22]  Likewise, it would mean that a private museum (such as the Maryland Center for History and Culture[23]) could prohibit patrons from carrying weapons inside its premises, but a public museum (such as the Jefferson Patterson Park and Museum in Calvert County) could not.  The inability of the government to regulate the carrying on firearms on its own property would be especially unsound, given that, "[u]nlike private ent[ities],

---

[22] All entrants to FedEx Field, including law enforcement personnel not on duty at the game, are prohibited from bringing weapons into the stadium.  *See* https://www.commanders.com/stadium/stadium-guide.

[23] The Maryland Center for History and Culture prohibits "[g]uns, knives, and other weapons" on its property.  *See* https://www.mdhistory.org/rules-of-conduct/.

government is vested with the responsibility of protecting the health, safety, and welfare of its citizens." *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 342-43 (2007).

In sum, like a private corporation, a government that chooses to act in a proprietary or market participant capacity should similarly have the ability to choose the firearms policy that best reflects the preferences of those who are responsible for its governance, i.e., its citizenry.[24] Consistent with these well-established principles, all of the challenged locations that implicate government-owned or operated property do not burden conduct covered by the Second Amendment, and therefore are categorically constitutional.[25]

### IV. PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE THEY FAIL TO SHOW EITHER THAT THEY ARE LIKELY TO SUCCEED ON THE MERITS OR THAT THEY ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW.[26]

As noted above, a party seeking a preliminary injunction "must 'clear[ly] show[ ]' that it is likely to succeed on the merits." *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290

---

[24] As might be the case generally, the guardrail on government overreach in this context is the democratic process itself. Indeed, this was the Supreme Court's response to concerns in *Summum* about the lack of restraints on the government speech doctrine: "[A] government entity is ultimately 'accountable to the electorate and the political process for its advocacy.' 'If the citizenry objects, newly elected officials later could espouse some different or contrary position.'" 555 U.S. at 468-69 (citation omitted).

[25] These principles thus provide a complete defense to many of the locations challenged in the complaint, including mass transit, highway rest areas, and state parks and forests. All of the other challenged locations, however, are implicated to the extent that they include locations that are government owned or operated. And as discussed below, to the extent that plaintiffs challenge restrictions at government buildings (and grounds) that are not owned or operated in a proprietary capacity, those locations generally fall within the "sensitive locations" doctrine as explicitly approved in *Bruen*. *See Bruen*, 142 S. Ct. at 2133.

[26] As indicated in plaintiffs' motions, similar lawsuits to this one are pending in other federal courts outside of Maryland. New York and New Jersey, for example, also passed laws following the Supreme Court's decision in *Bruen* that, among other things, place limits on where handguns may be carried publicly. These laws have been challenged on Second Amendment

(4th Cir. 2011) (citation omitted).  Plaintiffs fail to meet this high bar, and therefore their motion should be denied.  Similarly, plaintiffs have failed to show that they are entitled to judgment as a matter of law, and therefore this Court should deny their motion for summary judgment.  This is because the restrictions on the specific locations challenged by plaintiffs either fall outside of the scope of the Second Amendment or are supported by a robust historical tradition.  Likewise, assuming plaintiffs have standing to challenge it, the private building consent rule in Senate Bill 1 does not implicate Second Amendment principles and, even if it did, it is supported by a historical tradition of excluding individuals from carrying firearms onto another's property with first receiving permission to do so.  Finally, plaintiffs' First Amendment challenge to the private building consent rule fails both for lack of standing and on the merits.

### A. The Challenged Locational Restrictions Are All Either Sensitive Places that Fall Outside of the Second Amendment or Otherwise Supported by this Nation's Historical Tradition of Firearm Regulation.

As explained above, any challenge to the specific locations identified in the Maryland Code and regulations should be rejected because plaintiffs have failed to demonstrate that these locations fall outside of the "presumptively lawful" "sensitive place" restrictions that were

---

grounds and, because of the timing for those states' legislative sessions relative to Maryland's, the district courts have already rendered decisions.  *See Koons v. Platkin*, __ F. Supp. 3d __, No. 22-7464 (RMB/AMD), 2023 WL 3478604 (D.N.J. May 16, 2023), *appeal pending*, No. 23-1900 (3d Cir.); *Christian v. Nigrelli*, 22-CV-695 (JLS), __ F. Supp. 3d __, 2022 WL 17100631 (W.D.N.Y. Nov. 22, 2022), *appeal pending*, No. 22-2987 (2d Cir.); *Antonyuk v. Hochul*, No. 1:22-cv-0986, __ F. Supp. 3d __, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022), *appeal pending*, Nos. 22-2908, 22-2972 (2d Cir.).  Some locational restrictions have been upheld and others struck down.  But whatever precedential value those decisions might have once had, the weight of authority for each is, at least temporarily, inconsequential because all of those cases are now pending before their respective courts of appeals.

approved by the Supreme Court in *Heller* (and reaffirmed in *McDonald* and *Bruen*).  But even

if this Court determines that plaintiffs have met their initial burden, their claims nonetheless

fail because each of the categories is supported by historical tradition.

### 1.  Health Care Facilities

Plaintiffs' challenge to restrictions in Senate Bill 1 relating to "health care facilities"

must be rejected because health care facilities are sensitive places under *Bruen*.

Any analysis of this restriction must begin with the fact that modern hospitals and other

health care facilities are unlike anything that existed at the time of the Founding.  *See Maryland*

*Shall Issue, Inc. v. Montgomery County*, __ F. Supp. 3d __, No. 21-1736-TDC, 2023 WL

4373260, at *14 (D. Md. July 6, 2023) (noting that "hospitals did not exist in their modern

form at the time of the ratification of the Second or Fourteenth Amendment").  Instead, "[i]t

was not until the late nineteenth century, 'as society became increasingly industrialized and

mobile and as medical practices grew in their sophistication and complexity,' that there was a

shift from the norm of medical care practice at home to 'the professionalization of health care

services that eventually included the development of a full and competitive commercial market

for medical services that increasingly took place in hospitals.'" *Id*. (citing Barbra Mann Wall,

*History of Hospitals*, Univ. of Pa. School of Nursing[27])).  As a result, when considering

whether the public understanding of the Second Amendment would have contemplated these

modern restrictions, this Court must apply the more "nuanced approach" approved in *Bruen*.

*Id*.

---

[27] Available at https://www.nursing.upenn.edu/nhhc/nurses-institutions-caring/history-of-hospitals/

This approach reveals that health care facilities not only fulfill one of the inherent characteristics of a "sensitive place," but that restrictions on these facilities are consistent with the historical tradition discussed above.  First, health care facilities are, by their very nature, places that serve vulnerable individuals, including the sick and disabled.  As with protecting the learning environment for children at schools, restrictions on firearms at health care facilities preserve an environment that is most conducive to the location's purposes of healing and rehabilitation.  Introducing firearms into such circumstances would thus disrupt the sense of security and serenity that individuals with compromised health need.  Indeed, health care facilities are places of heightened emotions and uncertainty, as individuals and their families often confront literal life-and-death decisions in a perhaps unfamiliar location.[28]

Moreover, the various health care facilities, especially hospitals, are similar to the many historical analogues referenced above in which several states prohibited firearms in places where persons are assembled for "scientific purposes."  (*See, e.g.*, Exs. 17, 18, 19, 20, & 22.) Recognizing that firearms are inconsistent with environments designed for "scientific purposes" thus dovetails with restrictions on places, such as health care facilities, where science is being applied in furtherance of such a vital purpose as human health.  *See Maryland Shall Issue*, 2023 WL 4373260, at *15 ("Hospitals are certainly locations at which people are engaged in scientific activities, including medical care.").

Likewise, many hospitals in Maryland have a teaching component. *See id.* at *14 (noting that many hospitals in Montgomery County "are also involved in teaching or clinical

---

[28] The Supreme Court recognized that impaired health could be a basis for restricting firearm possession.  *See Heller*, 554 U.S. at 626 ("[n]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by . . . the mentally ill").

research that constitutes educational or scientific activities"). Those hospitals therefore share many of the same features as schools, for which the Supreme Court has expressly concluded are sensitive places outside of the purview of the Second Amendment. *Bruen*, 142 S. Ct. at 2133.

Plaintiffs have no answer for these principles other than to point to a few examples of hospitals that existed at the time of the Founding and the lack of governmental restrictions at those specific locations. (ECF 13-1 at 22.) But given the novelty of those locations and their relatively small number, the lack of specific governmental regulation at these few institutions is not significant, and plaintiffs' shallow historical analysis fails. Instead, because the historical tradition supports the conclusion that health care facilities are sensitive places due to their purposes and service of vulnerable populations, firearm possession at these locations may be restricted consistent with the Second Amendment.

### 2.      Museums[29]

Museums, like health care facilities, are sensitive places for which restrictions on carrying firearms are constitutional. In fact, museums are analogous to schools (which, as noted above, are expressly-approved "sensitive places" by the Supreme Court) in that they serve an educational purpose and, despite serving all ages, are often predominantly geared to serve the interest of children. (*See, e.g.*, Declaration of Anita Kassof, Executive Director of

---

[29] In their complaint, in addition to challenging restrictions at museums generally, plaintiffs challenge restrictions at "[p]roperty operated as a museum by the Department of Planning or a unit within the Department of Planning." (ECF 1, ¶ 50.) Plaintiffs, however, have not in fact identified any such property, or any such museum. Plaintiffs therefore lack standing to pursue this claim. Even if they had standing, firearms restrictions at any such museum would be constitutional not only for the reasons applicable to all museums, but also because any such museum would be operated by the government in its proprietary capacity, *see* Section III.

the Baltimore Museum of Industry ("BMI"), ¶¶ 4-7, attached as Exhibit 8 (noting that "[m]any of the exhibits and programs at the [BMI] are designed to be of interest to children").)  And museums in Maryland can, and do, host hundreds (and sometimes thousands) of children at one time.[30]  Because the presence of children justifies the approved restrictions on schools (and other vulnerable populations), it similarly justifies Maryland's restrictions on firearms in museums.  Finally, carry restrictions in museums also are plainly supported by the more specific historical limitation related to any "place where persons are assembled for educational, literary, or scientific purposes."  (*See, e.g.*, Exs. 17, 18, 19, 20, & 22.)

### 3.  Stadiums, Amusement Parks, Racetracks, Casinos

Plaintiffs next challenge restrictions at various locations such as stadiums, amusement parks, racetracks, and casinos.  All of these locations share a common characteristic:  they are places where people gather for recreational and social activities.  And, as set forth above, there is a well-established "historical tradition of restricting the carrying of firearms in places where individuals gather for recreation or social activities[.]"  *See Maryland Shall Issue*, 2023 WL 4373260, at *12 (citing, e.g., laws set forth in defendants' exhibits 14, 15, 17, 19, and 20).  Moreover, "[t]he reasons for these historical restrictions, which appear to be to protect individuals engaged in these recreational and social activities from confrontations and encounters involving firearms or other dangerous weapons, are comparable to the reason for

---

[30] *See also* Kassof Declaration, Ex. 8 at ¶ 7 (BMI hosts up to 230 children at a time); Declaration of Mark J. Potter, President and Chief Executive of the Maryland Science Center, ¶ 6, attached as Exhibit 9 (hosting as many as 2,000 children); Declaration of Carter Arnot Polakoff, President and Chief Executive Officer of the Port Discovery Children's Museum, ¶ 7, attached as Exhibit 10 (hosting as many as 500 children); Declaration of Terri Lee Freeman, Executive Director of the Reginald F. Lewis Museum of African American History & Culture, ¶ 7, attached as Exhibit 11 (hosting as many as 100 children).

the prohibitions of [Senate Bill 1], which is to address possible gun violence in or near places of public assembly." *Id.* Indeed, as discussed above, States that prohibited firearms at places where large numbers of people gathered recognized that the ability of individuals to safely defend themselves with firearms would be diminished in such circumstances, and that the potential for other harms (whether through mass panic or an errant bullet) made the carrying of firearms in such circumstances dangerous and imprudent. (*See* Exs. 14, 15, 16, 17, 18, 19, 20, 21, 22.) Because Maryland's restrictions at these locations are consistent with the historical traditions discussed above, those restrictions do not offend the Second Amendment.

### 4. Locations Licensed to Sell or Dispense Alcohol for On-Site Consumption[31]

Plaintiffs next challenge firearms restrictions at locations that are licensed to sell or dispense alcohol for on-site consumption. These restrictions are broadly consistent with restrictions on firearms at social gatherings and places of public assembly. And more specifically, this restriction is substantively identical to laws, like that enacted in Oklahoma in 1890, that prohibited the carrying of firearms in "any place where intoxicating liquors are sold[.]" (Ex. 20.)

Laws restricting firearms at places where alcohol is served thus stands at the intersection of two of the fundamental principles underpinning the historical tradition of

---

[31] In their complaint, plaintiffs do not limit their challenge to this provision of Senate Bill 1 to restrictions at locations that serve alcohol, and therefore the complaint could be read to include a challenge to restrictions at locations that dispense cannabis for onsite consumption. Yet no identified plaintiff has claimed that they intend to carry their firearm at a cannabis dispensary, and therefore no plaintiff has standing to challenge this restriction. *See Southern Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 183-84 (4th Cir. 2013). Even if plaintiffs had standing, this claim fails for the same reasons discussed above with respect to locations licensed to sell alcohol.

restrictions at sensitive places: crowds and vulnerable populations.  As discussed above, the presence of large crowds diminishes the ability of an individual to safely use a firearm in self-defense, and increases the possibility of unintended harm.  When alcohol is added to crowds, and people begin to lose their inhibitions and their judgment becomes impaired, these concerns are amplified.

Although the dangers of mixing firearms and alcohol are readily apparent, the historical tradition also reflects this commonsense understanding.  "[B]y the mid-eighteenth century, many colonial lawmakers viewed liquor and arms bearing as a potentially dangerous combination." (Charles Decl., Ex. 4 at ¶24 (compiling statutes that prohibited the sale of liquor to militiamen both before and around the time of the ratification of the Constitution).)  And at the same time that States were prohibiting the carrying of firearms in public gatherings, they were prohibiting outright the carrying by people who were intoxicated.  (*See* Charles Decl., Ex. 4 at ¶ 26 (citing laws from Kansas (1867), Mississippi (1878), Missouri (1879), Oklahoma (1890), and Wisconsin (1883), as well as laws from local jurisdictions).)

Even if the person carrying the firearm is not themselves consuming alcohol, the underlying concerns about crowds, conflict, and the diminished capacity and safety of defensive use of a firearm remain.  Moreover, the historical tradition has never required a "least restrictive means" fit between the interests served by a sensitive place restriction and the individuals affected.  Indeed, nothing in *Bruen* or *Heller* suggests that a restriction at schools could only be applied to students and not staff or visitors.  Instead, as with schools, the

restriction on firearms in locations that serve alcohol is designed to preserve the safety of *all* individuals who are present.[32]

### 5. Any Transit Vehicle or Transit Facility Owned or Controlled by the Maryland Transit Administration

Plaintiffs also challenge firearms restrictions on public transportation vehicles and facilities that are operated by the MTA.  This challenge fails for several independent reasons.

