# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **Kipke**, *et al.*,<br><br>**Plaintiffs**,<br><br>v.<br><br>**Wesley Moore**, *et al.*,<br><br>**Defendants.** | **CASE NO.: 1:23-cv-01293** |

## DECLARATION OF PATRICK J. CHARLES

Pursuant to 28 U.S.C. § 1746, I, Patrick J. Charles, declare and state as follows:

1.     I am over the age of eighteen (18) years, competent to testify to the matters contained in this declaration and testify based on my personal knowledge and information.

2.     I have been retained by the Office of the Attorney General for Maryland as a historical and constitutional expert on Second Amendment matters. I also have expertise in legal history and its multiple uses in adjudicating constitutional questions.

3.     Maryland is currently defending multiple lawsuits, including *Kipke v. Moore*, challenging Maryland laws and regulations that govern where individuals may legally wear, carry, and transport firearms.

4.     I have read the Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)*,* and Maryland has asked me to expound on the history of the law restricting armed carriage in locations jurisprudentially referred to as "sensitive places," as well as the history of the law pertaining to firearms and liquor.

5.      Most of the information contained in this declaration is from research conducted prior to having been retained by the Office of the Attorney General for Maryland on May 27, 2023.

<div align="center">Background and Qualifications</div>

6.      I am a historian, legal scholar, and author of dozens of articles and books on the Constitution, legal history, and standards of review. I received my L.L.M. in Legal Theory and History with distinction from Queen Mary University of London in 2014, J.D. from Cleveland-Marshall College of Law in 2009, and B.A. in History and International Affairs with honors from George Washington University in 2005. My writings on the history of the law have been cited by the Supreme Court of the United States, federal Circuit Courts of Appeal, federal District Courts, and State supreme courts. A true and correct copy of my curriculum vitae is attached as **Exhibit 1** to this declaration.

7.      For the past 13 years I have served as a historian for the United States Air Force (USAF) in several capacities, including deploying several times with Special Operations Forces (SOF) for contingency operations in Afghanistan and the Middle East. I currently serve as the Research Division Supervisor for the Air Force Historical Research Agency (AFHRA) located at Maxwell Air Force Base, Alabama, where I oversee all historical information requests and archival research for the USAF.

8.      This declaration was compiled and completed outside my official duties for the USAF. Moreover, the contents and opinions expressed in this declaration are solely my own, and not those of the USAF, AFHRA, Department of Defense, or the federal government.

## I.    *Bruen* and the "Sensitive Places" Doctrine

9.      *Bruen* established a general test for the lower courts when examining the constitutionality of modern firearm regulations. First, the challenger must show that "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2129-30. If the challenger succeeds in this pursuit, the "government must then justify its regulation by demonstrating that it is consistent with the Nation's tradition of firearm regulation." *Id*. at 2130. At this second step, the regulation is constitutional if the government can point to historical laws that are analogous—not identical—to the modern regulation. *Id*. at 2133. The *Bruen* Court went on to note that "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id*.

10.     One regulatory area that the *Bruen* Court expounded upon was that of "sensitive places," *i.e.*, locations "where arms carrying could be prohibited consistent with the Second Amendment." *Id*. (citations omitted). In expounding upon this rule, the Court singled out prohibitions on carrying in "schools and government buildings," "legislative assemblies, polling places, and courthouses" as constitutionally permissive examples. *Id*. (citations omitted). And the Court upheld arms carrying prohibitions at these locations despite "the historical record yield[ing] relatively few" examples. *Id*. (David. B. Kopel & Joseph S. Greenlee, *The "Sensitive Places" Doctrine: Location Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 205, 229-36, 244-47 (2018); Brief of Amicus Curiae the Independent Institute in Support of Petitioners, New York State Rifle & Pistol Association, Inc. v. City of New York, New York, No. 18-280, at 11-17). In other words, the Court found it "settled" that "these locations were [indeed] 'sensitive places'" because it was not made "aware of *[any] disputes* regarding the lawfulness of such prohibitions." *Id*. (emphasis added).

**II.     The History of "Sensitive Places" Through the Nineteenth Century**

11.     For nearly five centuries in England, from the late thirteenth century through the late eighteenth century, what constituted a "sensitive place" in which arms bearing could be regulated and restricted was rather broad. It encompassed densely populated areas, as well as areas where people regularly congregated for lawful purposes or conducted commerce. The text "fairs" and "markets" language contained within the 1328 Statute of Northampton makes this abundantly clear. 2 Edw. 3, c. 3 (1328) (Eng.). So too do several other English legal sources. For instance, in 1351, Edward III issued a proclamation declaring it was unlawful to "go armed" with dangerous weapons "within the City of London, or within the Suburbs, or any other places between the said city and the Palace of Westminster…except the officers of the King…" *Royal Proclamation as to the Wearing of Arms in the City, and at Westminster; and as to Playing at Games in the Palace at Westminster*, MEMORIALS OF LONDON AND LIFE 268-69, 273 (H.T. Riley ed., 1868). Similarly, in John Carpenter's 1419 treatise *Liber Albus*, it stipulates that "no one, of whatever condition he be, go armed in the said *city [of London] or in the suburbs*, or carry arms, by day or by night, except the va[]lets of the great lords of the land, carrying the swords of their masters in their presence, and the serjeants-at-arms of his lordship the King, of my lady the Queen, the Prince, and the other children of his lordship the King, and the officers of the City, and such persons as shall come in their company in aid of them, at their command, for saving and maintaining the said peace; under the penalty aforesaid, and the loss of their arms and armour." JOHN CARPENTER, LIBER ALBUS: THE WHITE BOOK OF THE CITY OF LONDON (Henry Thomas Riley ed., 1861); *see also id.* at 229, 555, 556, 558, 560, 580 (providing other examples denoting that going armed in densely populated public places was unlawful).

4

12.     As it pertains to express restrictions on carrying dangerous weapons into specific locations, English law was relatively silent. This is because English restrictions on going armed in "sensitive places" were worded quite broadly, and therefore there was no need for the law to carve out individual locations. Churches or places of worship are one notable exception. *See* 4 Hen 4, c. 29 (1403) ("no Man be armed nor bear defensible armor to Merchant Towns Churches nor Congregations in the same, nor in the Highways, in affray of the Peace or the King's Liege people").

13.     The extent in which this broad, English understanding of what constituted a "sensitive place"—that is where arms bearing could be restricted—traveled across the Atlantic is unknown.  Local enforcement records did not survive for historical posterity, and therefore it is impossible for historians or anyone to reconstruct exactly how often, when, and where armed carriage restrictions were enforced. Most instances of legal enforcement were done at the local level, and, as a result, the records of said enforcement have been lost to time. And those records of enforcement that have miraculously survived often require time consuming, archival research, not ad hoc, keyword digital searches. *See, e.g.,* Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 U.C. Davis L. Rev. 2603 (2022).

14.     What the historical record does unequivocally inform is that armed carriage restrictions and the English common law against 'going armed' in urban and densely populated locations indeed made their way into the American Colonies and subsequent United States. *See* Patrick J. Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 Clev. St. L. Rev. 1, 31-32 (2012). Additionally, historians can state with certainty that state and local governments were well within their authority to prohibit armed assemblies circa the late eighteenth century, no matter whether said assemblies

were deemed the militia or not. *See* Patrick J. Charles, *The 1792 National Militia Act, the Second Amendment, and Individual Militia Rights: A Legal and Historical Perspective*, 9 Geo. J.L. & Pub. Pol'y 323, 326,-27, 374-90 (2011); An Act to Prevent Routs, Riots, and Tumultuous Assemblies, and the Evil Consequences Thereof, September Session, Chapter VIII (Mass. 1786); An Act for the More Speedy and Effectual Suppression of Tumults and Insurrections in the Commonwealth, September Session, Chapter IX (Mass. 1787); An Act to Prevent Routs, Riots, and Tumultuous Assemblies (N.J. 1797); An Act to Prevent Hunting with Fire-Arms in the City of New-York, and the Liberties Thereof (NY 1763); An Act Against Riots and Rioters (Pa. 1705); *see also* William Rawle, A View of the Constitution of the United States 126 (2d ed., 1829) (noting that the Second Amendment "ought not…in any government…be abused to the disturbance of the public peace," which included the assembling "of persons with arms, for an unlawful purpose"). This is because it had long been understood that any armed assemblage required the consent of government officials.[1]

15.     It was not until the mid-to-late nineteenth century that state and local governments within the United States began enacting express, location specific armed carriage restrictions.[2] Beginning with state laws, in 1869 Tennessee enacted a law restricted the carrying of dangerous weapons into "any election…fair, race course, or other public assembly of the people." Public Statutes of the State of Tennessee Since the Year 1858, at 108 (James H. Shankland ed.,

---

[1] This understanding of the law goes all the way back to the 1328 Statute of Northampton. *See* 2 Edw. 3, c. 3 (1328) (Eng.); *see also* 3 Calendar of Close Rolls, Richard II, 1385-1389, at 399-400 (May 16, 1388, Westminster) (H.C. Maxwell-Lyte ed., 1914); 1 Calendar of Close Rolls, Richard II, 1377-1381, at 34 (December 1, 1377, Westminster) (H.C. Maxwell-Lyte ed., 1914).

[2] There are, of course, a few exceptions, such as two mid-seventeenth century Maryland laws that prohibited dangerous weapons within legislative assemblies. 1647 Md. Laws 216; 1650 Md. Laws 273. But other than these two Maryland laws, the historical record until the mid-to-late nineteenth century provides very little in the way of express "sensitive" locations where armed carriage could be prohibited.

1871), *available at* https://catalog.hathitrust.org/Record/010432413. Not long thereafter, in 1870, Texas enacted a law restricting the carrying of dangerous weapons "into any church or religious assembly, any school-room or other place where persons assembled for educational, literary, or scientific purposes, or into a ball room, social party, or other social gathering, composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this state are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly…" 2 GEORGE W. PASCHAL, A DIGEST OF THE LAWS OF TEXAS: CONTAINING THE LAWS IN FORCE, AND THE REPEALED LAWS ON WHICH RIGHTS REST FROM 1864 TO 1872, at 1322 (1873), *available at* https://catalog.hathitrust.org/Record/010448003. That very same year, Georgia enacted a law providing that "no person in said State of Georgia be permitted or allowed to carry about his or her person any . . . pistol or revolver, or any kind of deadly weapon, to any Court of justice, or any election ground, or precinct, or any place of public worship, or any other public gathering in this State…" ACTS AND RESOLUTIONS OF THE GENERAL ASSEMBLY OF THE STATE OF GEORGIA PASSED…AT THE SESSION OF 1870, at 421 (1870), *available at* https://catalog.hathitrust.org/Record/100143502.

16.     In 1874, Missouri followed suit by enacting a restriction on carrying "any kind of fire-arms…or other deadly weapon" into "any place where people may be assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court-room during the sitting of court, or into any other public assemblage of persons meet for other than militia drill or meetings…" ACTS OF THE…GENERAL ASSEMBLY OF THE STATE OF MISSOURI  43 (1874), *available at* https://catalog.hathitrust.org/Record/000534559; *see also* LAWS OF MISSOURI: GENERAL AND LOCAL LAWS PASSED AT THE REGULAR SESSION OF THE

TWENTY-EIGHTH GENERAL ASSEMBLY 50-51 (1875), *available at*
https://catalog.hathitrust.org/Record/000534559 (same). In 1883, Missouri amended the law to
increase the fine. LAWS OF MISSOURI PASSED AT THE SESSION OF THE THIRTY-SECOND GENERAL
ASSEMBLY 76 (1883), *available at* https://catalog.hathitrust.org/Record/000534559.

17.      In 1889, Arizona enacted a law providing that "[i]f any person shall go into any
church or religious assembly, any school room, or other place where persons are assembled for
amusement or for educational or scientific purposes, or into any circus, show or public exhibition
of any kind, or into a ball room, social party or social gathering, or to any election precinct on the
day or days of any election, where any portion of the people of this Territory are collected to
vote at any election, or to any other place where people may be assembled to minister or to
perform any other public duty, or to any other public assembly, and shall have or carry about his
person a pistol or other firearm . . . he shall be punished by a fine not less than fifty nor more
than five hundred dollars, and shall forfeit to the County the weapon or weapons so found on his
person." ACTS, RESOLUTIONS AND MEMORIALS OF THE FIFTEENTH LEGISLATIVE ASSEMBLY OF
THE TERRITORY OF ARIZONA 30-31 (1889), *available at*
https://catalog.hathitrust.org/Record/010083734. Then there was the state of Oklahoma, which in
1890 restricted the carrying of dangerous weapons "into any church or religious assembly, any
school room or other place where persons are assembled for public worship, for amusement, or
for educational or scientific purposes, or into any circus, show or public exhibition of any kind,
or into any ball room, or to any social party or social gathering, or to any election, or to any place
where intoxicating liquors are sold, or to any political convention, or to any other public
assembly…" STATUTES OF OKLAHOMA 1890, at 495-96 (Will T. Little, L.G. Pitman, & R.J.
Barker eds., 1891), *available at* https://catalog.hathitrust.org/Record/010447936.

8

18.     In addition to the above state laws, there was an abundance of mid-to-late

nineteenth century ordinances restricting the carrying of dangerous weapons in so-called

"sensitive places."[3] The reason that so many localities enacted these ordinances was the

prevalence of the legal concept of "firearms localism"—this concept being a preference among

state and local lawmakers to regulate firearms and deadly weapons more strictly at the local

rather than the state level. *See* Joseph Blocher, *Firearms Localism*, 123 YALE L.J. 82, 112-16

(2013).[4]  One example is that of Columbia, Missouri, which in 1890 passed an ordinance

expressly restricting the carrying of dangerous weapons "into any church, or place where people

have assembled for religious worship; or into any school room, or place where people are

assembled for educational, literary or social purposes; or into any court room, during the sitting

---

[3] *See, e.g., An Ordinance*, July 9, 1891, *reprinted in* WACO DAILY NEWS (Tx), July 12, 1891, at 8 (**Exhibit 2**) ("If any person shall go into any church or religious assembly, any schoolroom, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or social party or social gathering or to any election precinct on the day or the days of any election, where any portion of the people of the State are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any public duty, or to any other public assembly, and shall have or carry about [their] person a pistol or other fire-arm…[they] shall be punished by a fine…").

[4] Many mid-to-late nineteenth century state laws and local government charters weigh this out. *See, e.g.,* THE LAWS OF THE STATE OF KANSAS 118, 134 (1871), *available at* https://catalog.hathitrust.org/Record/100836175 (providing all Kansas cities "of the third class" wide latitude to "prohibit and punish the carrying of firearms or other deadly weapons, concealed or otherwise"); LAWS OF THE STATE OF INDIANA PASSED AT THE FIFTY-FIRST REGULAR SESSION OF THE GENERAL ASSEMBLY 201, 202 (1879), *available at* https://catalog.hathitrust.org/Record/008892461 (1879 law providing all Indiana towns the authority "to regulate or prohibit the use of firearms, fireworks, or other things tending to endanger persons and property"); ACTS OF TENNESSEE: EXTRAORDINARY SESSION 48, 55 (1885), *available at* https://catalog.hathitrust.org/Record/100666682 (providing the mayor and alderman of the city of Knoxville the authority to "prevent and suppress the sale of fire-arms and carrying of concealed weapons'); ACTS OF THE ONE HUNDRED AND TWELFTH LEGISLATURE OF THE STATE OF NEW JERSEY AND THE FORTY-FOURTH UNDER THE NEW CONSTITUTION 483, 501 (1888), *available at* https://catalog.hathitrust.org/Record/010134285 (1888 law providing all New Jersey towns the authority "to regulate or prohibit the use of firearms and the carrying of weapons of any kind"); THE COMPLETE CODES AND STATUTES OF THE STATE OF MONTANA IN FORCE JULY 1, 1895, at 424, 427 (1895), *available at* https://catalog.hathitrust.org/Record/010447759 (providing all Montana "city or town council[s]" the authority to "prevent and suppress the sale of firearms the carrying of concealed weapons"); *see also* Patrick J. Charles, *The Fugazi Second Amendment: Bruen's Text, History, and Tradition Problem and How to Fix It*, 71 CLEV. ST. L. REV. 623, 662 n.256, 685 n.406 (2023) (providing more than two dozen examples of firearms localism within state laws and local government charters).

of court, or to any election precinct on any election day; or into any other public assemblage of

persons met for any lawful purpose…" *Chapter XVII: Carrying Concealed Weapons—Firing*

*Guns, Pistols, Fire Crackers, Etc.*, May 22, 1890, *reprinted in* GENERAL ORDINANCES OF THE

TOWN OF COLUMBIA, IN BOONE COUNTY, MISSOURI 34, 35 (Lewis M. Switzler ed., 1890),

*available at* https://catalog.hathitrust.org/Record/001754262.[5] The Columbia ordinance mirrored

Missouri state law, and was not the only Missouri locality to do so. The localities of Gainesville

(1896),[6] Huntsville (1894),[7] Leonard (1891),[8] Marceline (1892),[9] Ridgeway (1893),[10] Rocheport

(1895*),[11] and Warrensburg (1890),[12] all enacted similar ordinances.  Meanwhile, other Missouri

---

[5] *See* LAWS OF MISSOURI: GENERAL AND LOCAL LAWS PASSED AT THE REGULAR SESSION OF THE TWENTY-NINTH GENERAL ASSEMBLY 158, 166 (1877), *available at* https://catalog.hathitrust.org/Record/000534559 (1877 Missouri state law empowering city and town councils, such as Columbia, with the authority to "prohibit and punish the carrying of firearms and other deadly weapons, concealed or otherwise"). Like Columbia, Webb City, Missouri and Huntsville, Missouri enacted similar laws. *See Ordinance No. 577: An Ordinance Defining What Shall constitute Misdemeanors or Offenses Against the City of Webb City, and Providing Penalties Therefor*, May 15, 1905, *reprinted in* REVISED ORDINANCES OF THE CITY OF WEBB CITY, MISSOURI, 1905, at 99, 100 (1905), *available at* https://catalog.hathitrust.org/Record/008604358; *An Ordinance in Relation to Carrying Deadly Weapons*, July 17, 1894, *reprinted in* THE REVISED ORDINANCES OF THE CITY OF HUNTSVILLE, MISSOURI OF 1894, at 58-59 (1894), *available at* https://everytownlaw.org/documents/2022/12/huntsville-mo-1894.pdf/.

[6] *Ordinances, of the Incorporation of the Town of Gainesville*, May 26, 1896, *reprinted in* OZARK COUNTY NEWS (Gainesville, MO), June 4, 1896, at 1 (**Exhibit 3**) ("It shall be unlawful for any person…to go into any public gathering or place where people are assembled for any lawful purpose, with any kind of fire-arms…or other deadly weapon…").

[7] *An Ordinance in Relation to Carrying Deadly Weapons*, July 17, 1894, *reprinted in* THE REVISED ORDINANCES OF THE CITY OF HUNTSVILLE, MISSOURI OF 1894, at 58-59 (1894), *available at* https://everytownlaw.org/documents/2022/12/huntsville-mo-1894.pdf/.

[8] *Ordinance No. 23: Ordinance Concerning the Carrying of Deadly Weapons*, July 6, 1891, *reprinted in* SHELBY COUNTY HERALD (Shelbyville, MO), July 29, 1891, at 4 (**Exhibit 4**).

[9] *Ordinance No. 9*, September 12, 1892, *reprinted in* MARCELINE JOURNAL-MIRROR (MO), October 28, 1892, at 8 (**Exhibit 5**).

[10] *Town Ordinance No, XXVIII: An Ordinance in Relation to Misdemeanors*, April 3, 1893, *reprinted in* RIDGEWAY JOURNAL (MO), April 6, 1893, at 4 (**Exhibit 6**).

[11] *An Ordinance: Misdemeanors*, undated, *reprinted in* ROCHEPORT COMMERCIAL (MO), September 20, 1895, at 8 (**Exhibit 7**) ("If any person shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any court, or into any public assemblage of persons met for a lawful

localities, including Collins (1887),[13] Craig (1880*),[14] Cuba (1881),[15] Granby (1873)[16] just to name a few, enacted ordinances restricting the carrying of dangerous weapons within their "corporate" or "incorporate" limits, whether such carrying was open, concealed, or both. This meant that the carrying of dangerous weapons within these localities' commercial and public epicenters was legally deemed off limits.

