IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| KATHERINE NOVOTNY, ET AL., | * | |
| *Plaintiffs*, | * | |
| v. | * | No. 1:23-cv-01295-GLR |
| WESLEY MOORE, ET AL., | * | |
| *Defendant*. | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

### DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS THE NOVOTNY COMPLAINT

In their opposition, the Novotny Plaintiffs demonstrate that their position relies on several faulty premises, and is ultimately dependent on a distorted reading of *New York State Rifle and Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), that no court has yet adopted. Because plaintiffs have failed to plead a valid Second Amendment claim, their claims should be dismissed.

1. First, plaintiffs' position appears to rise or fall on their theory that, although the Supreme Court had expressly approved of "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Court in *Bruen* somehow walked back that endorsement. They claim that, although *Bruen* retained the idea of sensitive places as a conceptual matter, *Bruen* nonetheless abandoned *Heller*'s language so as to limit the universe of "sensitive places" to only three particular locations (and, in doing so, disavowed the notion of "schools" as sensitive places entirely). Building on that false premise, plaintiffs assert that any analysis of whether a modern location is a sensitive place must be analogized from those specific locations.

Plaintiffs further argue that any analogy must be consistent with what they claim is the unifying factor amongst those three specific locations: the presence of comprehensive state-provided security. Each of these claims is refuted by the language in *Bruen*.

Because "*Bruen* did not overturn—and in fact reaffirmed—*Heller*" (ECF 38 at 12), *Heller* remains the starting point for any analysis. In *Heller*, the Supreme Court explained that, although its opinion was announcing an individual right to possess firearms, the right was "not unlimited." 554 U.S. at 626. In that vein, the Court stated that its opinion did not "cast doubt" on "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id*. And two years later, the Court "repeat[ed] those assurances." *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010). The Supreme Court again left that language undisturbed in *Bruen*:

> Consider, for example, *Heller*'s discussion of "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—e.g., legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carrying of firearms in *new* and analogous sensitive places are constitutionally permissible.

142 S. Ct. at 2133 (citations omitted).

This language belies plaintiffs' assertion that the Supreme Court in any way narrowed the phrase "such as schools and government buildings" simply by identifying three particular types of government buildings. Indeed, it would be a skewed reading of *Bruen* to suggest that, when the Court makes references to "these locations" or "those historical regulations," it has

2

read *Heller*'s language out of existence and has sub silentio endorsed reliance on only the exemplar buildings it has specifically identified.

Plaintiffs' reading is thus not only contrary to the plain text of the *Bruen* majority opinion, but also of the concurrences of three justices. In his solo concurrence, Justice Alito was adamant that the *Bruen* decision did not "disturb[] anything that we said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns." *Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring). And in a concurrence joined by Chief Justice Roberts, Justice Kavanaugh simply blockquoted the "sensitive places" language from *Heller*, signaling that affirmation of the *Heller* language was integral to his views, and that nothing in the *Bruen* decision altered how that language should be interpreted. As a result, what is left is where the Court started in *Heller*: the reaffirmation of "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings."

2.     Plaintiffs' assertion that "sensitive places" must include state-provided comprehensive security relies on a skewed reading of *Bruen* as well. Plaintiffs make reference to this "comprehensive state-provided security" premise no less than 15 times in their opposition. Of course, that is 15 times more than the Supreme Court makes reference to it in *Heller*, *McDonald*, and *Bruen* combined. Thus, although plaintiffs claim that the presence of comprehensive state-provided security is the fundamental and exclusive benchmark by which all locational restrictions must be judged, it is notable that the *Bruen* Court did not articulate such a standard. Indeed, given that *Bruen*'s discussion of "sensitive places" was within a passage ostensibly designed to *clarify* the application of the history-and-tradition standard announced in *Heller*, the Court could have easily included this limiting principle in furtherance of that purpose. That it did not speaks volumes.

But perhaps what is more telling is what the Court actually did say. In *Bruen*, the Court rejected New York's assertion that the "sensitive places" doctrine could encapsulate all "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." *Bruen*, 142 S. Ct. at 2133. In the Court's view, New York was essentially making the argument that the entire "island of Manhattan [is] a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." *Id.* at 2134. However, had the Court believed that "comprehensive state-provided security" was the dispositive benchmark, it could have easily rejected New York's argument out of hand. But it did not. Instead, the Court used cautious language, stating only that including within the category of "sensitive places" "all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly," and would "eviscerate the general right to publicly carry arms for self-defense . . . ." *Id.* All of this language would have been unnecessary if the Court could have just put the issue to rest by announcing and applying plaintiffs' proffered "comprehensive state-provided security" thesis.

