**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| SUSANNAH WARNER KIPKE, et al. | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-01293-GLR |
| | ) | |
| WES MOORE, in his official capacity | ) | |
| as Governor of Maryland, et al. | ) | |
| | ) | |
| *Defendants.* | ) | |

**PLAINTIFFS' CONSOLIDATED REPLY IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT, RESPONSE IN OPPOSITION TO DEFENDANTS'
CROSS-MOTION FOR SUMMARY JUDGMENT, AND REPLY IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Respectfully submitted,

/s/ *John Parker Sweeney*
John Parker Sweeney (Bar No. 08761)
James W. Porter, III (Bar No. 19416)
Marc A. Nardone (Bar No. 18811)
Connor M. Blair (Bar No. 20985)
Bradley Arant Boult Cummings LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
Phone: 202-393-7150
Facsimile: 202-347-1684
jsweeney@bradley.com

Dated: August 11, 2023                Counsel for Plaintiffs

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................ 3

I.  Plaintiffs are entitled to summary judgment on their Second Amendment challenges to the Carry Bans. ............................................................................. 3

A.  Defendants have not rebutted Plaintiffs' showing that the Second Amendment's plain text covers their conduct. ...................................... 3

B.  Defendants fail to meet their burden to demonstrate that the Carry Bans are consistent with the Nation's historical tradition of firearms regulation. ............... 7

1.  Defendants rewrite the *Bruen* analysis for "sensitive places." .................. 7

a.  Firearms prohibitions in "sensitive places" are not exempt from the historical-tradition scrutiny required by *Bruen*. ....................... 7

b.  Defendants' sensitive places "principles" are irreconcilable with *Bruen*. ................................................................................ 10

c.  Defendants' proffered sensitive places traditions are not supported by the historical record or *Bruen*. ................................ 14

2.  Defendants cannot justify any of the Carry Bans through a purported status as a proprietor or market participant. ............................................. 19

3.  Defendants fail to demonstrate that a historical tradition of firearms regulation supports any of the Carry Bans. ............................................... 21

a.  Bars and Restaurants ................................................................. 21

b.  Public Parks (state parks, state forests, Chesapeake Forest Lands, and highway rest areas) ................................................... 23

c.  Public Transportation ................................................................ 25

d.  Stadiums, Racetracks, Amusement Parks, and Casinos .............. 26

e.  Museums ................................................................................... 28

f.  Public Demonstrations ............................................................... 29

g.  Healthcare Facilities .................................................................. 32

h.  School Grounds .......................................................................... 34

i.  Government Buildings ................................................................ 36

j.  Private Property (i.e., the no-carry default) ............................... 38

II.  Plaintiffs are entitled to summary judgment on their First Amendment compelled-speech challenge. .............................................................................. 42

III.  Maryland's cross-motion for summary judgment should be denied as to Counts One and Two. ........................................................................................................ 44

IV.     Plaintiffs are entitled to a preliminary injunction barring enforcement of the
        challenged laws. ................................................................................................ 44

CONCLUSION ............................................................................................................... 45

INDEX OF SUPPLEMENTAL EXHIBITS ................................................................... 46

CERTIFICATE OF SERVICE ....................................................................................... 47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis,*
  143 S. Ct. 2298 (2023) ................................................................................................3, 43

*Antonyuk v. Hochul,*
  No. 1:22-CV-0986 (GTS/CFH), 2022 WL 16744700 (N.D.N.Y.
  Nov. 7, 2022) ................................................................................................16, 33, 37, 41

*Biden v. Knight First Amendment Inst. at Columbia Univ.,*
  141 S. Ct. 1220 (2021) ..........................................................................................43

*Burns v. Martuscello,*
  890 F.3d 77 (2d Cir. 2018) .....................................................................................43

*Caetano v. Massachusetts,*
  577 U.S. 411 (2016) ................................................................................................5

*California v. Texas,*
  141 S. Ct. 2104 ......................................................................................................40

*Christian v. Nigrelli,*
  No. 22-CV-695 (JLS), 2022 WL 17100631 (W.D.N.Y. Nov. 22, 2022) ...........4, 6, 40, 41, 42

*Clappter v. Amnesty Int'l USA,*
  568 U.S. 398 (2014) ..............................................................................................30

*Common Cause/Georgia v. Billups,*
  554 F.3d 1340 (11th Cir. 2009) ............................................................................39

*DaimlerChrysler Corp. v. Cuno,*
  547 U.S. 332 (2006) ........................................................................................39, 43

*Dep't of Com. v. New York,*
  139 S. Ct. 2551 (2019) ...............................................................................30, 32, 40

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ................................................................................... *passim*

*Engquist v. Or. Dep't of Ag.,*
  553 U.S. 591 (2008) ..............................................................................................20

*Espinoza v. Mont. Dep't of Revenue,*
  140 S. Ct. 2246 (2020) ..........................................................................................12

*Gamble v. United States*,
    139 S. Ct. 1960 (2019)......................................................................................12, 13

*GeorgiaCarry.Org, Inc. v. Georgia*,
    687 F.3d 1244 (11th Cir. 2012) ..........................................................................6, 13

*Giboney v. Empire Storage & Ice. Co.*,
    336 U.S. 490 (1949)...................................................................................................43

*Harper v. Pub. Serv. Comm'n of W. Va.*,
    396 F.3d 348 (4th Cir. 2005) ....................................................................................20

*Hedges v. Obama*,
    724 F.3d 170 (2d Cir. 2013)......................................................................................31

*Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*,
    14 F.4th 407 (4th Cir. 2021) .....................................................................................13

*Kanter v. Barr*,
    919 F.3d 437 (7th Cir. 2019) ....................................................................................37

*Kenny v. Wilson*,
    885 F.3d 280 (4th Cir. 2018) ....................................................................................31

*Konigsberg v. State Bar of Cal.*,
    336 U.S. 36 (1961)......................................................................................................5

*Koons v. Platkin*,
    No. 22-7464 (RMB/AMD), 2023 WL 3478604 (D.N.J. May 16, 2023)........................ *passim*

*Legend Night Club v. Miller*,
    637 F.3d 291 (4th Cir. 2011) ....................................................................................45

*Libertarian Party of Va. v. Judd*,
    718 F.3d 308 (4th Cir. 2013) ....................................................................................40

*Maryland Shall Issue, Inc. v. Hogan*,
    971 F.3d 199 (4th Cir. 2020) ..............................................................................31, 40

*Maryland Shall Issue, Inc. v. Montgomery Cnty.*,
    No. TDC-21-1736, 2023 WL 4373260 (D. Md. July 6, 2023)...............................27

*McDonald v. City of Chicago*,
    561 U.S. 742 (2008)...................................................................................7, 11, 14, 21

*Minn. Voters Alliance v. Mansky*,
    138 S. Ct. 1876 (2018).............................................................................................19

*Moore v. Madigan,*
    702 F.3d 933 (7th Cir. 2021) .............................................................. 13

*Morse v. Frederick,*
    551 U.S. 393 (2007) .......................................................................... 17

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra,*
    138 S. Ct. 2361 (2018) ...................................................................... 43

*N.C. Right to Life, Inc. v. Bartlett,*
    168 F.3d 705 (4th Cir. 1999) .............................................................. 31

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
    142 S. Ct. 2111 (2021) ................................................................. *passim*

*NLRB v. Noel Canning,*
    573 U.S. 513, 572 (2014) ................................................................... 14

*Nunn v. State,*
    1 Ga. 243 (1846) ................................................................................ 5

*Ramos v. Louisiana,*
    140 S. Ct. 1390 (2020) ...................................................................... 12

*Reeves, Inc. v. Stake,*
    447 U.S. 437 (1980) .......................................................................... 20

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,*
    487 U.S. 781 (1988) .......................................................................... 43

*Rogers v. Grewal,*
    140 S. Ct. 1865 (2020) ...................................................................... 19

*Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.,*
    547 U.S. 47 (2006) ............................................................................ 44

*Siegel v. Platkin,*
    No. 22-7464 (RMB/AMD), 2023 WL 1103676 (D.N.J. Jan. 30, 2023) ................... 6

*Simon v. E. Ky. Welfare Rights Org.,*
    426 U.S. 26 (1976) ............................................................................ 40

*Speech First, Inc. v. Sands,*
    69 F.4th 184 (4th Cir. 2023) .............................................................. 42

*Stuart v. Camnitz,*
    774 F.3d 238 (4th Cir. 2014) .............................................................. 43

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014).................................................................30, 39

*Texas v. United States,*
   945 F.3d 355 (5th Cir. 2019) ...............................................................39

*Teixeira v. Cnty. of Alameda,*
   873 F.3d 670 (9th Cir. 2017) ...............................................................35

*Timbs v. Indiana,*
   139 S. Ct. 682 (2019)..........................................................................13

*Thole v. U.S. Bank N.A,*
   140 S. Ct. 1615 (2020)..........................................................38, 40, 43

*Tsao v. Captiva MVP Rest. Partners, LLC,*
   986 F.3d 1332 (11th Cir. 2021) ...........................................................39

*United States v. Kokinda,*
   497 U.S. 720 (1990)............................................................................20

*United States v. Rahimi,*
   61 F.4th 443 (5th Cir. 2023) ...............................................................13

*United States v. Stevens,*
   559 U.S. 460 (2010)............................................................................43

*Virginia v. Moore,*
   553 U.S. 164 (2008)............................................................................13

*Winter v. Nat'l Res. Def. Council, Inc.,*
   555 U.S. 7 (2008)................................................................................44

*Wolford v. Lopez,*
   No. CV 23-00265 LEK-WRP, 2023 WL 5043805 (D. Haw. Aug. 8, 2023)....................24, 42

*Worth v. Harrington,*
   No. 21-cv-1348 (KMM/LIB), 2023 WL 2745673 (D. Minn. Mar. 31, 2023)........................12

**Statutes**

Md. Code Ann., Crim. Law § 4-111 ........................................................... *passim*

Md. Code Ann., Crim. Law § 4-208 ...................................................................29

Md. Code Ann., Crim. Law § 6-411 ...............................................................2, 38

Md. Code Ann., Pub. Safety § 5-307 ...............................................................30

Md. Code Ann., Transp. § 7-705 ......................................................................25

**Regulations**

COMAR 04.05.01.03 ........................................................................................36

COMAR 08.01.07.14 ........................................................................................23

COMAR 08.07.01.03 ........................................................................................24

COMAR 08.07.01.04 ........................................................................................23

COMAR 08.07.06.03 ........................................................................................24

COMAR 08.07.06.04 ........................................................................................23

COMAR 11.04.07.01 ........................................................................................23

COMAR 11.04.07.12 ........................................................................................25

COMAR 14.25.02.06 ........................................................................................22

COMAR 36.03.10.48 ........................................................................................27

**Other Authorities**

1812 Del. Laws 329 ..........................................................................................24

Amy Hetzner, *Comment, Where Angels Tread: Gun-Free School Zone Laws and an Individual Right to Bear Arms*, 95 Marq. L. Rev. 359 (2011). ....................................................................34

Brief for Center for Human Liberty as *Amicus Curiae*, *Antonyuk v. Nigrelli*, No. 22-2908(L) (2d Cir. Feb. 9, 2023) (ECF No. 313). ..............................................10

Brief for Independent Institute as *Amicus Curiae*, *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) (No. 20-843)..............................................10

CBS Baltimore Staff, *NRA sues Maryland: What could it mean for the state's new gun laws?*, CBS News Baltimore (May 17, 2023)...................................................................30

David B. Kopel, *Pretend "Gun-Free" School Zones: A Deadly Legal Fiction*, 42 Conn. L. Rev. 515 (2009). ..................................................................................34

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev 203 (2018) ..........................................................................................................................9

Jeffrey O. Usman, *The Game is Afoot: Constitutionalizing the Right to Hunt and Fish in the Tennessee Constitution*, 77 Tenn. L. Rev. 57 (2009) ....................................24, 41

Nathaniel B. Schurtleff, *Records of the Governor and Company of the Massachusetts Bay in New England* (William White Press 1853) .........................................10

Patrick J. Charles, *The Fugazi Second Amendment:* Bruen*'s Text, History, and Tradition Problem and How to Fix* It, 71 Clev. St. L. Rev. 623 (2023)................................18

Saul Cornell, *Cherry-picked history and ideology-driven outcomes:* Bruen*'s originalist distortions*, SCOTUSblog (June 27, 2022) ...........................................................18

3 William Hand Browne, *Archives of Maryland: Proceedings of the Council of Maryland 1636–1667* (Baltimore, Md. Hist. Soc'y 1885).......................................................10

## INTRODUCTION

*Bruen* held that the Second Amendment protects "an individual's right to carry a handgun for self-defense outside the home." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2122 (2022). Although the Court suggested that state could prohibit carrying firearms in "sensitive places," *Bruen* warned that "relatively few" of these "exceptional" places exist and that bans must be supported by "the historical record" to be "consistent with the Second Amendment." *Id.* at 2133, 2156. Maryland's Carry Bans "eviscerate the general right to publicly carry arms for self-defense" throughout most of the state, in open defiance of the Second Amendment's "unqualified command" and our Nation's historical tradition. *Id.* at 2126. The Court should grant summary judgment to the *Kipke* Plaintiffs and strike down the Carry Bans.

