IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| SUSANNAH WARNER KIPKE, ET AL., | * | |
| *Plaintiffs*, | * | |
| v. | * | No. 1:23-cv-01293-GLR |
| WES MOORE, ET AL., | * | |
| *Defendants*. | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

### DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

The Kipke Plaintiffs' opposition demonstrates that their claims are based on several faulty premises, and are ultimately dependent on a distorted reading of *New York State Rifle and Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), that no court has yet adopted. Because plaintiffs have failed to plead a valid claim under any constitutional theory, defendants are entitled to judgment as a matter of law.

1. First, plaintiffs have abandoned several of their claims by failing to present any argument in opposition to the State's motion for summary judgment, and therefore this Court should grant summary judgment at the outset as to those claims. Although plaintiffs asserted four counts in their complaint, plaintiffs presented argument in their opposition to the State's motion only as to Counts One and Two, and only then to the extent that those counts challenged locational restrictions on the carry of firearms (including the related First Amendment challenge to the private building consent rule). (ECF 29 at 44.) Plaintiffs, however, presented absolutely no argument as to any claim that did not challenge a locational restriction, including with respect to (1) plaintiffs' challenge, set forth in Count One, to "Maryland's objective and

subjective requirements to obtain a carry permit" (ECF 1 ¶ 49); (2) Count Three, which asserts a Second Amendment and Due Process Challenge to the "propensity for violence" standard of Maryland's permitting scheme (ECF 1 ¶¶ 57-61); and (3) Count Four, which asserts an Equal Protection claim (ECF 1 ¶¶ 62-68). Accordingly, these claims should be deemed abandoned, and summary judgment granted in the State's favor. *See CSAA Affinity Ins. Co. v. Scott Fetzer Co.*, No. 21-1543-JKB, 2023 WL 2714026, at *6 n.5 (D. Md. Mar. 30, 2023) (stating that, where a plaintiff fails to address a claim in its opposition to a motion for summary judgment, that claim will be deemed abandoned, and summary judgment should be granted for defendant).

2. With regard to plaintiffs' remaining Second Amendment claims, which challenge firearms restrictions in various locations, their position appears to rise or fall on their theory that, although the Supreme Court had expressly approved of "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Court in *Bruen* somehow walked back that endorsement. They claim that, although *Bruen* retained the idea of sensitive places as a conceptual matter, *Bruen* nonetheless abandoned *Heller*'s language so as to limit the universe of "sensitive places" to only three particular locations (and, in doing so, disavowed the notion of "schools" as a paradigmatic sensitive place). (ECF 29 at 9-10, 20, 34.) Building on that false premise, plaintiffs assert that any analysis of whether a modern location is a sensitive place must be analogized from those specific locations. Plaintiffs further argue that any analogy must be consistent with what they claim is the unifying factor amongst those three specific locations: that they "offer[] some heightened assurance of governmental protection

2

from violence." (ECF 29 at 10 (citation omitted).) Each of these claims is refuted by the language in *Bruen*.

Because *Bruen* did not overturn, and in fact reaffirmed, *Heller*, that case remains the starting point for any analysis. In *Heller*, the Supreme Court explained that, although its opinion was announcing an individual right to possess firearms, the right was "not unlimited." 554 U.S. at 626. In that vein, the Court stated that its opinion did not "cast doubt" on "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id.* And two years later, the Court "repeat[ed] those assurances." *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010). The Supreme Court again left that language undisturbed in *Bruen*:

> Consider, for example, *Heller*'s discussion of "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—e.g., legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carrying of firearms in *new* and analogous sensitive places are constitutionally permissible.

142 S. Ct. at 2133 (citations omitted).

This language belies plaintiffs' assertion that the Supreme Court narrowed the phrase "such as schools and government buildings" simply by identifying three particular types of government buildings. Indeed, it would be a skewed reading of *Bruen* to suggest that, when the Court makes references to "these locations" or "those historical regulations," it has read *Heller*'s language out of existence and has sub silentio endorsed reliance on only the exemplar buildings it has specifically identified.

3

Plaintiffs' reading is thus not only contrary to the plain text of the *Bruen* majority opinion, but also to the concurrences of three justices.  In his solo concurrence, Justice Alito was adamant that the *Bruen* decision did not "disturb[] anything that we said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns." *Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring).  And in a concurrence joined by Chief Justice Roberts, Justice Kavanaugh simply blockquoted the "sensitive places" language from *Heller*, signaling that affirmation of the *Heller* language was integral to his views, and that nothing in the *Bruen* decision altered how that language should be interpreted.  As a result, what is left is where the Court started in *Heller*:  the reaffirmation of "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings."