First, plaintiffs' claim is, by its nature, limited to transit vehicles and transit facilities that are owned or controlled by an agency of the State of Maryland.  As discussed above, because the State operates these transportation services and facilities in its proprietary capacity, it possesses the fundamental authority—just like any private entity similarly engaged in transportation services—to determine the regulations that will apply to its own property, including with respect to firearms.  Because the State can lawfully condition entry to these locations both as an inherent feature of its ownership rights and as a matter of historical tradition, this prohibition on firearms does not offend the Second Amendment.

Second, restrictions on public transportation vehicles and facilities are consistent with the historical tradition of limiting firearms in sensitive places.  Although there appear to be no governmental regulations from the Founding or Reconstruction eras relating specifically to public transportation, this is for good reason.  "Until the twentieth century, transportation services were typically operated by private companies vested with the authority to fashion their own rules and regulations for customers."  (Declaration of Dr. Brennan Rivas, ¶ 13, attached as Exhibit 5); (*see also* Cornell Decl. Ex. 3 at ¶ 13 ("There was no modern style mass

---

[32] Likewise, there can be no guarantee that an individual who carries a firearm into a bar with no intention to consume alcohol will not later change their mind.

transportation [in the Founding era].  All forms of transport were all privately owned.").)  And because public transportation is therefore a modern phenomenon "implicating unprecedented societal concerns or dramatic technological changes," any analysis of whether firearms restrictions fall outside of the scope of the Second Amendment requires a "nuanced approach" that allows for a measured flexibility.  *Bruen*, 142 S. Ct. at 2132.

Applying that standard reveals that public transit vehicles and facilities are properly considered sensitive places, and thus outside of the scope of the Second Amendment, because they share many of the same characteristics of those places where firearms have historically been limited.  First, public transportation vehicles and facilities are crowded locations, and thus similar to the restrictions on public assemblies discussed above.  And accommodating large crowds is by design, as the purpose of a mass transit system is to move large numbers of people in an efficient manner.  Therefore, just as with the crowded ballrooms of the Reconstruction era, the carrying of firearms on a crowded bus or subway train has the potential to insert chaos into an already chaotic environment.  And even more so.  As anyone who has taken the MTA's CityLink Red bus down York Road in Baltimore knows, passengers on buses and subway trains can expect to find themselves jam-packed into extremely close contact with each other, often so close as to be actually touching.  These circumstances render effective self-defense with a firearm entirely impractical, and vastly increase the chance that any attempt to use a firearm will result in disastrous and unintended consequences.  Not only would the discharge of a firearm in a crowded transit vehicle have the potential to strike any number of innocent bystanders, but would cause extreme panic in closed environments (whether within the vehicle itself or a subway station with controlled entry/exit points) where any mass attempt to escape could cause injury or worse.  Further, use of a firearm, even in legitimate self-

defense, would likely result in massive disruptions of the transit system as the circumstances were investigated, thus interfering with the State's purpose and interest in providing a reliable form of transportation for the public.  Indeed, in contrast to the use of a firearm at a social gathering, which would have an immediate impact only on that particular event, the use of a firearm on a public transit system would have cascading effects with the potential to grind entire routes to a halt.

The MTA's vehicles and transit facilities are also sensitive places because they serve vulnerable populations, most notably children.  Like many municipal public transit systems, MTA "provides free transportation to and from school and school-related activities to eligible students of the Baltimore City Public School system."  (Randall Decl., Ex. 6 at ¶ 4); (*see* Randall Decl., Ex. 6 at ¶ 7 (noting that, through April 2023, "MTA will have recorded approximately 134,000 rides by Baltimore City Public School students for the 2022-23 school year").)  And by serving this integral role in getting children to and from school, the transit system occupies the same sphere as the school itself.[33]

Finally, restrictions on public transit are consistent with the restrictions that private entities have historically imposed on their transit systems.  As Dr. Brennan Rivas explains in her declaration, "[p]rivate companies would have had the authority to decide where and how legally transported weapons could be stowed and carried by customers aboard their vehicles and within their stations."  (Rivas Decl., Ex. 5 at ¶ 13.)  And surviving records demonstrate

---

[33] Maryland state law also provides free "ridership on transit vehicles to any permanent employee in any unit of the Executive Branch of State government[.]"  Transp. § 7-711(a).  Restrictions on carrying firearms on public transit thus further the government's strong interest in, and preferred method of, keeping its workforce safe.

that railroad companies operating in the Reconstruction era did in fact restrict firearms on their trains.  For example, the North Pennsylvania Railroad's "'rules and regulations' document for conductors . . . specifically charged passenger conductors with the responsibility of preventing passengers from taking 'into the cars guns, dogs, valises, large bundles or baskets.'" (Rivas Decl., Ex. 5 at ¶ 13 & Ex. B); (*see* Rivas Decl., Ex. 5 at ¶ 14 (noting that railroad companies shipped firearms by "separating [them] from the passenger and placing [them] in a designated baggage space").)  During this period, various States vested railroads and their employees with the authority to police their trains, and that "[i]ncluded within this power . . . was a responsibility to enforce weapon regulations in effect at the time." (Rivas Decl., Ex. 5 at ¶ 14-15.)

Plaintiffs have presented nothing to rebut this historical tradition.  Nor can they, especially since the historical tradition has persisted to this day.  The four largest rail rapid transit systems in the United States by ridership—the New York City subway, the Washington, D.C. Metro, the Chicago "L," and the "T" in Massachusetts—all prohibit firearms under a state, local, or system rule.[34]

Instead, plaintiffs attempt to cobble together a historical tradition out of exceptions for "travelers" that appeared in various statutes that otherwise restricted the carrying of firearms. (ECF 13-1 at 17-18.)  But this term, as used in those statutes, did not have the freewheeling definition that plaintiffs wish to ascribe it.  As Dr. Rivas explains, this was "[f]ar from a blanket exception for people to go armed at all times outside their homes[,]" but was an affirmative

---

[34] *See* N.Y. Penal Law § 265.01-e(2)(n); D.C. Code § 7-2509.07(a)(6); 430 Ill. Comp. Stat. 66/65(a)(8); Mass. Bay Transportation Authority, Rider Rules and Regulations, available at https://www.mbta.com/safety/rider-rules-and-regulations.

defense that "was narrowly defined by state appellate courts."  (Rivas Decl., Ex. 5 at ¶ 9.)
This defense "encompassed a type of travel that separated a person, small group, or family
from the protections of the law that went hand-in-hand with organized society[.]" (Rivas Decl.,
Ex. 5 at ¶ 9.)  Thus, "[w]earing one's weapons in an unfamiliar town or city could fall within
the travel exception so long as such carriage was limited to merely passing through the area or
conducting one's business." (Rivas Decl., Ex. 5 at ¶ 9.)  But, contrary to plaintiffs' assertions,
it could not encompass a person carrying a firearm "within the routine of his daily business."[35]
*Eastlick v. United States*, 104 S.W.941, 942 (Indian Terr. 1907); (*see also* Rivas Decl., Ex. 5
at ¶ 9 (collecting cases denoting the limitations of the traveler exception).)

When plaintiffs forego private modes of transportation and opt to use the State's public
transit system for their own benefit, they do so under those rules that the people of Maryland,
through the General Assembly, have determined best serves their safety interests.  And because
Maryland's decision to restrict the carrying of firearms on public transit is consistent with
historical practice, plaintiffs' challenge to those restrictions must fail.

### 6.   State Parks and Forests

Finally, plaintiffs challenge regulations prohibiting the carrying of firearms in state
parks and state forest lands.  Like their challenge to publicly owned and operated public transit,
plaintiffs' challenge fails for multiple reasons.

---

[35] Even if being a "traveler" was somehow an exception or defense that limits the
application of a restriction on public transit, it would play no role in the disposition of plaintiffs'
facial challenge here.  "To succeed in a facial constitutional challenge, a movant 'must establish
that no set of circumstances exists under which [an act] would be valid.'" *Fusaro v. Howard*, 19
F.4th 357, 373 (4th Cir. 2021) (citation omitted)).

First, as with the challenge to public transportation, plaintiffs' claim is, by its nature, limited to parks and forests owned and operated by the State of Maryland.  Accordingly, just as a private park may restrict firearms as it sees fit on its own property, the State, as proprietor of lands dedicated to a recreational purpose, may restrict those who choose to enter these locations from carrying firearms.

Second, state parks and forests are also "sensitive places" that are outside of the scope of the Second Amendment.  This is because state parks and forests often host large gatherings of people, and specifically cater to children.[36]  (See Declaration of Daryl Anthony, Acting Deputy Director of the Maryland Park Service of the Maryland Department of Natural Resources, ¶¶ 4-6, attached as Exhibit 7 (noting that "Maryland State parks offer programs geared toward school-age children, including arts and crafts programs, educational programs and nature presentations . . .").)  The Department of Natural Resources "encourages children and families to visit the State forests and State parks, through advertising and other marketing methods." (Anthony Decl., Ex. 7 at ¶ 6.)  It is for these reasons, among others, that several courts have held that parks and similar recreational areas are sensitive areas where firearms may be prohibited.  See, e.g., GeorgiaCarry.Org v. U.S. Army Corps of Engineers, 212 F. Supp. 3d 1348, 1366-67 (N.D. Ga. 2016); Warden v. Nickels, 697 F. Supp. 2d 1221, 1229

---

[36] It is no response that state parks and forests cannot be sensitive places because they contain wooded or other remote areas that may not ordinarily be crowded or have children present. Plaintiffs' claim is a facial challenge, which is "disfavor[ed]", and therefore they must show that the prohibition on firearms in state parks cannot be applied in any circumstances.  See Fusaro, 19 F.4th at 373 (stating that facial constitutional challenge "'must establish that no set of circumstances exists under which [an act] would be valid'" (citation omitted)).

(W.D. Wash. 2010); *United States v. Masciandaro*, 648 F. Supp. 2d 779, 790 (E.D. Va. 2009), *aff'd*, 638 F.3d 458 (4th Cir. 2011); *Zaitzeff v. City of Seattle*, 484 P.3d 470, 479 (Wash. App. 2021).

Even if this Court determines that state parks and forests are not presumptively constitutional "sensitive places," restrictions on firearms in those locations nonetheless do not violate the Second Amendment because they are consistent with the Nation's historical tradition of firearm regulation.  (*See* Cornell Decl., Ex. 3 at ¶ 56 ("During the era of the Fourteenth Amendment there was little disagreement that state and local governments had the authority under the police power to regulate and prohibit guns in parks.").)

Any discussion of the historical tradition relating to parks must start with the fact that "[t]here were no modern-style parks in the era of the Second Amendment."  (Cornell Decl., Ex. 3 at ¶ 54.)  Instead, "[t]he creation of parks as we now know them began in the middle of the nineteenth century and was influenced by the slow impact of romanticism and the Transcendentalist ideas of visionaries such as Henry David Thoreau."  (Cornell Decl., Ex. 3 at ¶ 55.)  "[I]nspired [by] a new attitude toward nature and public spaces," the modern parks movement re-envisioned certain public spaces "as places of relaxation, repose, and recreation."  (Cornell Decl., Ex. 3 at ¶ 55.)  Thus, "[b]y the middle of the [nineteenth] century these new public spaces . . . had become places of refuge from the congestion, grime, and stresses of city life."  (Cornell Decl., Ex. 3 at ¶ 55); (*see also* Cornell Decl., Ex. 3 at ¶ 14 (noting "[t]he development of [modern-style parks] in [the] period before the Civil War was itself a response to the greater urbanization of the nation and a perception that America needed to create havens of tranquility to offset the negative impacts of the market revolution").)

The parks movement is perhaps "best exemplified by New York's Central Park," which opened in 1858.  (Cornell Decl., Ex. 3 at ¶ 55.)  From its inception, the adopted ordinances applicable to Central Park provided that "[a]ll persons are forbidden . . . to carry fire-arms[.]" (Ex. 37.)  As the modern parks movement spread across the country, so too did firearms restrictions.  Around the time the Fourteenth Amendment was ratified, laws were passed prohibiting firearms in public parks in the five most populous cities in the Nation: New York City (1858), Ex. 37; Philadelphia (1868), Ex. 39; Chicago (1873), Ex. 41; St. Louis (1881), Ex. 46; and Boston (1886), Ex. 49.  (Cornell Decl., Ex. 3 at ¶ 56.)  But these bans were not just limited to the Nation's largest municipalities.  Indeed, dozens of laws prohibited firearms in public parks in at least 14 States by 1900,[37] and in at least 24 States by 1921.[38]

Pertinent to this case, "[t]here was a close connection between the urban park movement and the rise of state parks."  (Cornell Decl., Ex. 3 at ¶ 57.)  Similarly, "[t]he federal government's decision to create Yellowstone [National Park] in 1872 added yet another type of park to America's roster of public spaces."  (Cornell Decl., Ex. 3 at ¶ 57.)   It is thus not surprising that Yellowstone National Park imposed a firearms ban in 1897, (Ex. 104, at 1), and

---

[37] These include jurisdictions in: (1) New York (1858), Ex. 37; (2) Pennsylvania (1868), Ex. 39; (3) Illinois (1873), Ex. 41; (4) California (1875), Ex. 42; (5) Missouri (1881), Ex. 46; (6) Massachusetts (1887), Ex. 49; (7) Utah (1888), Ex. 50; (8) Minnesota (1889), Ex. 51; (9) New Jersey (1908), Ex. 52; (10) Michigan (1891), Ex. 53; (11) Washington (1892), Ex. 57; (12) Delaware (1893), Ex. 58; (13) Indiana (1896), Ex. 63; and (14) Colorado (1898), Ex. 66.

[38] These include jurisdictions in: (15) Connecticut (1902), Ex. 69; (16) Texas (1904), Ex. 74; (17) Nebraska (1904), Ex. 75; (18) Tennessee (1909), Ex. 86; (19) Kentucky (1909), Ex. 88; (20) Virginia (1910), Ex. 89; (21) Alabama (1917), Ex. 95; (22) Wisconsin (1917), Ex. 97; (23) Vermont (1921), Ex. 100; and (24) North Carolina (1921), Ex. 101.

the federal government instituted regulations limiting firearms in all national parks in 1936 (Ex. 105).[39]

These laws demonstrate a robust historical tradition of laws that are not only analogous, *but substantively identical to*, the regulations at issue here. *See Maryland Shall Issue*, 2023 WL 4373260, at *11 (concluding that these laws "demonstrate that there is 'historical precedent' from before, during, and after the ratification of the Fourteenth Amendment that 'evinces a comparable tradition of regulation' of firearms in parks"). And it is significant that these laws, numerous as they were, stood without challenge until only very recently. *See Bruen*, 142 S. Ct. at 2133 (noting that one indicia of whether locational restrictions are constitutional is if there are, as a historical matter, "no disputes regarding the lawfulness of such prohibitions").