19. Localities throughout the state of Kansas enacted similar ordinances. Indeed, in the case of Stockton, Kansas, persons were prohibited from carrying dangerous weapons "into any church or place where the people have assembled for public worship, or into any school room or place where people have assembled for educational, literary or social purposes, or to any election on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons …or shall go upon the public streets or public places of the city…" *Ordinance No. 76: An Ordinance Prohibiting Deadly Weapons*, July 1, 1887, *reprinted in*

---

[12] *Concealed or Deadly Weapons*, June 5, 1890, *reprinted in* JOHNSON COUNTY STAR (Warrensburg, MO), June 7, 1890, at 4 (**Exhibit 8**).

[13] *Town Ordinances: Adopted by the Board of Trustees of the Town of Collins, Mo.: Ordinance No. 4*, May 2, 1887, *reprinted in* OSCEOLA ADVANCE (Osceola, MO), July 7, 1887, at 4 (**Exhibit 9**) ("Any person who shall carry any concealed weapon or any revolver, pistol, knife or dirk which may not be concealed within the corporate limits of the town of Collins, shall…be fined…except however, that upon good cause shown, the board may grant a permit to any citizen of good reputation to carry weapons for self defense.").

[14] *Ordinances of Craig, Mo.: Ordinance No. 8—Carrying Concealed Weapons*, undated, *reprinted in* CRAIG WEEKLY GAZETTE (MO), October 13, 1880, at 4 (**Exhibit 10**) ("Any person who shall within the corporate limits of said city of Craig, carry of have upon his person, any concealed weapon or weapons, shall be adjudged guilty of a misdemeanor…").

[15] *Revised Ordinances: Ordained and Established May 24, 1881: Chapter VIII: Misdemeanors*, May 24, 1882, *reprinted in* CRAWFORD MIRROR (Steelville, MO), July 27, 1882, at 1 (**Exhibit 11**) ("If any person be found carrying concealed about his person in the corporate limits, any kind of fire arms…or other deadly weapon, within the limits of said town he shall be fined....").

[16] *Ordinances of the Town of Granby: No. 8: An Ordinance Concerning the Carrying of Weapons*, October 30, 1873, *reprinted in* GRANBY MINER (Granby, MO), November 1, 1873, at 2 (**Exhibit 12**) ("That any person within the corporate limits of the town of Granby who shall be found carrying, either openly or concealed, any pistol…or any other offensive weapon…shall be fined…").

STOCKTON REVIEW AND ROOKS COUNTY RECORD (KS), July 1, 1887, at 1 (**Exhibit 13**).

However, most Kansas localities that enacted restrictions on the carrying of dangerous weapons in "sensitive places" did so by making their entire "corporate" or "incorporate" area off limits, whether such carrying was open, concealed, or both. Abilene (1870),[17] Arkansas City (1885),[18] Beloit (1872),[19] Caldwell (1885),[20] Coolidge (1886),[21] Elk City (1898),[22] Harper (1887*),[23]

---

[17] *An Ordinance Relating to the Carrying of Fire Arms and Other Deadly Weapons*, to take effect on May 20, 1870, *reprinted in* ABILENE WEEKLY CHRONICLE (KS), May 12, 1870, at 1 (**Exhibit 14**) ("That any person who shall carry, within the limits of the town of Abilene, or commons, a pistol, revolver….or other dangerous weapon…either openly or concealed, except to bring the same and forthwith to deposit it or them at their house, boarding house, store room or residence, shall be fined…").

[18] *Ordinance No. 1*, May 11, 1885, *reprinted in* ARKANSAS CITY WEEKLY TRAVELER (KS), May 20, 1885, at 4 (**Exhibit 15**) ("That any person carrying any deadly or dangerous weapons, such as loaded fire-arms…or any other weapons which when used are liable to produce death or great bodily harm, unconcealed, within the corporate limits of the city" shall pay a fine of $1 to $10, and the carrying of said weapons "concealed" will pay a fine of $5 to $25).

[19] *An Ordinance in Relation to the Carrying of Fire-Arms or Other Weapons*, September 9, 1872, *reprinted in* BELOIT GAZETTE (KS), September 19, 1872, at 4 (**Exhibit 16**) ("That any person who shall be found within the corporate limits of this city with any revolver, pistol…or any other dangerous or deadly weapon concealed or otherwise shall be deemed guilty of a misdemeanor…").

[20] *Revised Ordinances of the City of Caldwell*, undated, *reprinted in* CALDWELL ADVANCE (KS), May 4, 1885, at 2 (**Exhibit 17**) ("Any person carrying any deadly or dangerous weapon, such as firearms…or any other weapon which when used is liable to produce death or great bodily harm, unconcealed, within the corporate limits of the city" shall pay a fine of $10 to $100, and carrying of said weapons "concealed" will pay a fine of $15 to $100).

[21] *An Ordinance Concerning Offenses in the Nature of Misdemeanors*, April 26, 1886, *reprinted in* BORDER RUFFIAN (Coolidge, KS), May 1, 1886, at 1 (**Exhibit 18**) ("It shall be unlawful for any person or persons to display or make any improper use of any deadly weapon withing the corporate limits of this city…Any person or persons, other than the duly appointed and commissioned officers of this city, or officers of this county or State, carrying concealed deadly weapons…within the corporate limits of the city, shall, upon conviction, be deemed guilty of a misdemeanor.").

[22] *Ordinance No. 165*, March 7, 1898, *reprinted in* ELK CITY ENTERPRISE (KS), March 11, 1898, at 2 (**Exhibit 19**) ("That any person within the corporate limits of said city of Elk City who…shall carry or have on his or her person in a concealed manner, or otherwise any pistol…or any deadly weapon…shall be deemed guilty of a misdemeanor…").

[23] *Ordinance No. 180*, undated, *reprinted in* HARPER DAILY SENTINEL (KS), August 23, 1887, at 2 (**Exhibit 20**) ("That is shall be unlawful for any person to carry any deadly or dangerous weapon, such as fire arms…within the incorporate limits of said city.").

Howard (1889),[24] Kendall (1887),[25] Meade Center1885),[26] Mount Hope (1887),[27] and Scandia (1893)[28] are just a few examples in this regard.

20.    Ordinances restricting the carrying of dangerous weapons in localities' entire "corporate" or "incorporate" areas were not limited to the states of Missouri and Kansas. Much like armed carriage licensing laws, Charles, *The Fugazi Second Amendment*, *supra*, at 569-65, ordinances restricting the carrying of dangerous weapons in "corporate" or "incorporate" areas proliferated across the United States during the mid-to-late nineteenth century, *id*. at 709-10. For instance, Ashville, North Carolina enacted an ordinance prohibiting the carrying of "pistols, bowie-knives, sling-shots, billeys, [and] other deadly weapons (officers excepted) within the corporate limits…" *Ordinances of the Town of Asheville*, in force as of June 1, 1882, *reprinted in* ASHEVILLE WEEKLY CITIZEN (NC), June 3, 1882, at 1 (**Exhibit 21**). Similarly, in 1874, Lake Charles, Louisiana passed an ordinance prohibiting the carrying of any "weapon or weapons…within the corporate limits…such as Bowie knives, pistols, revolvers, dirks…or any

---

[24] *Ordinance No. 72: An Ordinance to Prevent Carrying Concealed Weapons and the Discharge of Firearms*, May 16, 1889, *reprinted in* CITIZEN (Howard, KS), May 22, 1889, at 3 (**Exhibit 22**).

[25] *Ordinances: Of the City of Kendall, in the County of Hamilton, State of Kansas*, undated, *reprinted in* KENDALL FREE PRESS (KS), March 23, 1887, at 1 (**Exhibit 23**) ("It shall be unlawful for any person or persons to display or make any improper use of any deadly weapon withing the corporate limits of this city…Any person or persons, other than the duly appointed and commissioned officers of this city, or officers of this county or State, carrying concealed deadly weapons…within the corporate limits of the city, shall, upon conviction, be deemed guilty of a misdemeanor.").

[26] *City Ordinances*, November 23, 1885, *reprinted in* MEADE GLOBE (Meade Center, KS), November 28, 1885, at 2 (**Exhibit 24**) (prohibiting all persons "not authorized by the laws of the United States or the state of Kansas" from carrying a "pistol…or other deadly weapons" within the "incorporate limits").

[27] *Ordinance No. Twelve: Peace, Good Government and Welfare*, May 4, 1887, *reprinted in* MOUNT HOPE CLARION (KS), May 5, 1887, at 3 (**Exhibit 25**) (prohibiting all except officers and travelers from carrying "firearms…or other deadly weapons, concealed, within the corporate limits," and "any person under the age of twenty one years of age" from "carrying any deadly weapon, concealed or otherwise").

[28] *Ordinance No. 79*, December 27, 1893, *reprinted in* SCANDIA JOURNAL (KS), January 5, 1894, at 8 (**Exhibit 26**) (prohibiting the concealed carry of any "pistol…or other deadly weapon" within the "corporate limits" except for persons "engaged in a lawful occupation and of good moral character" who are "granted a permit to carry such concealed weapons").

other dangerous weapon…" *The Town Council*, June 20, 1874, *reprinted in* LAKE CHARLES

ECHO (Lake Charles, LA), July 18, 1894, at 4 (**Exhibit 27**). The same was true for the

Pennsylvania capital city of Harrisburg, which in 1873 enacted an ordinance prohibiting the

carrying of "any pistol, dirk-knife, slung-shot or deadly weapon, within the city limits…except

police officers…" LOUIS RICHARDS & JAMES M. LAMBERTON, A DIGEST OF LAWS AND

ORDINANCES FOR THE GOVERNMENT OF THE CITY OF HARRISBURG, PENNSYLVANIA IN FORCE

AUGUST 1, A.D. 1906, at 557-58 (1906), *available at*

https://catalog.hathitrust.org/Record/100565572.

21.    There are indeed other local ordinance examples abound.[29] Historically speaking,

however, it is impossible to state with specificity just how many localities maintained "sensitive

---

[29] *See, e.g., Misdemeanors: Chapter 12, By Laws and Ordinances*, undated, *reprinted in* LAWRENCE
DEMOCRAT (Lawrenceburg, TN), July 26, 1895, at 4 (**Exhibit 28**) ("That is shall not be lawful for any
person to carry about their person any pistol…or other deadly weapon within this Corporation…"); *An
Ordinance Prohibiting the Carrying of Concealed Weapon and Fixing the Punishment Therefor*, January
23, 1895, *reprinted in* PERRY DAILY TIMES (OK), February 2, 1895, at 2 (**Exhibit 29**) (prohibiting the
concealed carry of dangerous weapons across the city of Perry, Oklahoma, and all carrying of dangerous
weapons within the "corporate limits"); THE REVISED ORDINANCES OF PROVO CITY, UTAH 96 (1893),
*available at* https://catalog.hathitrust.org/Record/009037720 ("Every person who shall wear, or carry
upon his person any pistol, or other fire arm, slungshot, false-knuckles, bowieknife, dagger or any other
dangerous or deadly weapon within the city limits of this city is guilty of an offence, and upon conviction
thereof shall be liable to a fine in any sum not exceeding twenty-five dollars, or to be imprisoned in the
city jail not exceeding twenty-five days, or to both fine and imprisonment."); *Ordinance No. 2133*, July
23, 1889, *reprinted in* OMAHA WORLD-HERALD (NE), August 4, 1889, at 12 (**Exhibit 30**) ("It shall be
unlawful for any person to wear under his clothes, or concealed about his person, any pistol or revolver,
colt, billy, slug-shot, brass knuckles or knuckles of lead, dirk, dagger, or any knife resembling a bowie
knife, or any other dangerous or deadly weapon within the corporate limits of Omaha."); *Ordinance No.
11*, December 4, 1882, *reprinted in* BLACK HILLS WEEKLY JOURNAL (SD), December 8, 1882, at 1
(**Exhibit 31**) ("That is shall be, and it is hereby declared to be unlawful for any person to carry, openly or
concealed, any musket, rifle, shot gun, pistol…or any other dangerous or deadly weapon within the
corporate limits of the town of Rapid City, Dakota territory…me[re]…transportation from one place to
another" excluded); *Ordinance No. 44*, May 8, 1883, *reprinted in* ARIZONA DAILY STAR (Tucson, AZ),
May 19, 1883, at 3 (**Exhibit 32**) ("If any person within the corporate limits if the city of Tucson carry
concealed upon his person any gun, pistol, bowie-knife, dagger, or other deadly weapon, he shall be
deemed guilty of…a misdemeanor"); *An Ordinance (No. 18): Regulating the Keeping and Bearing of
Deadly Weapons*, August 19, 1873, *reprinted in* GALVESTON DAILY NEWS (TX), August 28, 1873, at 4
(**Exhibit 33**) ("That any person carrying on or about his person, saddle or vehicle, within the corporate
limits of the city of Galveston, any pistol [or other dangerous weapons]…for the purposes of offense or

places" ordinances by the close of the nineteenth century. Like most local government records up to the close of the nineteenth century, many local ordinances have been lost to time. Indeed, often localities published their ordinances in local newspapers, and, in fact, it is from local newspapers that I was able to locate many "sensitive places" ordinances. But as any professional historian or archivist can attest, the records of local ordinances that have survived for historical posterity are only a fragment of the whole.

22.     Despite being unable to fully reconstruct the exact number "sensitive places" laws, what is known upon examining all the state and local "sensitive places" laws from a macro level is that come the mid-to-late nineteenth century state and local governments maintained the authority to restrict the carrying of dangerous weapons in a variety of "sensitive places" where people were known to congregate. Such "sensitive places" categories included 1) churches and places of worship; 2) places where large public assemblies generally took place, *i.e.*, parks,[30] town squares, and the like; 3) polling places and other buildings where political activity generally took place; 4) schools and institutions of higher learning; 5) places where events of amusement took place, *i.e.*, places where people congregate for large planned events; and 6) bars, clubs, social venues, or anywhere in which alcohol or psychoactive or mood altering drugs were purchased or consumed.

---

defense….unless he has reasonable grounds for fearing an unlawful attack on his person, and that such attack shall be immediate and pressing" will be a pay between $25 and $100); *An Ordinance Prohibiting the Carrying of Fire Arms and Concealed Weapons*, undated, *reprinted in* NEBRASKA CITY NEWS (NE), July 7, 1869, at 3 (**Exhibit 34**) ("That it shall be, and it is hereby declared to be unlawful for any person to carry openly or concealed, any musket, rifle, shot gun, pistol…or any other dangerous or deadly weapons, within the corporate limits of Nebraska City, Nebraska…mere…transportation from one place to another" excluded).

[30] For some "park" examples, see Charles, *The Fugazi Second Amendment*, *supra*, at 710-12 and accompanying notes.

23.     What historically buttresses that each of these categories were generally understood to be "sensitive places" is the fact that there is no historical evidence that informs otherwise. As far as I am aware, not one nineteenth century court of law found any of these "sensitive places" categories to be unconstitutional.[31] The same is true for nineteenth century legal commentary—not one said commentary calls these "sensitive places" categories into constitutional question. This is rather important because *Bruen* denotes that when it comes to the "sensitive places" doctrine a *lack* of historical evidence disputing their lawfulness *presumes* their constitutionality. 142 S. Ct. at 2133.

**The History of Restrictions on Liquor and Arms Bearing**

24.     All the while armed carriage licensing laws and "sensitive places" laws were spreading across the country, so too were laws regulating liquor and arms bearing. *See infra* pp. 18-22. It is difficult to state with specificity when the first law restricting arms bearing and liquor came into existence in the American Colonies. *See, e.g., General Court for Elections, Boston*, May 28, 1679, *reprinted in* 2 MILITARY OBLIGATION: THE AMERICAN TRADITION: PART 6. MASSACHUSETTS ENACTMENTS 125 (1947), *available at* https://catalog.hathitrust.org/Record/100721030 (prohibiting the bringing to any militia muster or

---

[31] In fact, the opposite is true. *See State v. Shelby*, 90 Mo. 302, 468–69 (Mo. 1886); *State v. Wilforth*, 74 Mo. 528, 530–31 (Mo. 1881); *Owens v. State*, 3 Tex. App. 404 (Tex. App. 1878), *reprinted in* CASES ARGUED AND ADJUDGED IN THE COURT OF APPEALS OF THE STATE OF TEXAS 404–8 (Vol. 3, 1878); *Hill v. State*, 53 Ga. 472, 473–75 (Ga. 1874); *English v. State*, 35 Tex. 473, 473–74, 476 (Tex. 1873); *Andrews v. State*, 50 Tenn. 165, 168 (Tenn. 1871). *See also The Supreme Court: On Carrying Concealed Weapons*, STATE JOURNAL (Jefferson City, MO), April 12, 1878, at 2 (**Exhibit 35**) (copy of 1878 Missouri Supreme Court decision *State v. Reando*, upholding a constitutional challenge to the state's "sensitive places" law). The case cannot be found in the Missouri Supreme Court Historical Database but was briefly reported in a contemporaneous issue of *The Central Law Journal*. *See Abstract of Decisions of the Supreme Court of Missouri: October Term, 1877*, 6 CENTRAL L. J. 16, 16 (1878) ("The act of the legislature prohibiting the conveying of fire-arms into courts, churches, etc….is constitutional. It is a police regulation not in conflict with the provisions of the organic law…*State v. Reando*.").

training "any wine, strong liquor, cider, or any other inebriating" drinks). What is known is that by the mid-eighteenth century, many colonial lawmakers viewed liquor and arms bearing as a potentially dangerous combination. For instance, in 1746, New Jersey made it unlawful "to sell any strong Liquor" to any militiaman during the "Days or Times that they are obliged to appear in Arms at the Place of Mustering or Training, or within a Mile thereof, until after they are dismissed for that day"—militiamen on leave from their commanding officers excluded. *An Act for Better Settling and Regulating the Militia of the Colony of New-Jersey, for the Repelling of Invasion, and Suppressing Insurrections and Rebellions*, May 8, 1746, *reprinted in* ACTS OF THE GENERAL ASSEMBLY OF THE PROVINCE OF -JERSEY 139, 146 (1776), *available at* https://catalog.hathitrust.org/Record/010448351. Similarly, in 1756, Delaware made it unlawful to "expose to sale at or Bring on any Pretence whatsoever any strong Liquor" to any militia muster or meeting. *An Act for the Establishing a Militia in this Government*, March 24, 1756, *reprinted in* 2 MILITARY OBLIGATION: THE AMERICAN TRADITION: PART 3. DELAWARE ENACTMENTS 10, 12 (1947), *available at* https://catalog.hathitrust.org/Record/100721030; s*ee also An Act for Regulating the Militia of the Province of Maryland*, May 22, 1756, *reprinted in* 2 MILITARY OBLIGATION: THE AMERICAN TRADITION: PART 5. MARYLAND ENACTMENTS 83, 93 (1947), *available at* https://catalog.hathitrust.org/Record/100721030 (prohibiting the selling, disposing, or vending of "Strong Liquor" at "any place of training or at any other Place within Five Miles of any Place of training").

25.     After the ratification of the Constitution, many lawmakers continued to view liquor and arms bearing as a potentially dangerous combination. *See, e.g., An Act for the Regulation of the Militia of New-Jersey*, June 13, 1799, *reprinted in* LAWS OF THE STATE OF NEW JERSEY 436, 444 (William Patterson ed., 1800), *available at*

https://catalog.hathitrust.org/Record/010448353 ("Any person, who shall bring any kind of spiritous liquors to the place of exercise, shall forfeit such liquors…"); *New Militia Law: An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania*, April 11, 1793, *reprinted in* INDEPENDENT GAZETTEER (Philadelphia, PA), April 20, 1793, at 1, 4 ("No company or regiment shall meet at a tavern on any of the days of exercise, nor shall march to any tavern before they are discharged, and any person who shall bring any kind of spiritous liquors to such place of training, shall forfeit such liquors so brought…");  AN ACT FOR THE BETTER REGULATION OF THE MILITIA, OF THE CITY OF BALTIMORE, PASSED BY THE LEGISLATURE OF MARYLAND, DECEMBER SESSION, 1817, at 15 (1818), *available at* https://archive.org/details/gpl_1337206/page/n9/mode/2up (law prohibiting militia members from "appear[ing] drunk"). Of course, not every state enacted liquor-related arms bearing restrictions, nor did every locality effectively enforce them. But this is in part why the state militias fell into such disrepute by the mid-nineteenth century. *See, e.g.,* Lena London, *The Militia Fine 1830-1860*, 15 MILITARY AFFAIRS 133, 136 (1951) ("The excessive consumption of liquor at militia musters resulted in more than just inebriation. Disorderly conduct and riots were often the outcome."); PATRICK J. CHARLES, ARMED IN AMERICA: A HISTORY OF GUN RIGHTS FROM COLONIAL MILITIAS TO CONCEALED CARRY 79, 130 (2018) (containing historical images of the militia drinking alcohol during musters).