Furthermore, the Court rejected the narrow standard advanced by plaintiffs here when it gave some insight into the characteristics of places it might deem as "sensitive places." In rejecting New York's more expansive view described above, the *Bruen* Court stated: "It is true that people sometimes congregate in 'sensitive places,' and it is likewise true that law enforcement professionals are *usually* presumptively available in those locations." 142 S. Ct. at 2133-34 (emphasis added). The Court's observation that law enforcement officials are "usually" available in places deemed "sensitive places" thus entirely refutes plaintiffs' theory, which is premised on comprehensive state-provided security *always* being available. And

4

again, the Court's ponderings would have been entirely pointless—and indeed counterproductive—if the true benchmark of what makes a "sensitive place" is, as plaintiffs maintain, the presence of comprehensive state-provided security.

Moreover, plaintiffs' reliance on the presence of comprehensive state-provided security as the determinative factor is counter to *Bruen*'s broader command to remain faithful to history and tradition. Plaintiffs assert that, "for a modern location to be validly deemed a 'sensitive place' such that firearm-carry may be restricted there, it must" have comprehensive state-provided security. (ECF 38 at 22.) But if that is the case, would a "sensitive place" expressly endorsed by *Bruen*—such as a polling place—lose that status just because the government has opted not to implement such comprehensive security?[1] Or, conversely, may a location that might have historically allowed firearms now be elevated to "sensitive place" status simply by adding "metal detectors and armed guards at every point of entry"? (ECF 38 at 11.) Plaintiffs appear to think so. (*See* ECF 38 at 25 (noting that, "if the State wishes to ban firearms from public museums or Ravens stadium, it may provide comprehensive security").)[2] Plaintiffs' approach thus not only disregards history and tradition, but also appears to surrender the vitality of their Second Amendment rights to the extent of the government's security budget.

---

[1] In 2022, there were over 1,500 polling places throughout Maryland. *See* https://elections.maryland.gov/elections/2022/2022_primary_number_of_precincts_by_legislative.pdf And there are no laws, regulations, or policies requiring comprehensive security at these sites. Indeed, it would be intimidating to many citizens if, upon showing up to vote, they were greeted by metal detectors and armed guards. That is why some states have actually made it illegal for a uniformed law enforcement officer to be present at a polling place unless they are there to vote or they have been summonsed to the location to preserve the peace. *See, e.g.*, 25 Pa. Cons. Stat. § 3520.

[2] And what about places that may initially screen everyone (such as an airport terminal), but then isolate everyone within an area where there is no comprehensive security (the airplane itself)?

3.      Equally meritless is plaintiffs' repeated insistence that *Bruen* "did not endorse schools as a 'sensitive place.'" (ECF 38 at 2, 9, 20, 28.)  This assertion is seriously misplaced—the language "such as schools" is plainly in the Court's decisions in *Heller*, *McDonald*, and *Bruen*.  But taken at face value, plaintiffs appear to argue that the Court really didn't mean what it said, and that schools are "sensitive places" only to the extent that firearms restrictions can be applied to students.  (ECF 38 at 20-21, 28.)  To support that hypothesis, plaintiffs rely on the doctrine of *in loco parentis*.  (ECF 38 at 2, 20-21, 28.)

At the outset, plaintiffs' argument is refuted by the fact that when *Heller*, *McDonald*, and *Bruen* all identify "schools" as "sensitive places," the language is unqualified.  Again, given the implications, what the Court did not say is nearly as important as what it did say.  Although the Court could have easily clarified that restrictions in schools are valid only as applied to students, it did not do so.  There is therefore no basis to conclude that the Court intended such an important limiting principle to apply.  Moreover, plaintiffs' argument ignores the fact that the Court identified "schools" as "sensitive *places*." (emphasis added).  Had the Court intended to limit restrictions to students only, it would not have used a locational term such as "place," but would have instead categorized such a restriction with regard to the class of people to whom it purportedly applied.[3]

---

[3] Plaintiffs' theory also ignores the fact that, by coupling together "government buildings and schools," the Court was signaling that the scope of the restrictions that could be applied to these two locations would not only be identical, but grounded in similar doctrinal underpinnings.  *See Donovan v. Anheuser-Busch, Inc.*, 666 F.2d 315, 327 (8th Cir. 1981) ("The phrase 'such as' is not a phrase of strict limitation, but is a phrase of general similitude indicating that there are includable other matters of the same kind which are not specifically enumerated by the standard.").