*Bruen* forecloses any dispute that the Carry Bans prohibit conduct that "the Second Amendment's plain text covers." *Id.* The text covers the right to "carry[] handguns publicly for self-defense." *Id.* at 2134. This includes on the street, into private properties held open to the public, into government buildings, and anywhere else "outside the home." *Id.* at 2122. The Carry Bans destroy the right to carry a handgun in each subject location. The Second Amendment thus "presumptively protects [Plaintiffs'] conduct," and the Carry Bans are unconstitutional unless Defendants "demonstrate that [each] regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126. Defendants have not carried their burden.

Unable to show that the Carry Bans are consistent with "an enduring American tradition of state regulation," *id.* at 2155, Defendants resort to unmeritorious misconstructions of the Second Amendment's analytical framework for sensitive places and otherwise. Defendants' concocted "sensitive places" doctrine is inconsistent with the "sensitive places" identified in *Bruen*. Merely labeling a place as "sensitive" does not exempt a restriction from *Bruen*'s historical-tradition

scrutiny. And that requisite scrutiny demonstrates that the Carry Bans lack the necessary historical support. *Id.* at 2133 (listing the "relatively few" places "where weapons were altogether prohibited" according to "the historical record"). Defendants rely principally on analogical reasoning, but that is appropriate only for "*new* and analogous places" unknown at the Founding. *Id.* The Carry Bans do not regulate *new* places, so Defendants must show that the Founders in fact banned firearms at the Carry Bans' subject locations. The historical record confirms that the Founders did not. To the contrary, the Founding generation expected and often mandated carrying firearms outside the home. Defendants' other efforts to justify the bans on sensitive-places theories defy *Bruen*'s prohibition on "defin[ing] the category of 'sensitive places' far too broadly," which would "eviscerate the general right to publicly carry arms for self-defense." *Bruen*, 142 S. Ct. at 2134. These arguments do not justify the Carry Bans.

Defendants also misconstrue the framework for historical-tradition scrutiny by offering a patchwork assortment of historical sources that are too remote in time from the Founding, outliers, or otherwise insufficient to demonstrate a historical tradition limiting the right to publicly carry for self-defense. The inquiry must focus on the Founding. *See Bruen*, 142, S. Ct. at 2131, 2137. Any historical tradition must be "well-established," "representative," and sufficiently "similar." *Id.* at 2132, 2133. Defendants fail to justify the Carry Bans under this straightforward framework set forth in *Bruen*. The Court therefore should strike down the Carry Bans.

Even if the Court decides that the no-carry default—which presumptively bans carrying on every inch of private property in Maryland, Md. Code Ann., Crim. Law § 6-411(d)—complies with the Second Amendment, then it should still invalidate the provision as violative of the First Amendment. The no-carry default compels property owners to convey the state's preferred

messages about firearm regulation when they "would prefer to remain silent," a compulsion forbidden by the First Amendment. *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2312 (2023).

The Court should grant Plaintiffs' Motion for Summary Judgment, deny Defendants' Motion for Summary Judgment in relevant part, and strike down the Carry Bans. The Court should also grant preliminary injunctive relief while it further considers dispositive briefing.

## ARGUMENT

### I.  Plaintiffs are entitled to summary judgment on their Second Amendment challenges to the Carry Bans.

The analytical framework under *Bruen* is straightforward: "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and in such case a firearm regulation is unconstitutional unless the state "demonstrate[s] that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. Defendants do not dispute that this framework applies here. Defendants fail to rebut Plaintiffs' showing that the Second Amendment covers their proposed conduct. They also fail to meet their burden to "affirmatively prove" that the Carry Bans are consistent with "historical tradition." *Id.* at 2127. The Court should grant Plaintiffs' motion for summary judgment on their Second Amendment claims.

### A.  Defendants have not rebutted Plaintiffs' showing that the Second Amendment's plain text covers their conduct.

Plaintiffs have shown that the Second Amendment's plain text covers their conduct: "carry[ing] a handgun for self-defense outside the home." *Bruen*, 142 S. Ct. at 2122. Defendants' atextual and ahistorical counterarguments do not counsel otherwise. (Md. Br. at 20–22, 70–75).

The Second Amendment protects "the right of the people to keep and bear Arms." U.S. Const. amend II. That text "guarantee[s] the individual right to possess and carry weapons in case

of confrontation," *Bruen*, 142 S. Ct. at 2127 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008)). Because "confrontation can surely take place *outside the home*," the plain text protects the right to carry "in *public* for self-defense," *id.* at 2135 (emphasis added), which simply means anywhere "outside the home," *id.* at 2122. Nothing in the *text* of the Second Amendment limits its scope based on where a law-abiding citizen seeks to carry for self-defense, just as "[n]othing in the Second Amendment's text draws a home/public distinction." *Id.* at 2134; *cf. Koons v. Platkin*, No. 22-7464 (RMB/AMD), 2023 WL 3478604, at *61 (D.N.J. May 16, 2023) ("The right to armed self-defense follows the individual everywhere he or she lawfully goes."). The plain text covers Plaintiffs' proposed course of conduct, *i.e.*, carrying a handgun for self-defense outside the home in various Maryland locations prohibited by the Carry Bans.

Defendants attempt to evade Second Amendment scrutiny by arguing that any and all places Maryland labels "sensitive" fall outside the textual scope of the Second Amendment. (Md. Br. at 20–21). That argument is irreconcilable with constitutional text and *Bruen*, and it is no more persuasive than claiming that a search was "reasonable" and therefore not subject to Fourth Amendment scrutiny. A law-abiding citizen indisputably "bears Arms" both "publicly" and "outside the home," *Bruen*, 142 S. Ct. at 2122, 2135, when she carries a handgun for self-defense onto any public property or private property held open to the public, *Christian v. Nigrelli*, No. 22-CV-695 (JLS), 2022 WL 17100631, at *6 n.12 (W.D.N.Y. Nov. 22, 2022) ("*Bruen*'s articulation of 'in public' is not a limitation."). *Bruen* and *Heller* made clear that justification for bans in "sensitive places" are historical, not textual. *Bruen*, 142 S. Ct. at 2133–34; *Heller*, 554 U.S. at 635 (leaving for a later day the necessary exposition of "the historical justifications" for sensitive places). The Second Amendment's text protects the right to carry a handgun for self-defense

anywhere "outside the home." *Bruen*, 142 S. Ct. at 2122. Defendants must justify each ban through historical tradition.

Defendants argue incorrectly that the Carry Bans comply with the Second Amendment because, according to their expert, "the Framers understood that the term 'infringement' meant to 'violate or destroy.'" (Md. Br. at 22). But the Bans self-evidently "violate" or "negate the underlying *right*," *id.*, to "carry a handgun for self-defense outside the home," *Bruen*, 142 S. Ct. at 2122. Defendants ignore that the Second Amendment's "unqualified command" is equal to that of the First Amendment, *see Bruen*, 142 S. Ct. at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 336 U.S. 36, 49 n.10 (1961) (comparing the First Amendment's "unqualified terms" to "the equally unqualified command of the Second Amendment")), and that *Heller* endorsed that Second Amendment rights "shall not be *infringed*, curtailed, or broken in upon, in the smallest degree," *Heller*, 554 U.S. at 612 (quoting *Nunn v. State*, 1 Ga. 243, 251 (1846)). The Supreme Court implicitly rejected Defendants' argument by assuming that a ban on certain *kinds* of weapons (*i.e.*, stun guns) could violate the Second Amendment. *Caetano v. Massachusetts*, 577 U.S. 411, 411–12 (2016). The *Bruen* plaintiffs were allowed to "carry to and from work," 142 S. Ct. at 2125, yet the Court held the Second Amendment's protections do not depend on "the severity of the law's burden on that right." 142 S. Ct. at 2126, 2127. The Court should reject Defendants' argument.

Defendants' arguments specific to the no-carry default on private property are equally unpersuasive. Nothing supports Defendants' assertion that the Second Amendment's plain text does not cover "carry[ing] firearms onto another's property absent consent." (*Id.* at 71). As set forth above, there are no location-based limitations on the textual scope of the Second Amendment. *See Bruen*, 142 S. Ct. at 2122 ("outside the home"); *id.* at 2135 ("in public"). Nor is there any

textual distinction between public and private property.[1] Defendants also argue that there is a historical tradition of allowing private-property owners to exclude others from carrying a firearm onto their property "against the owner's wishes." *See GeorgiaCarry.Org., Inc. v. Georgia*, 687 F.3d 1244, 1264 (11th Cir. 2012), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. (Md. Br. at 71). But reliance on historical tradition is inappropriate at the textual-analysis stage, and there is no such tradition of allowing the government to decide who a private property owner excludes from their property in the first instance. Defendants conflate the rights of private-property owners (who are free to exclude without implicating the Second Amendment) with the powers of a state (which cannot burden Second Amendment rights without justification in "historical tradition"). The textual-analysis inquiry simply asks whether "the Second Amendment's plain text covers" Plaintiffs' proposed conduct. *Bruen*, 142 S. Ct. at 2126. There can be no doubt that it does.

Maryland's Carry Bans (including the no-carry default) indisputably burden activities that "the Second Amendment's plain text covers." *Id.* The Second Amendment therefore "presumptively protects that conduct," which means that each of the Cans is unconstitutional unless Defendants "affirmatively prove" that each is "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126, 2127. Defendants fail to meet this burden.

---

[1] *Heller*, 554 U.S. at 594 ("an individual right protecting against both public and private violence"); *Koons*, 2023 WL 3478604, at *61 ("The right to armed self-defense follows the individual everywhere he or she lawfully goes."); *Siegel v. Platkin*, No. 22-7464 (RMB/AMD), 2023 WL 1103676, at *16 (D.N.J. Jan. 30, 2023) ("The Second Amendment's text draws *no* distinction between one's right to bear arms for self-defense on either *public* or *private* property."); *Christian*, 2022 WL 17100631, at *6 n.12 ("*Bruen*'s articulation of 'in public' is not a limitation. . . . The Court did not indicate that the right ceased at the property line of others.").

**B. Defendants fail to meet their burden to demonstrate that the Carry Bans are consistent with the Nation's historical tradition of firearms regulation.**

Defendants misconstrue the analysis for sensitive places and otherwise rewrite *Bruen*'s analytical framework. They then try to justify the Carry Bans under this improper framework with improper analogies and inadequate sources. Under the framework set forth in *Bruen*, Defendants have failed to meet their burden to "affirmatively prove" that the Carry Bans are consistent with "an enduring American tradition" of firearms regulation. *Bruen*, 142 S. Ct. at 2127, 2155. The Court should grant summary judgment to Plaintiffs and strike down the challenged Carry Bans.