3.      Plaintiffs' assertion that "sensitive places" must include "some heightened assurance of governmental protection from violence" relies on a flawed reading of *Bruen* as well.  Indeed, although plaintiffs claim that the assurance of state-provided security is the fundamental and exclusive benchmark by which all locational restrictions must be judged, the *Bruen* Court did not articulate such a standard.  Given that *Bruen*'s discussion of "sensitive places" was within a passage ostensibly designed to *clarify* the application of the history-and-tradition standard announced in *Heller*, the Court could have easily included this limiting principle in furtherance of that purpose.  That it did not speaks volumes.

But perhaps what is more telling is what the Court actually did say.  In *Bruen*, the Court rejected New York's assertion that the "sensitive places" doctrine could encapsulate all "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." *Bruen*, 142 S. Ct. at 2133.  In the Court's view, New York was essentially making the argument that the entire "island of Manhattan [is] a

4

'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." *Id*. at 2134. However, if the Court had believed that a "heightened assurance of governmental protection from violence" was the dispositive benchmark, it could have easily rejected New York's argument out of hand. But it did not. Instead, the Court used cautious language, stating only that including within the category of "sensitive places" "all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly," and would "eviscerate the general right to publicly carry arms for self-defense." *Id*. All of this language would have been unnecessary if the Court wanted to adopt plaintiffs' proffered thesis.

Furthermore, the Court rejected the narrow standard advanced by plaintiffs here when it gave some insight into the characteristics of places it might deem as "sensitive places." In rejecting New York's more expansive view described above, the *Bruen* Court stated: "It is true that people sometimes congregate in 'sensitive places,' and it is likewise true that law enforcement professionals are *usually* presumptively available in those locations." 142 S. Ct. at 2133-34 (emphasis added). The Court's observation that law enforcement officials are "usually" available in places deemed "sensitive places" thus entirely refutes plaintiffs' theory, which appears to be premised on state-provided security (or some "heightened assurance" of it) *always* being available.

Moreover, plaintiffs' reliance on the "heightened assurance" of state-provided security as the determinative factor is counter to *Bruen*'s broader command to remain faithful to history and tradition. For instance, would a "sensitive place" expressly endorsed by *Bruen*—such as a polling place—lose that status just because the government has opted not to implement such

5

heightened security?[1] Or, conversely, may a location that might have historically allowed firearms now be elevated to "sensitive place" status simply by furnishing "heightened assurances" of state-provided security? Plaintiffs' approach thus not only disregards history and tradition, but also appears to surrender the vitality of their Second Amendment rights to the extent of the government's security budget.

4. Equally meritless is plaintiffs' insistence that *Bruen* did not endorse schools as a paradigmatic "sensitive place." (ECF 29 at 17, 34.) Although the language "such as schools" is plainly in the Court's decisions in *Heller*, *McDonald*, and *Bruen*, plaintiffs appear to argue that the Court really didn't mean what it said, and that schools are "sensitive places" only to the extent that firearms restrictions can be applied to students. (ECF 29 at 17.) To support that hypothesis, plaintiffs rely on the doctrine of *in loco parentis*. (ECF 29 at 17.)

At the outset, plaintiffs' argument is refuted by the fact that when *Heller*, *McDonald*, and *Bruen* all identify "schools" as "sensitive places," the language is unqualified. Again, given the implications, what the Court did not say is nearly as important as what it did say. Although the Court could have easily clarified that restrictions in schools are valid only as applied to students, it did not do so. There is therefore no basis to conclude that the Court intended such an important limiting principle to apply. Moreover, plaintiffs' argument ignores

---

[1] In 2022, there were over 1,500 polling places throughout Maryland. *See* https://elections.maryland.gov/elections/2022/2022_primary_number_of_precincts_by_legislative.pdf  And there are no laws, regulations, or policies requiring state-provided security at these sites. Indeed, it would be intimidating to many citizens if, upon showing up to vote, they were greeted by metal detectors and armed guards. That is why some states have actually made it illegal for a uniformed law enforcement officer to be present at a polling place unless they are there to vote or they have been summonsed to the location to preserve the peace. *See, e.g.*, 25 Pa. Cons. Stat. § 3520.

the fact that the Court identified "schools" as "sensitive *places*." (emphasis added). Had the Court intended to limit restrictions to students only, it would not have used a locational term such as "place," but would have instead categorized such a restriction with regard to the class of people to whom it purportedly applied.[2]

But brushing all that aside, the doctrinal theory upon which plaintiffs rely—*in loco parentis*—fails to bear the weight of plaintiffs' flawed reasoning. First, the Supreme Court has made clear that children do not "shed their constitutional rights . . . at the schoolhouse gate," *Tinker v. Des Moines Independent Community Sch. Dist.*, 393 U.S. 503, 506 (1969), and therefore the fact that a child is in school cannot alone support, as plaintiffs would suggest, a wholesale deprivation of a constitutional right. Thus, rather than abrogating all students' constitutional rights, a child's status as a student merely informs how constitutional rights are to be balanced against other state interests. *See, e.g.*, *New Jersey v. T.L.O.*, 469 U.S. 325, 336-37 (1985) (rejecting the *in loco parentis* doctrine in the context of the Fourth Amendment, but nonetheless employing a balancing test to hold that constitutional standards may be relaxed in the school context). But the Second Amendment does not countenance a balancing test, *see Bruen*, 142 S. Ct. at 2131, and therefore plaintiffs' reliance on the inherent relationship between a child and their school is misplaced.