Nonetheless, in their motions, plaintiffs attempt to distract this Court from the robust history described above by pointing to locations that have existed since before the Founding, such as Boston Common, and then arguing that, because no restrictions on firearms at these locations have been located, there can be no relevant historical tradition on firearm regulation in "parks" generally. (ECF 13-1 at 15-16.) But this reasoning is flawed on many levels. First, it would be constitutional folly to attempt to derive a historical tradition from the *absence* of a particular type of regulation in such a small number of places. And it would be especially problematic to do so, given that the concept of a dedicated space for public recreation would have been a novel and undeveloped concept at the time. Moreover, plaintiffs mischaracterize

---

[39] That the federal government opted to ban firearms in national parks is especially pertinent, given that federal lands were indisputably governed by the Second Amendment irrespective of the incorporation doctrine.

the nature of the use of these few public spaces.  At the time of the Founding, Boston Common "was used primarily as a pasture, a place of execution, and site for the militia to muster and drill."  (Cornell Decl., Ex. 3 at ¶ 54.)  "Yet, even when used for militia purposes these public spaces were tightly regulated," with colonial "Massachusetts prohibit[ing] coming to muster with a loaded firearm."  (Cornell Decl., Ex. 3 at ¶ 54.)  Finally, and perhaps most importantly, plaintiffs ignore the integral role and purpose of the collective parks movement described above, and the fact that when parks proliferated throughout the Nation, firearms regulations were a complementary aspect of that movement.

Plaintiffs simply have no legitimate answer to the vast number of firearms regulations pertaining to public parks that were enacted in the era both before and immediately after the ratification of the Fourteenth Amendment.  Because these laws reflect and implement an understanding of the historical tradition of the right to bear arms embodied in the Second Amendment, plaintiffs' challenge to Maryland's substantively identical regulations should be rejected.

### 7.  A State Highway Rest Area

COMAR 11.04.07.12 provides that, at a highway rest area, "[t]he display or discharge of firearms . . .  is prohibited."  As a preliminary matter, however, no plaintiff has standing to challenge this prohibition.  *See Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 217 (4th Cir. 2020) ("[T]o bring a cognizable preenforcement challenge, a party must allege 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" (citation omitted)).  Here, no plaintiff has expressed any desire or intent to "display" or "discharge" their firearm at a rest area.

COMAR 11.04.07.12 is thus constitutional for these same reasons.  The Supreme Court in *Bruen* held that, although States may not prohibit public carry altogether, they could place limits on the manner in which handguns were carried.  *See Bruen*, 142 S. Ct. at 2146-47, 2156 (identifying a historical tradition of allowing States to prohibit either open or concealed carry, but not both).  Accordingly, just as Maryland may constitutionally prohibit individuals from openly carrying a handgun generally, Maryland may enact specific regulations that do the same.  In other words, because this prohibition on the "display" of a firearm does nothing more than prohibit the open carry of a firearm at a rest area (while leaving unaffected the ability to carry a concealed handgun), it is consistent with the historical tradition set forth in *Bruen* for restrictions on the manner in which a handgun may be carried.

### 8. Government Buildings and Property Under the Jurisdiction of the Department of General Services

Plaintiffs challenge Senate Bill 1's restriction on firearms in government buildings, as well as the provisions in COMAR 04.05.01.01 and 04.05.01.03 that restrict firearms on property under the jurisdiction of the Department of General Services.  These claims fail for multiple reasons.

First, for the reasons discussed above in Section III, to the extent that any government property is being operated in the government's proprietary capacity, any restrictions on the carrying of firearms at any such properties (both buildings and grounds) will be constitutional.

Second, any restrictions in government buildings are constitutional because the Supreme Court has already expressly recognized such locations as "sensitive places."  In *Heller*, the Supreme Court stated expressly that "nothing in [its] opinion should be taken to cast doubt on . . . laws forbidding the carrying of firearms in sensitive places such as schools

and *government buildings*[.]"  554 U.S. at 626 (emphasis added).  Then, in *McDonald*, the Court "repeat[ed] those assurances."  561 U.S. at 786.  Finally, in *Bruen*, the Supreme Court once again reaffirmed *Heller*'s language regarding the constitutionality of firearms restrictions at "government buildings."[40]  *Bruen*, 142 S. Ct. at 2133.

Any analysis regarding firearms restrictions at government buildings should end there. Indeed, because plaintiffs have brought a facial challenge, they "must 'establish that no set of circumstances exists under which the [law] would be valid,' or show that the law lacks 'a plainly legitimate sweep[.]'" *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021) (citations omitted); *Martin v. Lloyd*, 700 F.3d 132, 135 (4th Cir. 2012) ("[A] facial challenge is ineffective if the statute has a 'plainly legitimate sweep.'").  Yet, as Plaintiffs concede, the Supreme Court has also already specifically approved of firearms restrictions in several types of government buildings—courthouses, polling places, and legislative assemblies.  (ECF 13-1 at 24); *Bruen*, 142 S. Ct. at 2133.  Accordingly, because there is no dispute that firearms can be prohibited at some government buildings, plaintiffs' claim fails.[41]

Moreover, although plaintiffs claim that *Bruen*'s express reference to "government buildings" does not extend to all government buildings, they ignore the fact that the Court in

---

[40] The concurrences of three justices in *Bruen* reiterated this point.  *See Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) ("Nor have we disturbed anything that we said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns."); *id.* at 2162 (Kavanaugh, J., concurring) (restating the language in *Heller* regarding "government buildings" as "sensitive places").

[41] Plaintiffs claim that "[d]efendants must justify every one of its Carry Bans, including each of its bans on carrying a handgun in each type of government building, with history and tradition."  (ECF 13-1 at 24.)  In other words, plaintiffs assert that they need only announce an intent to challenge a law, and that the defendants must then justify each and every possible application of that law.  But this is the opposite of how a facial challenge works.

*Bruen* did not qualify that phrase in any way.  As a judge of this Court has noted, "[n]owhere in *Bruen* (nor in *Heller*, for that matter) is the definition of 'sensitive places' narrowed to government buildings devoted to, e.g., national security or the exercise of political functions." *United States v. Power*, __ F. Supp. 3d __, No. 20-po-33-GLS, 2023 WL 131050, *5 (D. Md. Jan. 9, 2023).  Instead, the phrase "government buildings" is "presented as broadly as possible, allowing the reader to consider all possible subtypes" of government buildings.  *Id*.  The Court observed:  "If the *Bruen* Court intended [its reference to 'government buildings'] to restrict the applicability of the 'sensitive places' doctrine to, e.g., a small subset of government buildings, the Supreme Court could have explicitly made that limitation."  *Id*.; *see also United States v. Marique*, __ F. Supp. 3d __, No. 8:21-po-2263-AAQ, 2022 WL 17822443, at *8-9 (D. Md. Dec. 20, 2022) (rejecting any attempt to limit the scope of the phrase "government buildings" to only those buildings that "host core government functions").

Even if *Bruen*'s reference to "government buildings" cannot be read to include *all* types of government buildings, this Court should nonetheless decline to adopt plaintiffs' narrow view of that phrase.  Instead, it is clear that *Bruen*'s reference to "government buildings" encompasses, at the very least, those buildings where government services or other administrative functions are being performed.  Indeed, applying firearms restrictions at these types of locations not only furthers Maryland's (and any government's) inherent interest in protecting the everyday functioning of governmental operations, but is also (for perhaps those very reasons) consistent with historical tradition.  As far back as the 1328 Statute of Northampton, individuals were prohibited from going armed "before the King's justices, or other of the King's ministers doing their office."  2 Edw. 3 c. 3 (1328).  And, as discussed above, these restrictions made their way across the Atlantic when jurisdictions such as Virginia

and North Carolina enacted or retained their own versions of the Statute of Northampton. (Ex. 12 (Virginia, 1786)); (Ex. 13 (North Carolina, 1792)). "Limit[ing] the ability of individuals to bring firearms into areas where [government] employees are performing their duties is sufficiently analogous to the Virginia and North Carolina founding-era regulations banning 'force and arms' in the presence of the 'ministers' and 'justices' performing their duties." *Power*, 2023 WL 131050, at *11. "[I]n both cases there is the logical interest of preventing the disruption of government vis a vis the introduction of firearms, potentially putting those executing government functions in harm's way." *Id.* Because restrictions on firearms in buildings where government employees are performing government functions have a historical tradition dating to the Founding (and beyond), those restrictions are constitutional.

Finally, to the extent that plaintiffs challenge firearms restrictions on "grounds" (i.e., not buildings) of government property that are under the jurisdiction of the Department of General Services (and where the property is not being operated by the government in a proprietary capacity), firearms restrictions would be valid to the extent that the grounds are associated with a government building that is appropriately deemed a "sensitive location." Indeed, where buildings house government officials and employees performing official governmental functions, there is no compelling reason why the grounds adjacent to such a building should be treated any differently than the buildings themselves. It is perhaps for that reason that courts have had no trouble concluding that, where a particular building may properly be considered a sensitive place for purposes of restricting firearms, those restrictions may constitutionally extend to any grounds that are reasonably adjacent to that building.[42] *See,*

---

[42] Because of the specific contexts in which courts have decided these cases, no court has yet needed to articulate a definitive standard for determining whether particular grounds are

59

*e.g.*, *United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019) ("As for the Maryland Avenue parking lot, . . . we conclude that it is sufficiently integrated with the Capitol for *Heller I*'s sensitive places exception to apply."); *Bonidy v. United States Postal Service*, 790 F.3d 1121, 1128 (10th Cir. 2015) ("[T[he security of the postal building itself is integrally related to the security of the parking lot adjacent to it."); *United States v. Dorosan*, 350  Fed. App'x 874, 875 (5th Cir. 2009) (upholding a conviction for possessing a firearm in the parking lot of a post office); *Power*, 2023 WL 131050, at *12 (upholding restrictions on carrying firearms "[w]ithin [National Institutes of Health] grounds").

The ability to constitutionally restrict firearms within the grounds of government property is further supported by the historical tradition of "buffer zones" that restrict the carrying of firearms in areas near to, but outside of the grounds of, an otherwise sensitive place.[43]  *See Maryland Shall Issue*, 2023 WL 4373260, at *13 (noting that there is a historical tradition of "buffer zones" that prohibit the carrying of firearms within a certain distance of certain sensitive places).  As a judge of this Court recently articulated, "[s]uch restrictions were plainly enacted to further presumptively valid restrictions on the right to self-defense in the area immediately adjacent to such locations for purposes of public safety and to allow the activity at issue, such as voting or the education of children, to occur without concern for violence or other interruption."  *Id*.  Because restrictions on the carrying of firearms may be

---

sufficiently associated with an otherwise sensitive place such that a restriction may constitutionally extend to those grounds.  This Court need not do so here either.  Instead, because plaintiffs' challenge is a facial one, it is sufficient that there are *some* grounds (say, for example, the grounds within State Circle) that would plainly be considered sufficiently associated with a location that is unquestionably a sensitive place under *Bruen*.

[43] With the exception of restrictions at public demonstrations, *see* Section IV.A.10, none of the provisions challenged in this case implicates a "buffer zone."

constitutional even outside the bounds of sensitive places, there can be no question that similar restrictions will be constitutional where they extend no further than the actual grounds of property on which a government building is located.

As a final note, synthesizing the relevant principles together reveals a coherent and administrable doctrine for analyzing whether a firearms restriction on government property will be constitutional.  First, to the extent that a building houses government officials or government administrative services, it is a "sensitive place" as referenced in *Bruen*.  And where a government building is a sensitive place, firearms restrictions may constitutionally extend to those grounds that are adjacent to, or integrally connected with, that building. Second, where government property—whether buildings or grounds—is being operated in a proprietary capacity, the government may act in that capacity—just like any private property owner—to restrict the carrying of firearms. In certain other locations, such as sidewalks and streets, firearms restrictions would be presumptively unconstitutional, subject to exceptional circumstances (such as restricting firearms on the sidewalk area in front of a restaurant where a presidential candidate is visiting).

### 9.  School Grounds[44]

Plaintiffs next challenge restrictions on the public carrying of firearms on the grounds of schools.[45]

---

[44] Plaintiffs' challenge extends to the grounds of both public and private schools.  Although restrictions at both private and public schools are constitutional for the reasons stated above, *see Maryland Shall Issue*, 2023 WL 4373260, at *9, restrictions at public schools are also constitutional to the extent that schools are being operated by governments in their proprietary capacity.

[45] In their complaint, plaintiffs assert that they are challenging restrictions on the carrying of handguns at a preschool or prekindergarten facility or the grounds of the facility.  (ECF 1 at ¶50.) Plaintiffs, however, have failed to identify any individual who intends to carry a firearm onto

Plaintiffs do not challenge restrictions as they pertain to the school buildings themselves. This is not surprising, given that *Bruen* expressly recognizes schools as sensitive places where the carrying of firearms may be restricted. *Bruen*, 142 S. Ct. at 2133 (citing *Heller*, 554 U.S. at 626); *see also Kovacic v. Cuyahoga County Dept. of Children and Family Services*, 724 F.3d 687, 707-08 (6th Cir. 2013) (noting that "[t]he Second Amendment protects a right to carry guns, . . . but not in school zones" (citing *Heller*)). But, as set forth above in Section IV.A.8, where firearms restrictions are constitutional within a building that is properly deemed a sensitive place, firearms restrictions will also be constitutional as applied to the grounds adjacent to those buildings.