26.     As far non-militia based restrictions on liquor and arms bearing, the territory of New Mexico appears to have been the forefront. Therein, in 1852, it was made unlawful for "any person" to carry "fire arms or other deadly weapons" into any "ball where Liquors are sold…" LAWS OF THE TERRITORY OF NEW MEXICO, PASSED BY THE SECOND LEGISLATIVE ASSEMBLY IN THE CITY OF SANTA FE 69 (1853), *available at* https://catalog.hathitrust.org/Record/010476920. However, it was not until after the Civil War—after lawmakers and public officials began to

18

increasingly witness the negative consequences of alcohol on war veterans[32]—that broad, general restrictions on liquor and arms bearing began to spread across the country. On the state level, Kansas (1867),[33] Mississippi (1878),[34] Missouri (1879),[35] Oklahoma (1890),[36] and Wisconsin (1883)[37] all enacted liquor-related arms bearing restrictions.

27.     And given the prevalence of firearms localism during the mid-to-late nineteenth century, *see supra* pp. 9-12, so too did many localities. Much like "sensitive places" and armed carriage licensing laws during this period, it is impossible to historically pinpoint just how many localities enacted ordinances governing liquor and arms bearing. Many localities made intoxication and unlawful arms bearing separate offenses, each with their own penalty or fine. Other localities, however, combined the two offenses into one. Such was the case for Grand Junction, Colorado circa 1899, which made it unlawful to not only "carry any…weapon or weapons when drunk or in a state of intoxication," and to "sell, barter, loan or deliver any such weapon or weapons to any drunk or intoxicated person." *Ordinance No. 83: Article VIII: Offensives Affecting the Public Safety*, June 30, 1899, *reprinted in* GRAND JUNCTION NEWS (CO),

---

[32] *"Half the Time Unfit for Duty": Alcoholism in the Civil War*, NATIONAL MUSEUM OF CIVIL WAR MEDICINE, September 2, 2021, *available at* https://www.civilwarmed.org/alcoholism/.

[33] *An Act to Prevent the Carrying of Deadly Weapons*, February 23, 1867, *reprinted in* LAWS OF THE STATE OF KANSAS 25 (1867), *available at* https://catalog.hathitrust.org/Record/100836175 (prohibiting any "person under the influence of intoxicating drink" from carrying dangerous weapons).

[34] *Laws of the State of Mississippi: An Act to Prevent the Carrying of Concealed Weapons, and For Other Purposes*, February 28, 1878, *reprinted in* CLARION-LEDGER (Jackson, MS), March 13, 1878, at 3 (**Exhibit 36**) ("That it shall not be lawful for any person to sell to…any person intoxicated, knowing him to be…in a state of intoxication, any" dangerous weapons).

[35] REVISED STATUTES OF THE STATE OF MISSOURI, 1879 at 224 (1879), *available at* https://catalog.hathitrust.org/Record/002030306 (law prohibiting any person from carrying any dangerous weapons "upon his person when intoxicated or under the influence of intoxicating drinks").

[36] STATUTES OF OKLAHOMA 1890, *supra*, at 496 (prohibiting the carrying of dangerous weapons "to any place where intoxicating liquors are sold").

[37] *An Act to Prohibit the Use and Sale of Pistols and Revolvers*, April 7, 1883, *reprinted in* LAWS OF WISCONSIN 290 (1883), *available at* https://catalog.hathitrust.org/Record/005877100 ("It shall be unlawful for any person in a state of intoxication, to go armed with any pistol or revolver.").

July 8, 1899, at 4, 7 (**Exhibit 37**). In 1895, Rocheport, Missouri enacted an ordinance, prohibiting the carrying of "any…weapon upon or about [their] person when intoxicated or under the influence of intoxicating drinks…" *And Ordinance: Misdemeanors*, undated, *reprinted in* ROCHEPORT COMMERCIAL (MO), September 20, 1895, at 8 (**Exhibit 7**). Meanwhile, in 1891, Lyons, Kansas enacted an ordinance prohibiting the carrying of any "pistol, bowie knife, dirk or other deadly weapon" with the city limits by anyone "not engaged in any legitimate business" or "under the influence of intoxicating drink…" *Ordinance No. 179*, September 7, 1891, *reprinted in* LYONS REPUBLICAN (KS), September 10, 1891, at 4 (**Exhibit 38**). There are indeed other examples to point to,[38] but none as broad as the prohibition adopted by two of the country's three most populous cities—New York and Brooklyn respectively. Both enacted prohibitions on the selling, loaning, or giving of any dangerous weapon to a person that posed "any danger to [the] life" of others, which naturally would have precluded the selling, loaning, or giving of any dangerous weapons to any intoxicated persons. *See* METROPOLITAN BOARD OF HEALTH: CODE OF HEALTH ORDINANCES, AND RULES AND SANITARY REGULATIONS 52 (1866), *available at* https://catalog.hathitrust.org/Record/008905639; *Sanitary Code*, July 15, 1873, *reprinted in* BROOKLYN UNION (NY), August 21, 1873, at 1 (**Exhibit 39**).

---

[38] *Town Ordinance No. 21*, August 7, 1894, *reprinted in* K COUNTY DEMOCRAT (Blackwell, OK), August 23, 1894, at 8 (**Exhibit 40**) (prohibiting the general carrying of dangerous weapons within the "corporate limits," but also prohibiting all "public officers" from carrying if "under the influence of intoxicating drinks"); *An Ordinance—To Prohibit Intoxication Breach of the Peace, Carrying of Deadly Weapons…and to Repeal Certain Ordinances in Said City*, December 22, 1887, *reprinted in* WALLACE COUNTY REGISTER (KS), December 24, 1887, at 7 (**Exhibit 41**) ("Any person who shall, while intoxicated be found carrying on his person, a pistol…or other deadly weapon, shall upon conviction be fined in a sum not exceeding $100, or by imprisonment in the city jail not exceeding 3 months."); *Ordinance No. 39*, January 4, 1886, *reprinted in* DADE COUNTY ADVOCATE (Greenfield, MO), January 21, 1886, at 4 (**Exhibit 42**) (prohibiting the carrying of dangerous weapons by those "intoxicated, or under the influence of intoxicating drinks").

28.    As far as I am aware, not one nineteenth century legal commentator or nineteenth century court of law found any liquor-related arms bearing restriction unconstitutional.[39]

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on   12 July 2023                          _Pat J. Chm_

                                                    PATRICK J. CHARLES

---

[39] In fact, the opposite is true. *See Shelby*, 90 Mo. at 468–69; *see also* Tipler v. State, 57 M. 365 (1880), *reprinted in* 57 REPORTS OF CASES IN THE SUPREME COURT FOR THE STATE OF MISSISSIPPI (1880) (noting that the reasonableness exception to the state's armed carriage law could not apply to instances of "idle threats" or "the offspring of intoxication"); *Concealed Weapons: Judge Brannon's Decision on This Subject*, WHEELING REGISTER (WV), October 15, 1883, at 1 (**Exhibit 43**) (noting that the principal purpose of most armed carriage restrictions are to prevent an "armed riot or affray," particularly during "dangerous moments of anger or intoxication").

# EXHIBIT 1

## PATRICK J. CHARLES
www.patrickjcharles.com

---

**EDUCATION**

**Queen Mary-University of London School of Law**, LLM Legal Theory and History with Distinction, Dec 2014.
    Legal Theory and History Full Scholarship Recipient
    Peer Review Editor, Queen Mary Law Journal

**Cleveland-Marshall School of Law**, Juris Doctor, May 2009.
    2008 Judge John R. Brown Award for Legal Writing ($10,000 award given annually to best student article, note, comment or paper in the United States)

**George Washington University**, B.A. History with Honors, International Affairs Conflict & Security,
    International Affairs European Affairs, Jun 2005.

---

**EXPERIENCE**

**Air Force Historical Research Agency, USAF**, Maxwell AFB, AL      *Lead Research Team Archivist*   04/22 – Pres

**U.S. Special Operations Command, Legislative Affairs, USAF**, Washington, DC   *Legislative Liaison*   01/21 – 4/22

**U.S. Senate, Office of U.S. Senator Martin Heinrich**, Washington, DC      *Legislative Fellow*    01/20 – 01/21

**Dept of State, Office of U.S. Foreign Assistance Resources**, Washington, DC   *Legislative Analyst*   07/19 - 01/20

**U.S. Special Operations Command, USAF**, MacDill AFB, FL      *Senior Historian*   07/16 - 07/19

**Journal of Immigration, Asylum, and Nationality Law**, London, UK      *Peer Review Editor*   09/15 - 09/18

**24th Special Operations Wing, USAF**, Hurlburt Field, FL      *Historian*   08-14 - 07/16

**352nd Special Operations Group, USAF**, Mildenhall, UK      *Historian*   12/10 - 08/14

**Immigration Reform Law Institute**, Washington, DC      *Legal Analyst/Legal Historian*   5/09 - 12/10

**United States Marine Corps**, Shanghai, China      *Sergeant/Assistant Detachment Commander*   8/97 - 8/02

---

**FELLOWSHIPS AND GRANTS**

United States Air Force, Air Force Legislative Fellows Program, July 2019-April 2022.

Eisenhower Foundation Research Travel Grant 2019, Dwight D. Eisenhower Presidential Library, Abilene, KS.

Carl Albert Congressional Research Center Visiting Scholars Grant 2018, University of Oklahoma, Norman, OK.

Bordin-Gillette Research Fellowship 2018, University of Michigan Bentley Historical Library, Ann Arbor, MI.

Clark-Yudkin Research Fellowship 2013-14, United States Air Force Academy Library, Colorado Springs, CO.

---

**BOOK PUBLICATIONS AND BOOK CHAPTERS**

*Vote Gun: How Gun Rights Became Politicized in the United States* (Columbia University Press, forthcoming 2023).

"The 'Reasonable Regulation' Right to Arms: The Gun Rights Second Amendment Before the Standard Model," *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment*, Jennifer Tucker, Barton C. Hacker, and Margaret Vining eds. (Smithsonian Institution Press, 2019).

*Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* (Prometheus Books, 2019) (paperback edition with new foreword).

*Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* (Prometheus Books, 2018).

*United States Special Operations History, 1987-2017* (7th edition, USSOCOM History and Research Office, 2017) (contributor).

*Historicism, Originalism and the Constitution: The Use and Abuse of History in American Jurisprudence* (McFarland, 2014).

*The Second Amendment: The Intent and its Interpretation by the States and the Supreme Court* (McFarland, 2009).

*Irreconcilable Grievances: The Events that Shaped the Declaration of Independence* (Heritage Books, 2008).

## ARTICLES AND OTHER PRINT PUBLICATIONS

"The Fugazi Second Amendment: *Bruen*'s Test, History, and Tradition Problem and How to Fix It," 71 *Cleveland State Law Review* 623 (2023).

"Racist History and the Second Amendment: A Critical Commentary," 43 *Cardozo Law Review* 1343 (2022).

"The Invention of the Right to 'Peaceable Carry' in Modern Second Amendment Scholarship," 2021 *Illinois Law Review Online* 195 (2021).

"The Faces of the Second Amendment Outside the Home, Take Three: Critiquing the Circuit Courts Use of History-in-Law," 67 *Cleveland State Law Review* 197 (2019).

"The Second Amendment and the Basic Right to Transport Firearms for Lawful Purposes, 13 *Charleston Law Review* 125 (2018) (invited).

"The Forgotten Emblems of the World War II Air Commandos," 6 *Air Commando Journal*, Issue 3, 2018: 42-47.

"The Difficulties in Changing an Air Force Emblem," 6 *Air Commando Journal*, Issue 3, 2018: 48.

"Dissecting the Origins of Air-Centric Special Operations Theory," 81 *Journal of Military History*, Issue 3, July 2017: 803-28.

"The Call to Embrace Immigration Federalism in the United States," 30 *Journal of Immigration, Asylum, and Nationality Law* 353 (2016).

"The Faces of the Second Amendment Outside the Home, Take Two: How We Got Here and Why it Matters," 64 *Cleveland State Law Review* 373 (2016) (lead article).

"The Sudden Embrace of Executive Discretion in Immigration Law," 55 *Washburn Law Journal* 59 (2015) (invited).

"The Second Amendment in the Twenty-First Century: What Hath *Heller* Wrought?" 23 *William & Mary Bill of Rights Journal* 1143 (2015).

"The 'Originalism is Not History' Disclaimer: A Historian's Rebuttal," 63 *Cleveland State Law Review Et Cetera* 1 (2015).

"Finding History: How Captain Cortez Enloe's Journal Sheds New Light on the History of the World War II Air Commandos and Operation THURSDAY," 3 *Air Commando Journal*, Issue 4, 2015: 11-17.

"Weighing the Constitutionality of State Immigration Verification Laws in the Wake of *Arizona v. United States*," 27 *Journal of Civil Rights & Economic Development* 441 (2014) (invited) (lead article).

"History in Law, Mythmaking, and Constitutional Legitimacy," 63 *Cleveland State Law Review* 23 (2014) (invited).

"The Statute of Northampton by the Late Eighteenth Century: Clarifying the Intellectual Legacy," 40 *Fordham Urban Law Journal City Square* 10 (2013).

"The Second Amendment and Militia Rights: Distinguishing Standard Model Legal Theory from the Historical Record," 40 *Fordham Urban Law Journal City Square* 1 (2013).

"Historical Reflections on the Beginnings of an Air Commando Theory," 2 *Air Commando Journal*, Issue 3, 2013: 9-13.

"The Second Amendment in Historiographical Crisis: Why the Supreme Court Must Reevaluate the Embarrassing 'Standard Model' Moving Forward," 39 *Fordham Urban Law Journal* 1727 (2012) (invited).

"Saving the Press Clause from Ruin: The Customary Origins of a 'Free Press' as Interface to the Present and Future," 2012 *Utah Law Review* 1691 (2012).

"Recentering Foreign Affairs Preemption in *Arizona v. United States*," 60 *Cleveland State Law Review* 133 (2012).

"The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review," 60 *Cleveland State Law Review* 1 (2012) (lead article).

"Decoding the Fourteenth Amendment's Citizenship Clause: Unlawful Immigrants, Allegiance, Personal Subjection, and the Law," 51 *Washburn Law Journal* 211 (2012) (invited and lead article).

"Scribble Scrabble, the Second Amendment, and Historical Guideposts: A Reply to Lawrence Rosenthal and Joyce Lee Malcolm," 105 *Northwestern University Law Review* 1821 (2011) (selected for print from Colloquy).

"Restoring 'Life, Liberty, and the Pursuit of Happiness' in Our Constitutional Jurisprudence: An Exercise in Legal History," 20 *William & Mary Bill of Rights Journal* 457 (2011).

"The 1792 National Militia Act, the Second Amendment, and Individual Militia Rights: A Legal and Historical Perspective," 9 *Georgetown Journal of Law & Public Policy* 323 (2011).

"The Second Amendment Standard of Review After *McDonald*: Historical Guideposts and the Missing Arguments in *McDonald v. City of Chicago*," 2 *Akron Law Journal of Constitutional Law & Policy* 7 (2011) (invited).

"The Constitutional Significance of a 'Well-Regulated' Militia Asserted and Proven with Commentary on the Future of Second Amendment Jurisprudence," 3 *Northeastern Law Journal* 1 (2011) (invited and lead article).

"Scribble Scrabble, the Second Amendment, and Historical Guideposts: A Reply to Lawrence Rosenthal and Joyce Lee Malcolm," 105 *Northwestern University Law Review Colloquy* 227 (2011).

"Representation Without Documentation?: Unlawfully Present Aliens, Apportionment, the Doctrine of Allegiance, and the Law," 25 *BYU Journal of Public Law* 35 (2011).

"Originalism, John Marshall, and the Necessary and Proper Clause: Resurrecting the Jurisprudence of Alexander Addison," 58 *Cleveland State Law Review* 529 (2010) (lead article).

"The Plenary Power Doctrine and the Constitutionality of Ideological Exclusions: A Historical Perspective," 15 *Texas Review of Law & Politics* 61 (2010).

"The Right of Self-Preservation and Resistance: A True Legal and Historical Understanding of the Anglo-American Right to Arms," 2010 *Cardozo Law Review De Novo* 18 (2010) (invited).

"'Arms for Their Defence'?: A Historical, Legal and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated in *McDonald v. City of Chicago*," 57 *Cleveland State Law Review* 351 (2009) (lead article).

## NEWSPAPER AND ONLINE MEDIA PUBLICATIONS

"The Long Fight to Achieving Military Integration," *Air Force Historical Research Agency* (Feb. 2023).

"The History of the Air Force Song," *Air Force Historical Research Agency* (Sep. 2022).

"NRA Convention Protests Highlight US Gun Reform Divide," *Deutsche Welle*, May 30, 2022.

Q&A with Frank Wilkinson, "America's Long History of Gun Regulation," *Bloomberg News* and *Washington Post*, November 3, 2021.

"A Historian's Assessment of the Anti-Immigrant Narrative in *NYSRPA v. Bruen*," Second Thoughts: A Blog from the Center for Firearms Law at Duke University, August 4, 2021.

"Judging the Ninth Circuits Use of History in *Young v. Hawaii*," Second Thoughts: A Blog from the Center for Firearms Law at Duke University, April 16, 2021.

"The Black Panthers, NRA, Ronald Reagan, Armed Extremists, and the Second Amendment," *Second Thoughts: A Blog from the Center for Firearms Law at Duke University*, April 8, 2019.

"The 90th Anniversary of NRA's First Guiding Legislative Policies and the Implications for NYSRPA v. City of New York," *Second Thoughts: A Blog from the Center for Firearms Law at Duke University*, December 1, 2019.

"The Untold, Somewhat Embarrassing Story Behind the NRA's Laudatory Messages from Presidents Roosevelt, Truman, and Eisenhower," *Second Thoughts: A Blog from the Center for Firearms Law at Duke University*, September 23, 2019.

"The NRA is Blaming Journalists for Gun Violence," *Slate*, May 25, 2018.

"Why Does the NRA Almost Always Win?" *Buzzfeed News*, March 23, 2018.

"Conceal-Carrying the Day: We Debated Arming More People in the 1920s as a Solution to Gun Violence. The Idea Lost then, But It's Winning Now," *Slate*, March 6, 2018.

"Propaganda Machinery: How the NRA Pioneered the Right-Wing Art of Demonizing the Media," *Slate*, February 28, 2018.

"How the Gun Lobby Came to Be So Powerful," *Newsweek*, February 16, 2018.

"Justice Thomas Needs a History Lesson in the History of the 2nd Amendment," *History News Network*, December 11, 2015.

"The Hollow Impact of *Moore v. Madigan* on Gun Control?" *Huffington Post*, December 12, 2012.

"The Tale of Two Second Amendments," *Huffington Post*, September 7, 2012.

"Placing the Declaration of Independence in Historical Context: Thoughts on Educating Current and Future Generations About America's Founding Document," *ConSource Blog*, August 4, 2012.

Encyclopedia Entries "Second Amendment" and "Gun Control," *Encyclopedia Britannica*, December 2010.

## PUBLISHED BOOK REVIEWS

"Governing Immigration Through Crime: A Reader," 28 *Journal of Immigration, Asylum, and Nationality Law* 409 (2014).

"The Latino Threat: Constructing Immigrants, Citizens, and the Nation," 28 *Journal of Immigration, Asylum, and Nationality Law* 193 (2014).

## PRESENTATIONS, PANELS, AND DEBATES

"5th Annual Firearms Research Works in Progress Workshop," Texas A&M University School of Law, June 7-8, 2023.

"Debate with Stephen P. Halbrook: What Rights Does the Second Amendment Guarantee Outside the Home," Federalist Society, November 17, 2021 (available online).

"Militias Challenge Gun Laws in Virginia: 'It's About Shooting Tyrants in the Face'," *CBS News*, November 12, 2020 (available online).

"NRA Origins and 1930s Politics," C-SPAN 3 American History TV, Washington, DC, January 3, 2020 (available online).