6

But brushing all that aside, the doctrinal theory upon which plaintiffs rely—*in loco parentis*—fails to bear the weight that plaintiffs hope it will.  First, the Supreme Court has made clear that children do not "shed their constitutional rights . . . at the schoolhouse gate," *Tinker v. Des Moines Independent Community Sch. Dist.*, 393 U.S. 503, 506 (1969), and therefore the fact that a child is in school cannot alone support, as plaintiffs would suggest, a wholesale deprivation of a constitutional right.  Thus, rather than abrogating all students' constitutional rights, a child's status as a student merely informs how constitutional rights are to be balanced against other state interests.  *See, e.g.*, *New Jersey v. T.L.O.*, 469 U.S. 325, 336-37 (1985) (rejecting the *in loco parentis* doctrine in the context of the Fourth Amendment, but nonetheless employing a balancing test to hold that constitutional standards may be relaxed in the school context).  But the Second Amendment does not countenance a balancing test, *see Bruen*, 142 S. Ct. at 2131, and therefore plaintiffs' reliance on the inherent relationship between a child and their school is faulty.

In any event, no court has adopted plaintiffs' novel reading of *Bruen*.  Instead, courts that have addressed the issue have, in line with *Bruen*'s express command, consistently concluded that firearms restrictions at schools (and not just for students) are constitutional.  *See, e.g.*, *Kovacic v. Cuyahoga County Dep't of Children and Family Services*, 724 F.3d 687, 707-08 (6th Cir. 2013) (noting that "[t]he Second Amendment protects a right to carry guns, . . . but not in school zones").  And it appears that plaintiffs do not even have confidence in their own theory.  After all, although Maryland prohibits ordinary law-abiding non-student

citizens from carrying firearms on public school grounds (and in private school buildings), plaintiffs leave these restrictions unchallenged.[4]

4.     Plaintiffs also take issue with the proposition that the government may, when acting in a proprietary capacity, enact firearms restrictions on its property just as any private party may do with regard to a similar endeavor. (ECF 38 at 23.)  Plaintiffs argue that, when the State *enforces* laws that restrict firearms at particular locations, it is acting in a sovereign capacity rather than a proprietary capacity, and that this therefore sets it apart from private actors.  It is true, of course, that the State possesses enforcement powers as a fundamental aspect of its inherent authority as a sovereign.  But that authority is independent of the government's ability to express its preference as to the conduct that will be permitted on its own property.  Indeed, plaintiffs' challenge extends only to the *manner* in which the State chooses to enforce its statutes and regulations.  But such a challenge, even if it had merit, does not implicate the government's underlying ability to place the same restrictions on firearms on its own properties that private actors may do at theirs.[5]

---

[4] Even the *Kipke* plaintiffs, who have chosen a more widespread strategy with regard to their locational restriction challenges, appear to understand the plain language of *Bruen*, and have declined to challenge firearms restrictions in school buildings. *Kipke v. Moore*, No. 1:23-cv-1293-GLR (D. Md.), ECF 1 at ¶ 50.  Likewise, in a separate lawsuit in which plaintiff Maryland Shall Issue, Inc. is a party, the plaintiffs expressly declined to challenge firearms restrictions relating to public elementary and secondary schools. *See Maryland Shall Issue, Inc. v. Montgomery County*, No. 21-1736-TDC, 2023 WL 4373260, at *9 (D. Md. July 6, 2023).