**1. Defendants rewrite the *Bruen* analysis for "sensitive places."**

Defendants contort the Second Amendment's analytical framework as applied to "sensitive places" in their effort to justify the Carry Bans. Those contortions are irreconcilable with *Bruen*.

**a. Firearms prohibitions in "sensitive places" are not exempt from the historical-tradition scrutiny required by *Bruen*.**

Defendants disregard their burden to "affirmatively prove that [each] firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. They instead mistakenly proceed as if they can justify prohibitions of firearms in self-labeled "sensitive places" without meeting for that burden. That is wrong.

Defendants incorrectly claim that "*Bruen* permits significant flexibility at determining whether a particular location is a 'sensitive place.'" (Md. Br. at 23). But *Bruen*, *McDonald*, and *Heller* unambiguously mandate that the scope of the Second Amendment is governed by *history*. *Bruen*, 142 S. Ct. at 2126 ("Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the scope of the Second Amendment's 'unqualified command.'" (citation omitted)); *McDonald v. City of Chicago*, 561 U.S. 742, 748 (2008) (canvassing the history record and holding that the right to keep and bear

arms is "deeply rooted in this Nation's history and tradition"); *Heller*, 554 U.S. at 592, 627 (relying on "the historical background of the Second Amendment" and defining limitations based on "historical tradition"). There is no support for Defendants' claim. (Md. Br. at 23).

*Heller* and *Bruen* make clear that the constitutionality of a ban on carrying in a particular location must be supported, like any law burdening Second Amendment rights, by a "historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126; *id.* at 2156 (explaining that only "an American tradition" could establish "the exceptional circumstances under which one could not carry arms, such as before justices of the peace and other government officials"). Recognizing that it did not "undertake an exhaustive historical analysis," *Heller* left open the extent to which government may prohibit carrying "in sensitive places such as schools and government buildings." 554 U.S. at 626. It reserved "expound[ing] upon the historical justifications" for future cases. *Id.* at 635. *Bruen* elaborated that "the *historical record* yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses." 142 S. Ct. at 2133 (emphasis added). And only because of both historical support and lack of "disputes regarding the lawfulness of such prohibitions" did the court "assume" that bans in those "relatively few," "exceptional" places were constitutional. *Id.* at 2133, 2156. *Heller* and *Bruen* thus confirm that a "sensitive place" ban must be supported by a well-established, representative historical tradition. *Koons*, 2023 WL 3478604, at *55 (explaining that a sensitive place ban must be supported by "a historical tradition that is well-established and representative").

The Second Amendment's analytical framework for prohibitions in self-labeled "sensitive places" is far stricter than Defendants suggest. *See Bruen*, 142 S. Ct. at 2138 (explaining that only "exceptional circumstances" can justify a prohibition on "carry[ing] arms"). Defendants otherwise misconstrue the analytical framework in three ways.

8

First, Defendants try to justify the Carry Bans only by analogizing them to other places. But reasoning by analogy is not permitted when the law at issue bans carrying in a place that existed at the Founding. Reasoning by analogy is appropriate only for bans in "*new*" locations unknown at the Founding. *Id.* at 2133 (emphasis in original). *Bruen* explains that "courts can use analogies . . . to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* For other locational restrictions, analogies are inappropriate and the government must show that the Founders in fact banned firearms there. *Id.* at 2131 ("[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."); *id.* at 2154 ("[L]ate-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence.").

Second, Defendants' proposed analogous reasoning would allow Maryland to eviscerate the right to carry. Even when analogical reasoning is appropriate, courts cannot define sensitive places "too broadly," lest courts "eviscerate the general right to publicly carry arms for self-defense." *Id.* at 2134. Any analogy that would "in effect exempt cities [or, obviously, an entire state] from the Second Amendment" is improper. *Id.* (rejecting analogy for "crowded" places).

Third, Defendants' proposed analogies are not anchored to the sensitive places identified by *Bruen*. Analogical reasoning is limited to the characteristics that made "legislative assemblies, polling places, and courthouses" sensitive places. *Id.* at 2133 (limiting analogies to "those historical regulations"). Each location involved deliberative processes central to government functions. David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 207 (2018) (relied upon in *Bruen*,

142 S. Ct. at 2133); *Bruen*, 142 S. Ct. at 2156 ("Those restrictions, for example, limited . . . the exceptional circumstances under which one could not carry arms, such as before justices of the peace and other government officials."). Those places "offered some heightened assurance of governmental protection from violence," *see* Brief for Independent Institute as *Amicus Curiae* 8, *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) (No. 20-843) (relied upon in *Bruen*, 142 S. Ct. at 2133), such as with the presence of armed guards that absolved the need for public carry, *see* Brief for Center for Human Liberty as *Amicus Curiae* 9–17, *Antonyuk v. Nigrelli*, No. 22-2908(L) (2d Cir. Feb. 9, 2023) (ECF No. 313). These are the defining characteristics of a sensitive place under *Bruen* when reasoning by analogy.

The Carry Bans are inconsistent with the strong Colonial and Founding Era tradition of requiring or expecting law-abiding citizens to carry arms publicly.[2] The constitutional default therefore is "being armed and ready for offensive or defensive action," *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 584), overcome only by historic tradition. The Second Amendment demands that "sensitive places" be strictly confined to their historical antecedents.

### b. Defendants' proposed sensitive places "principles" are irreconcilable with *Bruen*.

Defendants try to reconceptualize the historical-tradition analysis for "sensitive places" as necessary to justify the Carry Bans. A plain reading of *Bruen* refutes each of their arguments.

---

[2] *Heller*, 554 U.S. at 601 (observing that "[m]any colonial statutes required individual arms bearing for public-safety reasons"); *id.* (citing 1770 Georgia law that required men to carry firearms "to places of public worship"); *Koons*, 2023 WL 3478604, at *73 ("[S]ix out of the thirteen original colonies required their citizens to go armed when attending religious services or public assemblies."); Nathaniel B. Schurtleff, *Records of the Governor and Company of the Massachusetts Bay in New England* 190 (William White Press 1853) (attached hereto as <u>Exhibit 2</u>) (1636 Massachusetts law requiring that "all such persons . . . shall come to the publike assemblyes with their muskets, or other peeces fit for service"); 3 William Hand Browne, *Archives of Maryland: Proceedings of the Council of Maryland 1636–1667* 103 (Baltimore, Md. Hist. Soc'y 1885) (attached to ECF No. 13-1 as <u>Exhibit 17</u>) (requiring men to carry arms to church).

First, nothing in *Bruen* supports Defendants' assertion that "relatively few analogues" are necessary to justify a location-based restriction. (Md. Br. at 23). To the contrary, *Bruen* observed that "the historical record yields relatively few . . . 'sensitive places.'" 142 S. Ct. at 2133. That language demonstrates the exceedingly limited scope of the so-called "sensitive place" doctrine.

Second, Defendants cannot justify the Bans with Reconstruction Era (or later) sources. After admitting that "location specific armed carriage restrictions" did not exist at the Founding, Defendants argue that "it is appropriate to consider evidence from both the Founding era as well as the era around when the Fourteenth Amendment was ratified." (Md. Br. at 24). As explained below, only Founding Era understandings can establish a historical tradition. Post-Founding developments (such as Reconstruction Era sources) are relevant only as "mere confirmation" of Founding Era understandings, *Bruen*, 142 S. Ct. at 2137; those sources *cannot* establish a historical tradition that did not exist at the time of the Founding or contradict Founding Era understandings.

The meaning of the Second Amendment "is fixed according to the understandings of those who ratified it," *i.e.*, in 1791. *Id.* at 2132; *see also id.* at 2136 ("Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." (quoting *Heller*, 554 U.S. at 634–35)). "[I]ndividual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Id.* at 2137; *see McDonald*, 561 U.S. at 765 (rejecting that "only a watered-down" version of the Second Amendment applies to states (citation omitted)). Thus, the Second Amendment's meaning must, as the Supreme Court has assumed, be "pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 142 S. Ct. at 2137.

*Bruen* recognized that "not all history is created equal," 142 S. Ct. at 2136, and that "post-Civil War discussions of the right to keep and bear arms . . . do not provide as much insight into

[the Second Amendment's] original meaning as earlier sources," *id.* at 2137 (quoting *Heller*, 554 U.S. at 614) (internal quotation marks omitted). *Heller* and *Bruen* focused on Founding Era understandings as applied to the federal government, *Heller*, 554 U.S. at 605–610, and to a state, *Bruen*, 142 S. Ct. at 2138–2145. *Heller* analyzed 19th-century sources only "after surveying what it regarded as a wealth of [pre-Founding Era and Founding Era] authority for its reading" of the Second Amendment and only as "mere confirmation of what . . . had already been established" by Founding Era understandings. *Bruen*, 142 S. Ct. at 2137 (quoting *Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019) (clarifying *Heller*'s analysis)). And *Bruen* canvassed post-enactment history only to confirm that "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." *Id.* at 2138. These are "clear signs" that 1791 is "the date for determining the historical snapshot of 'the people' whose understanding of the Second Amendment matters." *Worth v. Harrington*, No. 21-cv-1348 (KMM/LIB), 2023 WL 2745673, at *11 (D. Minn. Mar. 31, 2023) (analyzing state law). The Court must not "endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights." *Bruen*, 142 S. Ct. at 2163 (Barrett, J., concurring). Although *Bruen* acknowledged "an ongoing scholarly debate" on this issue, *id.* at 2138, the Court's discussion of the issue and its overall historical analysis strongly suggest the meaning of the Second Amendment is rooted to its Founding Era understandings. Later history can only *confirm* Founding Era understandings.

Focusing on the Founding is not novel to the Second Amendment. *See, e.g.*, *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2258–59 (2020) (rejecting reliance on a practice that "arose in the second half of the 19th century" that could not "evince a tradition that should inform our understanding of the Free Exercise Clause"); *Ramos v. Louisiana*, 140 S. Ct. 1390, 1395–96

(2020) (relying on 19th century sources only to "confirm th[e] understanding" of the Sixth Amendment based on Founding Era understandings); *Gamble*, 139 S. Ct. at 1965, 1975–76 (relying primarily on Founding Era for Sixth Amendment Double Jeopardy Clause); *Timbs v. Indiana*, 139 S. Ct. 682, 687–88 (2019) ("Adoption of the Excessive Fines Clause was in tune not only with English law; the Clause resonated as well with colonial-era provisions."); *Virginia v. Moore*, 553 U.S. 164, 168–69 (2008) ("We look to the statutes and common law of the Founding era to determine the norms that the Fourth Amendment was meant to preserve."). Defendants could not identify a single Supreme Court decision analyzing a Bill of Rights guarantee against a state that relied principally on understandings post-dating the Founding. (*See* Md. Br. at 23–25).

Various courts of appeals have focused on 1791 as the "the critical year for determining the Amendment's historical meaning." *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 419, *vacated as moot*, 14 F.4th 322 (4th Cir. 2021) (federal law) (quoting *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012) (state law)); *see also GeorgiaCarry.Org, Inc.*, 687 F.3d at 1264–65 (analyzing state law based on understandings of "our Founding Fathers [who] drafted the Second Amendment"); *United States v. Rahimi*, 61 F.4th 443, 456 (5th Cir. 2023) (recognizing in challenge to federal law "that greater weight attaches to laws nearer in time to the Second Amendment's ratification"), *cert. granted*, No. 22-915 (U.S. June 30, 2023). Founding Era understandings define the meaning of the Second Amendment. Post-enactment developments can only serve as "mere confirmation" of what the Second Amendment meant in 1791.

Third, the Second Amendment does not "yield" to other constitutional rights. (Md. Br. at 30). Defendants' contrary argument ignores the Supreme Court's repeated mandate that "[t]he constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to

an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 142 S. Ct. at 2156 (quoting *McDonald*, 561 U.S. at 780).