---

[2] Plaintiffs' theory also ignores the fact that, by coupling together "government buildings and schools," the Supreme Court was signaling that the scope of the restrictions that could be applied to these two locations would not only be identical, but grounded in similar doctrinal underpinnings. *See Donovan v. Anheuser-Busch, Inc.*, 666 F.2d 315, 327 (8th Cir. 1981) ("The phrase 'such as' is not a phrase of strict limitation, but is a phrase of general similitude indicating that there are includable other matters of the same kind which are not specifically enumerated by the standard.").

In any event, no court has adopted plaintiffs' novel reading of *Bruen*. Instead, courts that have addressed the issue have, in line with *Bruen*'s express command, consistently concluded that firearms restrictions at schools (and not just for students) are constitutional. *See, e.g.*, *Kovacic v. Cuyahoga County Dep't of Children and Family Services*, 724 F.3d 687, 707-08 (6th Cir. 2013) (noting that "[t]he Second Amendment protects a right to carry guns, . . . but not in school zones"). And, in contrast to the otherwise broad scope of their challenge to locational restrictions, it appears that plaintiffs do not even have confidence in their own theory. After all, although Maryland prohibits ordinary law-abiding non-student citizens from carrying firearms in school buildings (public and private), plaintiffs leave these restrictions unchallenged.

5.      Plaintiffs also take issue with the proposition that the government may, when acting in a proprietary capacity, enact firearms restrictions on its property just as any private party may do with regard to a similar endeavor. (ECF 29 at 19-21.) Plaintiffs argue that, when the State *enforces* laws that restrict firearms at particular locations, it is acting in a sovereign capacity rather than a proprietary capacity, and that this therefore sets it apart from private actors. (ECF 29 at 20.) It is true, of course, that the State possesses enforcement powers as a fundamental aspect of its inherent authority as a sovereign. But that authority is independent of the government's ability to express its preference as to the conduct that will be permitted on its own property. Indeed, plaintiffs' challenge extends only to the *manner* in which the State chooses to enforce its statutes and regulations. But such a challenge, even if it had merit, does not implicate the government's underlying ability to place the same restrictions on firearms on its own properties that private actors may do at theirs.

Next, plaintiffs assert that defendants' argument "makes little logical sense" because, if correct, "*Bruen* would not have needed to enumerate the 'relatively few' government-owned-or-operated places where firearms prohibitions might comply with the constitution." (ECF 29 at 20.)  But in that passage, *Bruen* was discussing the "sensitive places" doctrine, which is not the only doctrine under which a government may restrict the carrying of firearms.  As defendants discussed in their motion for summary judgment memorandum, firearms may be restricted at government buildings under either (and sometimes both) of two theories: (1) because they house government officials or administrative services, and thus are "sensitive places," or (2) because the government is acting in its proprietary capacity and chooses, just like any other private property owner, to exclude the carrying of firearms.  (ECF 21-1 at 61.)  Thus, the Court in *Bruen* was not providing an *exclusive* list of the places (governmental or otherwise) where the carrying of firearms could be prohibited, but rather was providing examples of the types of government buildings that would squarely fall within the "sensitive places" doctrine due to the inherent nature of those locations.

6.  Plaintiffs also reiterate the argument that the proper era for determining the meaning of the right to carry publicly is the time of the Founding and not the ratification of the Fourteenth Amendment.  (ECF 29 at 11-13.)  But as many courts have recognized, the public understanding of the right to keep and bear arms during the Reconstruction era is critical to understanding the scope of that right as applied to the States because that is the era when the States acceded to those constitutional limitations through their adoption of the Fourteenth Amendment.  *See, e.g.*, *Maryland Shall Issue, Inc. v. Montgomery County*, __ F. Supp. 3d __, No. 21-1736-TDC, 2023 WL 4373260, at *15 (D. Md. July 6, 2023).  And, despite plaintiffs' assertions, *Bruen* does not hold otherwise.  (ECF 29 at 11-12.)  Rather than resolve the issue,

9

the Court in *Bruen* engaged in an internal dialectic that compared the merits of both positions. The *Bruen* Court recognized that, on one hand, "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*," 142 S. Ct. at 2136 (emphasis in original), thus suggesting that the Reconstruction era was the appropriate timeframe for discerning the scope of the right. And the Court noted that, "[s]trictly speaking, [States] are bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." *Id*. at 2137. But the Court also recognized its prior statements, made in other contexts, that constitutional rights made applicable to the States through the Fourteenth Amendment generally "have the same scope as against the Federal Government," and that the Court has "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id*. at 2137-38. Ultimately, the Court "acknowledge[d]" the "ongoing scholarly debate" and set the issue aside for another day, concluding that it was unnecessary to resolve the issue because, in the Court's view, the public understanding of the right to public carry was the same in 1791 as it was in 1868. *Id*. at 2138.