These principles are even more salient as they relate to schools. Unlike government buildings, where most of the government functions are performed indoors, many school activities, such as recess or even certain lessons, take place outside on school grounds that are specifically designed for children's activities. Children also often walk outside between class buildings or remain outside as they await the beginning of the school day (or celebrate its end). The purposes underlying firearms restrictions—to protect children and to preserve the sanctity of the learning environment—are thus as equally served by restrictions on school grounds as restrictions within the school buildings themselves. *See Hall v. Garcia*, No. C 10-03799 RS, 2011 WL 995933, *4 (N.D. Cal. Mar. 17, 2011) (noting that, "[f]or the same reason that

---

the grounds of a daycare, and therefore no plaintiff has standing to challenge this restriction. *See Southern Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 183-84 (4th Cir. 2013). Even if the plaintiffs had established standing, and to the extent that Plaintiffs' challenge actually does implicate such restrictions, they are constitutional for the same reasons that restrictions on the grounds of schools generally are constitutional. *Maryland Shall Issue*, 2023 WL 4373260, at *9.

schools are sensitive places—the presence of large numbers of children either at school or traveling to and from it—possession of firearms within some distance around such locations similarly presents the risk of danger and disruption"). For perhaps these reasons, plaintiffs have failed to articulate any reason why school grounds should be treated any different than the school buildings themselves.[46] And as with grounds adjacent to sensitive locations generally, courts have had little difficulty concluding that the entire grounds of school campuses are places where firearms restrictions are constitutional. *See, e.g.*, *United States v. Walter*, No. 3:20-CR-0039, 2023 WL 3020321, *8 (D.V.I. Apr. 20, 2023) ("Reasoning by analogy to the relevant historic tradition . . ., the Court finds that the area within 1,000 feet of the school grounds is within the scope of 'sensitive places' as contemplated by *Heller* and required to ensure security of the school's occupants and to prevent gun violence."); *Power*, 2023 WL 131050, at * 12 (concluding that NIH is "similar to a college campus," and thus upholding restrictions "[w]ithin NIH grounds"); *Hall*, 2011 WL 995933, at *4 (upholding the federal Gun-Free School Zones Act); *DiGiacinto v. Rector & Visitors of George Mason Univ.*,

---

[46] It appears that plaintiffs' main concern is that they will not be able to carry their handgun "in a car while in the pick-up, drop-off lines, and in the school parking lot." (ECF 13-1 at 23.) But plaintiffs are not prevented by law from doing so, at least with respect to private schools. Although Senate Bill 1 does prohibit the carrying of firearms on the grounds of a private primary or secondary school, Senate Bill 1 provides an exemption for a firearm that is carried or transported in a motor vehicle, so long as the firearm is either carried by an individual with a valid public carry permit or is locked in a container. 2023 Md. Laws ch. 680 (to be codified at Crim. Law § 4-111(b)(11)). In other words, an individual with a carry permit breaks no laws by keeping a handgun in their vehicle when they pick up their children from a private school. And with respect to public schools, this concern appears to be a simple matter of convenience, as there is nothing preventing a permit holder from waiting on a public street adjacent to the school. *See Teixeira v. County of Alameda*, 873 F.3d 670, 680 (9th Cir. 2017) ("[T]he Second Amendment does not elevate convenience and preference over all other considerations.")

704 S.E.2d 365, 370 (Va. 2011) (concluding that because GMU was a school, gun restrictions could apply to its entire campus).

### 10. Public Demonstrations

Plaintiffs challenge § 4-208(b)(2) of the Criminal Law Article, which prohibits an individual from "hav[ing] a firearm in the person's possession or on or about the person at a demonstration in a public place or in a vehicle that is within 1,000 feet of a demonstration in a public place[.]"  An individual, however, becomes subject to this prohibition only after "(i) the person has been advised by a law enforcement officer that a demonstration is occurring at the public place; and (ii) the person has been ordered by the law enforcement officer to leave the area of the demonstration until the person disposes of the firearm." Crim. Law § 4-208(b)(2).

As a preliminary matter, no plaintiff has standing to challenge this prohibition.  To establish standing, a plaintiff must "demonstrate they have suffered an injury in fact," which "ensures that they have 'a personal stake in the outcome of the controversy.'" *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 210 (4th Cir. 2020) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  "Under this rubric, the Supreme Court has defined such an injury as "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Maryland Shall Issue*, 971 F.3d at 210 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)).

Justiciable injury for purposes of Article III must be "real and immediate" and not purely speculative and abstract.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149,

158 (2014) (internal quotation marks omitted).  "'[A]llegations of *possible* future injury' are

not sufficient."  *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013) (citation omitted; emphasis

in original); *see also Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979)

(finding no standing where claims are "imaginary," "speculative," "hypothetical," or

"abstract" (citations omitted)).

Here, no plaintiff faces an "actual or imminent" threat of prosecution for violating this

statute.  Instead, any enforcement of this statute is entirely hypothetical and would "rel[y] on

a highly attenuated chain of possibilities."  *Clapper*, 568 U.S. at 410; *Beck v. McDonald*, 848

F.3d 262, 272 (4th Cir. 2017).  For example, Mrs. Kipke has alleged an intent to carry a

handgun at "a demonstration in a public place (and/or in a vehicle that is within 1,000 feet of

a demonstration in a public place)."  (ECF 1, ¶ 12; ECF 12-2 ¶ 7.)  But simply carrying a

handgun at a public demonstration is not an offense under the statute.  Rather, two independent

events must still occur.  First, the individual must be "advised by a law enforcement officer

that a demonstration is occurring at the public place."  Yet a law enforcement officer has no

legal obligation to make this advisement (whether generally or to Mrs. Kipke in particular),

even if a public demonstration is in fact occurring.  Moreover, the individual must be ordered

by the law enforcement officer to leave and/or dispose of the firearm.  This provision thus

requires an order from a law enforcement directed to a particular individual regarding a

particular firearm.  Putting aside the steps that would be required to occur to reach this point,

because she intends only to carry her handgun in a concealed manner, Mrs. Kipke has not

explained how a law enforcement officer would become aware that she was carrying a firearm

in the first place.  As a result, neither Mrs. Kipke nor any other plaintiff face an actual (let alone imminent) harm that is cognizable under the law.[47]

In any event, a prohibition on the possession of firearms at public demonstrations is supported by the historical record.  As discussed above, several states and territories—Texas, Tennessee, Georgia, Missouri, Arizona, Oklahoma, Idaho, and Montana (as well as numerous municipalities)—historically prohibited carrying firearms at places of public assembly, public gathering, or public assemblage.  (*See* Exs. 14, 15, 16, 17, 18, 19, 20, 21, 22.)  Maryland's ban on firearms at or near public demonstrations is thus constitutional given the foregoing longstanding laws that similarly banned firearms at public assemblies.

## B.     Even if Plaintiffs Have Standing, the Private Building Consent Rule Fails to Implicate Conduct Covered by the Second Amendment, and in Any Event is Supported by Historical Tradition.

In Count One of their complaint, plaintiffs also challenge Senate Bill 1's prohibition on carrying a firearm into another person's private building unless the owner or their agent has posted clear and conspicuous signage or given express permission allowing individuals to carry a firearm into that building (hereinafter the "private building consent rule").  (ECF 1, Compl. ¶¶ 15-17, 50.)  Plaintiffs allege that the private building consent rule injures them by impractically burdening their Second Amendment right to carry firearms for self-defense. More specifically, plaintiffs claim that, were it not for the private building consent rule, they would bring their firearms into privately-owned buildings that they typically visit that do not expressly prohibit firearms on their property, such as grocery stores, drug stores, and gas

---

[47] Underscoring the remoteness of any prosecution is the lack of any showing that anyone has ever been prosecuted for a violation of this statute.

stations.  As set forth below, plaintiffs' claim fails for several reasons: (1) plaintiffs lack

standing to challenge the law, (2) the private building consent rule does not implicate conduct

within the scope of the Second Amendment, and (3) the law is consistent with the historical

tradition of firearm regulation.

> **1.** **Plaintiffs Lack Standing Because They Have Not Sustained an Injury, and Any Purported Injuries They Might Sustain are Neither Traceable to the Actions of the State nor Redressable by this Court.**

To establish Article III standing, a plaintiff must allege (1) an "injury in fact" (2) that

is "fairly traceable" to the defendant's conduct and (3) "that is likely to be redressed by the

requested relief." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Plaintiffs'

claim fails at all three levels.

First, plaintiffs have failed to allege that they will suffer a legally cognizable injury.

"To seek injunctive relief, a plaintiff must show that he is under threat of suffering 'injury in

fact' that is concrete and particularized; the threat must be actual and imminent, [and] not

conjectural or hypothetical." *Summers v. Earth Island Inst*., 555 U.S. 488, 493 (2009).  Here,

however, plaintiffs' alleged injury is entirely hypothetical.  Their claim is based on the premise

that there exists some private building (that plaintiffs wish to enter armed) for which the owner

both (1) consents to individuals entering their building armed, and (2) for whatever reason will

decline to express that consent through a sign (or other express permission).  Because plaintiffs

have identified no such building, they have failed to meet their burden to show a

constitutionally-cognizable injury.

For similar reasons, plaintiffs' allegations do not establish traceability. A plaintiff fails

to establish traceability when the injuries that are alleged are attributable to the "broad and

legitimate" discretion of independent third parties not before the court, unless the defendant's conduct had a "determinative or coercive effect" on the third party's actions. *See Lujan*, 504 U.S. at 560; *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976); *Bennett v. Spear*, 520 U.S. 154, 169 (1997).  For example, in *Simon*, the Supreme Court held that indigent patients lacked standing to challenge an IRS ruling that extended charitable tax exemptions to nonprofit hospitals that did not provide hospitalization services to patients who could not pay. 426 U.S. at 29-30.  The Court so held because plaintiffs' alleged harm—reduced access to hospital services—was not traceable to the IRS's ruling. *Id.* at 42-43. Instead, their alleged harm was properly attributable to the legitimate discretion of hospitals, which could decide to reduce access to hospital services for indigent patients for reasons other than the tax implications. *Id.* at 43.  The same is true here; plaintiffs' alleged harm is not attributable to any state actor, but rather the legitimate discretion of the property owners.

Indeed, plaintiffs' alleged harm flows from property owners withholding consent to the wearing, carrying, or transporting of firearms on their property, not from the State.  But the private building consent rule preserves property owners' ability to allow or prohibit firearms on their property at their discretion.  Owners of private buildings—even those open to the public—already have the right to exclude individuals from their grounds for carrying a firearm. *See Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021) (stating that the right to exclude is "'one of the most essential sticks in the bundle of rights that are commonly characterized as property'"); *cf. Lloyd Corp. v. Tanner*, 407 U.S. 551, 569 (1972) ("Nor does property lose its private character merely because the public is generally invited to use it for designated purposes.").  Further, the private building consent rule preserves property owners' legitimate discretion to allow firearms on their premises through signage or express

permission.  *Compare* 2023 Md. Laws ch. 680 (to be codified at Crim. Law § 6-411(d)) (preserving property owner discretion); *with Bennett*, 520 U.S. at 169 (concluding that plaintiffs had standing under "determinative or coercive effect" theory to challenge administrative opinion from non-action agency because statutory scheme "presupposed" administrative opinion would play a "central role" in action agency decision making). Consequently, plaintiffs' alleged harm ultimately depends on the legitimate discretion of property owners, not the State. Because "'legitimate discretion' breaks the chain of constitutional causation" necessary for traceability, *Turaani v. Wray*, 988 F.3d 313, 317 (6th Cir. 2021), it eliminates plaintiffs' standing along with it.

Finally, plaintiffs fail to establish redressability. Plaintiffs must show that a favorable judicial decision will "likely, as opposed to merely speculative[ly]," eliminate their alleged injury. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000). In *Lujan*, the Supreme Court concluded that plaintiffs failed to establish redressability when they asked the court to enjoin regulations that they alleged would increase funding for programs that harmed endangered species. 504 U.S. at 562-63. The Court reasoned that even if it enjoined the regulation, their order would not stop private entities and agencies arguably not bound by the regulations from funding the programs at issue and the plaintiff's alleged harms could persist. *Id.* at 570-71. Similarly, when the private building consent rule takes effect, there is no certainty that plaintiffs' alleged "injury"—not being able to carry a firearm into particular private buildings—would dissipate. Plaintiffs have not alleged that any establishment would consent to their carrying firearms absent the private building consent rule, but would not do so if the private building consent rule took effect. Because Senate Bill 1 has no tangible effect on a building owner's ultimate decision whether to allow firearms into their

building, plaintiffs fail to establish redressability and therefore lack standing.  *Cf. Department of Education v. Brown*, 143 S. Ct. 2343, 2353 (2023) ("Nor have we ever accepted that an injury is redressable when the prospect of redress turns on the Government's wholly discretionary decision to create a new regulatory or benefits program.")

<blockquote>

**2.      The Text of the Second Amendment Does Not Cover the Plaintiffs' Conduct Because the Second Amendment does not Bestow the Right to Carry Arms into Another's Building Absent Consent.**

</blockquote>

In any case, plaintiffs still fail because they cannot meet their burden under *Bruen*'s first step to show that the plain text of the Second Amendment covers plaintiffs' conduct at issue.  *Bruen*, 142 S. Ct. at 2129-30.  Only upon this showing must the State demonstrate that its regulation is consistent with the Nation's historical tradition of firearm regulation.  *Id.*  In *Heller*, the Court examined history to determine that the scope of the Second Amendment's text (i.e. "the right . . . to keep and bear arms") included a right to carry in the home.  554 U.S. at 581-95, 626-27.  And in *Bruen*, the Court extended that right to include a "general right" to carry publicly.  142 S. Ct. at 2134.  But neither decision addressed whether "the right" embodied in the Second Amendment overrides a property owner's right to exclude.  *See Bruen*, 142 S. Ct. at 2134 ("Like *Heller*, we 'do not undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment.'").  Here, plaintiffs fail to make the predicate showing that the Second Amendment's text confers a right to carry firearms into another's building absent their consent.  As a result, plaintiffs failed to satisfy the first step in *Bruen*, obviating the need for further analysis under the Second Amendment.

Indeed, plaintiffs' complaint does not challenge private property owners' right to exclude an individual from their buildings for carrying a firearm.  Instead, they allege that the

private building consent rule generally burdens their right to carry in public, but without discussing the scope of that right. These bare allegations do not establish that the plain text of the Second Amendment allows them to carry firearms onto another's property absent consent.