"A Right to Bear Arms? The Contested Role of History in Contemporary Debates on the Second Amendment," 2020 American Historical Association Meeting, January 3, 2020.

"Jim Bohannon Show: *Armed in America* Book Talk," *Westwood One Affiliates*, April 19, 2019 (available online).

"Law and Society Series: The Second Amendment 228 Years Later," Riley Institute and Charleston Law Review, Charleston, SC, February 2019.

"Book Talk: History of Gun Rights in America," National Constitution Center, Philadelphia, PA, February 2018 (available online).

"Guns in American Society," Wesleyan University, Middletown, CT, October 2017.

"Firearms and the Common Law Tradition," Aspen Institute, Washington, DC, September 2016.

"Fifty Years of 7th Special Operations Squadron History," Duxford Imperial War Museum, Cambridge, UK, May 2014.

"History and the Meaning of the Constitution," Cleveland-Marshall School of Law, Cleveland, Ohio, April 2014.

"How Much Do We Really Know About Our Gun Laws?" *NPR WBEZ 91.5 Afternoon Shift*, Chicago, IL, January 14, 2013 (available online).

"The Second Amendment is First on Our Minds," *NPR WBEZ 91.5 Morning Shift*, Chicago, IL, January 14, 2013 (available online).

"The Second Amendment Steps Outside," *Huffington Post Live*, New York, NY, December 12, 2012 (available online).

"The Objective Dilemma Facing State Immigration Enforcement," Indiana University School of Law—Indianapolis Junior Faculty Workshop, Indianapolis, Indiana, March 2012.

"Does the Second Amendment Extend Outside the Home?" Cleveland-Marshall School of Law, Cleveland, Ohio, March 2012.

"Foreign Affairs Preemption and the Federal-State Spheres of Government," St. John's University School of Law Immigration Symposium, New York, New York, March 2012.

"The History and Evolving Conceptions of the Right to Bear Arms," Fordham School of Law Second Amendment Symposium, New York, New York, March 2012 (available online).

"State Policy Potpourri: Some Comparative Assessments," and "Curtailing Birthright Citizenship," Washburn School of Law Breaching Borders Symposium, Topeka, Kansas, October 2011 (available online).

"Law Enforcement Authority to Verify Immigration Status: *Estrada v. Rhode Island*," Law Enforcement and Public Safety Channel, Washington, District of Columbia, April 2010.

"*McDonald v. City of Chicago*: An Anglo-American Right to Arms?" Cleveland-Marshall School of Law, Cleveland, Ohio, April 2010.

"Debate with Clark M. Neilly on *McDonald v. City of Chicago*," Akron University School of Law Federalist Society, Akron, Ohio, April 2010.

"Keynote Speaker for 'Chamber to Chambers: Second Amendment Symposium'," and "Panelist for 'Who's Right to Bear Arms?'" Northeastern University School of Law, Boston, Massachusetts, March 2010.

"Bearing Arms in the Ohio Constitution," Cleveland-Marshall School of Law, Cleveland, Ohio, April 2008.

"Washington's Decision: George Washington's Decision to Reaccept Black Enlistments," Trenton Chamber of Commerce Patriot Week, Trenton, New Jersey, December 2006.

## AWARDS

Joint Civilian Service Commendation Award, July 2019.

Allan S. Major Award for Air Force History Program Excellence, July 2016 (Air Force Level Award).

24th Special Operations Wing Supervisory Civilian of the Quarter, Civilian Category IV, July 2015.

Allan S. Major Award for Air Force History Program Excellence, July 2014 (Air Force Level Award).

352d Special Operations Group Supervisory Civilian of the Quarter, Civilian Category II, March 2013.

352d Special Operations Group Supervisory Civilian of the Quarter, Civilian Category II, March 2012.

Air Force Special Operations Command Excellence in Periodic History Award, February 2012.

Judge John R. Brown Award for Excellence in Legal Writing, August 2008 (National Award).

Certificate of Commendation, Commanding Officer, Marine Security Guard Battalion, May 2002.

Meritorious Mast, United States Marine Corps, April 2000.

Meritorious Mast, United States Marine Corps, August 1999.

Navy and Marine Corps Achievement Medal, United States Marine Corps, July 1999.

Certificate of Commendation, Commanding Officer, Marine Aviation Support Group, April 1998.

# EXHIBIT 2

## AN ORDINANCE.

Be it ordained by the city council of the city of Waco:

Section 1. That title "public peace and order" of the ordinance of the city of Waco be amended by adding thereto article 412, a.

Article 412 a. Any person who, in this city shall commit an aggravated assault or an aggravated assault and battery upon the person of another, shall upon conviction be fined in any sum not less than twenty-five nor more than one thousand dollars, or by imprisonment in the calaboose not less than one month nor more than two years, or by both such fine and imprisonment; but any one charged with a violation of this article shall be entitled to the same defenses that he would be entitled to under the statutes of the state as a justification or in mitigation of the penalty. An aggravated assault and aggravated assault and battery are such as defined in Title XV, Chapter 2 of the penal code of the state of Texas.

Section 2. That this ordinance take effect and be in force from and after ten days after its passage.

Passed July 9, 1891.

Approved:      C. C. McCULLOCH,
                              Mayor.

Attest:

JONEY JONES, City Secretary.

Be it ordained by the city council of the city of Waco:

Section 1. That whereas article 118 of the ordinances of the city of Waco as it now stands is inoperative and void by virtue of the action of the 20th Legislature of the state of Texas, in increasing the penalty for unlawfully carrying arms. Therefore article 118 shall hereafter read as follows, to-wit:

Article 118. If any person in this city shall carry on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung shot, sword cane, spear, or knuckles made of any metal or any hard substance, bowie-knife, or any other kind of knife, manufactured for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the city calaboose not less than 20 nor more than 60 days, or both by such fine and imprisonment.

Sec. 2. Said ordinance as to dead-

ly weapons shall be further amend by adding thereto article 1190, to re as follows:

Art. 119 a: If any person shall into any church or religious assembl any schoolroom, or other place whe persons are assembled for amus ment or for educational or scientifi purposes, or into any circus, show o public exhibition of any kin or into a ball room, or social party o social gathering or to any electio precinct on the day or the days of an election, where any portion of th people of the State are collected t vote at any election, or to any othe place where people may be assemble to muster, or to perform any publi duty, or to any other public assembl and shall have or carry about his per son a pistol or other fire-arm, dirk dagger, slung shot, sword-cane, shea brass-knuckles, bowie-knife, or an other kind of a knife manufacture and sold for the purpose of offence o defence, he shall be punished by fin of not less than Fifty nor more tha Five hundred dollars.

Section 2. That this ordinanc shall take effect and be in force fro and after Ten days after its passage

Passed July 9th, 1891. Approved
                              C. C. McCULLOCH,
                                    Mayor.

Attest,

JONEY JONES, City Secretary.

## Summer Days, Where Shall W Spend Them.

Half rate excursion tickets to Look out Mountain Tennessee, via, Cotto Belt Route. The only line with through sleeping car service to Memphis, and the only line delivering passenger for Lookout Mountain, to connecting lines at Memphis, without a long and disagreeable omnibus transfer.

Tickets will be sold July the 4th to 8th inclusive, good for return until September 30th, 1891. For further information write or call on any agent of the company.

W. H. WINFIELD,
General Passenger Agent,
Texarkana, Texas.

Drink "Tea Cup Tea," 50 cents per pound, at Joe S. Thompson's, The Grocer.

Choice baled millet at T. M. Sleeper & Co. only 40c. a bale.

Copyright © 2023 Newspapers.com. All Rights Reserved.

# EXHIBIT 3

https://www.newspapers.com/image/492594128

Printed on Jun 25, 2023



Copyright © 2023 Newspapers.com. All Rights Reserved.

# ORDINANCES,

### Of the Incorporation of the Town of Gainesville.

#### Passed Upon by the Board of Trustees, May 26.

Be it ordained by the board of trustees of the inhabitants of the village of Gainesville; Missouri, as follows:.

**Section 1.** It shall be unlawful for any person within the corporate limits of the village of Gainesville of Missouri, to, directly, or indirectly sell intoxicating liquors in any quantity less than three gallons at retail or in the original package without taking out license as a dramshop keeper, and every person violating the provision of this section shall be deemed guilty of a misdemeanor and upon conviction, be punished by a fine of not less than forty nor more than two hundred dollars.

**Section 2.** It shall be unlawful for any person within the corporate limits of the village of Gainesville, Mo., to discharge any kind of fire-arms to the terror of the inhabitants of the village, or any one of them; and every person violating the provisions of this section shall be deemed guilty of a misdemeanor, and upon conviction shall be fined not less than five nor more than twenty-five dollars.

**Section 3.** It shall be unlawful for any person within the limits of the incorporation of the village of Gainesville, Mo., to play at any game whatsoever for money, property, or grain, with cards, dice, or any other device which may be adepted to, used in playing any game of chance or in which chance is a material element, or shall bet or wager on the hands of or cards or on the sides of such as do play, as aforesaid. Every such person shall be deemed guilty of a misdemeanor, and upon conviction shall be fined not less than five nor more twenty-five dollars.

**Section 4.** It shall be unlawful for any person within the corporate limits of the village of Gainesville, Mo., to make use of any loud, offensive or indecent language or to threaten, quarrel, or challenge to fight. or by fighting. Every person violating the provisions of this section shall be deemed guilty of a misdemeanor, and upon conviction shall be punished by a fine of not less than five dollars nor more than forty dollars.

**Section 5.** It shall be unlawful for any person inside the corporate limits of the village of Gainesville, Mo., to run or cause to be run upon any of the public streets or alleys or upon any highway in common use inside of said corporate limits of the village of Gainesville, Mo., any horse or horses so as to interrupt travelers or persons thereon; he shall be adjudged guilty of a misdemeanor, and punished by a fine of not less than five nor more than twenty-five dollars.

**Section 6.** It shall be unlawful for any person inside of the corporate limits of the village of Gainesville, Mo., to keep open or cause to be kept open any store, shop, or other place of business, or labor himself or cause any other person to labor on the first day of the week, commonly called Sunday. Any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and fined not exceeding fifty dollars.

**Section 7.** It shall be unlawful for any person within the corporate limits of the village of Gainesville, Mo., to set up or maintain any bawdy house or place of prostitution or whoredom, brothel or other place of ill fame, or for any person to frequent such place or places, and every person violating the provisions of this section shall be adjudged guilty of a misdemeanor and punished by a fine of not less than ten and not exceeding one hundred dollars.

**Section 8.** It shall be unlawful for any person within the corporate limits of the village of Gainesville, Mo., to practice catching a base ball or to practice striking same on any of the public streets of the village of Gainesville. Any person violating the provisions of this section shall be adjudged guilty of a misdemeanor, and punished by a fine of not less than one and not more than five dollars.

**Section 9.** It shall be unlawful for any person within the corporate limits of the village of Gainesville, Mo., to carry concealed upon or about his person, any deadly or dangerous weapon, or to go into any public gathering or place where people are assembled for any lawful purpose, with any kind of fire-arms, bowie-knife, dirk, dagger slung-shot or other deadly weapon, or shall in the presence of one or more persons, exhibit any such weapons in a rude and angry manner, or shall have or carry any such weapons upon or about his person while intoxicated inside the corporate limits; any person violating the provisions of this section shall be adjudged guilty of a misdemeanor, and punished by a fine not less than ten nor more than twenty-five dollars.

**Section 10.** It shall be unlawful for any person within the corporate limits, or within half a mile of same, of the village of Gainesville, Mo., to sell or dispose of, or to give away any kind of wine, beer, or whiskey, or any other intoxicating spirits in any quantity without being authorized to do so as a druggist, as provided by law. Any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and upon conviction shall be fined not less than fifty nor more than one hundred dollars.

**Section 11.** It shall be unlawful for any person or persons to camp on any of the streets or the public square in the village of Gainesville, Mo. Every person violating the provisions of this section shall be deemed guilty of a misdemeanor, and fined not more than twenty-five dollars.

**Section 12.** It shall be unlawful for any person to give any public exhibition or show, circus or menagerie inside the corporate limits of the village of Gainesville, Mo., except exhibitions given for the benefit of religious, educational or charitable purposes, without first procuring a license from the marshal of said village. Every person violating the provisions of this section shall be deemed guilty of a misdemeanor and fined not more than twenty-five dollars.

**Section 13.** It shall be unlawful for any person within the corporate limits of the village of Gainesville, Mo., to appear upon any of the public streets while intoxicated or upon any of the alleys or commons of said village. Any person violating the provisions of this section shall be deemed guilty of a misdemeanor and upon conviction be punished by a fine not exceeding five dollars.

State of Missouri,
County of Ozark, } ss.

I, Y. B. McClendon, clerk of the village of the inhabitants of Gainesville, Missouri, do hereby certify that the foregoing is a true copy of the ordinances, passed and approved the Board of Trustees of the village of the inhabitants of Gainesville

**Children Cry for Pit**

THE CENTAUR COMPANY, 77 MURR

Children Cry for P

Children Cry for.

Children Cry for P

# EXHIBIT 4

Shelby County Herald (Shelbyville, Missouri) · Wed, Jul 29, 1891 · Page 4

https://www.newspapers.com/image/208831791

Printed on Jun 25, 2023



T. P. MANUEL, Chairman Board of Trustees.
I. N. WATSON, Village Clerk.

## ORDINANCE NO. 23.

### AN ORDINANCE CONCERNING THE CARRYING OF DEADLY WEAPONS.

Be it ordained by the Board of Trustees of the inhabitants of the Village of Leonard, Mo., as follows:

SECTION 1. If any person shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school-room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire-arms, bowie-knife, dirk, dagger, slung-shot or other deadly weapon, or shall in the presence of one or more persons, exhibit any such weapons in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall upon conviction be punished by a fine of not less than fifty nor more than two hundred dollars.

SECTION 2. This ordinance shall be in force from and after its passage and publication.

Passed and approved July 6th, 1891.

T. P. MANUEL, Chairman Board of Trustees.
I. N. WATSON, Village Clerk.

## TRUSTEE'S SALE

Copyright © 2023 Newspapers.com. All Rights Reserved.

Newspapers.com

# EXHIBIT 5

https://www.newspapers.com/image/953638676

Printed on Jun 25, 2023

## ORDINANCE NO. 9.

1. Penalty for violations of this ordinance.
2. Assault and battery.
3. Failing to assist in making arrest, etc.
4. Resisting arrest, etc.
5. Permitting games of chance.
6. Betting.
7. Disturbing religious meetings, etc.
8. Carrying concealed weapons into assemblies, etc.
9. Section 8 not to apply to police, etc.
10. Conflicting ordinances repealed.
11. Ordinance to take effect, when.

### In Relation to Miscellaneous Offenses and Their Penalties.

Be it ordained by the Board of Aldermen of the City of Marceline, as follows:

SECTION 1. It shall be unlawful for any person to commit any of the acts hereinafter mentioned or enumerated within the corporate limits of the City of Marceline, and any person so offending shall be deemed guilty of a misdemeanor against the ordinances of the city, and for each offense shall be punished as hereinafter provided.

SEC. 2. Every person who shall commit an assault and battery or a common assault upon another, or indecently expose his person, shall, upon conviction, be punished by a fine of not less than one, nor more than one hundred, dollars.

SEC. 3. Every person who, without reasonable cause, shall fail to assist in making an arrest or committing any person to the city jail when required to do so by any police officer of the city in the performance of his official duty, shall be punished by a fine of not less than five, nor more than twenty, dollars, for every such offense.

SEC. 4. Every person who shall resist or attempt to hinder any officer of the city in the performance of his official duty, shall be punished by a fine of not less than ten, nor more than one hundred, dollars.

SEC. 5. Every person who shall suffer or permit any game of chance, upon the result of which any money or property or valuable thing whatever is bet, to be played in any building or room or upon any premises of which such person is the owner or has possession or control, shall be punished by a fine of not less than ten, nor more than one hundred, dollars.

SEC. 6. Every person who shall bet any money or property or valuable thing whatever upon the result of any game of chance shall be punished by a fine of not less than five, nor more than twenty-five, dollars.

SEC. 7. Every person who shall willfully or contemptuously disquiet or disturb any congregation or assembly of persons met for religious worship, or for social or literary purposes, by making a noise or by rude or indecent behavior, or profane discourse within the place of assembly, or so near the same as to interrupt or disturb the order or solemnity thereof, or who shall willfully menace, threaten or assault any person there being, shall be punished by a fine of not less than one, nor more than one hundred, dollars.

SEC. 8. Every person who shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people have assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie-knife, dagger, slung-shot, or other deadly weapon, or shall in the presence of one or more persons exhibit any such weapon in a rude or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drink, or shall directly or indirectly sell or deliver, loan or barter, to any minor any such weapon without the consent of the parent or guardian of such minor, shall, upon conviction, be punished by a fine of not less than fifty, nor more than one hundred, dollars.

SEC. 9. The next preceding section shall not apply to any police officer, nor to any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace or make arrests, nor to persons moving or traveling peaceably through this state, and it shall be a good defense to the charge of carrying such weapon if the defendant shall show that he has been threatened with great bodily harm, or has good reason to carry the same in the necessary defense of his person, home or property.

SEC. 10. All ordinances and parts of ordinances in conflict with this ordinance are hereby repealed.

SEC. 11. This ordinance shall take effect and be in force from and after its passage.

Read three times and passed and approved this 12th day of March, 1892.    W. A. CATER, Mayor.
[SEAL.]    AARON ROOTS, President of Board.
ATTEST: J. HEMMINGS, City Clerk.

Copyright © 2023 Newspapers.com. All Rights Reserved.

# EXHIBIT 6

The Ridgeway Journal (Ridgeway, Missouri) · Thu, Apr 6, 1893 · Page 4
https://www.newspapers.com/image/858847805

Printed on Jun 25, 2023



**NEW GOODS.**

**S. H. Coleman w**
**about them.  Watch.**

**SEE NEXT ISSU**

Copyright © 2023 Newspapers.com. All Rights Reserved.

deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people have assembled for educational, literary or social purposes, or to any election precinct on any election day in said village, or into any court room during the sitting of court, or into any public assemblage of persons met for any lawful purpose, other than military drill or meetings called under the military law of the state, having on or about his person any kind of fire arms, bowie knife, dirk, dagger, slung shot or other deadly weapon, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon on or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of his parent or guardian, he shall, upon conviction, be adjudged guilty of a misdemeanor, and fined in a sum not less than twenty-five nor more than one hundred dollars.  Provided that this section shall not apply to officers or persons whose duty it is to execute warrants or suppress breaches of the peace, nor to persons traveling peaceably through said village, not a resident of said county.

SEC. 13.  Every person who shall play at any game of any kind whatsoever for money or property, with dice, cards or any other devise which may be used in playing any game of chance, or in which chance is an element, or shall bet or wager on the hands, or cards or sides of such as do play in said village, shall be deemed guilty of a misdemeanor and punished by a fine of not less than ten nor more than one hundred dollars.

SEC. 14.  Every person who shall either labor himself or compel or permit his apprentice or

# EXHIBIT 7



# An Ordinance.

## MISDEMEANORS.

Be it enacted by the Board of Trustees of the Town of Rocheport as follows:

SECTION 1. DISTURBING THE PEACE. Every person who shall willfully disturb the peace of any other person or persons, by loud and unusual noise, loud and offensive or indecent conversation, or by using any profane or offensive language calculated to provoke a disturbance of the peace, or by threatening, quarreling, challenging, or fighting, shall be deemed guilty of a misdemeanor and, upon conviction, fined not less than five dollars.

Sec. 2. CONCEALED WEAPONS. If any person shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any court room during the sitting of the court, or into any public assemblage of persons met for a lawful purpose, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slunkshot, or other deadly weapon, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry and threatening manner, or shall have or carry any such weapon upon or

Copyright © 2023 Newspapers.com. All Rights Reserved.

about his person when intoxicated or under the influence of intoxicating drinks; or shall, directly or indirectly, sell or deliver, loan or barter, to any minor any such weapon without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor and punished by a fine not less than ten dollars nor more than twenty-five dollars.

Sec. 3. BETTING PROHIBITED. Any person who shall play at any game for money or property with cards, dice, or any other device, which may be adapted to or used in playing any game of chance, or shall, bet or wager on the hands, or cards, or sides of such as do play as aforesaid, shall be deemed guilty of a misdemeanor and, on conviction, be fined not less than five dollars.