[5] Plaintiffs nonetheless assert that application of these principles would mean that "the Constitution does not apply in government-owned locations," and would result in "absurd consequences." (ECF 38 at 25.)  Plaintiffs recite a parade of hypotheticals, such as being subjected at a government-owned museum to "unreasonable searches and seizures, compelled to espouse the government's preferred messages, and prohibited from engaging in religious exercises like praying before meals." (ECF 38 at 25.)  Plaintiffs' manufactured fears are overblown.  First, a patron of a private museum may not be subject to a search or seizure

Next, plaintiffs argue that the State's acknowledgement that it cannot, as a general matter, restrict public carry of firearms on sidewalks and streets must be interpreted as a concession that it cannot regulate in several of the challenged locations, such as parks and public transportation.[6] (ECF 38 at 23.) In support, plaintiffs assert that there is no basis to distinguish between these types of public spaces. But defendants have already identified the applicable principles that set these locations apart. With regard to parks, public transportation, and many other places where the State has acted to regulate firearms, the place being regulated has been dedicated to a particular proprietary purpose that the State has deemed to be inconsistent with the carry of firearms. But unlike those proprietary functions, sidewalks and streets serve a traditionally public function where constitutional rights cannot otherwise be extinguished. *See Marsh v. Alabama*, 326 U.S. 501, 506 (1946) (holding that a privately-run "company town" could not prohibit solicitation on its sidewalks because, by opening its

---

against their will by the owner of the premises (that would be any number of torts), unless of course it is done by a law enforcement officer who has the requisite level of reasonable suspicion or probable cause. The same state of affairs would apply at a government-owned museum. Second, although under some circumstances a government-owned museum could "compel" (looking past, of course, an individuals' volitional choice to enter the museum) a patron to espouse the government's preferred message (such as by requiring all patrons to wear a button with the museum's name or slogan to show payment of admission), principles exclusive to the First Amendment would limit the scope of that authority. *See Wooley v. Maynard*, 430 U.S. 705, 715-16 (1977). And, third, even if civil rights laws do not similarly prohibit a private business from stopping an individual from praying before a meal, principles exclusive to the First Amendment would similarly act to prohibit a government-owned museum from doing so (looking past the implausibility of this actually happening).

[6] Earlier in their opposition, plaintiffs lament the fact that, if the government is able to enact firearms restrictions on its own property, it "could infringe on the Second Amendment . . . in any publicly owned and operated area, such as sidewalks, where, again, *Bruen* has already recognized a presumptive right to carry to firearms." (ECF 38 at 2.) As defendants explained in their motion to dismiss, and as plaintiffs appear to acknowledge in the passage cited above, defendants have, as a general matter, disclaimed any comprehensive authority to restrict firearm carry on sidewalks. (ECF 36-1 at 26 n.17.)

sidewalks and roads to the public, it was performing "essentially a public function"). And, importantly, these principles are consistent with *Bruen*'s pronouncement of a "general right to public carry." *Bruen*, 142 S. Ct. at 2135. Indeed, although the State can prohibit the carrying of firearms at locations that it has dedicated to a proprietary purpose (or that are otherwise "sensitive places"[7]), the State acknowledges that limiting the carrying of firearms on public thoroughfares such as streets and sidewalks might implicate an individual's Second Amendment right to public carry to the extent that it would destroy their ability to travel between locations where the carrying of firearms may otherwise be welcome. *See Heffron v. International Soc. For Krishna Consciousness, Inc.*, 452 U.S. 640, 651 (1981) (observing that a public street serves "a necessary conduit in the daily affairs of a locality's citizens").

5. Plaintiffs also reiterate the argument that the proper era for determining the meaning of the right to carry publicly is the time of the Founding and not the ratification of the Fourteenth Amendment. (ECF 38 at 11.) Plaintiffs derisively suggest that defendants have relied on the Reconstruction era as a simple matter of useful strategy, "presumably because it was only around then that some states began adopting certain locational firearm restrictions." (ECF 38 at 11.) But as many courts have recognized, the public understanding of the right to keep and bear arms during the Reconstruction era is critical to understanding the scope of that right as applied to the States because that is the era when the States acceded to those constitutional limitations through their adoption of the Fourteenth Amendment. *See, e.g.*,

---

[7] Although plaintiffs have not challenged restrictions at government buildings generally, it should be noted that defendants do not rely solely on a proprietary theory to support all restrictions at government buildings. Instead, consistent with history and tradition, government buildings may also be deemed sensitive places with respect to those buildings where government services or other administrative functions are being performed.