Fourth, Defendants argue that the lack of previous challenges to location-based restrictions supports the constitutionality of the Carry Bans. (Md. Br. at 25). The Carry Bans are not "open, widespread, and unchallenged *since the early days of the Republic*," *Bruen*, 142 S. Ct. at 2137 (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring in judgment) (emphasis added)), because no comparable restrictions existed at or near the Founding, (*see* Md. Br. at 24 (admitting that "location specific armed carriage restrictions" were unknown in the Founding Era)). Justice Scalia's *Noel Canning* concurrence, on which Defendants rely, (Md. Br. at 25 ("citation omitted")), excoriated "deference to late-arising historical practices" like the Carry Bans at issue here. 573 U.S. at 570.

Defendants also look for support in *Bruen*'s refusal to consider sources that were, in their words, "inconsistent with an earlier-established historical tradition of public carry." (Md. Br. at 25). The Carry Bans conflict with the Founding Era tradition of carrying a weapon "outside the home," *Bruen*, 142 S. Ct. at 2122, "for offensive or defensive action," *id.* at 2134. (*Supra* at 9–10). Defendants fail to reconcile the Carry Bans with *Bruen*.

### c. Defendants' proffered sensitive places traditions are not supported by the historical record or *Bruen*.

Before reaching any of the challenged laws, Defendants advance several concocted traditions they later use to defend the Carry Bans: a general tradition of limiting firearms in "certain locations," prohibiting firearms to protect the "vulnerable or impaired," and prohibiting firearms in "crowded" areas. (Md. Br. 26–32). These proffered "traditions" are not supported by the historical record and fail under *Bruen*.

First, Defendants' claim to a general tradition of "limiting firearms in certain locations" outside of the few sensitive locations identified in *Bruen* is not supported by history. The historical record confirms that citizens were expected to carry a weapon for self-defense outside the home. (*Supra* at 9–10). Defendants would define sensitive places "too broadly" and thus "eviscerate the general right to publicly carry arms for self-defense." *Bruen*, 142 S. Ct. at 2134. This overly broad argument cannot sustain the Carry Bans.

Defendants reimagine the Statute of Northampton and American Northampton-style laws as broad restrictions on the right to carry. (Md. Br. at 26). But "English common-law practices and understandings at any given time cannot be indiscriminately attributed to the Framers of our own Constitution." *Bruen*, 142 S. Ct. at 2136. In any event, *Bruen* recognized that the limited scope of these laws applies only to "bearing arms to terrorize the people." *Id.* at 2143; *see also id.* at 2141 (explaining that one's conduct fell within the scope of the Statute of Northampton if it "would terrify the King's subjects"). Those laws do not justify bans on carrying a firearm for self-defense at a particular location by a law-abiding citizens with no intent to "terrify people." *Id.* at 2142.

After admitting that location-specific restrictions were largely unknown to the Founders, Defendants invoke a handful of "mid-to-late nineteenth century" laws, (Md. Br. at 27–28), that are too remote from the Founding to establish a relevant historical tradition. (*Supra* at 11–13). Reliance on these cited state laws also would defy *Bruen* in other ways. (Md. Exs. 14–22). The 1870 Texas regulation (Md. Ex. 17) is unreliable because Texas was an "outlier jurisdiction" *Bruen*, 142 S. Ct. at 2153, 2156. The Georgia law (Md. Exhibit 16) supports the limited scope of sensitive places regulations and, to the extent it bans carry "in any place of public worship," contradicts Founding Era state law *requiring* carrying at churches. *See Heller*, 554 U.S. at 601 (discussing 1770 Georgia law); *see Bruen*, 142 S. Ct. at 2154 (rejecting "late-19th-century

evidence . . . when it contradicts earlier evidence"). The laws from Arizona (1889), Oklahoma (1890), Idaho (1901), and Montana (1903) are from territorial laws that "deserve little weight," *id.* at 2155, and the 20th century laws should be ignored, *id.* at 2154 n.28. (*See* Md. Exhibits 19–22). That leaves just Tennessee (1869) and Missouri (1874). But these two, late-19th-century laws "do not provide as much insight" as earlier sources, *id.* at 2137, and are insufficient to show a "well-established" and "representative" tradition, *id.* at 2133; *see id.* at 2142 (doubting "that *three* colonial regulations" could establish a tradition). (Md. Exs. 14, 18). In addition, churches, schools, social functions, assemblies, and balls indisputably existed at the Founding, such that Defendants' failure to show that the Founders in-fact prohibited firearms at those locations confirms that modern bans in those places are unconstitutional. *See id.* at 2131, 2133.

Defendants' collection of local ordinances from the late-19th century, (Md. Br. at 29), is entitled to negligible weight because "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 142 S. Ct. at 2154. The *absence* of Founding Era restrictions is therefore dispositive of unconstitutionality. *Id.* at 2131, 2154, 2156. As in *Bruen*, "localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting public carry," *id.* at 2154, which exists here, (*supra* at 9–10). Many of Defendants' cited ordinances "restricted wholesale the carrying of firearms within the entire municipality," (Md. Br. at 29), which are necessarily unconstitutional under *Bruen*, 142 S. Ct. at 2122, and defy *Bruen*'s admonition against "exempt[ing] cities from the Second Amendment," *id.* at 2134. Restrictions in these municipalities do not constitute "well-established" and "representative" traditions of banning firearms in sensitive locations, *id.* at 2133, and should be rejected, *see Antonyuk v. Hochul*, No. 1:22-CV-0986 (GTS/CFH), 2022 WL 16744700, at *45 (N.D.N.Y. Nov. 7, 2022) (rejecting a similar collection

of municipal restrictions). The historical sources presented by Defendants do not demonstrate a "well-established" and "representative" tradition of banning firearms in certain locations that can satisfy their burden under *Bruen*.

Second, Defendants cannot justify the Carry Bans on a purported tradition of banning firearms "where vulnerable or impaired people might ordinarily be present" (Md. Br. at 30). This attempt fails for several reasons. Defendants have not presented any evidence demonstrating that firearms traditionally have been banned wherever the vulnerable or impaired might be, as is their burden. *Bruen*, 142 S. Ct. at 2133, 2150. This attempt at analogical reasoning fails under *Bruen* because it would violate *Bruen*'s clear admonition against "defin[ing] the category of 'sensitive places' far too broadly," lest sensitive places "eviscerate the general right to publicly carry arms for self-defense." *Bruen*, 142 S. Ct. at 2134. Just as "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected," *id.*, there likewise is no support for the proposition that the state may ban firearms anywhere that the vulnerable (*i.e.*, children) or the impaired (*i.e.*, intoxicated persons) might be.

Defendants' argument finds no support in precedent or history. As for the vulnerable, neither *Heller*'s dicta regarding schools nor *Bruen*'s discussion of sensitive places restrictions supports Defendants' extrapolation that a state may prohibit firearms wherever vulnerable individuals might be. *See id.* at 2133; *Heller*, 554 U.S. at 626; *see id.* at 635 (leaving for a later day the necessary exposition of "the historical justifications" for sensitive places). In any event, historical evidence of prohibitions in schools is justified by the state's *in loco parentis* authority. *Morse v. Frederick*, 551 U.S. 393, 416 (2007) (Thomas, J., concurring) ("[T]he doctrine of *in loco parentis* limited the authority of schools to set rules and control their classrooms in almost no way."). As for the intoxicated, although the historical record includes some evidence of prohibiting

intoxicated individuals from carrying firearms, (Md. Br. at 45 (citing state laws from five states' laws from 1867–1883)), those far-too-remote analogues cannot establish a Founding Era tradition. *Bruen*, 142 S. Ct. at 2132. Nor are any of Maryland's Bans limited to intoxicated individuals. Maryland instead bans *all individuals* who might be at the same place as an intoxicated person from carrying a handgun. *Id.* at 2132–33 (defining "relevantly similar"). Analogical reasoning to taverns is also inappropriate because taverns existed at the Founding without any ban on carrying firearms there. There is no basis in text, history, or precedent to suggest that a state may ban firearms in a location simply because children (or other vulnerable individuals) or the impaired might be present. And Defendants' reliance on pre-*Bruen* caselaw that did not undertake the required historical inquiry cannot demonstrate otherwise. (Md. Br. at 31).

Third, Defendants reach for a "tradition of prohibiting firearms in crowded locations." (Md. Br. at 31). *Bruen* explicitly rejected this argument. *Bruen*, 142 S. Ct. at 2134 (rejecting banning firearms in New York "simply because it is crowded"). Neither of Defendants' historical sources provide the historical basis Defendants claim. Northampton-style laws are limited to laws criminalizing "bearing arms to terrorize the people." *Id.* at 2143. And Founding Era laws, contrary to the Carry Bans, required carrying at public assembly. (*See* Exhibit 2 (1636 Massachusetts law)).

Defendants' attempts to manufacture extensive sensitive places traditions cannot be reconciled with history. The *Bruen* Court meant what it said: "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited." 142 S. Ct. at 2133. The Court should reject the Defendants' ahistorical effort.

Defendants' efforts to rewrite *Bruen* are not unpredictable. Their principal resources are purported experts who mock the *Bruen*'s articulation of the Second Amendment as "historically ruined and fake," Patrick J. Charles, *The Fugazi Second Amendment:* Bruen*'s Text, History, and*

18

*Tradition Problem and How to Fix It*, 71 Clev. St. L. Rev. 623, 627 (2023), or as "little more than an ideological fantasy," Saul Cornell, *Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions*, SCOTUSblog (June 27, 2022), https://tinyurl.com/ystn3f3s. Defendants' effort to increase their page limit by burdening the record with 72 pages of unsupportable opinions by *Bruen* deniers carries no weight because the constitutionality of the Carry Bans are "legal questions" requiring "courts to assess" the "historical sources," *Bruen*, 142 S. Ct. at 2130 n.6, 2131, 2136, which forbid deference to biased experts whose incorrect opinions wind up in dissents, *Bruen*, 142 S. Ct. at 2177–78, 2187–88 (Breyer, J., dissenting) (citing Cornell); *id.* at 2188 (citing Charles); *see Rogers v. Grewal*, 140 S. Ct. 1865, 1870 n.3 (2020) (Thomas, J., dissenting from denial of certiorari) (noting Charles's scholarship "has been repudiated").

### 2. Defendants cannot justify any of the Carry Bans through a purported status as a proprietor or market participant.

Defendants argue that Maryland is exempt from the Second Amendment when it acts "in its proprietary capacity or as a market participant." (Md. Br. at 32). This argument finds no support in precedent, history, or logic.

Defendants claim a "historical tradition" supporting firearms regulations on properties "that are owned or operated by a governmental entity." (*Id.* at 33 & n.18). But at no point do Defendants "affirmatively" identify any historical evidence that "demonstrate[s] a tradition of broadly prohibit[ing]" the carry of firearms at places the government owns or operates. *See Bruen*, 142 S. Ct. at 2127, 2138. Defendants' failure to supply this required evidence, even though government properties and proprietorships existed before the Founding, dispositively shows that no tradition exists. *Bruen*, 142 S. Ct. at 2131, 2154. The argument fails under *Bruen*.

Nor does precedent otherwise support the Defendants' claim of unfettered authority to trample the fundamental rights of law-abiding citizens. Nobody doubts that a state enjoys limited

"power to preserve the property under its control," *Minn. Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1884 (2018) (citation omitted), to "manage [its] internal operation" as a proprietor, *Engquist v. Or. Dep't of Ag.*, 553 U.S. 591, 598 (2008), and to "operate freely in the free market," *Reeves, Inc. v. Stake*, 447 U.S. 429, 437 (1980). But those cases have nothing to do with the Second Amendment. Even the First Amendment precedents that Defendants cite provide no support for the "absolute[] freedom" they need to justify the Carry Bans. *United States v. Kokinda*, 497 U.S. 720, 725 (1990) ("The Government, even when acting in its proprietary capacity, does not enjoy absolute freedom from First Amendment constraints, as does a private business . . . .").