7. Throughout their brief, plaintiffs rely heavily on a purported "strong Colonial and Founding Era tradition of requiring or expecting law-abiding citizens to carry arms publicly." (ECF 29 at 10.) To support this tradition, plaintiffs rely on statutes mostly from the 1600s and early 1700s that required colonial Americans to carry firearms when they assembled together at religious or other public meetings. (ECF 29 at 10 n.2.) These laws, however, were designed in large part to better facilitate the defense from slave insurrections (or attacks by

Native Americans), not to further an underlying right to bear arms.[3]  For example, although plaintiffs reference a 1770 Georgia law requiring colonists to bring their firearms to "places of public worship," (ECF 29 at 10 n.2), this law applied only to White males, and its express purpose was to preserve the colony from "insurrections," a not-so-coded reference to slave uprisings.  Similarly, a South Carolina statute from 1743 that required colonists to bring their guns to church also laid bare its purpose: so that "the inhabitants of this Province may be the better secured and provided against the insurrections and other wicked attempts of negroes and other slaves."  Act No. 702, reprinted in 7 *Statutes at Large of South Carolina* 417-19 (D.J. McCord ed. 1840).[4]

Plaintiffs have thus failed to show that this purported tradition extended beyond these anachronistic circumstances in which colonists were collectively engaged in defending themselves from threats external to their political community, whether it be slave insurrections or attacks by Native Americans.  Indeed, outside of this context, plaintiffs have not presented any documentary evidence (from any historical era, let alone the Founding or Reconstruction eras) extolling the virtues of having everyone armed at social events or other public gatherings.  But there *is* evidence of a contrary tradition.  As detailed in defendants' memorandum in support of their motion for summary judgment, Reconstruction-era courts found it "little short of ridiculous" that anyone would have the right to carry a handgun into a "peaceable public assembly," *English v. State*, 35 Tex. 473, 478 (1871), and that carrying handguns into public

---

[3] In addition, given that these statutes impose a *duty*, plaintiffs err in using them to support the scope of the Second Amendment *right*.

[4] Available at https://www.carolana.com/SC/Legislators/Documents/The_Statutes_at_Large_of_South_Carolina_Volume_VII_David_J_McCord_1840.pdf

assemblies was "not an appropriate use of them," *Andrews v. State*, 50 Tenn. 165, 182 (1871), and was "an eye-sore to good citizens, offensive to peaceable people, an indication of a want of proper respect for the majesty of the laws, and a marked breach of good manners," *Hill v. State*, 53 Ga. 472, 476 (1874).  These were not outlier opinions.  *See, e.g.*, *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886) ("The mischief to be apprehended from an intoxicated person going abroad with fire-arms upon his person is equally as great as that to be feared from one who goes into an assemblage of persons with one of the prohibited instruments."); *Owens v. State*, 3 Tex. App. 404, 407 (1878) ("Nor does it matter how much or with what good reason I may be in dread of an immediate and pressing attack . . ., the imminence of such danger affords no excuse in my wearing deadly weapons to church, or in a ball-room, or other places mentioned where [an] attack may be made and the lives of innocent people there assembled placed in jeopardy or sacrificed.").

\*   \*   \*

As a final note, despite plaintiffs' complaints throughout their opposition, the State is not seeking to "undermine" *Bruen*, but rather to implement laws that are consistent with its framework.  Given that *Bruen* effectively invalidated an important aspect of Maryland's public carry scheme that had stood for over 50 years, Maryland is entitled to respond with reasonable locational restrictions that navigate and respect the history and tradition of the Second Amendment right to carry.  But this Court should not allow plaintiffs to rewrite that history and tradition so as to improperly render the Constitution a "regulatory straightjacket." *Bruen*, 142 S. Ct. at 2111.

## CONCLUSION

Plaintiffs' motion for summary judgment should be denied, and defendants' motion for summary judgment should be granted in its entirety.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland


/s/ Robert A. Scott
_____
ROBERT A. SCOTT
Federal Bar No. 24613
RYAN R. DIETRICH
Federal Bar No. 27945
JAMES N. LEWIS
Federal Bar No. 30220
Assistant Attorneys General
200 Saint Paul Place
20th Floor
Baltimore, Maryland  21202
rscott@oag.state.md.us
410-576-7005

September 8, 2023                                   Attorneys for Defendants