In fact, history suggests the opposite. "The right" codified in the Second Amendment was a preexisting right in English common law. *Heller*, 554 U.S. at 592. Therefore, as applied to private property, the Second Amendment right is best understood in light of the common law history of private property rights. *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1261 (11th Cir. 2012). At English common law, the right to exclude was fundamental to property rights. *Id.* at 1262. Blackstone wrote: "There is nothing which so generally strikes the imagination, and engages the affections of mankind, as the right of property; or that sole and despotic dominion which one man claims and exercises over the external things of the world, in total exclusion of the right of any other individual in the universe." *Id.* (quoting 2 William Blackstone, *Commentaries* *2); *see Cedar Point Nursery*, 141 S. Ct. at 2072 (citing the same). A guest was only allowed to enter or stay on private property with the owner's permission and was removable at the owner's discretion. *GeorgiaCarry.Org*, 687 F.3d at 1262. Tort law supported that right by granting private property owners a private cause of action of trespass against any individual who entered their property without consent. *Id.* at 1263 (citing 3 William Blackstone, *Commentaries* *209). This system reflected representative views of the time that the rights of "personal security," "personal liberty," and "private property" were "inviolate" and equally necessary for the preservation of civil liberties. *Id.* at 1265 (citing 1 William Blackstone, *Commentaries* *120). Thus, the English common law right to self-defense that the Framers memorialized in the Second Amendment was not meant to "expand, extend or enlarge the individual right to bear arms at the expense of other

71

fundamental rights."  *Id.* at 1264.  It is against this historical background that the Framers wrote, and the people adopted, the Second Amendment.  *Id.*

The Framers shared Blackstone's strong view of property rights.  Influential colonial leaders and scholars embraced the concept that an individual's "right to control his or her own private property occupied a special role in American society and in our freedom." *Georgiacarry.org*, 687 F.3d at 1264 (citing William Tudor, *Life of James Otis* 66-67 (1823); John Locke, *Two Treatises on Government*, 209-10 (1821)).  The Framers saw the protection of the right to own and acquire property as a paramount goal for the new Constitution.  *See* James W. Ely, *The Guardian of Every Other Right: A Constitutional History of Property Rights*, 43 (Oxford University Press 2008).  Like Blackstone, the Founders believed that the defense of both property and personal security rights were core aims of government and essential to liberty.  (*See* Cornell Decl., Ex. 3 at ¶ 36 ("Anglo-American constitutionalism was founded on the Lockean trinity of life, liberty, and property.")); The Federalist No. 10 (James Madison) (favoring republicanism over "pure democracy" because the latter is "incompatible with personal security or the rights of property"); James W. Ely, *supra*, at 43.  It defies reason to suggest that the Founders would consider property owners' fundamental right to exclude others from their property to be nonnegotiable in every instance except when another individual wanted to bring firearms into their private buildings.  Indeed, as Professor Cornell explains, "this robust view of property rights was captured in a celebrated English case where the Lord Chief Justice of the King's Bench summarized the implications of [the Blackstonian] view for English law: 'our law holds the property of every man so sacred, that no man can set his foot upon his neighbor's close without his leave; if he does he is a trespasser, though he

does no damage at all; if he will tread upon his neighbor's ground, he must justify it by law.'" (Cornell Decl., Ex. 3 at ¶ 37 (citing *Entick v. Carrington*, 95 Eng. Rep. 807 (K.B. 1765).)

The State thus does not offend the Second Amendment by adopting a framework governing private property that best effectuates private owners' preferences. The people, through their elected representatives, should have the ability to adopt the rules that best suit their private rights and the circumstances under which those rights must be respected. And the evidence demonstrates that the private building consent rule does, in fact, effectuate the preferences of the majority of Marylanders. *See* Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J. L., Medicine & Ethics 183, 189-90, Table A4 (2020) (finding statistically significant majority of Americans and Marylanders reject default right to carry weapons onto other people's property).

That the majority of Marylanders would support this policy choice is not surprising. For over 50 years, Marylanders operated under a legal and social landscape in which only those individuals who had an atypical need for self-defense were permitted to carry handguns publicly. As critics of that system were quick to point out, Maryland's good-and-substantial-reason requirement resulted in relatively few individuals carrying a handgun publicly. And one consequence of that was that Marylanders could go about their daily lives with the understanding that very few ordinary citizens would be armed. But now that the good-and-substantial-reason requirement has been eliminated, there are significantly more people who are permitted to carry a handgun publicly in Maryland.[48] Yet because Maryland has opted for

---

[48] *See* Erin Cox, *Md. tightened gun laws after watershed high-court ruling. The NRA sued.*, The Washington Post, May 16, 2023 (noting that approved public carry permits "skyrocketed" from 39,797 as of July 1, 2022 to 125,233 as of May 2023).

a concealed-carry only regime, as it is entitled to do under *Bruen*, Marylanders are left in the dark as to who may be carrying a firearm. By requiring individuals to receive permission before entering a private building with a firearm, the private building consent rule thus furthers the important purpose of allowing Marylanders to be better informed about who may be carrying a firearm into their buildings.

Moreover, the State's ability to set the rules for entry on private property is consistent with the fact that state legislatures regularly set reversible defaults to effectuate the preferences of their constituents in cases of silence. *See, e.g.,* Md. Code Ann., Est. & Trusts, § 3-101 (intestacy statute governing property distribution given decedent's silence on subject); Md. Code Ann., Comm. Law § 2-314 (implying warranty of merchantability "[u]nless excluded or modified" by parties). The reversibility of the private building consent rule in particular mitigates constitutional concerns. For example, in *Sveen v. Melin*, 138 S. Ct. 1815 (2018), the Supreme Court held that a Minnesota statute automatically revoking a former spouse's insurance beneficiary designation following divorce did not violate the Contracts Clause because it effectuated the presumed intent of policy holders and was easily reversible. *Id.* at 1819, 1825. The private building consent rule similarly effectuates the presumed intent of property owners and is easily reversible by those who personally hold another preference.

Thus, importantly, the State's private building consent rule maintains the proprietor's discretion. As a result, any limitation plaintiffs experience on their right to carry is derivative not of some state-sanctioned policy, but rather the independent decision of a property owner who withholds (or provides) consent. Plaintiffs ask this Court to force the foundational rights of property owners to give way to the plaintiffs' individual right to carry a firearm for self-defense. But the right to exclude "is a fundamental element of the property right that cannot

74

be balanced away." *Cedar Point Nursery*, 141 S. Ct. at 2077 (quotation omitted).  Accordingly, plaintiffs fail to meet their burden to establish that the plain text of the Second Amendment covers their ability to carry their firearms into another's private building without the owner's consent.  Having failed to meet that burden, plaintiffs' claim fails.

> **3.    Even if this Court Concludes that the Text of the Second Amendment Covers Plaintiffs' Conduct, the Private Building Consent Rule is Consistent with the Nation's History and Tradition of Firearm Regulations.**

As set forth above, the State may show that a regulation is consistent with the Nation's history and tradition of firearm regulations by identifying analogous historical regulations throughout the Nation's history.  *Bruen*, 142 S. Ct. at 2132-33.  Although these historical regulations may range from the pre-Founding era to the Reconstruction era, ultimately the analogous regulation inquiry is meant to reveal whether the original public understanding of the Second Amendment right at the time of ratification or incorporation would permit the modern regulation.  *See id.* at 2136-38.

The statutes discussed below merely effectuate the robust common law view of private property rights at the Founding discussed above.  This is important because the operative analysis here relates not to restrictions that specifically affect firearms, but rather the background principles against which the Second Amendment was adopted.  And because of our English common law tradition, it would be error to draw dispositive significance from the absence of enacted statutes that expressly set forth these principles.  Instead, looking to the common law discussed above reveals that there would have been a fundamental understanding at the time of the Founding that *all* entry onto another's land without consent constituted a trespass, even though the entrant "does no damage at all."  (Cornell Decl., Ex. 3 at ¶ 37 (citation

omitted).)   As Professor Cornell explains, because "[i]t would have been unthinkable to members of the Founding generation that any person could enter another's land armed, without permission or appropriate legal authority," Maryland's private building consent rule "simply restores the legal rule in place at the Founding."  (Cornell Decl., Ex. 3 at ¶¶ 36, 38); (Cornell Decl., Ex. 3 at ¶ 38 ("The prohibition on entering another's land without permission was part of the background assumptions against which the right to keep and bear arms would have been understood by those who wrote it and enacted the Second Amendment into law.").)

Nonetheless, the following Colonial-era statutes reinforce this history and tradition of making firearm carriage onto another's property a trespass absent consent.  In 1715, Maryland imposed criminal penalties against anyone "of evil fame, or a vagrant, or dissolute liver, that shall shoot, kill or hunt, or be seen to carry a gun, upon any person's land, whereon there shall be a seated plantation, without the owner's leave, having been once before warned."  (Ex. 24.) A 1721 Pennsylvania Colony statute made it unlawful for anyone "to carry any gun or hunt on the improved or inclosed lands of any plantation other than his own, unless he has license or permission from the owner of such lands or plantation."  (Ex. 25.) And in 1722, New Jersey passed a similar statute recognizing that "divers[e] abuses have been committed and, great Damages and Inconveniences arisen by Persons carrying of Guns and presuming to hunt on other Peoples Land."  (Ex. 26.)

In 1763, New York passed a law providing that nobody "other than the Owner, Proprietor, or Possessor, or his or her white Servant or Servants," shall "carry, shoot, or discharge any Musket, Fowling-Piece, or other Fire-Arm whatsoever, into, upon, or through any Orchard, Garden, Cornfield, or other inclosed Land whatsoever, within the City of New-York, or the Liberties thereof, without Licence in Writing first had and obtained for that

Purpose from such Owner, Proprietor or Possessor." (Ex. 27.) The New York legislature intended the statute to "more effectually [] punish and prevent" "idle and disorderly" individuals from "hunt[ing] with Fire-Arms, and to tread down the Grass, and Corn and other Grain standing and growing in the Fields and Inclosures there, to the great Danger of the Lives of his Majesty's Subjects," and "the grievous Injury of the Proprietors. *Id.* In 1771, New Jersey passed another statute prohibiting individuals from carrying "any Gun on any Lands not his own, and for which the Owner pays Taxes, or is in his lawful Possession, unless he hath License or Permission in Writing from the Owner or Owners or legal Possessor." (Ex. 28.) And in 1789, Massachusetts enacted a law, applicable to several islands in Dukes County, that made it unlawful for a person to "be seen with any gun or guns" unless the person had "the special license of the proprietors of the said Islands, or shall be able to shew sufficient reason therefor." (Ex. 29.)

Legislatures passed similar laws in the Reconstruction era. For example, in 1865 Louisiana passed a law declaring that "it shall not be lawful for any person or persons to carry fire-arms on the premises or plantations of any citizen, without the consent of the owner or proprietor, other than in lawful discharge of a civil or military order." (Ex. 30.) The next year, Texas passed a nearly identical statute. (Ex. 31.) And in 1893, Oregon made it "unlawful for any person, other than an officer on lawful business, being armed with a gun, pistol, or other firearm, to go or trespass upon any enclosed premises or lands without the consent of the owner or possessor thereof." (Ex. 32.)

These laws are relevantly similar to the State's private building consent rule. A law is "relevantly similar" if it uses similar means to achieve similar purposes. *Bruen*, 142 S. Ct. at 2133. Here, the private building consent rule and its analogs use the law of trespass as an

incentive for firearm owners to seek consent from property owners before they enter armed. Property owners are then better equipped to be able to exercise their property rights by choosing to allow or prohibit a guest to carry a firearm on their premises according to their preference. Without this incentive, property owners may never know whether a guest is armed and could not meaningfully exercise their right to exclude for the security and protection of themselves and their property. Maryland's law even facilitates this exchange of information between firearm owners and proprietors by excluding the "land adjacent to a building" and portions of buildings subject to a public easement from the private building consent rule. *See* 2023 Md. Laws ch. 680 (to be codified at Crim. Law §§ 6-411(a)(6), 6-411(b)(5)). Firearm owners are thus not precluded from being able to walk up to the doorway of a proprietor's building to seek consent. But beyond that point, both the private building consent rule and its historical analogs empower property owners to make their own decisions. In other words, both the private building consent rule and its historical analogs make it a trespass to carry a firearm onto another's property absent consent so as to facilitate a proprietor's exercise of the right to exclude and secure their property. As a result, the private building consent rule is consistent with the Nation's tradition of firearms regulation and is constitutional under the Second Amendment.

C.   **Plaintiffs' First Amendment Claim in Count Two Fails as a Matter of Law Because Plaintiffs Lack Standing, the Challenged Portion of Senate Bill 1 Does Not Regulate Speech and, Even if it Did, It Survives the Applicable Level of Scrutiny.**

Plaintiffs next challenge the private building consent rule on First Amendment grounds. Yet, for much the same reasons as set forth above, plaintiffs lack standing to challenge the law. Plaintiffs' claim fails on the merits as well. Because the conduct regulated by the law is not

"speech" for purposes of the First Amendment, the law does not offend constitutional principles. Even if the law regulates speech within the purview of the First Amendment, the law is nonetheless constitutional because it advances a substantial government interest and is properly drawn to achieve that interest.

### 1. Plaintiffs Lack Standing to Bring a First Amendment Challenge.

As discussed above in Section IV.B.1, no plaintiff has standing to challenge the private building consent rule because any possible injury is speculative, and is traceable not to any state action but rather the distinct and independent preferences of private property owners. But for yet another reason, plaintiffs do not have standing as it relates to their First Amendment challenge. In the complaint, Ms. Kipke asserts that she would allow individuals to possess firearms on her private property "[b]ut for the reasonable fear of prosecution for violation of the [private building consent rule]." (ECF 1, ¶ 13.) As the private property owner, however, Ms. Kipke does not face any liability under the private building consent rule—criminal or otherwise—for failing to provide express consent to others. This lack of the possibility of any legal consequences thus precludes standing.

### 2. The Private Building Consent Rule Does Not Implicate the First Amendment.

Plaintiffs claim that the private building consent rule "impermissibly compels the speech of property owners and lessees," and thus violates the First Amendment, "because it requires property owners and lessees to state one way or the other whether they will permit the public carriage of firearms by requiring them" to either post a conspicuous sign on their property or otherwise give express consent. (ECF 1, ¶ 55-56); (ECF 13-1 at 26-29). However, neither the First Amendment nor its compelled speech doctrine is implicated here. Instead,

because the private building consent rule does not regulate "speech" under the First Amendment, plaintiffs' claim fails as a matter of law.

As in First Amendment claims generally, plaintiffs bear the burden of demonstrating that the private building consent rule "burdens protected speech." *Billups v. City of Charleston*, 961 F.3d 673, 682 (4th Cir. 2020). Here, the purported "speech" at issue is the provision—or lack thereof—of consent to carry a firearm into a person's building. Yet although providing consent may be considered expressive in the sense that it communicates a discernible message regarding the subject of consent, the import of that expression is not the facts or ideas expressed therein, but rather the effect of that expression on others' legal rights. In other words, just like other legal concepts such as an offer and acceptance in the context of contract law, the expression of consent here can be categorized as a "situation-altering utterance" that "'actually alter[s] the normative world, shifting rights or obligations' because of their very assertion, and not because of any facts or ideas that they reveal." Eugene Volokh, *Speech as Conduct: Generally Applicable Laws, Illegal Courses of Conduct, "Situation-Altering Utterances," and the Uncharted Zones*, 90 Cornell L. Rev. 1277, 1328 (2005) (citation omitted); *cf. Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949) ("[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.").

Thus, that the private building consent rule mandates an individual to express consent in a particular manner (or at all) is not a novel or controversial proposition, and certainly does not run afoul of the First Amendment. It is no different than other laws that place legal significance on the articulation of particular words, such as a law that requires a doctor to

receive express consent before performing a medical procedure.  *See Sard v. Hardy*, 281 Md. 432, 438 (1977) (discussing the doctrine of informed consent).  And, as a broader concept, it is no different than a law that requires certain contracts to be in writing, Md. Code Ann., Courts § 5-901, a law that requires an individual to draft a will to depart from intestacy rules, Md. Code Ann., Estates & Trusts § 4-102, or even a law that requires drivers to express their intent to turn through the operation of a turn signal, Md. Code Ann., Transp. § 21-604.  In each of these circumstances, because the "speech" requirement at issue relates to a legal duty or effect independent of any expression, the First Amendment is not implicated.