Sec. 4. RECKLESS RIDING AND DRIVING. If any person shall unnecessarily ride or drive any horse or other animal upon or through any street or alley at a greater speed than a moderate gait, or shall so negligently ride or drive any such animal as to cause such animal, or the vehicle thereto attached, to come in contact with, or strike and injury any person or property; or shall, leave any such animal standing in any street, ally, or open lot, without being fastened or so guarded as to prevent its running away, or shall turn any such animal loose upon any street or alley, he shall be deemed guilty of a misdemeanor and, on conviction, be fined not less than five dollars for every such offense.

Sec. 5. OBSTRUCTING PASSAGE ON STREETS. Whoever shall, upon or near a street or alley, fly a kite or engage in any sport or exercise likely to scare horses, injure persons passing upon such street, or embarrass the passage of vehicle, shall be deemed guilty of a misdemeanor, and, upon conviction, be fined not less than one dollar nor more than ten dollars for every such offense.

Sec. 6. HITCH RACKS Any person who shall hitch any horse, mule, or other animal to any tree, post, block, fence, or other thing on Central street, between Third and Water streets, shall be deemed guilty of a misdemeanor, and fined not less than one dollar for every such offense. Provided, that this section shall not apply to doctors, nor to merchants, or butchers running a delivery wagon in connection with their business, and who shall be allowed to hitch such animals, so used in their business, to a post firmly set in the ground, at the edge of the sidewalk, immediately in front of their respective business houses. It shall be the duty of the Marshal to immediately remove or cause to be removed, all posts, rings, or other contrivances heretofore used for hitching purposes, except such as are herein provided for.

Sec. 7. PRISONERS REFUSING TO WORK. If any person adjudged to labor shall fail or refuse to obey any reasonable requirement of the Marshal, or to labor as directed, he shall be deemed guilty of a misdemeanor, and fined not less than ten dollars, for every such offense, to be enforced as other fines.

Sec. 8. MARSHAL POSSE. If any person, over the age of eighteen years, who, when called upon by the Marshal or assistant Marshal, to act as a posse to aid him, in arresting and taking prisoner any offender, shall refuse or neglect to do so, he shall be guilty of a misdemeanor, and fined three dollars.

Copyright © 2023 Newspapers.com. All Rights Reserved.

# EXHIBIT 8

Secretary.

## Concealed or Deadly Weapons.

The following ordinance in relation to the carrying of concealed or deadly weapons was passed by the council at the regular meeting Tuesday night:

Be it ordained by the Council of the city of Warrensburg as follows:

Sec. 1. If any person shall within this city carry concealed upon or about his person any deadly or dangerous weapon or shall go into any church or place where people have assembled for religious worship, or into any school room, or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any Court room during the sitting of court or into any other public assemblage of persons met for any lawful purpose than for Militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung shot or other deadly weapons, or shall in the presence of one or more persons, exhibit any such weapons in a rude, angry, or threatening manner or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks or shall directly or indirectly sell or deliver, loan or barter, to any minor without the consent of the parents or guardian of such minor he shall upon conviction be punished by a fine of not less than fifty or more than two hundred dollars or by imprisonment not less than five days or more than six months or by both such fine and imprisonment.

Sec. 2. This ordinance shall take effect and be in force from and after its passage and approval by the Mayor.

Passed June 3, 1890.

Approved June 5, 1890.

Copyright © 2023 Newspapers.com. All Rights Reserved.

# EXHIBIT 9



Copyright © 2023 Newspapers.com. All Rights Reserved.

Osceola Advance (Osceola, Missouri) · Thu, Jul 7, 1887 · Page 4

https://www.newspapers.com/image/863087542

Printed on Jun 25, 2023

J. E. Wells, Town Clerk.

**ORDINANCE NO. 4.**

Be it ordained by the Board of Trustees of the inhabitants of the town of Collins, Missouri:

Sec. 1.—Any person found intoxicated within the corporate limits of said town shall be arrested and confined in the calaboose or town jail until he shall become sober when he shall be k lent before the board for trial; if such person be found guilty he shall fined not less than Three nor more than Ten dollars for each offense.

Sec. 2.—Any person who shall use any profane, obscene or indecent language, or talk in a loud or unusual manner, or make any oth r loud or unusual noise, or threaten violence or quarrel or challenge any person to fight or indecently obstruct or assist in indecently obstructing the passage of any street, alley or sidewalk, or encourage ...

[Remainder of ordinance columns illegible due to faded print.]

Passed by the Board, May 2nd, 1887
Jame H. Gamma,
Ch'm'n, Town Board.
Attest:
J. E. Wells, Town Clerk.

Copyright © 2023 Newspapers.com. All Rights Reserved.

# EXHIBIT 10

The Craig Weekly Gazette (Craig, Missouri) · Wed, Oct 13, 1880 · Page 4

https://www.newspapers.com/image/859684459

Printed on Jun 25, 2023



Copyright © 2023 Newspapers.com. All Rights Reserved.

The Craig Weekly Gazette (Craig, Missouri) · Wed, Oct 13, 1880 · Page 4

https://www.newspapers.com/image/859684459

Printed on Jun 25, 2023

ORDINANCE No. 8—Carrying Concealed Weapons.

Be it Ordained by the Board of Aldermen of the city of Craig, Missouri, as follows :

Any person who shall within the corporate limits of said city of Craig, carry or have upon his person, any concealed weapon or weapons, shall be adjudged guilty of a misdemeanor, and shall upon conviction be fined in any sum not less than one dollar, nor more than ten dollars.

C. H. Thayer, Mayor.

P. B. Cook, President.

Copyright © 2023 Newspapers.com. All Rights Reserved.

# EXHIBIT 11

https://www.newspapers.com/image/491577103

Printed on Jun 25, 2023



Copyright © 2023 Newspapers.com. All Rights Reserved.

https://www.newspapers.com/image/491577103

Printed on Jun 25, 2023

Approved May 21, 1881.
Attest:    Jas. A. Green, Clm'n
M. H. Billing, Clerk.

## CHAPTER VII.

### License.

Be it ordained by the Board of Trustees of the Town of Cuba:

Sec. 1. There shall be levied on all dram shops duly licensed by the county court of Crawford county, Missouri, within the corporate limits of this town, or within one-half mile of said limits, a tax of fifty dollars per annum to be collected semi-annually; licenses to be issued and signed by the chairman of the board of trustees and attested by the clerk. All persons refusing to pay said license tax, shall upon conviction be fined not less than ten nor more than one hundred dollars.

Sec. 2. The marshal is hereby ordered to levy and collect a tax of twenty-five dollars for every circus or menagerie for each day's exhibition, and a tax of five dollars for each side show accompanying same, and a tax of three dollars for every night of hand show, minstrel troop, and all other exhibitions for each exhibition, except local shows or exhibitions for benevolent purposes.

Sec. 3. This ordinance shall be in force and effect from and after its approval.

Approved May 21, 1881.
Attest:    Jas. A. Green, Clm'n
M. H. Billing, Clerk.

## CHAPTER VIII.

### Misdemeanors.

Be it ordained by the Board of Trustees of the Town of Cuba:

Sec. 1. If any person, or persons shall put any dead animal carcass or parts thereof, offal or any other filth into any well, spring, brook or branch of water, out of which, or in any [illegible] premises, every person so offending shall be deemed guilty of a misdemeanor and fined in a sum not less than ten nor more than fifty dollars. If any persons shall remove or cause to be removed and place upon premises not his own or public roads any dead animal carcass or part thereof or other nuisance to the annoyance of the citizens of the town or any of them, every person so offending shall be deemed guilty of a misdemeanor and fined in a sum not less than ten nor more than fifty dollars and if such nuisance be not removed within three days thereafter, it shall be deemed a second offence against the provisions of this section.

Sec. 2. If any owner, or owners, occupiers or occupants of any slaughter-house wherein any hogs, bovine or other animals are slaughtered either in said house, or on the premises of the said owner, shall permit the same to remain on the lot from the day of April and the 1st day of October in each year, to the annoyance of the citizens of this town or any of them, every person so offending shall be fined in any sum not less than five nor more than fifty dollars, and if said nuisance be not removed in five days there after it shall be deemed a second offence against the provisions of this section, and every like neglect of each succeeding five days thereafter shall be considered an additional offence against the provisions of this section.

Sec. 3. Whenever complaint shall be made to the chairman of the board by the street commissioner, marshal or any member of the board or trustees or on the oath or affidavit of any citizen of the town that any person is keeping or permitting his or her property, or premises to remain, so noxious or filthy as to be a public nuisance it shall be the duty of the chairman to issue a summons to the owner of such premises if he be a resident of the town or if not a resident, to the person occupying or having charge of such premises commanding such person to appear before the board of trustees on a day therein named, and show cause why such noxious or filthy premises should not be declared a nuisance; such summons shall be served at least five days before the meeting of the board by reading the same in the presence and hearing of the party, or by leaving a copy with some member of the family over the age of fifteen years, and upon return of the summons the board shall examine into the facts and if the testimony shall warrant they shall declare such premises to be a nuisance and order the same to be abated either by removal or cleaning, and if any person shall permit or continue such nuisance for three days after such order of abatement such person shall be deemed guilty of a misdemeanor and fined not less than five dollars nor more than twenty-five dollars and costs, and the chairman may at his discretion order the marshal to have such nuisance abated and the costs thereof to be taxed against the defendant in such costs in the case.

Sec. 4. Every person who shall set up or keep a common gaming house or a bawdy house or a brothel shall upon a conviction be adjudged guilty of a misdemeanor and be punished in a fine not exceeding five hundred dollars.

Sec. 5. Every person who shall knowingly lease or let to another any house or building for the purpose of keeping or maintaining a gaming house, brothel, or bawdy house shall on conviction be adjudged guilty of a misdemeanor and punished by a fine not exceeding five hundred dollars.

Sec. 6. Every person who shall shoot off or discharge any gun or pistol or other fire arms within the corporate limits of this town shall be adjudged guilty of a misdemeanor and fined in any sum of not less than one nor more than ten dollars.

Sec. 7. If any person shall run or drive or cause to be run or drive upon any public square or public roads within the limits of this town, any horse or horses, or other animal so as to interrupt travelers thereon or put to flight the horses by being made or driven to shall upon conviction be adjudged guilty of a misdemeanor and punished by a fine of not less than five nor more than twenty dollars.

Sec. 8. If any two persons shall voluntarily or by agreement engage in any fight or use any blows or violence toward each other in any angry or quarrelsome manner or in any other any wilful mischief, or if any person shall assault or strike another or in the terror or disturbance of the citizen, the person or persons so offending shall be adjudged guilty of a misdemeanor and fined in any sum not less than five nor more than five dollars.

Sec. 9. If any person shall make use of any profane or obscene language in a loud or boisterous manner on or in any street or alley or within the hearing of the citizens of the town or if any person so was shall be guilty of unlawfully exposing his or her person in any public place in said town or shall be found in a state of beastly intoxication, every person so offending shall be deemed guilty of a misdemeanor and fined in any sum not less than one nor more than five dollars.

Sec. 10. If any person be found carrying concealed about his person in the corporate limits, any kind of fire arms, bowie knife, dirk, dagger, sling shot, or other deadly weapon, within the limits of said town he shall be find in a sum not less than five nor more than twenty-five dollars providing any person whose duty it is to keep arms in discharge of his duty imposed by law.

Sec. 11. Every person who shall be convicted of obstructing a street, crossing or side walk by leaving any carriage or horse or horses standing on or upon the sidewalk or leaving horses or teams standing on or across the same shall be guilty of a misdemeanor and fined not less than one nor more than two dollars.

Sec. 12. Every owner who shall be convicted of getting on or entering any railroad engine, car or vehicle moving or standing on the track or side track of any company within the corporate limits of said town unless such minors shall have business therein, shall be deemed guilty of a misdemeanor and fined not less than one nor more than five dollars.

Sec. 13. Every person who shall be convicted of maliciously and cruelly pounding and maiming, beating, or torturing any horse, mare or other cattle in the limits of this town of Cuba, whether it belongs to himself or another shall be deemed guilty of a misdemeanor and fined not less than ten nor more than ten hundred dollars.

Sec. 14. Every person who shall be convicted of leaving a team of horses standing in the streets of said town without being securely fastened shall be deemed guilty of a misdemeanor and fined in a sum not less than one nor more than five dollars.

Sec. 15. Every person who shall be convicted of playing or bow ball in the corporate limits on the city of the town commonly called townby shall be deemed guilty of a misdemeanor and fined not less than one nor more than five dollars.

Sec. 16. Whoever in the town of Cuba shall be in a state of intoxication or any man and woman who shall lewdly and lasciviously cohabit together being unmarried, or guilty of open or notorious acts of public indecency shall be adjudged guilty of a misdemeanor and upon conviction be fined not less than five nor more than one hundred dollars.

Continued on Eighth page.

Copyright © 2023 Newspapers.com. All Rights Reserved.

Crawford Mirror (Steelville, Missouri) · Thu, Jul 27, 1882 · Page 8

https://www.newspapers.com/image/491577327

Printed on Jun 25, 2023

## Cuba Town Ordinancet.

*[Continued from first page.]*

SEC. 17.   Whoever shall in the town of Cuba either directly or in directly expose to sale or sell intoxicating liquors or keep the doors of his house open for the purpose of selling or exposing liquor for sale on Sunday shall be deemed guilty of a misdemeanor and upen conviction thereof be fined not less than five nor more than one hundred dollars.

SEC. 18.   Every person being the owner of a slut who shall permit the same to run at large while in heat or proud shall be deemed guilty of a misdemeanor and upon conviction be fined not less than one nor more than five dollars.

SEC. 19.   This ordinance shall be in force and effect from and after its approval.

Approved May 24, 1882.

Attest:   JAS. A. GREEN, Chm'n.

M. H. HELLYER, Clerk.

CHAPTER IV

Copyright © 2023 Newspapers.com. All Rights Reserved.

# EXHIBIT 12

Case 1:23-cv-01293-GLR   Document 21-4   Filed 07/28/23   Page 59 of 143

The Granby Miner (Granby, Missouri) · Sat, Nov 1, 1873 · Page 2

https://www.newspapers.com/image/862701906

Printed on Jun 25, 2023

## ORDINANCES
### OF THE
## TOWN OF CRANBY

Copyright © 2023 Newspapers.com. All Rights Reserved.

The Granby Miner (Granby, Missouri) · Sat, Nov 1, 1873 · Page 2

https://www.newspapers.com/image/862701906

W. S. MESPLAY, Clerk.

## NO. 8.

AN ORDINANCE concerning the carrying of weapons.

Be it ordained by the Board of Trustees of the Town of Granby, as follows:

Sec. 1. That any person within the corporate limits of the town of Granby who shall be found carrying, either openly or concealed, any pistol, metalic knuckles, slingshot, large knife, or any other offensive weapon (except an official in the lawful discharge of his duty, or a person having such weapon for the purpose of some immediate lawful purpose) shall be fined not less than five nor more than fifteen dollars.

Passed and adopted October 30, 1873.

M. T. WILLIAMS, Chm'n.

W. S. MESPLAY, Clerk.

Copyright © 2023 Newspapers.com. All Rights Reserved.

# EXHIBIT 13



Copyright © 2022 Newspapers.com. All Rights Reserved.

Newspapers
by ancestry

Case 1:23-cv-01293-GLR   Document 21-4   Filed 07/28/23   Page 63 of 143

The Stockton Review and Rooks County Record (Stockton, Kansas) · Fri, Jul 1, 1887 · Page 1

https://www.newspapers.com/image/379709602

Downloaded on Oct 11, 2022

[SEAL] F. A. CHIPMAN, C. W. SMITH,
City Clerk.                    Mayor.

Published July 1, 1887.

## ORDINANCE NO. 76.

AN ORDINANCE PROHIBITING CARRY-
ING DEADLY WEAPONS.

*Be it ordained by the Mayor and
Councilmen of the City of Stockton,
Kansas.*

SEC. 1.—If any person shall carry up-
on or about his person any deadly or
dangerous weapons, or shall go into
any church or place where people have
assembled for public worship, or into
any school room or place where people
have assembled for educational, liter-
ary or social purposes, or to any elec-
tion on any election day, or into any
court room during the sitting of court,
or into any other public assemblage of
persons not met for any unlawful pur-
pose, or shall go upon the public streets
or public places of the city having
upon or about his person any kind of
fire arms, bowie knife, dirk, dagger,
sling shot or other deadly weapon, or
shall in any of the places above named
exhibit such weapon in a rude, angry
or threatening manner, or shall direct-
ly or indirectly, sell or deliver, loan or
barter to any minor, any such weapon
without the consent of the parent or
guardian of said minor, he shall upon
conviction be punished by a fine of not
less than ten nor more than fifty dol-
lars. Provided, this ordinance shall
not apply to peace officers of the city
or state.

SEC 2.—This ordinance shall take effect
from and after its publication in The
Rooks County RECORD.

Approved, C. W. SMITH,

Attest, F. A. CHIPMAN,        Mayor.
City Clerk.

Copyright © 2022 Newspapers.com. All Rights Reserved.

POWERED BY
Newspapers™

# EXHIBIT 14

# AN ORDINANCE

## Relating to the Carrying of Fire Arms and other Deadly Weapons.

*Be it ordained by the Trustees of the town of Abilene,*

SEC. 1. That any person who shall carry, within the limits of the town of Abilene, or commons, a pistol, revolver, gun, musket, dirk, bowie-knife, or other dangerous weapon upon his or their person or persons, either openly or concealed, except to bring the same and forthwith deposit it or them at their house, boarding house, store room or residence, shall be fined in a sum not less than ten dollars nor more than fifty dollars; and it shall be the duty of any town constable, or policeman of this town, to arrest and disarm any person violating this ordinance, and to deposit the arms so taken with the captain of the town police, to be by him kept until he is, by the magistrate taking cognizance of the offense of carrying arms as aforesaid, authorized to deliver the same to the person or persons from whom the same shall have been taken.

SEC. 2. Any and every person who shall be in violation of this ordinance, within the town of Abilene, or commons, and who shall refuse to deposit his or their arms with the constable or policeman as aforesaid, or shall resist any officer who may attempt to disarm him or them according to the provisions of section one of this ordinance, shall be imprisoned in the common gaol of the town not less than twenty-four hours nor more than ten days, and fined not less than $10 nor more than one hundred dollars; Provided, that the provisions of this ordinance shall not apply to the constable or any officer of the town of Abilene, while in the discharge of their duties as such constable or policeman.

SEC. 3. That any person who shall intentionally discharge any pistol, revolver or gun, within the town of Abilene, in any street, alley, highway, lot, house or other place where the life or limb of any person could be endangered, shall be punished by a fine not less than ten dollars nor more than one hundred dollars.

SEC. 4. This ordinance shall take effect and be in force from the 20th of May 1870.

T. C. HENRY, Chairman.

Attest: G. L. BRINKMAN, Clerk.

Copyright © 2023 Newspapers.com. All Rights Reserved.

# EXHIBIT 15

Arkansas City Weekly Traveler (Arkansas City, Kansas) · Wed, May 20, 1885 · Page 4

https://www.newspapers.com/image/53607957

Printed on Jun 25, 2023



Copyright © 2023 Newspapers.com. All Rights Reserved.

# EXHIBIT 16

## Ordinance No. 5.

An ordinance in relation to the carrying of fire-arms or other weapons.

*Be it ordained by the Mayor and Councilmen of the City of Beloit.*

Section 1. That any person who shall be found within the corporate limits of this city with any revolver, pistol, gun, sword, dagger, dirk or any other dangerous or deadly weapon concealed or otherwise shall be deemed guilty of a misdemeanor ; Provided, that this act shall not be construed in such a manner as to prevent any person or persons from carrying a gun or rifle through the street for the known and avowed purpose of hunting in the country.

Approved Sep. 9th, 1872.

T. F. HERSEY,
Mayor.

L. J. BEST,
City Clerk.

Copyright © 2023 Newspapers.com. All Rights Reserved.

# EXHIBIT 17



one hundred dollars.

Sec. 10. Any person carrying any deadly or dangerous weapon, such as firearms, slung shot, sheath or dirk knife or any other weapon which when used is liable to produce death or great bodily harm, unconcealed, within the corporate limits of the city, shall upon conviction, be fined in a sum not less than ten nor more than one hundred dollars.

Sec. 11. Any person or persons carrying any deadly or dangerous weapons concealed about their person, such as firearms, slung shot, sheath or dirk knife, brass knuckles or any other weapon, which when used are liable to produce death or great bodily harm and injury, shall, upon conviction be fined in a sum not less than fifteen nor more than one hundred dollars for each and every offense.