*Maryland Shall Issue, Inc. v. Montgomery County*, __ F. Supp. 3d __, No. 21-1736-TDC, 2023 WL 4373260, at *15 (D. Md. July 6, 2023). And, despite plaintiffs' assertions, *Bruen* does not hold otherwise. (ECF 38 at 11.) Rather than resolve the issue, the Court in *Bruen* engaged in an internal dialectic that compared the merits of both positions. The *Bruen* Court recognized that, on one hand, "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*," 142 S. Ct. at 2136 (emphasis in original), thus suggesting that the Reconstruction era was the appropriate timeframe for discerning the scope of the right. And the Court noted that, "[s]trictly speaking, [States] are bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." *Id*. at 2137. But the Court also recognized its prior statements, made in other contexts, that constitutional rights made applicable to the States through the Fourteenth Amendment generally "have the same scope as against the Federal Government," and that the Court has "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id*. at 2137-38. Ultimately, the Court "acknowledge[d]" the "ongoing scholarly debate" and set the issue aside for another day, concluding that it was unnecessary to resolve the issue because, in the Court's view, the public understanding of the right to public carry was the same in 1791 as it was in 1868. *Id*. at 2138.

6. Throughout their brief, plaintiffs rely heavily on a purported "tradition[] . . . of address[ing] the risk of violent conflict . . . by encouraging or even requiring law-abiding citizens to" carry firearms. (ECF 38 at 2.) To support this tradition, plaintiffs identify statutes mostly from the 1600s and early 1700s that required colonial Americans to carry firearms when they assembled together at church or other public meetings. (ECF 28 at 14-15.) These

11

laws, however, were designed in large part to better facilitate the defense from slave insurrections (or attacks by Native Americans), not to further an underlying right to bear arms.[8] It is thus not surprising that plaintiffs neglect to cite a South Carolina statute from 1743 requiring colonists to bring their guns to church, but that also lays bare its purpose: so that "the inhabitants of this Province may be the better secured and provided against the insurrections and other wicked attempts of negroes and other slaves." Act No. 702, reprinted in 7 *Statutes at Large of South Carolina* 417-19 (D.J. McCord ed. 1840).[9] But in an attempt to provide the court with a statute whose enactment is closer to the Founding, the purpose of these statutes is nonetheless revealed. The 1770 Georgia mandate cited by plaintiffs applies only to White males, and its express purpose is to preserve the colony from "insurrections," a not-so-coded reference to slave uprisings. (ECF 38-11.)

Plaintiffs have thus failed to show that this purported tradition extended beyond these anachronistic circumstances in which colonists were collectively engaged in defending themselves from threats external to their political community, whether it be slave insurrections or attacks by Native Americans. Indeed, outside of this context, plaintiffs have not presented any documentary evidence (from any historical era, let alone the Founding or Reconstruction eras) extolling the virtues of having everyone armed at social events or other public gatherings. But there *is* evidence of a contrary tradition. As detailed in defendants' memorandum in support of their motion to dismiss, Reconstruction-era courts found it "little short of

---

[8] In addition, given that these statutes impose a *duty*, plaintiffs err in using them to support the scope of the Second Amendment *right*.

[9] Available at https://www.carolana.com/SC/Legislators/Documents/The_Statutes_at_Large_of_South_Carolina_Volume_VII_David_J_McCord_1840.pdf

12

ridiculous" that anyone would have the right to carry a handgun into a "peaceable public assembly," *English v. State*, 35 Tex. 473, 478 (1871), and that carrying handguns into public assemblies was "not an appropriate use of them," *Andrews v. State*, 50 Tenn. 165, 182 (1871), and was "an eye-sore to good citizens, offensive to peaceable people, an indication of a want of proper respect for the majesty of the laws, and a marked breach of good manners," *Hill v. State*, 53 Ga. 472, 476 (1874). These were not outlier opinions. *See, e.g.*, *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886) ("The mischief to be apprehended from an intoxicated person going abroad with fire-arms upon his person is equally as great as that to be feared from one who goes into an assemblage of persons with one of the prohibited instruments."); *Owens v. State*, 3 Tex. App. 404, 407 (1878) ("Nor does it matter how much or with what good reason I may be in dread of an immediate and pressing attack . . ., the imminence of such danger affords no excuse in my wearing deadly weapons to church, or in a ball-room, or other places mentioned where [an] attack may be made and the lives of innocent people there assembled placed in jeopardy or sacrificed.").