The Supreme Court has "long held the view that there is a crucial difference, with respect to constitutional analysis, between the government exercising 'the power to regulate or license, as lawmaker,' and the government acting 'as proprietor, to manage [its] internal operation.'" *Engquist*, 553 U.S. at 598 (citation omitted). Maryland acted as a sovereign "lawmaker," not a proprietor, when it enacted or promulgated the Carry Bans, *id.*, and it will act as a sovereign when it imposes criminal liabilities that deprive citizens of liberty interests, *see Harper v. Pub. Serv. Comm'n of W. Va.*, 396 F.3d 348, 351 (4th Cir. 2005) ("Criminal proceedings are, perhaps, the most obvious example of the states' sovereign authority 'to perform their separate functions in separate ways.'"). It is in precisely these circumstances where the Bill of Rights matters most.

Defendants' argument also makes little logical sense. If Defendants were correct, then *Bruen* would not have needed to enumerate the "relatively few" government-owned-or-operated places where firearms prohibitions might comply with the constitution. *Bruen*, 142 S. Ct. 2133 ("legislative assemblies, polling places, and courthouses"). The argument would permit bans in any public place, in blatant defiance of the fundamental "right to bear arms in public for self-defense." *Id.* at 2156. That cannot be so.

Defendants complain that they are bound by the Second Amendment, *see McDonald*, 561 U.S. at 791, while private-property owners are not. Ratification of the Constitution and its amendments resulted in the surrender of many aspects of state sovereignty. And the Bill of Rights protects interests held against governments. It is not absurd to hold Maryland to the burdens that accompanied its inclusion in the Union. *See Koons*, 2023 WL 3478604, at *52 ("[T]he state cannot succeed in claiming that the scope of the Plaintiffs' public carry right does not extend to government property simply because there the State is acting in its proprietary capacity to exclude firearms for some good reason."). Maryland can protect its properties in many ways—trampling on the rights of law-abiding citizens is not one of them.

### 3. Defendants fail to demonstrate that a historical tradition of firearms regulation supports any of the Carry Bans.

The Carry Bans are unconstitutional unless Defendants "affirmatively prove" that the bans are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2127, 2130. They fail to carry that burden. The Carry Bans must therefore be stricken.

#### a. Bars and Restaurants

Defendants try to justify the ban on carrying firearms into any location licensed to sell or dispense alcohol for onsite consumption, Md. Code Ann., Crim. Law § 4-111(a)(8)(i), through inadequate historical sources and improper analogies. (Md. Br. at 44). They fail to meet their burden of proving that a historical tradition of firearms regulation supports this ban.[3]

Defendants cite an 1890 Oklahoma law that prohibited carrying in "any place where intoxicating liquors are sold," the only source it could muster that categorically banned firearms at these locations. (Md. Ex. 20). The Supreme Court declined to consider Oklahoma territorial law

---

[3] Plaintiffs do not challenge Section 4-111(a)(8)(i) to the extent it bans firearms at places that sell or dispense cannabis.

in *Bruen*. 142 S. Ct. at 2154. Justification based on this single law also would defy *Bruen*'s prohibition on permitting "a law in effect in a single State" to guide the Court's interpretation of the Second Amendment. 142 S. Ct. at 2154. In any event, this late-19th-century law is too remote in time to establish a Founding Era historical tradition. (*Supra* at 11–13). Defendants also cite a handful of laws banning carrying "by people who were intoxicated." (Md. Br. at 45). These laws are too late, (*supra* at 11–13), and are not "relevantly similar" to Maryland's ban on carrying by *anyone* in a place that sells alcohol. *Bruen*, 142 S. Ct. at 2132; *id.* at 2133 (explaining that "how . . . the regulations burden a law-abiding citizen's right to armed self-defense" is a metric for relevant similarity).

Defendants then try to justify this ban as a sensitive place restriction through improperly analogizing to places with "crowds and vulnerable populations." (Md. Br. 44–45). But analogical reasoning is not appropriate because establishments serving alcohol existed at the Founding without bans on firearms in these places, as Defendants do not dispute. *See Bruen*, 142 S. Ct. 2133 (explaining reasoning by analogy limited to "*new* and analogous sensitive places"); *see also id.* at 2131 ("[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."). Even if it were, Plaintiffs have shown that *Bruen* rejected "crowd[ing]" as a historical justification, *id.* at 2134, and that the presence of vulnerable people is "too broad[]" to justify a restriction, lest states "eviscerate the general right to publicly carry arms for self-defense." *Bruen*, 142 S. Ct. at 2134. (*Supra* at 9–10, 17–18). Defendants have failed to establish a historical tradition justifying a broad ban on carrying for anyone present in a location licensed to sell or dispense alcohol for onsite consumption. The law should be stricken. *See Koons*, 2023 WL 3478604, at *86 (holding

similar New Jersey law unconstitutional for lack of "well-established and representative historical firearm laws [that] support [the] handgun ban at bars and restaurants that serve alcohol").

### b. Public Parks (state parks, state forests, Chesapeake Forest Lands, and highway rest areas)

Through various regulations, Maryland bans the carrying of handguns for self-defense in state parks, state forests, the Chesapeake Forest Lands, and highway rest areas. Defendants have not shown that restrictions on carrying at state parks and forests are constitutional. COMAR 08.07.06.04, 08.07.01.04, 08.01.07.14, 11.04.07.01.

Defendants argue that Maryland is immune from the Constitution to the extent it owns or operates the lands subject to these regulations. This proprietorship defense fails. (*Supra* at 19–21).

Next, Defendants try to justify the Bans through various improper sensitive places analogies. Analogical reasoning is not appropriate here, because parks and commons are not "*new*." *Bruen*, 142 S. Ct. at 2133; *Koons*, 2023 WL 3478604, at *85 ("[T]he modern equivalent of parks existed during this nation's founding."). (ECF No. 24-1 at 15 (demonstrating that public park areas and violence at parks pre-date the Founding)). Even if they were new, the mere presence of "gatherings of people" and "children" are not adequate analogical justifications, lest states "eviscerate the general right to publicly carry arms for self-defense," *Bruen*, 142 S. Ct. at 2134; (*supra* at 9–10, 17–18), and parks obviously bear none of the characteristics of recognized sensitive places, *i.e.*, fundamental government functions, comprehensive security, and an absence of any expectation that people carry for self-defense. That a few pre-*Bruen* decisions upheld restrictions in parks and recreational areas does not change this analysis. (Md. Br. at 51–52). Parks and forests are not "sensitive places" where the right to carry for self-defense may be prohibited.

Defendants otherwise fail to identify a historical tradition of banning the carrying of firearms for self-defense at *all* state parks and forests across an entire state. The state has not

identified any historical example of a statewide ban at parks or forests, or even a Founding era example of a ban on carrying in parks or common areas. The Founder's choice not to prohibit carrying firearms in parks is dispositive that Maryland's bans are unconstitutional. *Bruen*, 142 S. Ct. at 2131, 2154. That one court "only uncovered colonial laws that prohibited *discharging* firearms in areas that were the forerunners of today's public park," *Koons*, 2023 WL 3478604, at *83 (emphasis added), shows that the Founders at least permitted carrying firearms, 1812 Del. Laws 329 (attached hereto as <u>Exhibit 3</u>) (prohibiting the "fir[ing] or discharg[ing] [of] any gun . . . within or on any of the greens . . . within this State"). In fact, some states during the Founding Era constitutionalized the right to hunt on unenclosed lands, which further supports that modern restrictions on carrying firearms in parks and forests are unconstitutional. *See* Jeffrey O. Usman, *The Game is Afoot: Constitutionalizing the Right to Hunt and Fish in the Tennessee Constitution*, 77 Tenn. L. Rev. 57, 75 (2009) (discussing 1776 Pennsylvania Constitution and 1777 Vermont Constitution). Defendants implausibly label parks and forests as sensitive places while permitting hunting within many of them. *See, e.g.*, COMAR 08.07.06.03 & 08.07.01.03. That cannot be so.

Defendants cite to a handful of mid- to late-19th century municipal bans in urban parks. (Md. Br. 53). Those laws are too late, (*supra* at 11–13), not "relevantly similar" to Maryland's much broader statewide ban in *all* state-owned parks and forests, *Bruen*, 142 S. Ct. 2132; *id.* at 2133, and indisputably "unrepresentative" of national tradition because "[b]y 1890, those laws— one state law and about 25 local ordinances—governed less than 10% of the nation's entire population and thus are unrepresentative," *Koons*, 2023 WL 3478604, at *85. The 20th-century laws that Defendants cite are entirely irrelevant. *Id.* at 2154 n.28. Thus, these laws collectively fail to establish national tradition. *See Wolford v. Lopez*, No. CV 23-00265 LEK-WRP, 2023 WL 5043805, at *24 (D. Haw. Aug. 8, 2023) (granting TRO and enjoining similar Hawaii restriction).

Defendants' reliance on 19th- and 20th-century regulations in national parks fails for the same reasons as municipal bans. The 1897 Yellowstone National Park regulation is not even a ban on carrying but is more akin to a licensing scheme. (Md. Ex. 104 at 8 (permitting carrying in Yellowstone "on written permission from the superintendent thereof")). The far-too-late regulations in national parks between 1897 and 1936, (Md. Exs. 104–05), are tailored to wildlife protection and thus differ in "why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133; *see Koons*, 2023 WL 3478604, at *84 (explaining that "federal regulations for national parks were specifically enacted to protect animals in the National Parks—not parkgoers"). Defendants have not proven "an enduring American tradition" to justify banning firearms at all state parks and forests. *Bruen*, 142 S. Ct. at 2155.

Defendants concede that the rest-area regulation does not prohibit "the ability to carry a concealed handgun." (Md. Br. at 56 (discussing COMAR 11.04.07.12)). On the basis of that concession, and *Heller*'s recognition that it would be "implausible" that a ban on discharge would be "enforced against a citizen acting in self-defense," 554 U.S. at 633, Plaintiffs lodge no further challenge to the rest-area regulation.

### c. Public Transportation

Defendants fail to justify Maryland's public transit ban. Md. Code Ann., Transp. § 7-705(b)(6). Maryland's status as owner or proprietor does not exempt the state from the Second Amendment. (*Supra* at 19–21). Defendants' other efforts to justify a ban that disarms people among the most likely to be the victims of violent crime, leaving them with no meaningful recourse to self-defense, ignore history and the limitations set forth in *Bruen*. (Md. Br. at 46–50).

Defendants have not rebutted Plaintiffs' evidence that precursors to modern public transportation existed at the Founding. (*See* ECF No. 13-1 at 16–18). The "nuanced approach" is

inappropriate here because transit does not present "unprecedented societal concerns." *Bruen*, 142 S. Ct. at 2132. Analogical reasoning is likewise inappropriate because transit is not "*new*." *Id.* at 2133. It is instead appropriate under *Bruen* to assess whether the Founders banned firearms within public transportation of those times. *Id.* at 2131, 2133. Defendants admit they cannot make that showing, conceding that "there appear to be no governmental regulations from the Founding or Reconstruction eras relating specifically to public transportation." (Md. Br. at 46).

In any event, Defendants' proffered analogies fall flat. (Md. Br. at 46–47). That transit is "crowded" or that vulnerable people could be present are not sufficient reasons to declare the entire Maryland transportation system a sensitive place. *Bruen*, 142 S. Ct. at 2134. Defendants' reference to "restrictions on public assemblies" ignores that the Founders *required* carrying at public assemblies. (*Supra* at 9–10 & n.2). And Defendants' scattershot efforts to inject interest-balancing back into the picture, (Md. Br. at 47–50), openly defy *Bruen*, 142 S. Ct. at 2131.

Defendants' reliance on regulation of firearms by private entities fail because those entities were not bound by the Second Amendment. (Md. Br. at 48–49). These regulations bear no relevance to the constitutionality of a government-imposed regulation of similar conduct. *See Bruen*, 142 S. Ct. at 2155 (looking for "an enduring American tradition of *state* regulation" (emphasis added)). Defendants cite no authority suggesting otherwise. Nor can their reliance on regulations of circumstances of "this day" shed light on the traditional understandings of the Second Amendment. (Md. Br. at 49). *See Bruen*, 142 S. Ct. at 2154 n.28. Defendants make no other effort to justify the ban. With no justifying tradition, the Court should strike it down.