Similarly, the private building consent rule falls outside of the First Amendment because it is directed at conduct and thus merely imposes an incidental burden on speech.  *See Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 567 (2011) ("[T]he First Amendment does not prevent restrictions directed at . . . conduct from imposing incidental burdens on speech."); *see also Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 60 (2006) (concluding that a law conditioning federal funding for law schools on military recruiters accessing the campus regulates conduct, not speech, because it affects what law schools must do, not what they may or may not say).  Specifically, the *conduct* that the law prohibits is that of the person with a firearm, who will be unable to carry a firearm onto another person's property without express consent.  And, importantly, the private building consent rule does not require a property owner to speak, nor does it punish them for staying silent or espousing any particular message they might choose to convey.

Therefore, for much the same reasons, plaintiffs' categorization of the private building consent rule as "compelled speech" is off base.  Not only are plaintiffs not required to speak *any* message (let alone the "government's message"), but they are under no circumstances

required to speak any message with which they disagree (unless, of course, they choose to do so). This sets this case apart from every other case involving some form of "compelled speech," where individuals were either (1) required to affirm their support for the government or speak the government's preferred message, *see Wooley v. Maynard*, 430 U.S. 705, 715 (1977); *West Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943); (2) required to "alter[] the content" of their speech by including the government's message alongside their own, *National Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018); *Riley v. National Fed. of the Blind*, 487 U.S. 781, 795 (1988); or (3) required to express views with which they disagree, *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2317-18 (2023). Indeed, plaintiffs have not identified any case in which a challenged law simply required, as in this case, that, in order for an individual to effectuate a preferred legal status, they must in fact express their preference for that legal status.[49] Because such a law does not implicate the First Amendment, plaintiffs' claim fails.

### 3. Even if the Private Building Consent Rule Implicates the First Amendment, It is Nonetheless Constitutional Because it Achieves a Significant Government Interest.

Even if the First Amendment is implicated, this Court should apply intermediate scrutiny because the private building consent rule is a content-neutral law that imposes only an incidental burden on speech. *Turner Broadcasting Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994). To meet this burden, the State must show that the law "directly advances a substantial

---

[49] Nor could they. Because if they could, it would mean that the current legal landscape—where individuals who do not wish to allow firearms on their property must affirmatively articulate that preference—would also be constitutionally problematic. Yet to the extent that constitutional principles are in fact implicated, the State should be entitled to resolve this stalemate in the manner that best effectuates the wishes of its citizens.

government interest and that the measure is drawn to achieve that interest." *Stuart v. Camnitz*, 774 F.3d 238, 250 (4th Cir. 2014) (quoting *Sorrell*, 564 U.S. at 572).

Here, the State has a substantial interest in clarifying the default rule when it comes to a firearm carrier's desire to bring their weapon onto another's property. The law addresses the convergence of two rights: (1) that of the firearm carrier and (2) that of the property owner to make informed decisions about firearms on their property. Because a lawfully carried firearm is *concealed* from view, a property owner will generally have no knowledge of the firearm, and would therefore be divested from an informed decision-making process as it relates to firearms being carried on their property. The private building consent rule thus clearly achieves the State's interests in providing clarity on how the rights of firearm carriers and property owners will be balanced. For those reasons, the private building consent rule is constitutional.

## V.   THE PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION SHOULD BE DENIED BECAUSE THE BALANCE OF THE EQUITIES FAVORS THE STATE.

As shown above, plaintiffs have failed to demonstrate a likelihood of success on the merits of their claims, which itself is fatal to their motion for preliminary relief. *See DiBiase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). But plaintiffs have also failed to establish, as they must in order to prevail, that "'the balance of equities tips in [their] favor, and that an injunction is in the public interest.'" *Id.* (quoting *Winter v. Natural Res. Defense Council*, 555 U.S. 7, 20 (2008)).

The State's authority to enforce duly enacted laws "clearly inflicts irreparable harm on the State." *Abbot v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018); *see also Cameron v. EMW Women's Surgical Ctr.*, 142 S. Ct. 1002, 1011 (2022). That harm is especially clear where, as

here, there is an "ongoing and concrete harm" to the State's "law enforcement and public safety interests." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).

Here, plaintiffs seek to enjoin laws designed to prevent gun violence. The risks of allowing firearms in public places like museums, public transit vehicles carrying school children, hospitals, state parks, and taverns serving alcohol are obvious. As shown by the declarations submitted herewith, many of these locations frequently host large numbers of school children.

The risk is not merely of intentional, criminal acts. Accidental shootings, misunderstandings, or arguments can result in serious injury to innocent bystanders when firearms are present. Studies show that the presence of weapons increases aggressive behavior and thoughts, meaning that a person in possession of a firearm is more likely to perceive others as hostile and react aggressively to ambiguous situations.[50] Serious risks also flow from the possible loss or theft of a firearm in sensitive places like a crowded bar, museum, or city bus.[51]

---

[50] *See* Arlin J. Benjamin Jr., Sven Kepes, & Brad. J. Bushman, *Effects of Weapons on Aggressive Thoughts, Angry Feelings, Hostile Appraisals, and Aggressive Behavior: A Meta-Analytic Review of the Weapons Effect Literature*, 22 Personality & Social Psych. R. 347, 359 (2018), attached as Exhibit 33; David Hemenway, Chloe Shawah, & Elizabeth Lites, *Defensive gun use: What can we learn from news reports?*, 9 Injury Epidemiology 19, 8 (2022), attached as Exhibit 34 (reviewing more than 400 news reports on defensive gun use and finding that in about one in five instances either both parties were engaged in illegal behavior or it was difficult to distinguish the perpetrator from the victim).

[51] David Hemenway, Deborah Azrael, & Matthew Miller, *Whose guns are stolen? The epidemiology of gun theft victims*, 4 Injury Epidemiology 11, 4 (2017), attached as Exhibit 35 (finding that persons who carry firearms for self-defense are more than three times more likely to have a firearm stolen); *see also* John J. Donohue et al., *More guns, more unintended consequences: the effects of right-to-carry on criminal behavior and policing in U.S. cities*, Nat'l Bureau of Econ. Research, Working Paper Series, Working Paper 30190 at 27, http://www.nber.org/papers/w30190 (2022), attached as Exhibit 36.

According to the Centers for Disease Control, in 2020, 45,222 people died from gun-related injuries in the United States, the most in any year recorded.  *See* Centers for Disease Control and Prevention, *Fast Facts: Firearm Violence Prevention*, https://www.cdc.gov/violenceprevention/firearms/fastfact.html.   Gun violence has now surpassed motor vehicle crashes as the leading cause of death among children and adolescents. J. Goldstick, R. Cunningham, & P. Carter, *Current Causes of Death in Children and Adolescents in the United States*, 386 New England J. Med. 1955 (May 19, 2022)

Courts historically recognize that public safety is an important governmental interest. *See, e.g.*, *United States v. Salerno*, 481 U.S. 739, 750 (1987); *Schall v. Martin*, 467 U.S. 253, 264 (1984).  Staying enforcement of Maryland's sensitive places restrictions would undermine the strong interest that the public has in preventing gun violence in areas where people, especially vulnerable populations, congregate.  Both the balance of equities and the public interest mandate denial of plaintiffs' request for extraordinary relief.

## VI.   THE STATE IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE REMAINING CLAIMS.

As discussed above, the Kipke plaintiffs have moved for a preliminary injunction, and for summary judgment, on various claims relating to restrictions on where they may carry a handgun publicly.  Defendants also move for summary judgment on those claims, and hereby incorporate the arguments made above in support of that motion.   Moreover, plaintiffs' complaint contains several additional claims that were not addressed in plaintiffs' motions, including challenges to the "objective and subjective requirements to obtain a carry permit" (ECF 1, ¶¶ 49, 58) and exceptions for retired law enforcement officers (ECF 1, ¶¶ 63-68).  For the reasons below, defendants are entitled to summary judgment on these claims as well.

85

### A. Defendants Are Entitled to Judgment as a Matter of Law as to Plaintiffs' Challenge to the Requirements to Obtain a Public Carry Permit.

In their complaint, the Kipke plaintiffs challenge various aspects of Maryland's public carry permitting process.  As set forth below, however, because Ms. Kipke and all named members of Maryland State Rifle and Pistol Association ("MSRPA") have already been issued permits, and because plaintiffs have failed to identify any individual who seeks to obtain a carry permit, no plaintiff has standing to challenge these requirements.  Even if plaintiffs had standing, their claims lack merit, as the Supreme Court in *Bruen* has already approved of permitting requirements similar to those challenged here.

#### 1. Plaintiffs Lack Standing to Challenge the Permitting Requirements.

As discussed above, to establish standing a plaintiff must "demonstrate they have suffered an injury in fact," which "ensures that they have 'a personal stake in the outcome of the controversy.'" *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 210 (4th Cir. 2020) (citation omitted).  "Under this rubric, the Supreme Court has defined such an injury as 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* (citation omitted).

Here, however, Ms. Kipke and all of the identified members of MSRPA already have public carry permits.  (ECF 1, ¶ 10; ECF 13-2, 13-3, 13-4, 13-5, 13-6.)  As a result, none of these plaintiffs can claim that they have been injured by any of the permitting requirements. In light of this simple fact, neither plaintiff has standing to challenge any of the permitting requirements.

Although MSRPA alleges in the complaint that it "has at least one member who possesses all of the qualifications necessary to apply for and obtain a carry permit" (ECF 1, ¶

19), such an allegation is insufficient.  "The Supreme Court has clarified that to show that its members would have standing, an organization must 'make specific allegations establishing that at least one *identified member* had suffered or would suffer harm."  *Southern Walk at Broadlands Homeowner's Ass'n v. Openband at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (emphasis in *Southern Walk*).  In other words, an association must identify a member by name who has suffered the requisite harm to establish standing.  *See, e.g.*, *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (noting that "the Supreme Court has said that an affidavit provided by an association to establish standing is insufficient unless it names an injured individual" (citing *Summers*)).  Here, MSRPA "has failed to identify a single *specific* member injured" by the permitting requirements, and therefore cannot establish standing.  *Southern Walk*, 713 F.3d at 184 (emphasis in original).

Yet even if MSRPA were to identify a member who could assert that they *would have applied* for a permit but for the statutory requirements, this too is not enough.  "As a general matter, to establish standing to challenge an allegedly unconstitutional policy, a plaintiff must submit to the challenged policy."  *Libertarian Party of Erie County v. Cuomo*, 970 F.3d 106, 121 (2d Cir. 2020) (citation omitted); *see also Madsen v. Boise State Univ.*, 976 F.2d 1219, 1220 (9th Cir. 1992) ("There is a long line of cases . . . that hold that a plaintiff lacks standing to challenge a rule or policy to which he has not submitted himself by actually applying for the desired benefit.").   Thus, "absent a showing of futility, a person who has failed to apply for a gun license . . . lacks standing to challenge the licensing laws of the state." *Libertarian Party*, 970 F.3d at 121 (citations and quotation marks omitted); *see also Parker v. District of Columbia*, 478 F.3d 370, 376 (D.C. Cir. 2007) ("[T]he formal process of application and

denial, however routine, makes the injury to Heller's alleged constitutional interest concrete and particular" for purposes of standing.); *Interstate Commerce Comm'n v. Appleyard*, 513 F.2d 575, 577 (4th Cir. 1975) ("Until he has shown that he cannot obtain a permit under the existing regulations, he has suffered no legally cognizable injury . . . .").

The fact that MSRPA's unidentified members have not even applied for carry permits thus means that, even if identified, they would lack standing to challenge the permitting requirements. As discussed below, this conclusion is entirely consistent with *Bruen*, which noted that the appropriate procedural vehicle for challenging particular aspects of a permitting process is an as-applied challenge by an aggrieved applicant.[52]  142 S. Ct. at 2138 n.9; *id.* at 2162 (Kavanaugh, J., concurring).

## 2. Plaintiffs' Challenge to "Objective" Requirements Fails as a Matter of Law.

Buried within Count One, in which plaintiffs challenge the various locational restrictions, plaintiffs make passing reference to challenging the "objective . . . requirements to obtain a carry permit." (ECF 1, ¶ 49.)  Plaintiffs, however, fail to state with any particularity which requirements they are in fact challenging. Thus, to the extent plaintiffs have in fact purported to advance a challenge to the "objective" permitting requirements, defendants are entitled to judgment as a matter of law on this basis alone. *See Ashcroft v. Iqbal*, 556 U.S.

---

[52] Nor would MSRPA's hypothetical plaintiffs be able to show futility. Thus, this case is unlike *Hamilton v. Pallozzi*, 848 F.3d 614, 620-21 (4th Cir. 2017), where the Fourth Circuit, involving the futility exception, held that the plaintiff did not need to apply for a carry permit to render his claim justiciable because he had been told by an Assistant Attorney General that he was ineligible for a permit.

662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Yet no matter which "objective" requirements plaintiffs may actually be challenging, their claim fails as a matter of law.  As discussed above, the Supreme Court in *Bruen* expressly approved of "shall-issue" permitting regimes that relied on objective factors.   142 S. Ct. at 2138 n.9; *id.* at 2161-62 (Kavanaugh, J., concurring).  And in describing these "constitutionally permissible" "shall-issue" regimes, the *Bruen* Court referenced features, like those present in Maryland's regime, such as background checks (with fingerprinting) and firearms training.  *Id.*

The Court in *Bruen*, of course, recognized that "any permitting scheme can be put toward abusive ends," and thus could not "rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry."  142 S. Ct. at 2138 n.9.  But that is plainly not the case here.  Because all of the identified plaintiffs already possess a public carry permit, no plaintiff can claim that they have experienced an unreasonable delay in receiving a permit.  And Maryland's fee of $125 is well below that of other jurisdictions.  Indeed, the Second Circuit has concluded that an application fee of $340 was constitutional.  *Kwong v. Bloomberg*, 723 F.3d 160, 166-67 (2d Cir. 2013).

### 3.  Plaintiffs' Challenge to "Subjective" Requirements Fails as a Matter of Law.

In Count Three of their complaint, plaintiffs challenge what they deem "subjective criteria," i.e., the permitting prerequisite that, "based on an investigation," an applicant "has not exhibited a propensity for violence or instability that may reasonably render the person's possession of a handgun a danger to the person or another[.]"  (ECF 1, ¶58 (referencing Pub.