Sec. 12. Any person who shall within the limits of the city, discharge or shoot off any gun, pistol, or other firearms, shall upon conviction thereof, be fined not less than one nor more than twenty-five dollars.

Sec. 13. Any person who shall

Copyright © 2023 Newspapers.com. All Rights Reserved.

# EXHIBIT 18

https://www.newspapers.com/image/274137116

Printed on Jun 25, 2023

Copyright © 2023 Newspapers.com. All Rights Reserved.

Border Ruffian (Coolidge, Kansas) · Sat, May 1, 1886 · Page 1

https://www.newspapers.com/image/274137116

Printed on Jun 25, 2023

violating this section shall be deemed guilty of a misdemeanor,

#### CONCEALED DEADLY WEAPON.

Sec. 8. Any person or persons, other than the duly appointed and commissioned officers of this city, or officers of this county or State, carrying concealed deadly weapons, such as pistols, revolvers, sling-shots, dirks or bowie-knives, within the corporate limits of the city, shall, upon conviction, be deemed guilty of a misdemeanor.

#### OPEN LEWDNESS AND DISORDERLY HOUSES.

Sec. 9. If any person shall be guilty of open lewdness or other notorious act of public indecency tending to debauch the public morals, or shall maintain or keep a lewd house or place of fornication, or shall keep a common, ill-governed and disorderly house, to the encouragement of idleness, gaming, drinking, fornication or other misbehavior, or who shall keep and maintain a common bawdy house, or house of ill-fame, shall, on conviction, be deemed guilty of a misdemeanor.

#### DRUNKENNESS.

Sec. 10. If any person shall be drunk in any highway, street, or in any public place or building, or if any person shall be drunk in his own house, or in any private building or place, disturbing his family or others, he shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined in any sum not exceeding twenty-five dollars, or by imprisonment in the calaboose or county jail for a period not exceeding thirty days. Prosecutions under this section must be commenced within thirty days after the said misdemeanor is alleged to have been committed.

#### WEAPONS TO MINORS.

Sec. 11. Any person who shall sell trade, give, loan or otherwise furnish any pistol, revolver or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie-knife, brass knuckles, sling-shot, or other dangerous weapon to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall, upon conviction before the Police magistrate, or any Justice of the Peace acting in such capacity, be fined not less than five nor more than one hundred dollars.

#### POSSESSION OF A MINOR

Sec. 12. Any minor who shall have in

Copyright © 2023 Newspapers.com. All Rights Reserved.

# EXHIBIT 19

https://www.newspapers.com/image/367253373

Printed on Jun 25, 2023

[Published March 11th, 1898.]

## Ordinance No. 165.

### An Ordinance Prohibiting the Use and the Carrying of Fire Arms and Other Deadly Weapons.

*Be it Ordained by the Mayor and Councilmen of the City of Elk City, Montgomery County, Kansas.*

SECTION I. That any person within the corporate limits of said city of Elk City, who shall draw any pistol or other weapon in a hostile manner, or shall make any demonstration or threat at using such weapon on or against any person, or any person who shall carry or have on his or her person in a concealed manner, or otherwise any pistol, dirk, bowie-knife, revolver, slung-shot, billy, brass, lead or iron knuckles, or any deadly weapon of any kind within the corporate limits of said city, shall be deemed guilty of a misdemeanor and on conviction thereof shall be fined in any sum of not less than five dollars nor more than one hundred dollars. Provided, that this ordinance shall not be so construed as to prohibit officers of the law from being armed.

SEC. 2. Be it further ordained that all ordinances or parts of ordinances in any manner conflicting with this ordinance, be, and the same are, hereby repealed.

SEC. 3. Be it further ordained that this ordinance shall be in full force and effect on and after its publication in the Elk City ENTERPRISE, the duly designated official paper of said city published and of general circulation therein. Passed and approved this 7th day of March, A. D. 1898.

[SEAL.]          J. A. BROWN, Mayor.

Attest: JOHN A. LOGAN, City Clerk.

STATE OF KANSAS,

MONTGOMERY COUNTY, } ss

CITY OF ELK CITY.

I, J. A. Logan, City Clerk of Elk City, do hereby certify that the above and foregoing ordinance was read and considered by sections at a public meeting of the City Council of said city, held on the seventh day of March, A. D. 1898. And was duly passed section by section and then as a whole by said Council. In witness whereof I have hereunto subscribed my name and caused the seal of said city to be affixed thereto.

[Seal.]          J. A. LOGAN, City Clerk.

Copyright © 2023 Newspapers.com. All Rights Reserved.

# EXHIBIT 20

https://www.newspapers.com/image/419606234

Printed on Jun 25, 2023



Copyright © 2023 Newspapers.com. All Rights Reserved.

Newspapers™
POWERED BY
.com

The Harper Daily Sentinel (Harper, Kansas) · Tue, Aug 23, 1887 · Page 2

https://www.newspapers.com/image/419606234

son therewith.

SEC. 11.   That it shall be unlawful for any person to be found drunk, or in a state of intoxication in any street, alley, public parks or other public place within the incorporate limits of the city of Harper.

SEC. 12.   That it shall be unlawful for any person to carry any deadly or dangerous weapon, such as fire arms, slung shots, sheath or dirk knife, billies, brass or metal knuckles or any other dangerous implement, which, when used, are liable to produce death or great bodily harm, within the incorporate limits of said city.

SEC. 13.   That it shall be unlawful for

Copyright © 2023 Newspapers.com. All Rights Reserved.

POWERED BY
Newspapers™
.com

# EXHIBIT 21



Copyright © 2023 Newspapers.com. All Rights Reserved.

The Asheville Weekly Citizen (Asheville, North Carolina) · Sat, Jun 3, 1882 · Page 1

https://www.newspapers.com/image/61589420

Printed on Jun 25, 2023

placed under the Street Commissioner and compelled to work upon the public streets for a period not to exceed five days for each offense.

SEC. 61. That if any person or persons are found carrying pistols, bowie-knives, sling-shots, billeys, or other deadly weapons (officers excepted) within the corporate limits of the town of Asheville, every person so offending shall for every such offense forfeit and pay a sum of ten dollars—one-half to the informer.

SEC. 62. Persons conducting gift enterprises, or persons establishing or controling

Copyright © 2023 Newspapers.com. All Rights Reserved.



Copyright © 2023 Newspapers.com. All Rights Reserved.

# EXHIBIT 22

https://www.newspapers.com/image/419099948

Printed on Jun 25, 2023

[Published May 22, 1889.]

## ORDINANCE NO. 72

An ordinance to prevent carrying concealed weapons and the discharge of firearms.

*Be it ordained by the Mayor and Councilmen of the City of Howard:*

**Section 1.** Any person who shall, within the corporate limits of the city of Howard have or carry concealed or partially conceal-ed upon his or her person any revolver, pistol bowieknife dagger, slungshot or other deadly weapon, shall, on conviction thereof, be fined in any sum not less than one dollar nor more than fifty dollars and costs. Provided, this sec-tion shall not apply to peace-officers of the city or state. The carrying of a weapon in a holster exposed to full view shall not be deemed a concealed or partially concealed weapon under this section.

**Section 2.** Any person who shall, within the corporate limits of the city of Howard, discharge any firearms, except by permis-sion of the Mayor, or when mustered for drill or review, or otherwise acting under the command, or by permission of some commissioned officer, or where done in self-defense, or for the protection of gardens and yards from destructive animals, shall, upon conviction thereof, be fined in any sum not less than One nor more than Fifty Dol-lars and costs.

**Section 3.** This ordinance shall take effect and be in force from and after its publica-tion once in the Howard DEMOCRAT.

Passed May 16, 1889.

Approved by me this 16th day of May, 1889.

R. F. GLENN,
Mayor of the city of Howard.

Attest: W. D. BURNS, City Clerk,

Copyright © 2023 Newspapers.com. All Rights Reserved.

# EXHIBIT 23

https://www.newspapers.com/image/379760351

Printed on Jun 25, 2023

### Clerk.

Be it ordained by the Mayor and Councilmen of the City of Kendall, Hamilton County, Kansas:

#### SECTION I.
##### DISCHARGING FIREARMS.

If any person shall within the corporate limits of the City of Kendall, fire or discharge any gun, fowling-piece, pistol, revolver, or firearm of any kind or description, or any other thing containing powder or combustibles, or anything made of nitro-glicerine, without first having obtained permission from the Mayor in writing, every such person shall be deemed guilty of a misdemeanor.

#### SECTION II.
##### INDECENT DRESS AND LEWD CONDUCT.

Any person who shall appear in any public place within the corporate limits of the city in a state of nudity, or a dress or garb not belonging to his or her sex, or an indecent or lewd dress or shall make an indecent exposure of his or her person, or be guilty of any lewd or indecent behavior, shall be deemed guilty of a misdemeanor.

#### SECTION III.
##### OBSCENE BOOKS, &C.—INDECENT PLAYS.

Any person who shall exhibit, sell or offer to sell, or give away, any indecent, lewd or obscene book, picture or other thing or shall exhibit or perform any indecent play or other representation, every such person shall be deemed guilty of a misdemeanor.

#### SECTION IV.
##### PLYING THE VOCATION OF A PROSTITUTE.

Any prostitute or lewd woman who shall within the corporate limits of this city, by word, sign, letter, picture, action, or the distribution of cards or other thing, ply her vocation upon the streets, at any door, or window of any house of this city, or at any other place within the limits of the same, shall be deemed guilty of a misdemeanor.

#### SECTION V.
##### CRUELTY TO ANIMALS.

Any person who shall inhumanly and unnecessarily beat, injure, or maltreat any dumb animal or animals within the corporate limits of this city, shall be deemed guilty of a misdemeanor.

#### SECTION VI.
##### DISPLAY OF DEADLY WEAPONS.

It shall be unlawful for any person or persons to display or make any improper use of any deadly weapon within the corporate limits of this city. Any person violating this section shall be deemed guilty of a misdemeanor, and it shall be the duty of the City Marshall and all police officers of said city to arrest any and all persons found violating this section, with or without process.

#### SECTION VII.
##### FIRE CRACKERS, &C.

The explosion of fire crackers, torpedoes,

Copyright © 2023 Newspapers.com. All Rights Reserved.



Copyright © 2023 Newspapers.com. All Rights Reserved.

https://www.newspapers.com/image/379760351

Printed on Jun 25, 2023

### OBSCENE BOOKS, &c.—INDECENT PLAYS.

Any person who shall exhibit, sell or offer to sell, or give away, any indecent, lewd or obscene book, picture or other thing or shall exhibit or perform any indecent play or other representation, every such person shall be deemed guilty of a misdemeanor.

### SECTION IV.
#### PLYING THE VOCATION OF A PROSTITUTE.

Any prostitute or lewd woman who shall within the corporate limits of this city, by word, sign, letter, picture, action, or the distribution of cards or other thing, ply her vocation upon the streets, at any door, or window of any house of this city, or at any other place within the limits of the same, shall be deemed guilty of a misdemeanor.

### SECTION V.
#### CRUELTY TO ANIMALS.

Any person who shall inhumanly and unnecessarily beat, injure or maltreat any dumb animal or animals within the corporate limits of this city, shall be deemed guilty of a misdemeanor.

### SECTION VI.
#### DISPLAY OF DEADLY WEAPONS.

It shall be unlawful for any person or persons to display or make any improper use of any deadly weapon within the corporate limits of this city. Any person violating this section shall be deemed guilty of a misdemeanor, and it shall be the duty of the City Marshall and all police officers of said city to arrest any and all persons found violating this section, with or without process.

### SECTION VII.
#### FIRE CRACKERS, &c.

The explosion of fire crackers, torpedoes, street, alley or other public place within the corporate limits of said city, such person or persons shall be deemed guilty of a misdemeanor and fined not less than one nor more than ten dollars, in default of payment of said fine he or they shall be confined in the calaboose not less than ten or more than twenty days.

### SECTION XXII.
#### CONCERNING THE CITY CLERK, CITY TREASURER, MARSHAL, AND STREET COMMISSIONER.

ART. 1—There are hereby created the offices of City Clerk, City Treasurer, City Marshal and Street Commissioner. The City Clerk shall keep a record faithfully of all proceedings of the Mayor and Council in books provided for that purpose.

ART. 2—The Treasurer shall safely keep all monies, notes, bonds and credits coming into his possession by virtue of his office and shall give a bond of five thousand dollars to the City of Kendall with at least two securities, conditional that he will faithfully account for all monies, notes, bonds and other credits coming into his possession by virtue of his office, said bond to be approved by the Mayor and Council. He shall pay out money only on the order of the Mayor attested by the City Clerk, which order shall also bear the seal of the city.

ART. 3—The City Marshall shall be the Chief of Police, and shall be charged with the preservation of the peace and good order of the city under the ordinances thereof and under the instructions of the Mayor and Council.

Approved March 18th, A. D., 1887.

[Attest]                              H. R. BELL,
T. A. JOHNSON,                        Mayor.
Clerk.

Copyright © 2023 Newspapers.com. All Rights Reserved.



# EXHIBIT 24

Copyright © 2023 Newspapers.com. All Rights Reserved.

costs are paid or replevied.

**[Published Nov., 28th 1885.]**

## ART. VI. SEC. I.

### WEAPONS.

*Sec. 11.* Be it ordained by the mayor and councilmen of Meade Center in the state of Kansas, that it shall be unlawful for any person or persons who are not authorized by the laws of the United States or of the state of Kansas or of the said city of Meade Center, who shall be found within the incorporate limits of said city of Meade Center, carrying on his person a pistol, bowie knife, dirk, or other deadly weapons, shall be subject to arrest upon charge of misdemeanor and upon conviction shall be fined in any sum not exceeding $25, and stand committed until paid or replevied.

**[Publishen Nov., 28th 1885.]**

ART. VII. SEC. I.

Copyright © 2023 Newspapers.com. All Rights Reserved.

# EXHIBIT 25

https://www.newspapers.com/image/478384879

Printed on Jun 25, 2023

d:ubt.

## ORDINANCE NO. TWELVE,

### Peace, Good Government and General Welfare.

Be it ordained by the Mayor and Councilmen of the city of Mt. Hope Kansas.

Sec. 1. That any person who shall beat, wound or assault another, or obstruct, oppose or resist any city officer in the discharge of his duty, shall upon conviction be fined in any sum not less than three dollars nor more than twenty-five dollars and costs of suit.

Sec. 2. That any person, not an officer or traveler, who shall carry any knives, (except pocket knives) firearms, brass knucks, slung shots or other deadly weapons, concealed, within the corporate limits of the city of Mt. Hope, shall be deemed guilty of an offense, and upon conviction thereof shall be fined for each and every offense, the sum of ten dollars and costs of suit.

Sec. 3. That any person under the age of twenty one years of age, who shall be found carrying any deadly weapon, concealed or otherwise, shall be deemed guilty of an offense, and upon conviction thereof, shall be fined in any sum not more than ten dollars and costs of suit. PROVIDED, this does not apply to any one leaving the city on a hunting expedition, or returning therefrom.

Sec. 4. That whoever disturbs any assembly of people met for a lawful purpose, or shall disturb the peace and quiet of the city, or any neighborhood, family or person, within the corporate limits of the city of Mt. Hope, by any improper conduct, or by loud or unusual noises, vulgar or offensive language, quarreling, fighting or challenging to fight or display any firearms or other deadly weapons, shall be deemed guilty of an offense, and upon conviction thereof be fined in any sum not less than three dollars, nor more than twenty-five dollars and costs of suit.

Sec. 5. That whoever discharges any firearms, or throws any stones or missiles by the hand or by the means of any device, or shall break, mar, deface, injure or destroy, any property, public or private, real or personal, not his own, within the corporate limits of the city of Mt. Hope, shall be deemed guilty of an offense and upon conviction thereof be fined in any sum not less than three dollars, nor more than twenty-five dollars and costs of suit.

Copyright © 2023 Newspapers.com. All Rights Reserved.

Newspapers
by ancestry

https://www.newspapers.com/image/478384879

The Mount Hope Clarion (Mount Hope, Kansas) · Thu, May 5, 1887 · Page 3

Printed on Jun 25, 2023

SEC. 6. That any tramp or any person found wandering, tramping, loafing or begging about, within the corporate limits of the city of Mt. Hope, without any visible means of support or honestly endeavoring to seek employment shall be deemed guilty of an offense and upon conviction thereof shall be fined in any sum not more than ten dollars and costs of suit.

SEC. 7. That any person who shall be found drunk or intoxicated or who shall be guilty of any disorderly conduct on any public street or alley or in any public place, within the corporate limits of the city of Mt. Hope shall be deemed guilty of an offense, and upon conviction thereof be fined in any sum not less than three dollars nor more than twenty dollars and costs of suit.

SEC. 8. That any person who shall be found gambling, owning directing or conducting any game of chance or gambling device, or playing thereat, and any person who shall let, rent or permit his property to be used as a gaming house club room or place where any game of chance or gambling device is kept, conducted or allowed to be carried on, shall be deemed guilty of an offense and upon conviction thereof shall be fined in any sum not xceeding one hundred dollars and costs of suit. PROVIDED this shall not apply to any game for social amusement, where no bets or charges are made and no stakes are played for.

SEC. 6. That this ordinance shall be in full force and effect after its publication in the Mt. Hope Mentor one issue.

Passed by the city council May 4th, 1887.

E. J. LENHART, City Clerk.

APPROVED.

S. M. JOHNS, Mayor

*[Published in the Mt. Hope Mentor May 5th, 1887.]*

Copyright © 2023 Newspapers.com. All Rights Reserved.

Newspapers
POWERED BY
.com

# EXHIBIT 26

https://www.newspapers.com/image/369072508

Printed on Jun 25, 2023



Copyright © 2023 Newspapers.com. All Rights Reserved.

Scandia Journal (Scandia, Kansas) · Fri, Jan 5, 1894 · Page 8

https://www.newspapers.com/image/369072508

Printed on Jun 25, 2023

return, they shall be deemed guilty of vagrancy, and the city marshal shall forthwith arrest such person and upon conviction they shall be fined in any sum not exceeding Fifty ($50.00) Dollars.

SECTION 6. Every person who shall, within the corporate limits of the city of Scandia, carry or have upon their person any concealed pistol, revolver, bowie-knife, dirk, sling-shot, billy, knuckles or other deadly weapon, shall upon conviction be fined in any sum not less than Two ($2.00) Dollars, nor more than Fifty ($50.00) Dollars. Provided:—That any person engaged in a lawful occupation and of good moral character, may, by the mayor, be granted a permit to carry such concealed weapons.

SECTION 7. Every person who shall, within the corporate limits of the city of Scandia, com-

Copyright © 2023 Newspapers.com. All Rights Reserved.

# EXHIBIT 27

https://www.newspapers.com/image/348612058

Printed on Jun 25, 2023

On motion, an ordinance to pre-
vent the carrying weapons within
the corporate limits of the town
of Lake Charles, was read twice
and adopted, as follows :

Section 1st. Be it ordained by
the board of Aldermen of the town
of Lake Charles, that whoever
shall carry a weapon or weapons
upon his person, within the corpo-
rate limits of said town, such as
Bowie knives, pistols, revolvers,
dirks, brass-knuckles, slung-shots,
or any other dangerous weapon or
weapons, shall be fined not less
than five dollars, and in default of
payment of fine with all costs, he
shall be imprisoned, in the parish
jail, not less than twenty-four
hours, and for a second offence the
fine shall be double.

Copyright © 2023 Newspapers.com. All Rights Reserved.

# EXHIBIT 28



Copyright © 2023 Newspapers.com. All Rights Reserved.

Lawrence Democrat (Lawrenceburg, Tennessee) · Fri, Jul 26, 1895 · Page 4

https://www.newspapers.com/image/174660388

Printed on Jun 25, 2023

more than twenty-five dollars with all cost.]

Sec. 18. Be it further ordained. That it shall be unlawful for any person to carry about their person any pistol, bouie knife, sling shot, brass knucks, dirk, sword, loaded cane, stilletto, razor or other deadly wapon in this Corporation, and it is hereby made the duty of the City Marshal or other officer who

Copyright © 2023 Newspapers.com. All Rights Reserved.