7. The weakness of plaintiffs' position is also demonstrated by the many ways in which plaintiffs mischaracterize the statutes upon which the defendants apply. For example, plaintiffs criticize the defendants' reference to an 1870 law from Texas that prohibited the carrying of firearms in various locations, claiming that *Bruen* "recognized [the law] as an outlier at the time for its relatively limited view of the public-carry right." (ECF 38 at 17); (ECF 36-17). But the actual Texas law at issue in *Bruen* (from 1871, not 1870) was much broader, forbidding "anyone from 'carrying on or about his person . . . any pistol . . . unless he has reasonable grounds for fearing an unlawful attack on his person." *Bruen*, 142 S. Ct. at 2153. Likewise, plaintiffs criticize defendants' reference to an 1869 Tennessee law (ECF 36-

13

14) that plaintiffs claim was discredited in *Bruen*. (ECF 38 at 17.) But plaintiffs again have a case of mistaken identity; the law referenced in *Bruen* related to prohibitions on carry generally, rather than specific locations. *Bruen*, 142 S. Ct. at 2147. Similarly, plaintiffs' claim that an 1874 Missouri law (ECF 36-18) allowed open carry is refuted by the very case law cited in *Bruen*. Indeed, in *Shelby*, the Supreme Court of Missouri noted that the law was not premised on the firearm being concealed (meaning that all manner of carry was prohibited), but explained that the act was nonetheless valid because it was a regulation "as to time and place." 2 S.W. at 469. Plaintiffs' mischaracterizations underscore the State's point: although a wholesale restriction on the public carrying of firearms was found to be contrary to the history and tradition underlying the Second Amendment, there was nonetheless a robust tradition of prohibiting the carrying of firearms in specific locations.

Plaintiffs also take aim at laws from Texas and Louisiana cited by defendants in support of the private building consent rule, claiming that these laws were part of the respective states' discriminatory "Black Codes." (ECF 38 at 41); (ECF 36-30); (ECF 36-31). Although plaintiffs cite to Justice Thomas's concurrence in *McDonald* to demonstrate this "discriminatory history," the passage plaintiffs cite once again refers to different laws. Justice Thomas referred to laws "banning firearm possession outright," which in the years following the Civil War "would have been nondiscriminatory only in the formal sense[.]" *McDonald*, 561 U.S. at 847 (Thomas, J., concurring). The laws cited by defendants, however, do not ban possession outright, but instead contain specific prohibitions on the carry of "fire-arms on the premises or plantations of any citizen, without the consent of the owner or proprietor." (ECF 36-30.) And notwithstanding that "the historical examples must speak for themselves" (ECF

38 at 40), plaintiffs have not advanced any legitimate basis to believe that these laws were racist in application and thus can be discounted on that basis.[10]

\* \* \*

As a final note, despite plaintiffs' complaints throughout their opposition, the State is not seeking to "undermine" *Bruen*, but rather to implement laws that are consistent with its framework.  Given that *Bruen* effectively invalidated an important aspect of Maryland's public carry scheme that had stood for over 50 years, Maryland is entitled to respond with reasonable locational restrictions that navigate and respect the history and tradition of the Second Amendment right to carry.  But this Court should not allow plaintiffs to rewrite that history and tradition so as to improperly render the Constitution a "regulatory straightjacket."  *Bruen*, 142 S. Ct. at 2111.

## CONCLUSION

The Court should dismiss the complaint in its entirety with prejudice.

---

[10] In fact, one district court has suggested the opposite conclusion, "question[ing] whether [the Lousiana and Texas laws] were enacted against a unique backdrop: one designed to quell sedition, protect public safety, and introduce a slate of civil rights for newly freed slaves." *Koons v. Platkin*, No. 22-7464 (RMB/AMD), 2023 WL 3478604, at \*68 (D.N.J. May 16, 2023), *appeal pending*, No. 23-1900 (3d Cir.).

                                      Respectfully submitted,

                                      ANTHONY G. BROWN
Attorney General of Maryland


/s/ Robert A. Scott
_____
ROBERT A. SCOTT
Federal Bar No. 24613
RYAN R. DIETRICH
Federal Bar No. 27945
JAMES N. LEWIS
Federal Bar No. 30220
Assistant Attorneys General
200 Saint Paul Place
20th Floor
Baltimore, Maryland  21202
rscott@oag.state.md.us
410-576-7005

August 2, 2023                            Attorneys for Defendants