#### d. Stadiums, Racetracks, Amusement Parks, and Casinos

Defendants try to justify Maryland's bans on carrying at stadiums, racetracks, amusement parks, and casinos by reliance on temporally and substantively irrelevant sources. *See* Md. Code

Ann., Crim. Law § 4-111(a)(8)(ii), (iv), (v) & (vi); COMAR 36.03.10.48; COMAR 14.25.02.06. (Md. Br. at 43–44). They have not met their burden.

Defendants do not dispute the historical evidence demonstrating that entertainment facilities existed at the Founding. *See Koons*, 2023 WL 3478604, at *88 ("[T]his nation has a long history of gambling establishments."). (ECF No. 13-1 at 18–19). It is necessary to assess whether the Founders banned firearms at these facilities. *Bruen*, 142 S. Ct. at 2131, 2133. Defendants offer no evidence of Founding Era bans. The absence of any distinctly similar restriction from the Founding Era confirms that the state's bans are unconstitutional. *Id.* at 2131, 2133, 2154.

Defendants' mid- to-late-19th-century laws (and 20th-century) laws provide no support. (Md. Exs. 14–22). *See Bruen*, 142 S. Ct. at 2163 (Barrett, J., concurring) (explaining that courts should not "endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights"). Defendants cite out-of-time, rare, and irrelevant analogues barring firearms at places like fairs, race courses, balls, circuses, and other social functions, (*id.*), but this patchwork assortment is comprised of unreliable sources: from an "outlier" jurisdiction (Texas, Md. Ex. 17); several territories whose laws "deserve little weight" (Arizona, Oklahoma, Idaho, and New Mexico, Md. Exs. 15, 19–21); a late-in-time 20th-century Montana law that should be ignored (Md. Ex. 22); and a Georgia law that says nothing about entertainment venues (Md. Ex. 16). That again leaves Tennessee and Missouri (Md. Exs. 14, 18), whose laws are insufficient to show a well-established and representative tradition, *Bruen*, 142 S. Ct. at 2142 (doubting "that *three* colonial regulations" could establish a tradition). These bans are unconstitutional under *Bruen*. *See Koons*, 2023 WL 3478604, at *6, *88 (concluding New Jersey's banning carry in a "theater, stadium, museum, arena, racetrack or other place where performances, concerts, exhibits, games or contests are held" and "casino[s]" are likely unconstitutional).

Defendants attempt to reference one of their ahistorical sensitive places analogies also fails. That "large numbers of people gather[]" at these venues, (Md. Br. at 44), is just a repackaging of the crowd argument that *Bruen* explicitly rejected, 142 S. Ct. at 2134.

These bans are unconstitutional, and the recent decision in *Maryland Shall Issue, Inc. v. Montgomery Cnty.*, No. TDC-21-1736, 2023 WL 4373260 (D. Md. July 6, 2023), *appeal filed*, No. 23-1719 (4th Cir. July 10, 2023), does not support a contrary conclusion. The *Maryland Shall Issue* decision suffered several outcome-determinative legal errors. The court misapplied *Bruen*'s guidance on reasoning by analogy. *Compare id.* at *16 (stating that *Bruen* "did not impose any specific requirement that the historical statutes considered must have applied to a certain number of states or a certain percentage of the relevant population"), *with Bruen*, 142 S. Ct. at 2133 (explaining that "the government [must] identify a well-established and representative historical *analogue*"). It also erred in concluding "that historical sources from the time period of the ratification of the Fourteenth Amendment are equally if not more probative of the scope of the Second Amendment." *Maryland Shall Issue*, 2023 WL 4373260, at *8; *contra Bruen*, 142 S. Ct. at 2136 ("[N]ot all history is created equal."). (*See supra* at 11–13). The *Maryland Shall Issue* court's erroneous recognition of a historical tradition of banning firearms wherever people "gather for recreation or social activities," 2023 WL 4373260, at *12, is an unsurprising outgrowth of the court's flawed analytical framework. This Court should not follow down that path of error.

Maryland's bans on carrying firearms at stadiums, amusement parks, racetracks, and casinos are indisputably inconsistent with history and tradition. They should be stricken.

### e. Museums

Maryland's statewide ban on carrying a handgun in any museum also violates the Second Amendment. *See* Md. Code Ann., Crim. Law § 4-111(a)(8)(iii).

Defendants begin by arguing that the museum ban is constitutional because "museums are analogous to schools." (Md. Br. at 42). That argument suffers several fundamental flaws. First, reasoning by analogy is not appropriate because museums are not "*new*." *Bruen*, 142 S. Ct. at 2133. It is instead appropriate to assess only whether the Founders banned firearms at museums, a point for which Defendants present *zero* evidence. Second, reasoning by analogy, if appropriate, would be limited to "legislative assemblies, polling places, and courthouses," *not* schools. *Id.* ("[C]ourts can use analogies to *those* historical regulations . . . ." (emphasis added)). Third, Defendants have not proven any historical basis to deem a place "sensitive" merely because vulnerable people might be there. That museums sometimes host children and generally serve educational purposes cannot justify the ban.

Similarly insufficient are Defendants' citations to late-19th- and early-20th-century bans in places where people assemble for educational, literary, scientific purposes. (Md. Exs. 17–20, 22). Again, this hodgepodge of rarities includes an outlier (Texas), territories (Arizona, Oklahoma), a 20th-century law from Montana which should be ignored, and Missouri. These far-too-late, far-too-few, and otherwise irrelevant sources do not show "an enduring American tradition of state regulation." *Bruen*, 142 S. Ct. at 2155. The museum ban is unconstitutional.

### f.  Public Demonstrations

Plaintiffs have standing to challenge Maryland's ban on carrying a firearm at a public demonstration. Md. Code Ann., Crim. Law § 4-208(b)(2). Defendants have failed to justify the ban through historical tradition. It therefore should be stricken.

Defendants challenge Plaintiffs' standing by arguing that Plaintiffs have not demonstrated an Article III injury. (Md. Br. at 64–65). To bring a pre-enforcement challenge to a criminal law, a plaintiff must show "[1] an intention to engage in a course of conduct arguably affected with a

constitutional interest, but proscribed by statute, and [2] there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). It is enough to show a "substantial risk" of future harm. *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) (disavowing that plaintiffs must show the harm is "literally certain" to occur)). Mrs. Kipke would carry her handgun at a yearly demonstration for Maryland Families for Safe Birth but for her fear of prosecution. (ECF No. 13-2 ¶¶ 6–7). She has elaborated that, but for her fear of prosecution, she would remain at a demonstration after being ordered by an officer to leave. (Supplemental Declaration of Susannah Kipke ¶ 2, attached hereto as <u>Exhibit 1</u>). The Court should have little trouble concluding that this is sufficient for an Article III injury in fact.

Defendants try to manufacture a "highly attenuated chain of possibilities" that they say precludes standing here, (Md. Br. at 65), but the Court should not be persuaded. It is highly plausible that a trained law enforcement officer would notice Mrs. Kipke's weapon during a public demonstration, such as worn on a holster "under or within an article of the person's clothing." Md. Code Ann., Crim. Law § 4-111(b)(8)(ii)(2) (describing permissible methods of carry post-SB1). It is likely that an officer would exercise his discretion to tell Mrs. Kipke and others that a demonstration is occurring and order her or all of them to leave, as a "predictable effect" of the state government's political hostility towards firearms. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019) (distinguishing *Clapper*'s admonition about "theories that rest on speculation about the decisions of independent actors" at traceability stage when the third-party conduct was a "predictable effect of Government action"). Governor Moore's press secretary recently said that "more guns on the street . . . *is actually the problem*."[4] These realities demonstrate a "substantial

---

[4] CBS Baltimore Staff, *NRA sues Maryland: What could it mean for the state's new gun laws?*, CBS News Baltimore (May 17, 2023), https://tinyurl.com/yc6peczb (emphasis added).

risk" that Mrs. Kipke's conduct would be "proscribed by a statute." *Susan B. Anthony List*, 573 U.S. at 159 (citations omitted).

Defendants also appear to challenge whether "there exists a credible threat of prosecution." *Id.* (Md. Br. at 66 n.47). Fourth Circuit precedent explains: "A non-moribund statute that 'facially restrict[s] expressive activity by the class to which the plaintiff belongs' presents such a credible threat, and a case or controversy thus exists *in the absence of compelling evidence to the contrary*." *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 711 (4th Cir. 1999) (emphasis added); *accord Kenny v. Wilson*, 885 F.3d 280, 289 (4th Cir. 2018) ("[T]here is a presumption that a 'non-moribund statute that facially restricts expressive activity by the class to which the plaintiff belongs presents such a credible threat.'"). The Supreme Court has also found relevant the government's refusal to disavow prosecution. *See Hedges v. Obama*, 724 F.3d 170, 197 & n.156 (2d Cir. 2013) (collecting cases); *see also Kenny*, 885 F.3d at 288 ("Threat of prosecution is especially credible when defendants have not 'disavowed enforcement' if plaintiffs engage in similar conduct in the future."). Here, the Ban facially restricts Mrs. Kipke's proposed conduct, Defendants have not disavowed prosecution, and Defendants have not otherwise presented "compelling evidence" disputing the likelihood of prosecution. *N.C. Right to Life, Inc.*, 168 F.3d at 710. The Fourth Circuit's decision in *Maryland Shall Issue, Inc.*, is distinguishable because the government issued an "FAQ" disavowing the interpretation the plaintiffs feared would lead to prosecution, the plaintiffs alleged no "concrete intention to (arguably) violate" the challenged law, and the court did not address the presumed-threat doctrine. *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 218 (4th Cir. 2020). Plaintiffs therefore have shown an Article III injury.

Plaintiffs also have established traceability, even though police officers have some discretion, because officers will "react in predictable ways" consistent with Maryland's hostility

towards firearms, *Dep't of Com.*, 139 S. Ct. at 2566, by trying to disarm law-abiding citizens like Mrs. Kipke. And their injury is redressable by a properly crafted order striking down the ban.

Turning to the merits, Defendants' single paragraph of evidence comes nowhere close to justifying the public demonstration ban. (Md. Br. 66). Colonial laws requiring "citizens to go armed when attending religious services or public assemblies," *Koons*, 2023 WL 3478604, at *73, demonstrate a public tradition permitting carrying at demonstrations, *i.e.*, the opposite of what Defendants need to prove. Similarly, because demonstrations existed at the Founding, Defendants' failure to identify any Founding Era ban on carrying at these events is sufficient to strike down the ban. *See Bruen*, 142 S. Ct. at 2131. Defendants' nine late-19th-and-early-20th-century exemplars are insufficient because they "contradict[] earlier evidence," *Bruen*, 142 S. Ct. at 2154, are otherwise far too late, (*supra* at 11–13), and for the reasons above do not evidence a well-established and representative national tradition. *See Bruen*, 142 S. Ct. at 2133. (*Supra* at 15–16). The public-demonstration ban is unconstitutional. *Koons*, 2023 WL 3478604, at *80 (holding likely unconstitutional New Jersey's ban on carrying "at public gatherings, demonstrations, or events requiring a government permit").

### g.  Healthcare Facilities

Defendants try to justify the healthcare facilities ban, Md. Code Ann., Crim. Law § 4-111(a)(2)(iii), through improper analogical reasoning and reliance on the same motley assortment of few and far-too-late analogues that bear no meaning on the Second Amendment. (Md. Exs. 17–20, 22). Defendants fail to meet their burden. The healthcare facilities ban should be stricken.