Safety § 5-306(a)(6)(i)).)  Plaintiffs appear to mount a two-pronged attack.  First, plaintiffs allege that this provision violates the Second Amendment because it "impermissibly empower[s] state officials with discretion that burdens conduct protected by the plain text" of that amendment.  (ECF 1, ¶ 61.)  Next, plaintiffs allege that this provision violates the Due Process Clause of the Fourteenth Amendment because it is void for vagueness.  (ECF 1, ¶ 60.) Both claims lack merit.

### a. Challenge Under the Second Amendment

As noted above, plaintiffs' claim appears to be that, because the "propensity for violence" provision requires a permitting official to exercise some level of discretion in its application, it violates the Second Amendment.  The Supreme Court in *Bruen*, however, expressly approved of "shall-issue" regimes that contained provisions granting similar (if not broader) discretion.  Because Maryland's "propensity for violence" standard is substantively identical to the provisions approved in *Bruen*, defendants are entitled to judgment as a matter of law on this claim.

As a preliminary matter, it should be noted that plaintiffs do not appear to be challenging Maryland's *substantive* authority under the Second Amendment to place firearms restrictions on those individuals who have "exhibited a propensity for violence or instability that may reasonably render the person's possession of a handgun a danger to the person or another."  Nor could they.  Courts—including the Fourth Circuit—have universally held that American history and tradition allows for the disarmament of persons who pose a danger to themselves or others.  *See, e.g.*, *United States v. Carter*, 669 F.3d 411, 415 (4th Cir. 2012) ("[T]he Anglo-American right to bear arms has always recognized and accommodated limitations for persons perceived to be dangerous."); *see also Doe I v. Governor of Pa.*, 977

F.3d 270, 273 (3d Cir. 2020); *Tyler v. Hillsdale County Sheriff's Dep't*, 837 F.3d 678, 691 (6th Cir. 2016).  Accordingly, as a substantive matter, Maryland's "propensity for violence" standard—which is "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens'"—is constitutional on its face.  *Bruen*, 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635).

Instead, plaintiffs claim that the standard set forth in Public Safety § 5-306(a)(6)(i) is "subjective" and therefore unconstitutionally vests permitting officials with impermissible discretion.  As stated above, however, this argument runs headlong into *Bruen*.  There, the Court stated clearly that "nothing in its analysis" called into question the constitutionality of "shall-issue" licensing regimes that "appear to contain only 'narrow, objective, and definite' standards guiding licensing officials, rather than requiring the "appraisal of facts, the exercise of judgment, and the formation of an opinion.'"  *Bruen*, 142 S. Ct. at 2138 n. 9 (quoting *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969) and *Cantwell v. Connecticut*, 310 U.S. 296, 305 (1940)).  To underscore its point, the Court noted that 43 jurisdictions had such regimes.  *Bruen*, 142 S. Ct. at 2123 n.1; *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring).

A review of these 43 jurisdictions reveals that several of them have standards that are substantively identical to Maryland's "propensity for violence" standard.  *See, e.g.*, Ark. Code Ann. § 5-73-308(b)(1) (allowing a license application to be denied if an official "submits an affidavit that the applicant has been or is reasonably likely to be a danger to himself or herself or others or to the community at large, as demonstrated by past patterns of behavior or participation in an incident involving unlawful violence or threats or unlawful violence . . ."); Colo. Rev. Stat. § 18-12-203(2) (allowing an official to deny a permit if they have "a reasonable belief that documented previous behavior by the applicant makes it likely the applicant will

present a danger to self or others if the applicant receives a permit to carry a concealed handgun"); La. Stat. Ann. § 1379.3(C)(16) (mandating denial of a permit if the applicant has "a history of engaging in violent behavior."); Mont. Code Ann. § 45-8-321(2) ("The sheriff may deny an applicant a permit to carry a concealed weapon if the sheriff has reasonable cause to believe that the applicant . . . may be a threat to the peace and good order of the community to the extent the applicant should not be allowed to carry a concealed weapon."). The fact that *Bruen* expressly endorsed the constitutionality of these standards—all of which plainly involve some exercise of discretion—controls the analysis here.

Moreover, "the *Bruen* Court acknowledged that some limited amount of discretion does not render a firearm permitting regime unconstitutional." *Oregon Firearms Fed. v. Kotek*, __ F. Supp. 3d __, No. 2:22-cv-1815-IM, 2023 WL 4541027, *48 (D. Or. July 14, 2023). As the district court in *Oregon Firearms Federation* notes, the Court in *Bruen* went out of its way to include among its list of "shall-issue" jurisdictions the licensing regimes of three states that "have *discretionary* criteria but appear to operate like 'shall-issue' jurisdictions." *Id.* (quoting *Bruen*, 142 S. Ct. at 2123 n.1; emphasis added). And these jurisdictions include Connecticut, which declines permits to "individuals whose conduct has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon," a standard that on its face is much broader than that of Maryland's.[53] *Id.* (citing *Bruen*, 142 S. Ct. at 2123 n.1).

---

[53] Several other "shall-issue" statutes endorsed by *Bruen* are similarly broader than Maryland's standard. *See also* Del. Code, Tit. 11, § 1441(a)(2) (an applicant must certify that they are of "good moral character, that the applicant bears a good reputation for peace and good order in the community in which the applicant resides"); Ga. Code Ann. § 16-11-129(d)(4) (a license cannot be issued if the applicant "is not of good moral character"); Ind. Code § 35-47-2-3(g)(2) (an applicant must be "of good character and reputation"); Me. Rev. Stat. Ann. tit. 25, § 2003(4)

In essence, the *Bruen* Court was expressing the common-sense proposition that States could impose discretionary requirements on applicants so long as those requirements were consistent with the Second Amendment's tradition of placing limits on those who were not law-abiding, responsible citizens.  And in doing so, the Court also identified the proper remedy if a permitting official were to exercise the discretion afforded by these otherwise constitutional standards in an unconstitutional manner.  After acknowledging that "shall-issue" regimes containing the standards set forth above are "constitutionally permissible," Justice Kavanaugh, joined in his concurrence by the Chief Justice, stated that those regimes would be "subject of course to an as-applied challenge if a shall-issue licensing regime does not operate in that manner in practice."  *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring).  In other words, where, as here, a permitting regime contains a facially constitutionally standard that nonetheless allows for some discretion, an applicant must first subject themself to the regime so that the licensing official has the opportunity to properly exercise that discretion.  Only in the context of a denial of a permit could a challenge on the basis of an unconstitutional exercise of that discretion be justiciable.  Yet, as noted above, plaintiffs have failed to identify any individual who has unsuccessfully applied for a permit, let alone anyone who has been denied on the basis that they had a "propensity for violence." Simply put, plaintiffs' claim that the "propensity for violence" standard would give permitting officials unbounded discretion to deny licenses to otherwise law-abiding, responsible citizens is based on untested and

---

(requiring an applicant to be of "good moral character"); 11 R.I. Gen. Laws § 11-47-11(a) (requiring that an applicant be "a suitable person to be so licensed").

unsupported speculation about how permitting officials *might* apply that standard. Because this claim is premature, plaintiffs' claims as presented fail as a matter of law.

### b. Challenge under Void for Vagueness

Plaintiffs also challenge the "propensity for violence" standard under the void-for-vagueness doctrine of the Due Process Clause. They claim that the standard is impermissibly vague because "Maryland law does not define or limit what these criteria mean," and does not "provide guidance to [permitting officials] for making these determinations, or set out the scope or requirements of, or limitations on, the required investigation." (ECF 1, ¶ 58.)

"To survive a vagueness challenge, a statute must give a person of ordinary intelligence adequate notice of what conduct is prohibited and must include sufficient standards to prevent arbitrary and discriminatory enforcement." *Manning v. Caldwell*, 930 F.3d 264, 272 (4th Cir. 2019). This test, however, "is not applied mechanically. The degree of vagueness tolerated in a law depends in part on the type of statute." *Id*. "Less clarity is required in purely civil statutes because the 'consequences of imprecision are qualitatively less severe.'" *Id*. (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982)). Moreover, statutes do not require "meticulous specificity" to avoid being void for vagueness; instead, there is room for "flexibility and reasonable breadth." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) (internal citations and quotations omitted).

Under any standard, defendants are entitled to judgment as a matter of law. Plaintiffs can only bring a "disfavored" facial challenge,[54] and therefore "must 'establish that no set of

---

[54] Plaintiffs purport to bring both a facial and as-applied challenge. (ECF 1, ¶ 60.) But given that there is no allegation that any plaintiff (nor any identified member of MSRPA) has been denied a permit on the grounds that they exhibited a propensity for violence, it is unclear exactly how that standard has in fact been "applied" to them. Nor can there be any plausible inference

94

circumstances exists under which the [law] would be valid,' or show that the law lacks 'a plainly legitimate sweep[.]'" *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021) (citations omitted). "And in assessing whether a statute meets one of these high bars, courts must typically take care 'not to . . . speculate about hypothetical or imaginary cases.'" *United States v. Miselis*, 972 F.3d 518, 530 (4th Cir. 2020) (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2009)); *see also Hill v. Colorado*, 530 U.S. 703, 733 (2000) (stating that facial challenge will not succeed when the statute "is surely valid 'in the vast majority of its intended applications.'" (citation omitted)).

Applying those principles, the phrase "propensity for violence" is not vague. "Propensity" means, e.g., "a natural inclination or tendency." *Webster's New Universal Unabridged Dictionary* (2003). "Violence" means, e.g., "rough or injurious physical force, action, or treatment." *Id.* Taken together, "propensity for violence" thus means a tendency to engage in physical force that causes injury. And the second part of the standard—"that may reasonably render the person's possession of a handgun a danger to the person or another"—adds a further limiting principle such that a person's "propensity for violence" must reflect on their ability to possess a handgun safely. A person of ordinary intelligence would therefore have no difficulty discerning the type of person who may be deemed to have a "propensity for violence or instability that may reasonably render the person's possession of a handgun a danger to the person or to another."

---

that the standard *would* apply to them. MSRPA does not allege that any of its members has a "propensity for violence" (but would somehow otherwise be entitled to a permit). To the contrary—MSRPA asserts that its members are all law-abiding, responsible citizens. (ECF 1, ¶¶ 14, 19.)

In addition to the availability of judicial review, the fact that the "propensity for violence" language has been part of Maryland's public carry permitting scheme since 1972 further demonstrates the shortcomings of plaintiffs' challenge.  1972 Md. Laws ch. 13. "Indeed, despite the presence of the challenged terms in [Maryland's] licensing regime for more than [fifty years], Plaintiffs have identified no 'evidence of confusion,'; and the 'repeated use for decades, without evidence of mischief or misunderstanding . . . suggests that the language is comprehensible.'" *Libertarian Party*, 970 F.3d at 126-27 (citation omitted).

Finally, further rebutting plaintiffs' claim that the "propensity for violence" standard is vague and incapable of constitutional application is the fact that assessments of whether someone has a propensity for violence are commonplace in multiple other contexts, such as criminal sentencing, immigration, the rules of evidence, and mental health jurisprudence. Courts across the country have had no difficulty interpreting and applying statutes that call for a determination of whether an individual has a "propensity for violence" or are otherwise "dangerous."  *See, e.g., United States v. Bernard*, 299 F.3d 467, 482 (5th Cir. 2022) (finding the government sufficiently provided evidence of defendant's record, including his "propensity for violence in prison," to establish future dangerousness at defendant's sentencing); *Safaryan v. Barr*, 975 F.3d 976, 988 (9th Cir. 2020) (citing to Board of Immigration Appeals' reasoning "why the 'use of a deadly or dangerous weapon or instrument' has been treated as a significant aggravating factor in assessing moral turpitude is that it 'magnifies the danger posed by the perpetrator and demonstrates his or her heightened propensity for violence and indifference to human life.'" (citation omitted)); *United States v. Rogers*, 371 F.3d 1225, 1228-29 (10th Cir. 2004) ("A defendant whose background includes domestic violence which advances to either criminal conviction or the imposition of a protection order has a demonstrated propensity for

the use of physical violence against others."); *Reyes v. State*, 257 Md. App. 596, 636 (2023) (assessing whether evidence presented at a criminal trial opened the door to introduce evidence of the victim's "propensity for violence" under the Maryland rules of evidence); *see also* Md. Code Ann., Courts § 5-609(b) (prohibiting "cause of action or disciplinary action" against mental health care providers for the violent behavior of their patients unless they "knew of the patient's propensity for violence . . .").

In sum, plaintiffs' claim appears not to be that the "propensity for violence" standard is incapable of common understanding, but rather is grounded in their concerns that the standard will be applied by permitting officials in a manner so inconsistent with that common understanding as to be arbitrary. But as *Bruen* counsels, this claim cannot be made in the abstract, and instead may be made only as an as-applied challenge after an applicant suffers the constitutionally cognizable injury of a permit denial.

### B. Plaintiffs' Equal Protection Challenge to the Public Carry Permit Scheme Fails as a Matter of Law.

In Count Four of their complaint, the Kipke plaintiffs challenge two aspects of Maryland's public carry permit scheme on Equal Protection grounds. First, they claim that current law (and as amended by House Bill 824) relating to the requirements for obtaining a permit is unconstitutional because it exempts retired law enforcement officers from the training otherwise required for permit applicants.[55]   (ECF 1, ¶¶ 62-68.)   Similarly, they claim that Senate Bill 1 is unconstitutional insofar as it exempts retired law enforcement officers from

---

[55] Because Mrs. Kipke already has a permit and no other plaintiff—identified or otherwise—has applied for a permit, no plaintiff has standing to assert a challenge with respect to the training requirements.

the prohibition on carrying a firearm (even with a public carry permit) in certain statutorily-identified locations.  (ECF 1, ¶¶ 62-68.)  This claim is legally untenable.

The Equal Protection Clause guarantees that no State shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const., amend. XIV, § 1.  This requires that legislatures and governmental decisionmakers treat similarly situated individuals alike. *Plyler v. Doe*, 457 U.S. 202, 216 (1982) (citation omitted)).  Thus, a successful plaintiff "must first demonstrate that they [have] been treated differently from others with whom [they are] similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination."  *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001) (citation omitted)).

The Kipke plaintiffs' claims fail for the simple fact that retired law enforcement officers are not similarly situated to the public at large.  First, Maryland conditions a law enforcement officer's authority to carry a firearm upon the officer's successful completion of extensive initial and continuing firearms classroom instruction, training, and qualification on that firearm.  *See* COMAR 12.04.02.03A, 12.04.02.04, 12.04.02.05, 12.04.02.06A, 12.04.02.07, 12.04.02.08.  Indeed, unlike ordinary applicants for a public carry permit, who are only required to complete 16 hours of training, a law enforcement officer's initial instruction must include a minimum of 35 hours of training.[56]  COMAR 12.04.02.04B.  Moreover, Maryland mandates annual firearms training on the legal aspects of firearms and their use.  COMAR 12.04.02.08; 12.04.02.10(B)(1).  This includes rules for the use of deadly force, alternatives to

---

[56] Thus, even if Plaintiffs' claim did not fail at the first step of the analysis, their claim would nonetheless fail because, despite their exemption from the training requirements specifically related to the permit process, law enforcement officers will have nonetheless engaged in a training program that is *more burdensome* that the one required for ordinary applicants.

the use of deadly force, emotional, mental, and psychological preparation needed for the possibility of a deadly force shooting situation, and judgmental or decision training on the use of deadly force.  COMAR 12.04.02.10(C).  Maryland also prescribes entrance-level and annual classroom training for law enforcement officers on numerous other topics including, but not limited to, safe handling and safe storage of firearms at home.  COMAR 12.04.02.10(D)(1).