Lawrence Democrat (Lawrenceburg, Tennessee) · Fri, Jul 26, 1895 · Page 4

https://www.newspapers.com/image/174660388

Printed on Jun 25, 2023

sees or knows of any person carrying such deadly weapons to immediately arrest every such person that they may be dealt with according to the provisions of this act, and any person found guilty of carrying any of the aboved named weapons or any other deadly weapon shall be fined not less than ten nor more than fifty dollars with all cost. Provided that this Section shall not apply to Marshals Sheriffs or other officer while on duty

Copyright © 2023 Newspapers.com. All Rights Reserved.

# EXHIBIT 29

https://www.newspapers.com/image/662973702

Printed on Jun 25, 2023

An Ordinance prohibiting the carrying of concealed weapon and fixing the punishment therefor.

Be it ordained by the mayor and councilmen of the city of Perry.

SECTION 1. It shall be unlawful for any person in the city of Perry to carry concealed on or about his person, saddle or saddlebags, any pistol, revolver, bowie knife, dirk, dagger, razor, slingshot, sword, cane, spear, metal knuckles or any other kind of knife or instrument manufactured or sold for the purpose of defense except in this ordinance provided.

SEC. 2. It shall be unlawful for any person in the corporate limits of the city of Perry to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles or any other offensive or defensive weapon, except as in this article provided.

SEC. 3. It shall be unlawful for any person within the corporate limits of the city of Perry, to sell or give to any minor, any of the arms or weapons designated in sections one and two of this article.

SEC. 4. Public officers while in the discharge of their official duties or while going from their homes to their place of duty or returning therefrom shall be permitted to carry arms, but at no other time and under no other circumstances, provided, however, that if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this ordinance as though he were a private person.

SEC. 5. Persons shall be permitted to carry shot guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using them in public muster or military drills or while traveling or removing from one place to another, and not otherwise.

SEC. 6. It shall be unlawful for any person to point any pistol or any other deadly weapon, whether loaded or not at any other person or persons either in anger or otherwise.

SEC. 7. Any person violating the provisions of any one of the foregoing sections, shall, upon conviction be fined in not less than Twenty Five Dollars and not more than Fifty Dollars, or imprisonment not more than 90 days or both.

SEC. 8. All ordinances or parts of ordinances in conflict with the provisions of this ordinance are hereby repealed.

SEC. 9. This ordinance shall take effect and be in force from and after its passage approved and publication.

Approved this 23 day of Jan. 1895.

                W. A. STONE,
(ATTEST)               Mayor.
[SEAL]
G. W. PURSELL, City Clerk.

## BUSINESS LOCALS.

Copyright © 2023 Newspapers.com. All Rights Reserved.

# EXHIBIT 30

Newspapers.com by Ancestry

Omaha Daily World-Herald (Omaha, Nebraska) · Sun, Aug 4, 1889 · Page 12

https://www.newspapers.com/image/859729118

Printed on Jun 25, 2023

## ORDINANCE No. 213.

An ordinance declaring certain acts unlawful, and defining certain offenses, misdemeanors and nuisances, and imposing fines and penalties for the violation of the provisions hereof, and repealing Chapter 16, that portion of Chapter 16 entitled "Lotteries", Chapter 29 and Chapter 31 of Chase's Compiled Ordinances, and also repealing Ordinances Nos. [illegible]

Be it ordained by the city council of the city of Omaha:

SECTION 1. It shall be unlawful for any person to disturb the good order or peace of the city of Omaha by making any loud or unusual noise, or by fighting or threatening to fight, or by tumultuous threatenings, of offensive carriages or by using any abusive, obscene or profane language in the streets or other places to the annoyance of citizens. Any person who shall violate any of the provisions of this section, shall, on conviction thereof be fined in any sum not exceeding one hundred dollars or be imprisoned not exceeding thirty days.

SEC. 2. Any person who shall be drunk in any street, alley, park or other public place within the city, or in or upon the premises of another without the consent of the owner or occupant thereof, or who shall be drunk and disorderly in any private house or place to such an extent as to jeopardize any person or property, or as to be injurious to the public morals, shall upon conviction thereof, be fined in a sum not less than one dollar nor more than twenty-five dollars, or be imprisoned not exceeding thirty days.

[illegible]

Health Is Wealth!

[illegible]

CANCER [illegible]

Copyright © 2023 Newspapers.com. All Rights Reserved.

Powered by Newspapers.com

https://www.newspapers.com/image/859729118

Printed on Jun 25, 2023

be imprisoned not exceeding thirty days.

SEC. 10. It shall be unlawful for any person to wear under his clothes, or concealed about his person, any pistol or revolver, colt, billy, slungshot, brass knuckles or knuckles of lead, dirk, dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon within the corporate limits of the city of Omaha. And any person guilty of a violation of this section shall, on conviction, be fined not exceeding one hundred dollars for each and every offense: nothing in this section, however, shall be so construed as to prevent the United States marshals and their deputies, sheriffs and their deputies, regular or special police officers of the city, from carrying or wearing such weapons as may be deemed necessary in the proper discharge of their duties. Provided, however, if it shall be proved from the testimony on the trial of any such case, that the accused was, at the time of carrying any weapon as aforesaid, engaged in the pursuit of any lawful business, calling or employment and the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid, for the defense of his person, property or family, the accused shall be acquitted.

Whenever any police officer shall make an arrest of a person having concealed on or about his person any weapon or weapons, as specified in this section, it shall be such officer's duty to take from such person arrested the weapon or weapons found upon him at the time of his arrest, and to retain the same, to abide such order concerning the same as may be made by the police judge.

Copyright © 2023 Newspapers.com. All Rights Reserved.

Newspapers™

# EXHIBIT 31

https://www.newspapers.com/image/351946935

Printed on Jun 25, 2023

## Ordinance No. 11.

Be it ordained by the president and board of trustees of the town of Rapid City:

SECTION 1. That it shall be, and it is hereby declared to be unlawful for any person to carry, openly or concealed, any musket, rifle, shot gun, pistol, sabre, sword, bowie knife, dirk, sword cane, billy, slung shot, brass or other metalic knuckles, or any other dangerous or deadly weapon within the corporate limits of the town of Rapid City, Dakota territory.

Provided, that nothing herein contained shall prevent the carrying of such weapon by a civil or military officer, or by a soldier in discharge of his duty, nor by any other person for meer purposes of transportation from one place to another.

Sec. 2. Upon complaint before the justice of the peace of the town, that an offence in violation of this ordinance has been committed, he shall inquire into the circumstances of the case, to determine whether the charge is well founded, and exercise his own discretion as to the dismissal. If the complaint shall be made good and the party arrested shall be adjudged guilty by the said justice of the peace, he shall fine the offender not less than ten nor more than fifty dollars, with the costs of prosecution.

Sec. 3. All funds assessed and collected under this ordinance shall be paid to the treasurer and be credited to the general revenue fund.

Sec. 4. This ordinance shall take effect and be in force from and after its passage and approval and publication as provided by law.

Approved December 4th, 1882.

Attest:   JOHN R. BRENNAN, President.

A. C. TUCKER, Clerk.

—New novelties for the ladies at the Montana Store of Felix Poznansky.

Copyright © 2023 Newspapers.com. All Rights Reserved.

# EXHIBIT 32

Arizona Daily Star (Tucson, Arizona) · Sat, May 19, 1883 · Page 3

https://www.newspapers.com/image/162705336

Downloaded on Jul 12, 2023





Copyright © 2023 Newspapers.com. All Rights Reserved.

Newspapers
by ancestry
https://www.newspapers.com/image/162705336

Arizona Daily Star (Tucson, Arizona) · Sat, May 19, 1883 · Page 3

Downloaded on Jul 12, 2023

eit in
l who
eath,
time
shall
hours

d the
is the
ne to

n ad-
of the
ng of
pses.
m the
grave
n the
f the

exceeding six months or be punished by both such fine and imprisonment.

Sec. 15. If any person shall within the corporate limits of the city of Tucson carry concealed upon his person any gun, pistol, bowie-knife, dagger or other deadly weapon, he shall be deemed guilty of having committed a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding three hundred dollars or be imprisoned in the County or City jail for any period of time not exceeding six months or be punished by both such fine and imprisonment; provided that this section shall not be construed to apply to sheriffs, constables or police officers, when exercising their legitimate duties.

Sec. 16. If any saloon, gambling house, house of prostitution, dance house keeper or proprietor of any place wherein intoxicating or

small
alty
fense
not le
dolla
Se
other
or bu
feet
missi
Fire
dolla
ing tl
same
Se
in ar
kept
vesse
penal

Copyright © 2023 Newspapers.com. All Rights Reserved.


Newspapers™

# EXHIBIT 33

https://www.newspapers.com/image/24064306

Printed on Jun 25, 2023

# AN ORDINANCE (No. 18)

Regulating the keeping and bearing of deadly weapons.

*Be it ordained by the City Council of the city of Galveston:*

SECTION 1. That any person carrying on or about his person, saddle or vehicle, within the corporate limits of the city of Galveston, any pistol, dirk, dagger, sling-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, or carried for purposes of offense or defense, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such attack shall be immediate and pressing, or unless having or carrying the same on or about his person for the lawful defense of the state of Texas or the city of Galveston, as a militiaman in actual service, or as a peace officer or policeman, shall be fined in a sum of not less than twenty-five dollars nor more than one hundred dollars, and in default of payment thereof shall be confined in the jail for a period not less than ten days nor more than three months, and whilst so confined shall be required to work on the streets of said city, or any public work under the control of the City Council for the period of such confinement ; *provided*, that this section shall not be so construed as to prohibit any person from keeping or bearing arms on his or her premises, or at his or her place of business, nor to prohibit sheriffs, their deputies, or other revenue officers, or other civil officers, from keeping or bearing arms whilst engaged in the discharge of their official duties, nor to prohibit persons traveling through the city of Galveston from keeping or carrying arms with their baggage.

SEC. 2. That any person charged under the first section of this act, who may offer to prove, by way of defense, that he was in danger of an attack on his person, or unlawful interference with his property, shall be required to show that such danger was immediate and pressing, and was of such a nature as to alarm a person of ordinary courage, and that such weapon so carried was borne openly and not concealed beneath the clothing; and if it shall apper that this danger had its origin in a difficulty first commenced by the accused, it shall not be considered as a legal defense.

SEC. 3. That this ordinance shall take effect and be of force on and after its due publication as prescribed by the city charter.

Approved August 19th, 1873.

C. W. HURLEY, Mayor.

Attest:

C. C. ALLEN, Clerk.                    aug20D1t

# AN ORDINANCE (No. 19)

Copyright © 2023 Newspapers.com. All Rights Reserved.

# EXHIBIT 34

Newspapers
by ancestry

Nebraska City News (Nebraska City, Nebraska) · Wed, Jul 7, 1869 · Page 3

https://www.newspapers.com/image/730567433

Printed on Jun 25, 2023

## AN ORDINANCE
### Prohibiting the carrying of Fire Arms and Concealed Weapons.

SECTION 1. *Be it ordained by the Common Council of Nebraska City,* That it shall be, and it is hereby declared to be unlawful for any person to carry openly or concealed, any musket, rifle, shot gun, pistol, sabre, sword, bowie knife, dirk, sword cane billy, slung shot, brass or other metalic knuckles or any other dangerous or deadly weapons, within the corporate limits of Nebraska City, Neb.; *Provided,* that nothing herein contained shall prevent the carrying of such weapon by a civil or military officer, or by a soldier in the discharge of his duty, nor by any other person for mere purposes of transportation from one place to another.

SEC. 2. Upon complaint before the Mayor that an offence in violation of this ordinance has been committed, he shall inquire into the circumstances of the case to determine whether the charge is well founded, and exercise his own discretion as to the dismissal thereof. If the complaint shall be made good and the party arrested shall be adjudged guilty by the Mayor, he shall fine the offender not less than twenty dollars and not more than one hundred with the costs of prosecution.

SEC. 3. All funds assessed shall collected under this ordinance shall be paid to the Treasurer, to be credited to the Police fund.

SEC. 4. This ordinance shall take effect and be in force from and after its passage, approval and publication.

Attest:

W. E. DILLON,
Mayor.

J. DAN. LAUER,
City Recorder.

— At a regular conclave of Mount

Copyright © 2023 Newspapers.com. All Rights Reserved.

POWERED BY Newspapers.com

# EXHIBIT 35



Copyright © 2023 Newspapers.com. All Rights Reserved.

Newspapers.com by Ancestry

The State Journal (Jefferson City, Missouri) · Fri, Apr 12, 1878 · Page 2

https://www.newspapers.com/image/68084065

Printed on Jun 25, 2023

## THE SUPREME COURT

### On Carrying Concealed Weapons.

State of Missouri, defendant in error, vs. Frank Reando, plaintiff in error.

The defendant was indicted at the February term, 1875, of the Washington County Circuit Court, for carrying concealed weapons.

Defendant was tried, convicted and fined ten dollars, and judgment was entered accordingly.

We are asked to reverse the judgment, because of the insufficiency of the indictment and the unconstitutionality of the act of the legislature, on which the indictment was founded. The act in question, Sess. Acts, 1874, 43, is as follows:

Whoever shall in this State go into any church or place where people have assembled for religious worship or into any schoolroom or into any place where people may be assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room, during the sitting of court, or into any other public assemblage of persons met for other than militia drill or meetings called under the militia laws of this State, having concealed about his person any kind of fire arms, bowie knife, dirk, dagger, slung shot or other deadly weapon, shall be deemed guilty of a misdemeanor, &c. The indictment alleges that defendant did unlawfully enter and go into the house or residence of one Baptiste Boyer, where a number of people were assembled for social purposes, and had then and there unlawfully concealed on his person a pistol loaded with gunpowder and leaden balls, which said pistol was then and there a kind of fire arm, &c. The indictment pursues the language of the statute creating the offence except in the use of the word "number" before people, which we think cannot in any respect vitiate it. It may be treated as mere surplusage.

It is, however, insisted, that the act under which the indictment is framed, is in derogation of the right of the citizen to bear arms, and is in conflict with and violative of the provision in the constitution of 1865, which declares "that their (the people's) right to bear arms in defense of themselves and of the lawful authority of the State cannot be questioned."

The question here presented is one not free from difficulty and has given rise to some diversity of opinion. The right to keep and bear arms, thus secured to the people, has in this country always been regarded as one not to be slightly interfered with or infringed upon; and there can be no question but that any legislative enactment which deprived them of this right, would be obnoxious to the provision of the constitution which guarantees it, and would be absolutely null and void.

In 2, Story on the Con., §1897, the author in speaking of a kindred provision in the constitution of the United States, which declares that "the right of the people to keep and bear arms" shall not be infringed upon, observes that "the right of the citizen to keep and bear arms, has justly been considered as the palladium of the liberties of the republic, since, it offers a strong moral check against usurpation and arbitrary power of rulers, and will in general, if these are successful in the first instance, enable the people to resist and triumph in the end."

If the statute in question had the effect of denying this right, and absolutely prohibiting the citizen from keeping and bearing arms, we would not hesitate to pronounce it void, as being violative of a constitutional right secured to every man by the constitution of the State. It, however, has no such scope. It simply denies to the citizen the right to enter certain places therein designated, having concealed about his person any kind of fire arms, bowie knife, &c. The places designated, into which it is made unlawful for any person to enter secretly armed with concealed weapons, are churches or places where people are assembled for public worship, school houses or other places where people have assembled for educational, literary or social purposes. Under this statute the right to enter, even such places, by any person bearing arms openly and exposed to public view is not prohibited; and if any citizen has so high a regard for the constitutional right guaranteed to him, to keep and bear arms, that he cannot forego the privilege of exercising it when entering a church where his neighbors have congregated for religious worship, or other places where they have met for educational, literary or social purposes, he can exercise it, but in doing so he must expose to view his arms and and deadly weapons, so that all may see and know that he is in the full enjoyment and exercise of his constitutional right. We do not say nor do we wish to be understood as saying that the legislature might not prohibit a person from bearing arms, even openly, in such places as are mentioned in the statute, without such prohibition to constitutional objections. No such enactment as this is before us and, we apprehend, never will be, for the moral sense of every well-regulated community would be so shocked by any one who would so far disregard it, as to invade such places with fire arms and deadly weapons exposed to public view on his person that it would very rarely, if ever, occur.

The statute in question is nothing more than a police regulation, made in the interest of peace and good order, perfectly within the power of the legislature to make. Such, or similar statutes, have been upheld in all the States, so far as we have been able to ascertain, except in Kentucky. Nunn vs. the State, 1 Kelly, Ga., 243. State vs. Jumel, 13 La. Ann., 399. Owen vs. State, 31 Ala., 387. State vs. Burgess, 4 Ark., 18. State vs. Andrews, 3 Heiskel, 165. State vs. Mitchell, 3 Blackford, 229. Cochran vs. State, 24 Tex., 394.

The right to keep and bear arms necessarily implies the right to use them, and yet acts passed by the legislature regulating their use, or rather making it an offence to use them in certain ways and places, have never been questioned. An instance is to be found in such acts as declare that every person who shall shoot at a mark along or across a public highway shall be deemed guilty of a misdemeanor. This is certainly a police regulation, within the power of the legislature to prescribe, without infringing on the right of a person to keep, bear and use arms.

The constitution protects a person in his right of property, and instances are numerous where the legislature has assumed to regulate and control it. A person has a right to own a mischievous or dangerous animal; yet under our statute, if the owner thereof, knowing its propensities, unlawfully suffer it to go at large or shall keep it without ordinary care, and such animal, while so at large and not confined, kill any human being, such owner is liable to be punished as for manslaughter in the third degree. It is provided in the constitution of the United States that the freedom of speech and of the press shall not be abridged by any law of Congress, and yet this provision has never been so construed as to deny to Congress the power to make it an offence for libelous matter to be published, rendering the offender liable to prosecution and punishment for the libel so published. Such a construction, in the language of Story, "would be too wild to be indulged in by any man." Story on the Con., § 1880.

Judgment affirmed, in which the other judges concur, except Judge Sherwood, who dissents.

E. H. NORTON, J.

Attorney-General, for defendant in error. Reynolds & Relfe, for plaintiff in error.

---

### A Courageous Syracuse Girl.

Residing on Van Buren street, in this city, is a widow named Mrs. Maria M. Beach, who alone occupies a comfortable home with her daughter. On Wednesday afternoon last Mrs. Beach was called to a side door by a woman, who first rapped, and after having the door opened in response, made sacveral inquiries of a natural character of the house-wife. Her presence their subsequently proved to be part of a plan to rob the house, for while Mrs. Beach was engaged in conversation, a sneak-thief entered the front door and was ransacking the parlor, when her eldest daughter came down stairs and discovered him. She fearlessly encountered the intrude and received for her pain a cruel blow in the eyes, which felled her to the floor and allowed the ruffian to escape unrecognized.

This escapade, happening in the daylight, proved to be but the prelude to a still more startling exploit in which Miss Beach, and, it is thought, the other actor of the afternoon before, played a more important part, the scene being enacted some time between 1 and 2 o'clock yesterday morning. Miss Beach, who sleeps with a sister younger than herself, was awakened in the middle of the night. Listening, she soon became aware that somebody was crawling on all fours toward the bed. She no sooner became convinced that such was the case, then she made a movement to get out of bed. As her feet reached the floor, she was caught by the ankles and thrown down by the intruder, a man who had doubtless come in search of plunder. The girl's outcry aroused the other sister, who jumped up and escaped from the room, screaming at the top of her voice for help. She ran outdoors and cried out, but could arouse no one until too late to render aid. Meantime the elder sister was struggling with her assailant in the room. Her efforts were in the direction of a pistol which she had under her pillow, but which fell on the floor out of her grasp before she had time to make use of it. Then a struggle ensued for its possession, the courageous girl finally succeeding in clutching it. By a sudden plunge the would-be thief freed himself and made a precipitate exit, a bullet whizzing in his wake, and penetrating the door, which he pulled after him. He succeeded in making his escape before the neighbors had been aroused by the cries of the younger sister.—Syracuse Courier.

---

Dr. Bull's Cough Syrup it fast taking the place of all the old fashioned Cough remedies. It never fails to relieve the most violent cold, and for throat diseases it is invaluable. Price 25 cents.

---

PRESBYTERIANS, NORTH AND SOUTH.—Some of us, North and South, who have a record in the past to look after, are afraid that either side will go more than half way in the settlement. O pshaw! What is the use of our standing on our dignity? If I had my way I would reach across the line, and with one hand take them by the beard, and with the other I would take them by the girdle, and in that grip of hearty Christian brotherhood I would have this whole trouble settled in three minutes. [Applause.] I tell you it is the disgrace of this century that the Presbyterian Church, North and South, are not in ecclesiastical correspondence to-day; and the greatest shame I ever suffered in all my life was when in this house three years ago, the attempt at fraternization was very basely defeated.—Talmage, Friday Night Talk.