Defendants claim that the healthcare facilities ban is constitutional through sensitive-places analogy because those facilities "serve vulnerable individuals" and "have a teaching component." (Md. Br. at 41). But analogical reasoning is not appropriate because health care facilities are not

"*new*." *Bruen*, 142 S. Ct. at 2133. Although healthcare might look somewhat different today, (Md. Br. at 40), "certainly the medical profession existed in 18th and 19th century America; and certainly gun violence existed in 18th and 19th century America." *Antonyuk*, 2022 WL 16744700, at *60; *see also Koons*, 2023 WL 3478604, at *93 ("[H]ospitals and medical care facilities existed before and after this Nation's founding."). That the Founders *could have* prohibited firearms in Founding Era health care facilities, but did not do so, confirms that Maryland's ban is unconstitutional. *Bruen*, 142 S. Ct. at 2131, 2133. Even if reasoning by analogy were proper, there is no historical basis or support in *Bruen* for the proposition that the presence of vulnerable individuals or having a teaching component justifies a location-based ban. (*Supra* at 9–10, 17–18).

Defendants again retreat to late-19th- and early-20th-century bans in places where people assemble for "scientific purposes." (Md. Ex. 17–20, 22). This collection of rare and unreliable sources—including laws from an outlier, two territories, the 20th-century, and Missouri—do not show a "well-established" and "representative" tradition. *Bruen*, 142 S. Ct. at 2133.

Defendants also attempt to resurrect interest balancing, (Md. Br. at 41), which *Bruen* repudiated, 142 S. Ct. at 2131. And they cite *Heller*'s statement that it left open the constitutionality of prohibitions "on the possession of firearms by . . . the mentally ill," 554 U.S. at 626, which has nothing to do with a law banning anyone in Maryland from carrying a handgun into a health care facility. Defendants have not met their burden of proving that the healthcare facilities ban "is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2135.

### h.  School Grounds

Defendants have failed to meet their burden of proving a historical tradition of prohibiting the carrying of a handgun for self-defense on the grounds of public[5] and private schools. *See* Md. Code Ann., Crim. Law § 4-111(a)(2)(i)–(ii).

Although Plaintiffs do not challenge Maryland's ban on carrying a handgun inside a school, it is important to recognize that *Heller* merely left open the extent to which governments could regulate firearms at schools, 554 U.S. at 626, and *Bruen*, in analyzing "the historical record," declined to recognize schools as among the "relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited." 142 S. Ct. at 2133.

School grounds are not "*new*," so Defendants must prove that school *grounds* are among the "relatively few" places "where weapons were altogether prohibited" through adequate historical evidence. *Id.* Defendants have not presented adequate historical evidence. Nor could they: "During most of America's history, there were no particular restrictions on the possession of firearms on school property." *See* David B. Kopel, *Pretend "Gun Free" School Zones: A Deadly Legal Fiction*, 42 Conn. L. Rev. 515, 518 (2009). Restrictions appeared in the 1990s. *See* Amy Hetzner, *Comment, Where Angels Tread: Gun-Free School Zone Laws and an Individual Right to Bear Arms*, 95 Marq. L. Rev. 359, 360 (2011). Defendants' failure to present evidence that restrictions on school *grounds* are supported by a historical tradition of firearms regulation is fatal to the school grounds ban.

---

[5] Defendants repeat their argument that Maryland is immune from the Second Amendment to the extent it operates schools "in its proprietary capacit[y]." (Md. Br. at 61 n.44). This argument fails for the same reasons as above. (*Supra* at 19–21). What matters is whether the ban is "consistent with the Second Amendment's text and historical understanding." *Bruen*, 142 S. Ct. at 2131.

Even if school *buildings* are sensitive places, Defendants still fail to meet their burden of justifying the ban on school *grounds*. They improperly place the burden on Plaintiffs to show a "compelling reason why the grounds adjacent to [schools] should be treated any differently than the buildings themselves." (Md. Br. at 59, 62). That is wrong. "[T]he burden falls on" Defendants to prove that the school grounds ban "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2135. And Defendants have presented zero historical evidence showing that the Founders tolerated bans on the *grounds* of schools or any of the places *Bruen* deemed sensitive (*i.e.*, "legislative assemblies, polling places, and courthouses"). *Id.* at 2133. Defendants' reliance on caselaw that predates *Bruen* or otherwise fails to engage in the requisite historical analysis cannot serve as a substitute for Defendants' burden to support its restrictions with historical evidence. (Md. Br. at 59–60, 63–64). At bottom, the state fails to show that school *grounds* are among the "relatively few" places "where weapons were altogether prohibited."

Defendants then try to justify the school grounds ban through reference to the presence of children. But the presence of vulnerable individuals cannot support a restriction under a sensitive places theory. (*Supra* at 9–10, 17–18). Again, reasoning by analogy is inappropriate because school grounds are not "*new*"; and even if they were, this analogical argument fails because it lacks the characteristics that made "legislative assemblies, polling places, and courthouses" sensitive places. 142 S. Ct at 2133–34. Defendants have not presented a sufficient basis in history to justify banning everyone from carrying a handgun on the grounds of a school for self-defense.

Plaintiffs recognize that post-SB1 Maryland law will allow an exception for "[a] firearm that is carried or transported in a motor vehicle" under certain circumstances. Md. Code Ann., Crim. Law § 4-111(b)(11). But that exception does not insulate the school grounds ban from unconstitutionality because Plaintiffs have a right to armed self-defense while on the grounds of a

school for reasons other than picking up their children. (ECF No. 13-2 at 4 ¶ 6(d)). Defendants also rely on the Ninth Circuit's pre-*Bruen* statement that "[t]he Second Amendment does not elevate convenience and preference over all other considerations," *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 680 (9th Cir. 2017), for the proposition that Plaintiffs can simply avoid school grounds, (Md. Br. at 63 & n.46). But the only consideration that matters under *Bruen* is history. Because Defendants fail to justify the school grounds ban with history, it is unconstitutional.

### i.   Government Buildings

Maryland's bans on carry within *all* government buildings, Md. Code Ann., Crim. Law § 4-111(a)(4)(i), and on the grounds of certain buildings, COMAR 04.05.01.03, are unconstitutional.

Defendants begin by repeating their "proprietary capacity" argument for immunity from the Constitution. (Md. Br. at 56). That argument fails. (*Supra* at 19–21). What matters is whether the ban is "consistent with the Second Amendment's text and historical understanding." *Bruen*, 142 S. Ct. at 2131. Defendants have not made that showing.

Defendants say that "the Supreme Court has already expressly recognized [government buildings] as 'sensitive places.'" (Md. Br. at 56). *Heller* and *Bruen* demonstrate that this is wrong. *Heller* reserved consideration of the "historical justifications" for bans in "schools and government buildings" for later cases. 554 U.S. at 626, 635. Likewise, *Bruen* explained that "the *historical record* yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses." 142 S. Ct. at 2133 (emphasis added). Only because of both historical support and lack of "disputes regarding the lawfulness of such prohibitions" did the court "assume" that bans in those "relatively few," "exceptional" places were constitutional. *Id.* at 2133, 2156. *Bruen*'s assumption specific to "legislative assemblies, polling places, and courthouses" presupposes that not all government

36

buildings are sensitive places. *Id.* at 2133. Neither *Heller* nor *Bruen* held that *all* government buildings are "sensitive places" where the state is free to ban carrying for self-defense without constitutional limitation. *See Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting) ("*Heller*'s dictum does not settle the question before us."), *abrogated by Bruen*, 142 S. Ct. at 2122. The burden falls on Defendants to prove that a statewide ban on carrying into any government building, and on the grounds of certain government properties, "is consistent with this Nation's historical tradition of firearm regulation." *Id.* 2135. Defendants have not done so.

Rather than address their burden, Defendants argue that Plaintiffs' facial challenge fails because "firearms can be prohibited at some government buildings." (Md. Br. at 57). That is wrong as a matter of law and logic. Although the Supreme Court has characterized a "relatively few" government buildings as sensitive places, *Bruen*, 142 S. Ct. at 2133, "[i]t would appear to defy" *Bruen*'s pronouncement of the historical-tradition standard to conclude that "a law is inconsistent with history and tradition, just to watch it be saved by the *one* possible application that makes it constitutional." *Antonyuk*, 2022 WL 16744700, at *47 (holding New York's "good moral character" requirement facially unconstitutional). After all, *Bruen* struck down New York's proper cause standard even though it presumably was applied constitutionally to some applicants. *See Bruen*, 142 S. Ct. at 2161 (Kavanaugh, J., concurring) (observing that the standard caused "many 'ordinary, law-abiding citizens'" to be denied "the right to carry handguns for self-defense").

Turning to the merits, Defendants fail to satisfy their burden. With respect to government buildings, Defendants have not shown that the sensitive characteristics of "legislative assemblies, polling places, and courthouses" (*i.e.*, fundamental government functions, comprehensive security, and no tradition of carrying firearms) apply to all government buildings. Nor have they otherwise shown that the nation has a well-established and representative historical tradition of banning law-

abiding citizens from carrying a handgun for self-defense in *all* government buildings across an entire state. Although Defendants cite Northampton-style laws, *Bruen* has already rejected the attempt to broaden those laws beyond carrying with intent to "terrify." 142 S. Ct. at 2141–43. Those exemplars do not permit the government to ban firearms wherever government employees are conducting *any* "government functions." (Md. Br. at 58). Even if the state can enact a ban on carrying within "legislative assemblies, polling places, and courthouses," *Bruen*, 142 S. Ct. at 2133, a statewide ban for *all* government buildings cannot pass constitutional muster.

Defendants' efforts similarly fail with respect to the grounds of government buildings. "[T]he government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. Defendants present no historical evidence to support a historical tradition of banning firearms on the grounds of government buildings. (Md. Br. at 59–60). Their reference to pre-*Bruen* caselaw and the recent *Maryland Shall Issue* decision do not satisfy their burden. The Court should strike down state's bans on carrying a handgun in government buildings and on their grounds.

### j.  Private Property (*i.e.*, the no-carry default)

Maryland presumptively bans carrying a handgun for self-defense on every inch of private property in the state. Md. Code Ann., Crim. Law § 6-411(d). Plaintiffs have standing. The law implicates "the plain text of the Second Amendment." *Bruen*, 142 S. Ct. at 2134. The law plainly violates the Second Amendment. The Court must strike it down.

Defendants challenge all three components of standing: injury in fact, traceability, and redressability. *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1618 (2020). Each challenge fails.

Plaintiffs have demonstrated a cognizable Article III injury in three, independently sufficient ways. First, Plaintiffs demonstrated they would carry a handgun for self-defense onto

private properties open to the public whenever there is no sign or other indication that firearms are prohibited, but they cannot continue to do so as a direct result of SB1's no-carry default. (*See* ECF Nos. 13-2 ¶¶ 6–8, 13-3 ¶ 7, 13-4 at 2–3, 13-5 ¶ 9). They accordingly proved "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute," and "there exists a credible threat of prosecution thereunder." *Susan B. Anthony List*, 573 U.S. at 159. The "lost time" associated with trying to gain express permission from the owner of a property lacking a sign is a concrete, tangible, certainly impending injury. *Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332, 1338 (11th Cir. 2021); *see also Texas v. United States*, 945 F.3d 355, 381 (5th Cir. 2019) ("[T]he time and money spent complying with the statute . . . constitutes the plaintiffs' injury."), *reversed on other grounds*, 141 S. Ct. 2104 (2021). Third, the burden of forcing Plaintiffs to obtain consent prior to exercising their Second Amendment rights is sufficient for standing, just as "[i]mposition of [a] burden" associated with casting a vote suffices. *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351–52 (11th Cir. 2009) (holding that requiring a voter "to obtain photo identification before they can vote," and requiring voters either "to produce photo identification to vote in person or to cast an absentee or provisional ballot" are Article III injuries). Defendants complain that Plaintiffs lack standing unless they identify a specific building for which the owner (1) consents to entry, but (2) refuses to post a sign or grant express permission. (Md. Br. at 67). That is wrong. The *absence* of a sign on a particular building will both deter entry and force Plaintiffs to expend time and energy obtaining consent. That is enough for standing.