Second, retired law enforcement officers are not similarly situated to members of the general public because they have experience that is unique to their law enforcement role. During their careers, law enforcement officials swear to uphold the law and serve the public and thus are "not to be equated with a private person engaged in routine public employment or other common occupations of the community."  *Foley v. Connelie*, 435 U.S. 291, 298 (1978).  Much like retired members or honorably discharged members of the U.S. Armed Forces or the National Guard, who are also exempted from requirements to obtain a carry permit yet do not face the challenge of plaintiffs here, retired law enforcement have real-world experience in exercising their discretion as to when (and, importantly, when not) to use a firearm, and how to best do so without causing unnecessary injury to others.  Allowing this exception to retired law enforcement officials is also in line with the understanding that there is "a greater risk of retaliatory violence following retirement" for former law enforcement officers than other Maryland citizens.  *See In re Wheeler*, 81 A.3d 728, 620 (N.J. Super. Ct. App. Div. 2013).

Consistent with these principles, the Fourth Circuit has already rejected a similar Equal Protection challenge to different treatment for retired law enforcement officers as it relates to access to firearms.  *See Kolbe v. Hogan*, 849 F.3d 114, 146-47 (4th Cir. 2017) (en banc) (rejecting equal protection challenge to law that allowed law enforcement officers to keep and

possess large capacity magazines and assault weapons even though law banned private citizens from having those weapons, because plaintiffs were not similarly situated to law enforcement officers) *abrogated on other grounds by Bruen*, 142 S. Ct. 2111; *see also Association of New Jersey Rifle and Pistol Clubs, Inc. v. Attorney Gen. New Jersey*, 910 F.3d 106, 125-26 (3d Cir. 2018) (rejecting an equal protection claim because "law enforcement officers are trained for and have experience in addressing volatile situations in both public streets and closed spaces, and they operate in noncombat zones where the Constitution and other rules apply"), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111; 18 U.S.C. § 926(C) (permitting retired law enforcement officers to carry concealed handguns with certain restrictions).  Indeed, the Ninth Circuit rejected a challenge specifically in the context of exempting retired law enforcement officers from prohibitions on carrying handguns in otherwise restricted locations. *Gallinger v. Becerra*, 898 F.3d 1012, 1020 (9th Cir. 2018) (concluding that exemption survived an Equal Protection challenge because "(1) retired peace officers are at a heightened risk of danger based on their previous exposure to crime, and (2) allowing them to carry firearms . . . on school grounds mitigates that risk and increases officer safety").

Considering their special training and experience and submission to rigorous vetting processes, retired law enforcement officials are not similarly situated to other Maryland citizens.  Thus, plaintiffs fail at the onset of their equal protection claim, and defendants are entitled to judgment as a matter of law.

## CONCLUSION

Plaintiffs' motion for summary judgment and motion for preliminary injunction should be denied, and defendants' motion for summary judgment should be granted.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland


/s/ Robert A. Scott
_____

ROBERT A. SCOTT
Federal Bar No. 24613
RYAN R. DIETRICH
Federal Bar No. 27945
JAMES N. LEWIS
Federal Bar No. 30220
Assistant Attorneys General
200 Saint Paul Place
20th Floor
Baltimore, Maryland  21202
rscott@oag.state.md.us
410-576-7055

July 28, 2023                          Attorneys for Defendants

# INDEX OF EXHIBITS

Ex. 1:        Intentionally Left Blank

Ex. 2:        Maryland Senate Bill 1 (2023)

Ex. 3:        Declaration of Saul Cornell

Ex. 4:        Declaration of Patrick J. Charles

Ex. 5:        Declaration of Brennan Rivas

Ex. 6:        Declaration of Thomas Randall

Ex. 7:        Declaration of Daryl Anthony

Ex. 8:        Declaration of Anita Kassof

Ex. 9:        Declaration of Mark J. Potter

Ex. 10:       Declaration of Arnot Polakoff

Ex. 11:       Declaration of Terri Freeman

Ex. 12:       Virginia, An Act Forbidding and Punishing Affrays, Ch. 49.

Ex. 13:       Statutes of the Parliament of England in force in North Carolina, Ch. 3 (1792)

Ex. 14:       Acts of the State of Tennessee, Ch. 22 § 2 (1869)

Ex. 15:       New Mexico Deadly Weapons Act, Ch. 32 §§ 1-6 (1869)

Ex. 16:       Georgia Offenses Against the Public Morality, Health, Police, etc. Part 5, Title 1, § 4528(1870)

Ex. 17:       Gen. Laws of the State of Texas, An Act Regulating the Right to Keep and Bear Arms, Chapter 46. § 1 (1870)

Ex. 18:       Laws of Missouri, An Act to Prevent the Carrying of Concealed Weapons § 1 (1874)

Ex. 19:       Session Laws of the Leg. Assembly of the Territory of Arizona (1889)

Ex. 20:       Statutes of Oklahoma, Crimes and Punishments, Ch. 25 §§7-10 (1890)

Ex. 21:       Penal Code of State of Idaho, Persons Other than Officers Carrying Certain weapons, Ch. 218 § 4781 (1901)

Ex. 22:       Montana General Laws, An Act to Prohibit Unlawful Carrying of Concealed Weapons, Ch. 35 § 1 (1903)

Ex. 23:       Columbia, Missouri General Ordinances, Ch. 17 (1890)

| | |
|---|---|
| Ex. 24: | Maryland Assembly, *An Act for the Speedy Trial of Criminals, and Ascertaining their Punishment*, Ch. 26 (1715) |
| Ex. 25: | The Statutes at Large of Pennsylvania, Vol. 3, Ch. 246 (1721) |
| Ex. 26: | Acts Passed by the General Assembly of the Province of New Jersey, Ch. 35 (1722) |
| Ex. 27: | Laws of New York, *An Act to prevent hunting with Fire-Arms in the City of New York*, Ch. 1233 (1763) |
| Ex. 28: | Acts of the General Assembly of the Colony of New Jersey (1771) |
| Ex. 29: | Acts and Laws of Massachusetts, Ch. 28 (1789) |
| Ex. 30: | Acts of the State of Louisiana, *An Act to Prohibit the Carrying of Firearms on Premises or Plantations, without the Consent of the Owner* (1865) |
| Ex. 31: | Laws of Texas, Offenses Against the Public Peace, Title II (1867) |
| Ex. 32: | General Laws of Oregon, 79 § 1 (1893) |
| Ex. 33: | Benjamin, Kepes, and Bushman, *Effects of Weapons on Aggressive Thoughts, Angry Feelings, Hostile Appraisals, and Aggressive Behavior: A Meta Analytic Review of the Weapons Effect Literature*, 22 Personality & Social Psych. R. 347 (2018) |
| Ex. 34: | Hemenway, Shawah, and Lites, *Defensive Gun Use: What Can We Learn from News Reports?*, 9 Injury Epidemiology 19 (2022) |
| Ex. 35: | Hemenway, Azrael, and Miller, *Whose Guns are Stolen? The Epidemiology of Gun Theft Victims*, 4 Injury Epidemiology 11 (2017) |
| Ex. 36: | Donohue, Cai, Bondy, et al., *More Guns, More Unintended Consequences: the effects of right-to-carry on criminal behavior and policing in U.S. Cities*, Nat'l Bureau of Econ. Research, Working Paper Series, Working Paper 30190 |
| Ex. 37: | Minutes of the Proceedings of the Board of Commissioners of Central Park, New York (1858) |
| Ex. 38: | Annual Report of the Brooklyn Park Commissioners, Park Ordinance No. 1, Art. 1 (1867) |
| Ex. 39: | Laws of the General Assembly of the State of Pennsylvania, No. 1020 § 21 (1868) |
| Ex. 40: | Annual Report of the Commissioners of Fairmount Park, § 21 (1869) |
| Ex. 41: | Laws and Ordinances of the City of Chicago, Ch. 31 § 6 (1873) |

Ex. 42:      San Francisco Municipal Reports, Park Commissioners Ordinances, Ordinance No. 2 § 2 (1875)

Ex. 43:      Laws and Ordinances Governing the Village of Hyde Park, IL., South Park Ordinances § 6 (1876)

Ex. 44:      Ordinances of the Town Council of the Borough of Phoenixville, Penn., Parks § 1 (1878)

Ex. 45:      Municipal Code of Chicago, Art. 43 § 1690 (1881)

Ex. 46:      The Revised Ordinance of the City of St. Louis, Art. 11 § 3 (1881)

Ex. 47:      The Revised Ordinance of the City of Danville, IL., § 4 (1883)

Ex. 48:      Rule and Regulations of Tower Grove Park of the City of St. Louis (1883)

Ex. 49:      City of Boston Department of Parks Ordinances (1887)

Ex. 50:      The Revised Ordinances of Salt Lake City, Ch. 27 § 6 (1888)

Ex. 51:      Rules and Regulations of the Public Parks and Grounds of the City of Saint Paul, MN. § 6 (1889)

Ex. 52:      Charter and Ordinances of the City of Trenton, N.J. (1890)

Ex. 53:      Ordinances of the City of Grand Rapids, Parks §432 (1891)

Ex. 54:      Laws and Ordinances of the City of Williamsport, Penn., Brandon Park § 21 (1891)

Ex. 55:      Annual Report of the Park Commissioners of the City of Lynn, MA., Ordinances § 3 (1892)

Ex. 56:      Laws and Ordinances of the City of Peoria, Il., Art. 35, Parks and Public Grounds §1724 (1892)

Ex. 57:      Municipal Code of the City of Spokane, WA., Ordinance No. A170 § 4 (1892)

Ex. 58:      Rules and Regulations of the Board of Park Commissioners of City of Wilmington, DE, § 7 (1893)

Ex. 59:      Acts of Assembly Relating to and the General Ordinances of the City of Pittsburgh, PA, Bureau of Parks §5 (1883)

Ex. 60:      Revised Ordinances of the City of Canton, IL., § 26 (1895)

Ex. 61:      Local Acts of the Legislature of the State of Michigan, No. 436 § 44 (1895)

Ex. 62:      Report of the Board of Park Commissioners of the City of Rochester, N.Y., § 4 (1896)

Ex. 63:          The General Ordinances of the City of Indianapolis §1971 (1896)

Ex. 64:          Laws and Ordinances of the City of Reading, PA., Park Rules and Regulations § 20 (1897)

Ex. 65:          Park Commissioners' Report for Springfield, MA., Park Ordinance No. 3 (1897)

Ex. 66:          Revised Ordinances of the City of Boulder, CO., Parks 511 § 1 (1898)

Ex. 67:          Charter and Revised Ordinances of Kansas City, Ordinance No. 9637 § 11 (1898)

Ex. 68:          Report of the Board of Commissioners of Wilmington DE., Park Regulations (1898)

Ex. 69:          Municipal Register of the City of Hartford, CT., Rules and Regulations No. 9 (1902)

Ex. 70:          Ninth Annual Report of the Department of Parks of the City of New Bedford, Massachusetts (1902)

Ex. 71:          First Annual Report of the Board of Park Commissioners of the City of Lowell, Massachusetts (1903)

Ex. 72:          Proceedings of the Board of Alderman of the City of New York, New York (1903)

Ex. 73:          Municipal Ordinances of the City of Troy, New York (1903)

Ex. 74:          Revised Code of Ordinances of the City of Houston, Texas (1904)

Ex. 75:          The Ordinances of the City of Neligh, Nebraska (1904)

Ex. 76:          Ordinances of the City of Pueblo, Colorado (1904)

Ex. 77:          A Digest of the Laws and Ordinances for the Government of the Municipal Corporation of the City of Harrisburg, Pennsylvania (1905)

Ex. 78:          Annual Report of the Park Commissioners of the City of Haverhill, Massachusetts (1905)

Ex. 79:          General Laws of the State of Minnesota (1905)

Ex. 80:          Charter of the City of Saginaw, Michigan (1905)_

Ex. 81:          Amendments to "The Revised Municipal Code of Chicago of 1905" and New

General Ordinances (1905)

Ex. 82:        Municipal Code of the City and County of Denver, Colorado (1906)

Ex. 83:        Penal Ordinances of the City of Los Angeles, California (1906)

Ex. 84:        Ordinances of the City of Olean, New York (1907)

Ex. 85:        The Charter of the City of Seattle and the Ordinances of the City of Seattle, Washington (1907)

Ex. 86:        A Digest of the Laws Ordinances and Contracts of the City of Memphis, Tennessee (1909)

Ex. 87:        General Municipal Ordinances of the City of Oakland, California (1909)

Ex. 88:        Constitution, Charter and Revision of the Ordinances and Municipal Laws of the City of Paducah, Kentucky (1909)

Ex. 89:        The Code of the City of Staunton, Virginia (1910)

Ex. 90:        The Code of Colorado Springs, Colorado (1913)

Ex. 91:        Compiled Ordinances of the City of Grand Rapids, Michigan (1914)

Ex. 92:        Charter and Ordinances of the City of New Haven, Connecticut (1914)

Ex. 93:        State of Connecticut Report of the State Park Commission for the Fiscal Year Ended September 30, 1914

Ex. 94:        New Code of Ordinances of the City of New York, New York (1912)

Ex. 95:        The Code of City of Birmingham, Alabama (1917)

Ex. 96:        The Joplin, Missouri Code of 1917

Ex. 97:        Wisconsin Session Laws Acts, Resolutions and Memorials (1917)

Ex. 98:        State of Connecticut Report of the State Park Commission for the Two Fiscal Years Ended September 30, 1918

Ex. 99:        Revised Ordinances of Salt Lake City, Utah (1920)

Ex. 100:       Revised Ordinances of 1921 for the City of Burlington, Vermont

Ex. 101:        State of North Carolina Public Laws and Resolutions (1921)

Ex. 102:        Digest of the Charter and Ordinances of the City of Chattanooga, Tennessee (1922)

Ex. 103:        Guide to Connecticut State Parks and Forests (1924)

Ex. 104:        National Park Service Publication on Firearm Regulations in the National Parks, 1897-1936

Ex. 105:        Federal Register- Rules and Regulations of National Park Service (1936)

Ex. 106:        Maryland House Bill 824 (2023)