---

Capt. Ayers Leforgee, a Fleming county poineer and a veteran of the Mexican war, denies the oft-repeated story that "Col. Johnson killed Tecumseh," and says emphatically that he did not kill him, but that one David Gooding did, and that he carried his "skelp" home with him, keeping and exhibiting it for several years as a trophy; and that it was finally lost by accident—the wind blew it out of the window, and before he could rescue it the dogs tore it to pieces.—Flemingsburg (Ky.) Democrat.

Copyright © 2023 Newspapers.com. All Rights Reserved.

Powered by Newspapers.com

# EXHIBIT 36

https://www.newspapers.com/image/895126985

Printed on Jun 25, 2023

[CONCLUDED NEXT WEEK.]

## LAWS OF THE
# STATE OF MISSISSIPPI

[PUBLISHED BY AUTHORITY.]

AN ACT to prevent the carrying of concealed weapons, and for other purposes.

SECTION 1. Be it enacted by the Legislature of the State of Mississippi, That any person, not being threatened with, or having good and sufficient reason to apprehend an attack, or traveling (not being a tramp,) or setting out on a journey, or peace officer, or deputies in discharge of their duties, who carries concealed in whole or in part, any bowie knife, pistol, brass knuckles, slung shot or other deadly weapon of like kind or description, shall be deemed guilty of a misdemeanor, and on conviction, shall be punished for the first offence by a fine of not less than five dollars nor more than one hundred dollars, and in the event the fine and cost are not paid shall be required to work at hard labor under the direction of the board of supervisors or of the court, not exceeding two months, and for the second or any subsequent offense, shall, on conviction, be fined not less than fifty nor more than two hundred dollars, and if the fine and costs are not paid, be condemned to hard labor not exceeding six months under the direction of the board of supervisors, or of the court. That in any proceeding under this section, it shall not be necessary for the State to allege or prove any of the exceptions herein contained, but the burden of proving such exception shall be on the accused.

SEC. 2. Be it further enacted, That it shall not be lawful for any person to sell to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any weapon of the kind or description in the first section of this act described, or any pistol cartridge, and on conviction shall be punished by a fine not exceeding two hundred dollars, and if the fine and costs are not paid, be condemned to hard labor under the direction of the board of supervisors or of the court, not exceeding six months.

SEC. 3. Be it further enacted, That any father, who shall knowingly suffer or permit any minor son under the age of sixteen years, to carry concealed, in whole or in part, any weapon of the kind or description in the first section of this act described, shall be deemed guilty of a misdemeanor, and on conviction, shall be fined not less than twenty dollars, nor more than two hundred dollars, and if the fine and costs are not paid, shall be condemned to hard labor under the direction of the board of supervisors, or of the court.

SEC. 4. Be it further enacted, That any student of any university, college or school, who shall carry concealed, in whole or in part, any weapon of the kind or description in the first section of this act described, or any teacher, instructor, or professor who shall, knowingly, suffer or permit any such weapon to be carried by any student or pupil, shall be deemed guilty of a misdemeanor, and, on conviction, be fined not exceeding three hundred dollars, and if the fine and costs are not paid, condemned to hard labor under the direction of the board of supervisors or of the court.

SEC. 5. Be it further enacted, That each justice of the peace before whom a conviction is had, shall, in addition to the costs now allowed by law, be entitled to a tax fee of two dollars and a half.

SEC. 6. Be it further enacted, That immediately after the passage of this act, the Secretary of State shall transmit a copy to each circuit judge in the State, who shall cause the same to be read in open court on the day for the calling of the State docket of the court.

SEC. 7. Be it further enacted, That this act take effect from and after its passage.

APPROVED, February 28, 1878.

Copyright © 2023 Newspapers.com. All Rights Reserved.

Newspapers™
POWERED BY
.com

# EXHIBIT 37



Copyright © 2023 Newspapers.com. All Rights Reserved.



Grand Junction News (Grand Junction, Colorado) · Sat, Jul 8, 1899 · Page 7

https://www.newspapers.com/image/535862657

Printed on Jun 25, 2023

in the same manner as animals running at large.

SEC. 6.   No person not being then and there an officer in the proper exercise of his duty as such shall carry or have concealed upon or about his person any pistol, gun, bowie knife, dirk, dagger, slung shot, stone, bludgeon, billy, metal knuckles or any other deadly or dangerous weapon, nor shall exhibit any such weapon in a rude, angry or threatening manner, nor shall have or carry any such weapon or weapons on or about his person when drunk or in a state of intoxication, nor shall any person, directly or indirectly, sell, barter, loan or deliver any such weapon or weapons to any drunk or intoxicated person.

SEC. 7.   No person shall throw any stones or other missile upon or at any building, whether occupied or unoccupied, nor at any

Copyright © 2023 Newspapers.com. All Rights Reserved.

# EXHIBIT 38

The Lyons Republican (Lyons, Kansas) · Thu, Sep 10, 1891 · Page 4

https://www.newspapers.com/image/427118938

Printed on Jun 25, 2023



# ORDINANCE NO. 179.

[First published in the Lyons REPUBLICAN, September 10th, 1891.]

An Ordinance relating to carrying concealed weapons, and repealing Ordinance No. 70.

Be it ordained by the Mayor and Councilmen of the City of Lyons, Kansas.

Sec. 1.  Any person who is not engaged in any legitimate business, any person under the influence of intoxicating drink, who shall be found within the limits of the City of Lyons, carrying on his person a pistol, bowie knife, dirk or other deadly weapon, shall be subject to arrest upon charge of misdemeanor, and upon conviction shall be fined in a sum not exceeding fifty dollars, or by imprisonment in the city jail not exceeding one month, or by both such fine and imprisonment.

Sec. 2.  Ordinance number seventy of the ordinances of the City of Lyons is hereby repealed.

Sec. 3.  This Ordinance shall take effect after its publication in the Lyons Republican.

Passed and approved, Sept. 7th, 1891.

[seal]                  E. A. RICHARDS, Mayor.

Attest:—A. E. Magoflin, City Clerk.

Copyright © 2023 Newspapers.com. All Rights Reserved.

# EXHIBIT 39

# The Brooklyn Daily Union.

VOL. X, NO. 291.    BROOKLYN THURSDAY AUGUST 21 1873    PRICE THREE CENTS

Copyright © 2023 Newspapers.com. All Rights Reserved.

https://www.newspapers.com/image/541935131

Printed on Jun 25, 2023

## BOARD OF HEALTH.

## SANITARY CODE.

### ADOPTED JULY 15, 1873.

At a meeting of the Board of Health, for the city of Brooklyn, held at 66 Court street, on the 15th day of July, A. D., 1873.

Present—James Jourdan, the President of the Board of Health, Joseph C. Hutchinson, M. D., and J. M. Conkling, M. D., members of the said Board.

The said Board of Health by virtue of, and in pursuance of the authority conferred by section 9 of chapter 107 of the Laws of 1873, entitled " An act to establish a Board of Health in and for the city of Brooklyn, passed March 26, 1873," which said section declares that said Board shall possess within the city of Brooklyn, all the authority, and be charged with all the duties (unless otherwise provided for in this act) conferred or imposed upon the Metropolitan Board of Health, under an act entitled " An act to create a Metropolitan Sanitary District and Board of Health therein for the preservation of life and health, and to prevent the spread of disease," passed February twenty-sixth, eighteen hundred and sixty-six, chapter seventy-four, and also all the powers conferred by the amendments to said act, passed April nineteenth, eighteen hundred and sixty-six, and May twenty-fifth, eighteen hundred and sixty-seven, and also all the powers conferred by any act amendatory thereof, and also all the powers applicable to Brooklyn, conferred by an act for the regulation of tenement and lodging houses in the cities of New York and Brooklyn, passed May fourteenth, eighteen hundred and sixty-seven, and also all the powers conferred by an act to authorize the abatement and prevention of certain nuisances, deemed dangerous to the public health in the city of Brooklyn, passed April twenty-third, eighteen hundred and sixty-seven, and also all the authority, duty and powers, whether given by any law or by ordinance made thereunder heretofore (for the purpose of preserving or protecting life or health, or preventing disease) conferred upon or now belonging to or being exercised by the Board of Health of the city of Brooklyn, are hereby exclusively conferred upon, and shall hereafter be exclusively exercised by the aforesaid Board of Health of the city of Brooklyn, the members and officers thereof," do hereby direct, order, ordain and enact as follows :

### DEFINITIONS OF TERMS.

SECTION 1. That the terms " Board," " this Board," and " said Board," shall be held to mean the " Board of Health of the City of Brooklyn ;" that the word " Department" wherever used herein, shall be held to mean the " Board of Health of the City of Brooklyn ;" that the words " person," " owner," " tenant," " lessee," " occupant," " contractor," " party," " manager," " Board," and " officer." shall respectively be held to apply to and include, both jointly and severally, each and all owners, part-owners, tenants, lessees, occupants, managers, contractors, parties in interest, persons, officers, boards and corporations who may sustain the relations, or may be in like position or any one or more thereof referred to in any ordinance or regulation; that every order, ordinance or regulation declared applicable to the built-up portions of Brooklyn, sh ll, so far as the subject-matter thereof is applicable (save as to interments), and so far as this Board has authority to make the same, be held to include and apply to the built-up portions of said city ; that every word or phrase anywhere herein defined shall be held to include the same sense wherever used ; that the words " city," or " this city," or " said city," whenever used herein, shall be held to mean the city of Brooklyn; that the word " regulations" shall be held to include " special regulation," (which latter will be from time t time issued, and will contain more detailed provisions that can be herein con-

Copyright © 2023 Newspapers.com. All Rights Reserved.

The Brooklyn Union (Brooklyn, New York) · Thu, Aug 21, 1873 · Page 1

https://www.newspapers.com/image/541935131

Printed on Jun 25, 2023

to a permit of the regulations of this Board or do
or fire any gun or other firearm or rock-blast in
any public street, alley, or place within the built-
up portions of said city, where any human life may
be imperilled.

SEC. 174. That no person shall sell, loan, or give
to, or allow to be taken by any other person, any
fire-arm, or other deadly or dangerous weapon,
when there shall be any reason for such first
named person to think or believe that any danger
to life may illegally result from the giving, loan-
ing, selling, or from the use of such arm or
weapon.

SEC. 175. That no large, or church bell shall be
rung or tolled at any funeral in said city without
a permit therefor from this Board, nor shall such
bell be rung or tolled at any other time therein to
the prejudice or peril of the life or health of any
human being.

Copyright © 2023 Newspapers.com. All Rights Reserved.

POWERED BY
Newspapers™
.com

# EXHIBIT 40

K County Democrat (Blackwell, Oklahoma) · Thu, Aug 23, 1894 · Page 8

https://www.newspapers.com/image/604120328

Printed on Jun 25, 2023

## TOWN ORDINANCE NO. 21.

An Ordinance regulating and prohibiting the carrying of deadly weapons:

Be it ordained by the Board of Trustees of the town of Blackwell:

SECTION 1:—It shall be unlawful for any person within the corporate limits of the town of Blackwell to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, boule knife, dirk, dagger, slung shot, billy, metal knucks, sand bag, or any other kind of knife or instrument manufactured or sold for the purpose of defnse except as in this ordinance provided.

SECTION 2:—It shall be unlawful for any person in the corporate limits of the town of Blackwell to carry upon or about his person any pistol, revolver, boule knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon except as in this ordinance provided.

SECTION: 3—Public officers, while in the discharge of their duties, or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under no other circumstances. Provided, however, that if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this ordinance as though he were a private person.

SECTION 4:—Persons shall be permitted to carry shotguns or rifles for the purpose of hunting, having them repaired, or for killing annimals, or for the purpose of using the same in public muster or military drills, or while traveling or moving from one place to another, and not otherwise.

SECTION 5:—It shall be unlawful for any person to point any pistol, revolver, shot gun or rifle, whether loaded or not, at any other person or persons either in anger or otherwise.

SECTION 6:—Any person violating the provisions of any of the forgoing sections, shall upon conviction, be adjudged guilty of a misdemeanor and be punished by a fine of not less than five dollars and costs, nor more than ten dollars and costs, and shall be committed until said fine and costs are paid.

SECTION 7:—This ordinance shall be in full force and effect ten days after its publication in the K County DEMOCRAT.

Passed August 7th 1894.

JOHN R. MAY, President.

Attest: BYEL W. HOLT, Town Clerk.

Per T. M. JONES, Deputy Town Clerk.

[First published in the K County DEMOCRAT, August 9th 1894.]

Copyright © 2023 Newspapers.com. All Rights Reserved.

# EXHIBIT 41

Owens lecture here before she leaves the Co.

**AN ORDINANCE.**—To prohibit intoxication breach of the peace, carrying of deadly weapons, the use of obscene language, the discharge of fire arms, and to close places of amusement on Sunday, in the city of Wallace Kansas, and to repeal certain ordinances in said city.

Be it ordained by the Mayor and Councilmen of the City of Wallace, in the State of Kansas.

Sec. 1. If any person shall be drunk in any highway, street or in any public place or building, or if any person shall be drunk in his own house or private building or place disturbing his family or others, he shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $25 or by imprisonment in the city jail for a period not exceeding 30 days.

Sec. 2. Any person who shall wilfully disturb the peace or quiet of any person, family or neighborhood, shall upon conviction thereof be fined in a sum not exceeding $100, or by imprisonment in the city jail not exceeding 3 months.

Sec. 3. Any person who shall, while intoxicated be found carrying on his person, a pistol, bowie-knife, dirk or other deadly weapon, shall upon conviction be fined in a sum not exceeding $100, or by imprisonment in the city jail not exceeding 3 months.

Sec. 4. Any person who shall carry concealed or otherwise upon his person, any pistol, bowie knife, dirk or deadly weapon, shall upon conviction be fined in any sum not exceeding $100, or by imprisonment in the city jail not exceeding 3 months. Provided however, that this shall not apply to any peace officer, of the State, County or Cities of the State, and provided further that if it shall appear to the court trying offences under this section, that the accused was engaged in any legitimate business or calling, that would necessitate the carrying of any such weapon, such person shall be acquitted.

Sec. 5. Any person who shall discharge any fire arms, rockets, powder firework torpedoes or other dangerous or combustable material, upon any streets, lots, grounds, alleys or in the vicinity of any building, shall upon conviction be fined in any sum not exceeding $100, or by imprisonment in the city jail not exceeding 3 months. Provided however, that it shall appear to the court, trying offences under this section, that the offence charged was committed by the accused in defence of his person or property or in celebrating any national holiday, public event, and that the same was done in such a manner as not to endanger the lives or property of another, such person shall be acquitted.

Sec. 6. Any person who shall speak, utter or use any indecent language in any public place in the presence and hearing of any female shall upon conviction be fined in any sum not exceeding $100, or by imprisonment in the city jail not exceeding 3 months.

Sec. 7. Any person who shall on the first day of the week, commonly called Sunday, keep open any billiard room, ball or tenally, skating rink, house, ground or other place of amusement, shall upon conviction be fined in any sum not exceeding $100, or by imprisonment, in the city jail not exceeding 3 months.

Sec. 8. Whoever shall aid assist, or counsel another to commit any of the offenses prohibited by this ordinance shall be deemed guilty of the same offense as the principal and punished accordingly notwithstanding, the principal may not have been charged with the offense.

Sec. 9. All fines and costs imposed by the Police Judge under this ordinance shall be by committment of the accused to the city jail until the same is paid and the offenses herein denominated and prohibited shall extend to all such acts committed within the corporate limits of the city of Wallace.

Sec. 10. That an ordinance entitled, an ordinance relating to the carrying of deadly weapons, passed Nov. 26th, 1887, and published Dec. 3rd, 1887, and an ordinance, without title passed Nov. 17th, 1887, published Nov. 19, 1887, are hereby repealed, and this ordinance shall take effect and be in force from and after its publication in the Wallace County Register.

Passed and approved Dec. 22nd, 1887.

Attest : Geo. W. Ewen, A. B. Chrysler,
Clerk Protem.      Pres. of Council.

Copyright © 2023 Newspapers.com. All Rights Reserved.

# EXHIBIT 42

https://www.newspapers.com/image/587532621

Printed on Jun 25, 2023

## Ordinance No. 39.

*Additional Penal Ordinance—Deadly or Dangerous Weapons—Malicious Mischief—Shop-lifting.*

Be it ordained by the Board of Aldermen of the City of Greenfield as follows:

SECTION I. If any person shall carry concealed upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day (whether National, State, School or Municipal), or into any Court room during the setting of Court, or into any other public assemblage of persons met for any lawful purpose other than for Militia drill or meetings called under the militia laws of the state, having upon or about his person any kind of fire-arms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon, or shall in the presence of one or more persons exhibit any such weapon in a rude, angry and threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated, or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor, any such weapon, without the consent of the parent or guardian of such minor (within the limits of the City of Greenfield) he shall upon conviction thereof be fined not less than Fifty Dollars, nor more than Two Hundred Dollars, or be imprisoned in the County Jail not longer than six months, or may be punished by both such fine and imprisonment.

SECTION II. Every person who shall wilfully and maliciously injure or remove any saddle, bridle, halter, hitch-rein, buggy or wagon harness, the personal property of another, or who shall wilfully and maliciously remove any tap or nut from the axle of any buggy, wagon or other vehicle, or otherwise injure the same, the personal property of another, or who shall wilfully or maliciously remove, deface or otherwise injure anything which is the personal property of another, and without the owners consent shall conceal, hide or do any act with the personal property of another, wilfully and maliciously which is calculated to annoy, damage or injure another or his property, shall upon conviction thereof be fined therefor in any sum not exceeding Fifty Dollars, or may be imprisoned in the County Jail not longer than six months, or may be punished by both such fine and imprisonment.

SECTION III. Every person who shall wilfully conceal about his person any article of personal property belonging to another, with intent to convert the same to his own use, or shall wilfully carry away from any dwelling house, shop or store, or from any public house any personal property not his own, or shall be guilty of any petit thievery ordinarily termed "Shop-lifting" shall upon conviction thereof be fined in any sum not exceeding One Hundred Dollars, or shall be committed to the County Jail for any term not exceeding six months or may be punished by both such fine and imprisonment.

SECTION IV. This ordinance shall be in full force and effect from and after its passage.

Passed and approved January 4th 1886.

WILL R. BOWLES, Mayor.
W. R. McREYNOLDS,
President Board Aldermen.
ATTEST: SEYMOUR HOYT, City Clerk.

Copyright © 2023 Newspapers.com. All Rights Reserved.

# EXHIBIT 43

public place. For purposes of self-defense in immediate danger it allows a peaceable citizen of good character to carry weapons.

# CONCEALED WEAPONS.

## Judge Brannon's Decision on This Question.

## HIS CONCLUSIONS VERY SWEEPING.

### The Law Recognizes No Difference in Persons and All Should be Prohibited from The Practice.

Buckhannon, W. Va., December 12—At the late term of the Circuit Court of Upshur county, a young man by the name of Long was tried on an indictment for carrying a pistol contrary to the act of 1887. The defense to the prosecution was that Long was seen going along the public highway with a revolver in his hand.

The defense proved that Long was a peaceable citizen of good moral character, and that he carried the weapon because that in passing along that road a short time previously, he had been pursued by persons, and was alarmed for his safety.

**The Judge Ruled Out**

that part of the evidence relating to the danger of a peaceable citizen, as if it was contemplated by the act of the Legislature which refers to the danger of bodily harm from some person so justifying the carrying of such weapon embraced in the law.

A verdict of guilty was rendered by the jury, and on the motion to arrest judgment and set aside the verdict, an able and elaborate argument was made by the prisoner's counsel. The testimony went to the constitutionality of the law—first confining the Fourteenth and Fifteenth amendments to the federal constitution, and also upon the matters and sub-matters of such constitutions.

Under consideration, upon certain legislation, it being contended that the feature which allows persons of good character and peaceable conduct, under certain circumstances, to be exempt from the penalties of the law, is part of the original law.

The decision rendered by Judge Henry Brannon is very sweeping and in part as follows:

As the law is one which has universally been enforced in this state, and has been invoked against citizens for the last twenty years back...

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.