Next, Plaintiffs' injuries are "fairly traceable to the defendant[s'] allegedly unlawful conduct." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006). By reversing the general rule that individuals may carry onto properties held open to the public absent the owner's prohibition, and by imposing burdens associated with compliance, Defendants' conduct "is at least

in part responsible for frustrating" Plaintiffs' Second Amendment rights. *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 316 (4th Cir. 2013); *accord Maryland Shall Issue, Inc.*, 971 F.3d at 212 (recognizing that the defendant's conduct "does not have to be 'the sole or even immediate cause of th[at] injury'"). Additionally, that the injury relies in small degree on the conduct of independent third parties (*i.e.*, property owners who could post a sign allowing carry) cannot defeat traceability because, given the current political climate, a property owner's refusal to post a sign commanded by the government would be a "likely react[ion]" to government conduct. *Dep't of Com.*, 139 S. Ct. at 2566. *Simon* is inapposite because it deals with a regulatory ruling governing third parties, *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976), does not address concurrent causation, *Libertarian Party of Va.*, 718 F.3d at 316, and predates the Supreme Court's holding that traceability is satisfied when the plaintiff "show[s] at the least 'that third parties will likely react in predictable ways.'" *California v. Texas*, 141 S. Ct. 2104, 2117 (2021) (quoting *Dep't of Com.*, 139 S. Ct. at 2566). Plaintiffs' injuries are fairly traceable to Defendants' conduct.

Finally, redressability is satisfied because, if the no-carry default is stricken, then Plaintiffs can once again enter privately owned properties that are held open to the public unless the property owner exercises his or her right to prohibit firearms. *See Christian*, 2022 WL 17100631, at *9 (recognizing that "this society—*this nation*—has historically" permitted "carrying on private property . . . absent the owner's prohibition"); *see also Maryland Shall Issue, Inc.*, 971 F.3d at 213–14 (holding redressability satisfied "if a favorable outcome would repeal the 'burdens' on" the exercise of Second Amendment rights). Plaintiffs' injuries "would likely be redressed by the requested judicial relief." *Thole*, 140 S. Ct. at 1618.

On the merits, Defendants argue that the no-carry default does not implicate conduct that "the Second Amendment's plain text covers." *Bruen*, 142 S. Ct. at 2126. (Md. Br. at 70).

Defendants' argument is wrong. (*Supra* at 5–6). Thus, the no-carry default is unconstitutional unless Defendants prove "that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. Defendants have not carried that burden.

To begin, Defendants cannot dispute that private property and associated violence existed at the Founding. (ECF No. 13-1 at 25–26). The absence of a "distinctly similar historical regulation" is dispositive that no tradition justifies the no-carry default. *Bruen*, 142 S. Ct. at 2131. Defendants' authorities do not prove otherwise. Nor could they; the no-carry default is the *opposite* of established American tradition. *Christian*, 2022 WL 17100631, at *9 (explaining that "the scope of the *right codified in the Second Amendment* demonstrates that this society—*this nation*—has historically" permitted "carrying on private property . . . absent the owner's prohibition").

Defendants cite a handful a pre-Founding laws that are self-evidently limited to hunting or poaching. (Md. Exs. 25, 26, 27). Reliance on those laws would violate *Bruen*'s emphasis that "how and why" the state burdens Second Amendment rights are critical "metrics" to establish an analogue. 142 S. Ct. at 2132–33; *Antonyuk*, 2022 WL 16744700, at *79 (rejecting reliance on "anti-poaching laws" for law that barred "*all* license holders from carrying *concealed* handguns in virtually *every commercial building* now"). The 1789 Massachusetts law was passed "for the protection and security of the sheep and other stock." (Md. Ex. 29). And the 1771 New Jersey law mentions "Traps and Dogs," and surrounding sections regulate hunting, which suggest that this law is also irrelevant. (Md. Ex. 28). A tradition of regulating hunting and prohibiting poaching cannot justify a state-wide no-carry default on all private properties. *Koons*, 2023 WL 3478604, at *67 ("The colonial hunting laws and the Default Rule are differently situated; they do not impose a comparable burden on licensed firearm carriers."). And Defendants do not acknowledge that some states even constitutionalized the right to hunt on unenclosed lands. Usman, *supra*, at 75.

Defendants are left with three Reconstruction Era laws that are too late and otherwise insufficient. (Md. Exs. 30, 31, 32). If "*three* colonial regulations" could not "suffice to show a tradition of public-carry regulation" in *Bruen*, 142 S. Ct. at 2142, then three Reconstruction Era laws necessarily fail. These laws also contradict Founding Era evidence establishing a tradition permitting entry on private property that is open to the public absent the owner's prohibition. *See Christian*, 2022 WL 17100631, at *9; *see Wolford v. Lopez*, 2023 WL 5043805, at *27–29. Defendants fail to justify the default-carry ban.

The Court need not "sift the historical materials for evidence" to justify the Carry Bans. *Bruen*, 142 S. Ct. at 2150. That is Defendants' burden. *Id.* Because they fail to show "an enduring American tradition of state regulation" for any of the Carry Bans, each should be stricken. The Court should grant summary judgment to Plaintiffs on their Second Amendment challenges.

## II. Plaintiffs are entitled to summary judgment on their First Amendment compelled-speech challenge.

If the Court decides that the no-carry default for private property open to the public complies with the Second Amendment, then the Court should invalidate that provision under the First Amendment. Plaintiffs have standing. The no-carry default compels speech within the scope of the First Amendment, and it fails any plausibly applicable level of scrutiny.

Plaintiffs have standing. In a First Amendment claim, a plaintiff suffers an injury in fact "when the state has simply 'chilled' the right to engage in free speech and expression." *Speech First, Inc. v. Sands*, 69 F.4th 184, 192 (4th Cir. 2023). Mr. Smith declared that he would "allow any person who has the lawful right to carry a handgun" into his law offices, but SB1 forces him "to engage in compelled speech" that he "do[es] not want to engage in" because it "politicizes [his] law offices" and creates "the risk of losing . . . business." (*See* ECF No. 13-6 ¶¶ 10–11). But for SB1, he would exercise his First Amendment right "to remain silent" on the issue of permission to

carry onto private properties, *303 Creative LLC*, 143 S. Ct. at 2312. That injury is "fairly traceable" to the no-carry default. *DaimlerChrysler*, 547 U.S. at 342. And the injury "would likely be redressed" by a judgment striking the law. *Thole*, 140 S. Ct. at 1618.

Defendants argue that the law falls outside the scope of the First Amendment because it is a "situation-altering utterance." (Md. Br. at 80–81 (relying on *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949))). This cannot defeat Plaintiffs' claim. Certain kinds of regulations fall outside the scope of the First Amendment because "they would have been permissible at the time of the founding," *Biden v. Knight First Amendment Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1223–24 (2021) (Thomas, J., concurring in the denial of certiorari), but the burden falls on the government "to show that a type of speech belongs to a 'historic and traditional categor[y]' of constitutionally unprotected speech," *Bruen*, 142 S. Ct. at 2130 (discussing *United States v. Stevens*, 559 U.S. 460, 468 (2010)). Defendants have not "point[ed] to *historical* evidence" showing that situation-altering utterances are unprotected, *id.*, so this argument fails.

The no-carry default implicates speech protected by the First Amendment. The state does not dispute that the First Amendment "protects against . . . regulations that compel speech." *Stuart v. Camnitz*, 774 F.3d 238, 245 (4th Cir. 2014); *see Burns v. Martuscello*, 890 F.3d 77, 84 (2d Cir. 2018) ("[C]ompelled speech will vitiate the individual's decision either to express a perspective by means of silence, or to remain humbly absent from the arena."). The no-carry default compels Mr. Smith to convey the "particularized message" that firearms are allowed within his property, (*see* ECF No. 12-6 at 5 ¶¶ 10–11), which forces Mr. Smith to enter an arena from which he wishes "to remain humbly absent," *Burns*, 890 F.3d at 84. This is a content-based restriction, *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988), that triggers strict scrutiny, *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018).

Defendants argue incorrectly that the no-carry default only incidentally burdens speech. (Md. Br. 81–82). The compelled-speech component is not comparable to "[c]ompelling a law school that sends scheduling e-mails for other recruiters to send one for a military recruiter." *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 62 (2006). Commanding speech by property owners is a core function of the law, and speech is a prerequisite to carrying firearms.

Defendants do not address strict scrutiny, under which the no-carry default obviously fails. Even under scrutiny applicable to viewpoint-neutral restrictions, the no-carry default would fail for readily available alternative measures—*i.e.*, reliance on the trespass statute. (Doc. 13-1 at 29). As noted, the Court should reject Defendants' invitation to analyze the law as a restriction on conduct that only incidentally burdens speech—the no-carry default is designed precisely to command speech on a matter of paramount personal significance and political sensitivity. (*Id.*). No such burden on speech could be categorized as incidental. For these reasons, the Court should grant Plaintiffs' motion for summary judgment on their First Amendment compelled-speech claim.

## III. Defendants' cross-motion for summary judgment should be denied as to Counts One and Two.

For the reasons above, the Court should deny Defendants' Cross-Motion for Summary Judgment as to Plaintiffs' Second Amendment challenges to the Carry Bans (Count One) and their First Amendment compelled-speech challenge to the no-carry default (Count Two).

## IV. Plaintiffs are entitled to a preliminary injunction barring enforcement of the challenged laws.

Plaintiffs have satisfied each element for preliminary injunctive relief. *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiffs have made a "clear showing" that they are likely to succeed on the merits of their Second Amendment and First Amendment challenges. *Id.* at 20, 22. Defendants do not dispute that the denial of constitutional rights constitutes irreparable

harm to Plaintiffs, which Plaintiffs will suffer absent a preliminary injunction. *Id.* at 20. Nor have Defendants meaningfully disputed that the private and public equities favor injunctive relief. *Id.* Defendants cannot dispute that Maryland "is in no way harmed" by injunctive relief barring enforcement of unconstitutional firearms regulations. *See Legend Night Club v. Miller*, 637 F.3d 291, 302–03 (4th Cir. 2011). Likewise, the public interest sides with adherence to the constitution, not defiance of it. *Id.* at 303 ("[U]pholding constitutional rights is in the public interest.").

Defendants retreat to the interest balancing that *Bruen* rejected: "The Second Amendment 'is the very *product* of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." *Bruen*, 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635). (Md. Br. at 84–85). This Court should hold Maryland to the promises it made and the interests it affirmed when it ratified the Bill of Rights.

## CONCLUSION

Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Summary Judgment, deny Defendants' Cross-Motion for Summary Judgment in relevant part, and permanently enjoin the Carry Bans. To protect Plaintiffs' rights while the Court considers dispositive motions, the Court should grant Plaintiffs' Motion for Preliminary Injunction.

Respectfully submitted,

/s/ *John Parker Sweeney*
John Parker Sweeney (Bar No. 08761)
James W. Porter, III (Bar No. 19416)
Marc A. Nardone (Bar No. 18811)
Connor M. Blair (Bar No. 20985)
Bradley Arant Boult Cummings LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
Phone: 202-393-7150
jsweeney@bradley.com

Dated: August 11, 2023                      Counsel for Plaintiffs

### INDEX OF SUPPLEMENTAL EXHIBITS

| Exhibit Number | Exhibit Title | Related Pages |
|---|---|---|
| 1 | Supplemental Declaration of Susannah Kipke | 30 |
| 2 | Nathaniel B. Schurtleff, *Records of the Governor and Company of the Massachusetts Bay in New England* 190 (William White Press 1853) | 10 |
| 3 | 1812 Del. Laws 329 | 24 |

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 11th day of August, 2023, the foregoing was served, via electronic delivery to Defendants' counsel via CM/ECF system which will forward copies to Counsel of Record.

Respectfully submitted,

/s/ *John Parker Sweeney*
John Parker Sweeney (Bar No. 08761)