**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 21-2017**

───────────────

MARYLAND SHALL ISSUE, INC., for itself and its members; ATLANTIC GUNS, INC.; DEBORAH KAY MILLER; SUSAN BRANCATO VIZAS,

        Plaintiffs - Appellants,

and

ANA SLIVEIRA; CHRISTINE BUNCH,

        Plaintiffs,

v.

WES MOORE, in his capacity as Governor of Maryland; WOODROW W. JONES, III, Colonel,

        Defendants - Appellees.

-------------------------------

FIREARMS POLICY COALITION, INC.; FPC ACTION FOUNDATION; INDEPENDENCE INSTITUTE,

        Amici Supporting Appellant.

───────────────

**No. 21-2053**

───────────────

MARYLAND SHALL ISSUE, INC.; ATLANTIC GUNS, INC.; DEBORAH KAY MILLER; SUSAN BRANCATO VIZAS,

        Plaintiffs - Appellees,

and

ANA SLIVEIRA; CHRISTINE BUNCH,

   Plaintiffs,

v.

WES MOORE, in his capacity as Governor of Maryland; WOODROW W. JONES, III, Colonel,

   Defendants - Appellants.

―――――――――

Appeals from the United States District Court for the District of Maryland, at Baltimore. Ellen Lipton Hollander, Senior District Judge.  (1:16-cv-03311-ELH)

―――――――――

Argued:  March 10, 2023         Decided:  November 21, 2023

―――――――――

Before AGEE and RICHARDSON, Circuit Judges, and KEENAN, Senior Circuit Judge.

―――――――――

Reversed by published opinion.  Judge Richardson wrote the opinion, in which Judge Agee joined.  Senior Judge Keenan wrote a dissenting opinion.

―――――――――

**ARGUED:** Marc Alexander Nardone, BRADLEY ARANT BOULT CUMMINGS LLP, Washington, D.C., for Appellants/Cross-Appellees.  Ryan Robert Dietrich, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees/Cross-Appellants. **ON BRIEF:** Cary J. Hansel, III, Baltimore, Maryland; Mark W. Pennak, MARYLAND SHALL ISSUE, INC., Baltimore, Maryland, for Appellants/Cross-Appellees.  John Parker Sweeney, James W. Porter, III, Connor M. Blair, BRADLEY ARANT BOULT CUMMINGS LLP, Washington, D.C., for Appellant/Cross-Appellee Atlantic Guns, Inc.  Brian E. Frosh, Attorney General, Robert A. Scott, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees/Cross-Appellants.   David B. Kopel, INDEPENDENCE INSTITUTE, Denver, Colorado; Joseph G.S. Greenlee, FPC ACTION FOUNDATION, Las Vegas, Nevada, for Amici Curiae.

RICHARDSON, Circuit Judge:

If you live in Maryland and you want a handgun, you must follow a long and winding path to get one.  Like with any firearms transfer—whether a purchase from a licensed dealer, gun show, or private person, or even a gift from a family member or friend—you must comply with Maryland's 77R registration process, which requires you to fill out an application with certain identifying information and then wait seven days while the state performs a background check.  *See* Md. Code, Pub. Safety §§ 5-117, 118–130.  And if you want to carry your handgun, you need to get a separate carry permit too. *See* §§ 5-301–314.

But—for handguns specifically—before you do any of that, there is an additional, preliminary step:  You must also obtain a "handgun qualification license."  *See* § 5-117.1. Getting that license requires, among other things, submitting fingerprints to undergo a background "investigation" and taking a four-hour-long "firearms safety training course" in which you must fire at least one live round.  Then, after submitting your application for this extra license, you must wait up to thirty days for approval before you can start the rest of the process.

Plaintiffs seek to enjoin the state from enforcing only this additional, preliminary handgun-licensure requirement.  And Plaintiffs' challenge must succeed.  The challenged law restricts the ability of law-abiding adult citizens to possess handguns, and the state has not presented a historical analogue that justifies its restriction; indeed, it has seemingly admitted that it couldn't find one.  Under the Supreme Court's new burden-shifting test for

these claims, Maryland's law thus fails, and we must enjoin its enforcement.  So we reverse the district court's contrary decision.

## I.    Background

Plaintiffs first brought their Second Amendment challenge to Maryland's handgun-licensure law in 2016.[1]  [J.A. 1.]  The district court originally dismissed that challenge for lack of Article III standing, but we reversed and remanded for a decision on the merits. *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 210 (4th Cir. 2020).  On remand, the district court again rejected Plaintiffs' claims, this time holding that Maryland's handgun-licensure law did not violate the Second Amendment.[2]  So Plaintiffs appealed once more, finally presenting us with the merits of their constitutional claims.

The law at issue—which the parties call the handgun-qualification-license requirement—originated as one component of Maryland's Firearm Safety Act of 2013 and is now found at § 5-117.1 of the Maryland Public Safety Code.  Section 117.1(b) says that

---

[1] There are three groups of plaintiffs: Maryland Shall Issue, Inc., a nonprofit-gun-rights membership organization; two individual plaintiffs, Ana Sliveira and Christine Bunch, each of whom claims that she would like to own a handgun but has been deterred from doing so by Maryland's law; and Atlantic Guns, Inc., a gun store alleging that its customers have been similarly deterred and that it thus has been unable to sell as many guns.  The suit also originally included two other individual plaintiffs, Deborah Kay Miller and Susan Brancato Vizas, who are not parties to this appeal.  We will refer to the remaining individual plaintiffs collectively as "Plaintiffs."

[2] Through all these decisions, the Governor of Maryland—one of the parties whom Plaintiffs sought to enjoin from enforcing the challenged law—was Lawrence ("Larry") Hogan.  Now, Maryland's governor is Wes Moore.  Plaintiffs also sued to enjoin the Secretary and Superintendent of the Maryland State Police, who was then William M. Pallozzi, but is now Woodrow W. Jones, III.  For simplicity, we refer to defendants as "the state" or "Maryland."

no one may "sell, rent, or transfer a handgun" unless the recipient "presents . . . a valid handgun qualification license."   And § 117.1(c) likewise says that "[a] person may purchase, rent, or receive a handgun only if the person . . . possesses a valid handgun qualification license."   So, in simple terms, the challenged law imposes criminal liability on *both parties* to a handgun transaction (sale, rental, or gift), unless the recipient has the required license.   *See* § 5-117.1(b), (c); *see also* § 5-144(a)(1) (criminalizing knowing participation in the receipt of a regulated firearm in violation of § 5-117.1).

The law then defines how someone gets such a handgun-qualification license.   There are four requirements:   The applicant must be "at least 21 years old," he must be "a resident of the State," he must complete a "firearms safety training course,"[3] and he must undergo an "investigation"—*i.e.*, a background check—to show that he "is not prohibited by federal

---

[3] The course must be taught by a "qualified handgun instructor" and be at least four hours long.   § 5-117.1(d)(3)(i).   It must involve "classroom instruction" on firearms laws and firearms safety, § 5-117.1(d)(3)(ii), and "a firearms orientation component that demonstrates the person's safe operation and handling of a firearm," § 5-117.1(d)(3)(iii).   Regulations further require the orientation to include "a practice component in which the applicant safely fires at least one round of live ammunition."   Md. Code Regs. 29.03.01.29(C)(4).   The applicant bears the cost of the firearms safety training course as well as any range fees for the live-fire requirement.   Notably, these costs are not established by statute or regulation but by the private entities that administer the firearms safety training and, according to the record, can range "anywhere from $50 to in the several hundred dollars." J.A. 973; *see also* J.A. 961–62.

Certain people, including former members of the military and armored-car company employees, are exempt from the training-course requirement.   § 5-117.1(e).   And current and retired law enforcement officers are exempt from the entire statute.   § 5-117.1(a)(2).

or State law from purchasing or possessing a handgun."[4]  § 5-117.1(d).  If an applicant meets these four requirements, properly fills out an application, and pays the required $50 fee, then the Secretary of State Police "shall issue" him a handgun-qualification license within thirty days.  § 5-117.1(d), (g), (h).

Plaintiffs argue that this scheme violates the Second Amendment.  The district court disagreed, holding that it passed intermediate scrutiny.  But, after the district court's decision, the Supreme Court decided *New York State Rifle and Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022).

*Bruen* effected a sea change in Second Amendment law.  Before *Bruen*, the Courts of Appeals—including our own—used a two-step interest-balancing framework in analyzing firearm regulations.  *See Bruen*, 142 S. Ct. at 2125–26; *United States v. Chester*, 628 F.3d 673, 680–83 (4th Cir. 2010).  We first asked whether a challenged regulation burdened conduct protected by the Second Amendment.  *Bruen*, 142 S. Ct. at 2126; *Chester*, 628 F.3d at 680.  If it did, then we would assess the regulation's constitutionality using means-end scrutiny.  *Bruen*, 142 S. Ct. at 2126; *Chester*, 628 F.3d at 680.

Yet the Supreme Court held in *Bruen* that this approach was "one step too many." 142 S. Ct. at 2127.  In its place, the Court supplied an analysis centered on the Second Amendment's text and history.  *Id.* at 2126–30.  The Court explained that "when the Second

---

[4] To complete the background check, the state police submit to the Department of Public Safety and Correctional Services "a complete set of the applicant's legible fingerprints."  § 5-117.1(f)(3)(i).  The state police require applicants to submit their fingerprints with their application.  Md. Code Regs. 29.03.01.28(B)(3).  As with the firearms-safety-training course, the applicant bears the cost and burden of obtaining the fingerprints, which, according to the record, can cost $50 or more.  *See* J.A. 967–70.

Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."   *Id.* at 2126.   At that point, the challenged regulation is unconstitutional unless the government can show that "the regulation is consistent with this Nation's historical tradition of firearm regulation."   *Id.*   Only then "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"   *Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

*Bruen* applied this framework to invalidate New York's "may issue" licensing scheme for the concealed carry of handguns.   *Id.* at 2122, 2134–56.   It concluded that the proposed conduct at issue there, carrying handguns in public for self-defense, was presumptively protected by the Second Amendment because the petitioners were "law-abiding, adult citizens" and handguns are "weapons 'in common use' today for self-defense."   *Id.* at 2134 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)). The Court then examined the historical record assembled by the government and concluded that it had not met its burden to establish a historical tradition "of broadly prohibiting the public carry of commonly used firearms for self-defense."   *Id.* at 2138.

Thus, Plaintiffs' suit requires us to answer:   Does Maryland's law satisfy *Bruen*'s two-part test?

## II.   Discussion

Maryland's law fails the new *Bruen* test.   As we will explain, Plaintiffs have shown that Maryland's handgun-licensure law regulates a course of conduct protected by the

Second Amendment, and Maryland has not established that the law is consistent with our Nation's historical tradition.

## A.    Maryland's law restricts Second Amendment conduct

The first question *Bruen* asks is whether Plaintiffs' proposed course of conduct is protected by the Second Amendment's plain text.  *See* 142 S. Ct. at 2126.  The text's "operative clause," *see Heller*, 554 U.S. at 577–95, provides that "the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  To meet their burden at this stage, Plaintiffs must prove two things:  (1) that "they are among 'the people' entitled to the right," and (2) that their proposed "course of conduct" is covered by the Second Amendment's plain text, namely "keeping and bearing arms."  *Bruen*, 142 S. Ct. at 2134.

At first blush, the answer to this initial question seems obvious.  Here, Plaintiffs alleged that they are adult citizens who are legally eligible to own firearms.  *See* J.A. 22–24 (noting that the plaintiffs "could lawfully purchase and own a handgun" absent the challenged law).  So they fall within the Amendment's definition of "the people."  *See Bruen*, 142 S. Ct. at 2134 (noting that "'the people' whom the Second Amendment protects" includes, at a minimum, "ordinary, law-abiding, adult citizens").[5]  And Plaintiffs here say that they seek to own firearms for "lawful purposes," J.A. 22–24, a point that

---

[5] This is not necessarily to say that "the people" is limited to "ordinary, law-abiding, adult citizens."  Post-*Bruen*, several courts have held that "the people" refers to all Americans, and is not limited to ordinary, law-abiding adult citizens.  *See, e.g.*, *United States v. Silvers*, No. 5:18-cr-50-BJB, 2023 WL 3232605, at *5–6 (W.D. Ky. May 3, 2023).  We need not decide the precise scope of "the people" to resolve this case, for Maryland does not dispute that Plaintiffs are part of "the people."

Maryland does not contest.  Indeed, though the Amendment's plain text "extends, prima facie, to all instruments that constitute bearable arms," *Caetano v. Massachusetts*, 577 U.S. 411, 411 (2016), the Supreme Court has held that the specific weapons here—handguns—are protected "arms."  *See Heller*, 554 U.S. at 629.  So there appears to be little room for debate on this score.

Yet there are a few wrinkles to iron out.  To start, you might note that the Amendment's text protects only the right to "keep and bear" arms.  U.S. Const. amend. II.  But, on its face, the challenged law says nothing about whether Plaintiffs may "keep" or "bear" handguns.  It only restricts Plaintiffs' ability to "purchase, rent, or receive" them. § 5-117.1(c).  How, then, does the law regulate the right to keep and bear arms?

The answer is not complicated.  If you do not *already* own a handgun, then the only way to "keep" or "bear" one is to get one, either through sale, rental, or gift.  And the challenged law cuts off all three avenues—at least, for those who do not comply with its terms.

That brings us to the next wrinkle:  The challenged law does not *permanently* prohibit Plaintiffs from acquiring or carrying handguns.  *Contra Heller*, 554 U.S. at 573–75; *Bruen*, 142 S. Ct. at 2122–24.  Instead, it imposes certain requirements that they must meet before they can obtain a handgun.  And those requirements rely on "objective" criteria, *see Bruen*, 142 S. Ct. at 2138 n.9, which Plaintiffs admit that they can satisfy.

Once they do so, the law commands that the state "shall issue" them handgun-qualification licenses.  § 5-117.1(d).[6]

But even though Maryland's law does not prohibit Plaintiffs from owning handguns at some time in the future, it still prohibits them from owning handguns *now*.  In order to get a handgun, Plaintiffs still have to follow all of the law's steps.  And, although they will be able to complete each one, it is impossible to do so right away.  Plaintiffs can't receive a license to legally acquire a handgun until the state reviews their applications, which can take up to thirty days.[7]  *See* § 117.1(g), (h)(1).  So, no matter what Plaintiffs do, there will be a period of up to thirty days where their ability to get a handgun is completely out of their control.  In other words, though it does not permanently bar Plaintiffs from owning handguns, the challenged law deprives them of that ability until their application is approved, no matter what they do.

---

[6] As a shall-issue law, Maryland's handgun-qualification license is unlike the "may issue" licensure regime in *Bruen*, which afforded government officials substantial "discretion to deny licenses" if the applicant had not shown a "special need" for them.  142 S. Ct. at 2122–24.  Maryland did impose a may-issue regime for its handgun-*carry* license.  *See* § 5-306(a)(6)(ii).  But this type of law is precisely what *Bruen* rejected.  *See* 142 S. Ct. at 2124 n.2.  So, after *Bruen*, Maryland courts have declined to enforce the carry-licensure law's discretionary component as unconstitutional.  *See In re Rounds*, 279 A.3d 1048, 1052 (Md. Ct. Spec. App. 2022).

[7] That thirty days doesn't count the time needed to obtain and complete the application, to complete the instructional course and live-fire requirement, and to obtain the approved set of fingerprints that the handgun-qualification-license law requires.  Nor does it count the time that it would take to comply with Maryland's separate 77R registration process, which is required before every firearms transfer.  *See* § 5-117.  That separate registration process demands that Plaintiffs submit certain identifying information to the state and then wait up to an additional seven days while the state conducts a background check before they can finally purchase a handgun.  *See* §§ 5-118–130.

Our question at *Bruen*'s first step is simply whether Plaintiffs have made a prima facie case that the challenged law violates the Second Amendment.  So they just need to show that the law regulates a course of conduct that falls within the Amendment's plain text, *i.e.*, their ability "to possess and carry weapons in case of confrontation."  *Heller*, 554 U.S. at 592.  Nothing in the Amendment's text or *Bruen* says that it protects only against laws that *permanently* deprive people of the ability to keep and bear arms.[8]  *Cf. Bruen*, 142

---

[8] The dissent thinks differently.  According to the dissent, "a regulation is covered" by the Second Amendment "only if an individual can show that the regulation has 'infringed'" his "Second Amendment right to keep or right to bear arms."  Diss. Op. at 30.  And that right is only infringed, on the dissent's view, if the government wholly or effectively bans that individual from possessing or carrying firearms.  *See* Diss. Op. at 30, 36 n.9.  So at *Bruen*'s first step, the dissent would have us (or, more particularly, the district court) engage in a "fact-intensive" inquiry to determine whether a regulation sufficiently burdens Plaintiffs' right to keep and bear arms.  Diss. Op. at 34-38.  If it does not, then the government need not justify its regulation based on history and tradition.

But this stilted construction of the word "infringed" lacks grounding in original meaning, history, and *Bruen* itself.  The dissent cherry-picks dictionary definitions, yet those same dictionaries define "infringe" to contemplate burdens that fall short of total deprivations.  *Compare* Samuel Johnson, 1 Dictionary of the English Language 1101 (4th ed. 1773) ("Johnson") (defining "infringe" as "[t]o destroy; to *hinder*" (emphasis added)), *and* Noah Webster, American Dictionary of the English Language (1828) ("Webster") (defining "infringe" as "[t]o destroy or *hinder*" (emphasis added)), *with* Johnson at 1007 (defining "to hinder" as "to cause impediment"), *and* Webster (defining "hinder" as "to obstruct for a time" and "[t]o interpose obstacles or impediments").  So too do other sources that the Supreme Court has used to interpret the right.  *See* 1 St. George Tucker, Blackstone's Commentaries 143 n.40 (1803) ("The right of the people to keep and bear arms shall not be infringed . . . *and this without any qualification as to their condition or degree . . . .*" (emphasis added)); *Nunn v. State*, 1 Ga. 243, 251 (1846) ("The right of the whole people . . . to keep and bear *arms* . . . shall not be *infringed*, curtailed, or broken in upon, *in the smallest degree*."  (third emphasis added)); *see also Heller*, 554 U.S. at 594–95, 612 (relying on Tucker and *Nunn* to interpret the Second Amendment).  Moreover, nineteenth century state courts traditionally entertained Second Amendment challenges even to laws that merely regulated, rather than completely destroyed, the right.  *See, e.g.*, *State v. Reid*, 1 Ala. 612, 616 (1840) (upholding a law prohibiting bodies of men from parading with firearms because it was a reasonable regulation and analogous to laws (Continued)

11

S. Ct. at 2134 ("Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms.").  Yet, under the challenged scheme, an applicant without a firearm cannot possess or carry one until they are approved—a process that can take thirty days.  And the law's waiting period could well be the critical time in which the applicant expects to face danger.  So the temporary deprivation that Plaintiffs allege is a facially plausible Second Amendment violation.[9]

---

prohibiting the carrying of concealed weapons); *see also* William Baude & Robert Leider, *The General Law Right to Bear Arms*, 99 Notre Dame L. Rev. (forthcoming 2024) (manuscript at 18) (explaining that state courts considered challenges to laws regulating the right, even when those laws did not totally abridge the right).  Finally, *Bruen* itself contemplated suits over laws that impose burdens that fall short of total bans.  142 S. Ct. at 2133 (explaining how courts should approach challenges to designated sensitive places).

   None of this means that we require no nexus between a law and a proposed course of conduct.  *Bruen* seems to require that a law is a "regulation" of protected conduct, which entails some burden on or hindrance to its exercise.  *See* 142 S. Ct. at 2126.  We need not and do not now decide where to draw this line.  All we need to decide today is that Second Amendment scrutiny is not exclusively reserved for laws that wholly or effectively prohibit firearm possession.  If a law regulates an individual's conduct, and his conduct falls within the scope of the Second Amendment, then that law must be justified by resort to history and tradition.  And in this case, Maryland's law clearly regulates Plaintiffs' right to keep and bear arms.

   [9] Maryland and the dissent make much of *Bruen*'s Footnote Nine.  But that footnote does not bless Maryland's law.  While the footnote preemptively threw cold water on any "shall issue" regimes "put towards abusive ends" such as those that result in "lengthy wait times" or "exorbitant fees," it did not say those were the *only* types of unconstitutional "shall issue" regimes.  In other words, the Court suggested that the Second Amendment barred—at a minimum—certain "shall issue" schemes; but it did not say whether that floor was also a ceiling.

   Plaintiffs now ask us to answer that open question.  In doing so, it would be poor judicial practice to "read a footnote" in a Supreme Court case to "establish the general rule" for that case.  *United States ex rel. Schutte v. SuperValu Inc.*, 143 S. Ct. 1391, 1403 n.6 (2023).  *Bruen* was not shy about telling lower courts how to handle Second Amendment challenges:  We turn to the Amendment's "text," "informed by history," and by "the historical tradition that delimits the outer bounds of the right."  *Bruen*, 142 S. Ct. at 2127. (Continued)

Accordingly, Maryland's law regulates conduct that falls within the Second Amendment's plain text.  Plaintiffs' challenge thus satisfies the first step of *Bruen*'s test, and we must proceed to the second step:  Has Maryland shown that its law is justified by history and tradition?

_____

So if we have to choose between the outcome dictated by text, history, and tradition and the outcome hinted at in dicta, it is no contest:  Text, history, and tradition wins every time.

And even if we were to piece together a directive, it would have little bearing on the regulation before us.  As an initial matter, the dissent mistakenly reads this footnote as pertaining to *Bruen*'s first, rather than its second, step.  *See* Diss. Op. at 34–38.  This is not the case.  Footnote Nine is appended to a sentence explaining that there is no historical support for preventing law-abiding citizens from publicly carrying weapons simply because they cannot show a special need—a step two inquiry.  *Bruen*, 142 S. Ct. at 2138.  The footnote then explains that shall-issue regimes are different because, unlike may-issue regimes, they do not "necessarily prevent" law-abiding citizens from exercising Second Amendment rights.  *Id.* at 2138 n.9.  So the Court here was comparing the burdens may- and shall-issue regimes impose for purposes of identifying historical analogues to justify them, *not* to explain when the Second Amendment is triggered in the first place.  *See id.* at 2133 ("[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." (emphasis in original) (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010))).  In other words, the Court was simply clarifying that the mere fact that may-issue regimes fail the history test does not mean that most shall-issue regimes automatically fail that test too.  This is but an invitation for courts to examine these laws against the historical record at step two, which is precisely what we do here.

And even if we stretch the Court's language to actually bless most shall-issue *public carry* regimes, this says little about shall-issue regimes that limit *handgun possession altogether*.  A restriction on whether someone can even possess a firearm in or out of the home is more burdensome than one that only limits his right to carry that firearm publicly.  *See Heller*, 554 U.S. at 628 ("the home" is "where the need for defense of self, family, and property is most acute").  *Bruen* tells us that the relative burden a law imposes is "central" to step two's analogical reasoning.  *See* 142 S. Ct. at 2133 (quoting *McDonald*, 561 U.S. at 767).  So even if *Bruen* green-lighted similar but *less burdensome* restrictions, like some shall-issue *carry* regimes, we are still obligated to independently compare *more burdensome* restrictions, like shall-issue *possession* regimes, against the historical record.

**B.**   **Maryland has not shown that "history and tradition" justify such a restriction**

Maryland has not met its burden.  At *Bruen*'s second step, Maryland must provide historical evidence that justifies its law.  To do this, it may identify a "historical analogue" demonstrating that its law falls within a historically recognized exception to the right to keep and bear arms.  *See Bruen*, 142 S. Ct. at 2132–33.  But the two historical examples that Maryland cites are not "relevantly similar" to the challenged law.  *Id.* at 2132.  And it has offered no other historical evidence to justify its law.  Indeed, Maryland admitted at oral argument that it had not presented a proper historical analogue for the challenged law, noting that it had identified no Founding-era laws that "required advance permission" before a citizen could purchase a firearm.  Oral Arg. at 23:05 – 23:29; *see also* Oral Arg. at 31:22 – 31:35.

**1.**   **A historical tradition of prohibiting "dangerous" people from owning firearms does not justify Maryland's law**

Maryland's historical evidence is scant at best.  It first asserts that its law is justified by the "historical limitations" on the ability of "dangerous" people to own firearms.  *See* Appellee's Br. at 32–33.  But Maryland points to no historical laws for support.  Instead, it cites various provisions of the modern U.S. Code that prohibit certain categories of people—including felons, *see* 18 U.S.C. § 922(g)(1), those addicted to a controlled substance, *see* § 922(g)(3), and those convicted of a domestic violence misdemeanor, *see* § 922(g)(9)—from owning firearms.  *See* Appellee's Br. at 32–33.  Maryland simply assumes that those federal prohibitions are justified by a historical "dangerousness" exception; and because, Maryland says, the challenged law is ostensibly designed to

prevent those same groups of people from acquiring handguns, it also falls within the same "dangerousness" exception.

Though Maryland has not mustered independent historical support for a "dangerousness" exception, other judges have thoroughly canvassed the historical record. *See, e.g.*, *Kanter v. Barr*, 919 F.3d 437, 453–64 (7th Cir. 2019) (Barrett, J., dissenting); *Folajtar v. Att'y Gen.*, 980 F.3d 897, 913–20 (3d Cir. 2020) (Bibas, J., dissenting). And they tend to agree that history and tradition support an exception affording legislatures "the power to prohibit dangerous people from possessing guns." *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting); *see also Foljatar*, 980 F.3d at 912 (Bibas, J., dissenting). But even if the modern federal prohibitions that Maryland cites are all constitutional—because they fit within a historical tradition allowing states to prohibit "dangerous" people from owning firearms[10]—that says nothing about Maryland's law. That is because its law is not "relevantly similar" to the laws allegedly comprising that tradition.

*Bruen* is clear that a historical analogue only justifies a modern law if the two are "relevantly similar." 142 S. Ct. at 2132. The "metrics" that we use to decide whether two laws are "relevantly similar" are (1) "how" and (2) "why the regulations burden a law-abiding citizen's right." *Id.* at 2133. In other words, we ask (1) "whether modern and

---

[10] Even among judges who accept a historically grounded "dangerousness" exception, there is less agreement that these modern U.S. Code provisions fit within it. *Compare, e.g.*, *Range v. Att'y Gen.*, 69 F.4th 96, 106 (3d Cir. 2023) (en banc) (holding that § 922(g)(1) violates the Second Amendment, as applied to a particular nonviolent felon), *with United States v. Jackson*, 69 F.4th 495, 502 (8th Cir. 2023) (concluding "that there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)" under the Second Amendment).

historical regulations impose a comparable burden on the right," and (2) "whether that burden is comparably justified." *Id.*

Here, Maryland suggests that the justification may well be the same: prevent dangerous people from getting weapons. But the burden is markedly different. The historical "dangerousness" laws targeted people already deemed dangerous by the state and subjected them to penalties if they possessed firearms. *See Folajtar*, 980 F.3d at 914 (Bibas, J., dissenting). Maryland's law operates through an entirely different mechanism. It does not merely identify a dangerous group of people and prohibit them from acquiring handguns; other statutes already occupy that field. *See, e.g.*, Md. Code, Pub. Safety § 5-133. Instead, it prohibits *all* people from acquiring handguns until they can *prove* that they are not dangerous. So Maryland's law burdens all people—even if only temporarily—rather than just a class of people whom the state has already deemed presumptively dangerous.

The point is that different mechanisms often impose different burdens. And courts must consider the mechanism that the challenged law chooses to carry out its goal when evaluating whether it is "relevantly similar" to a historical law. *Cf. United States v. Silvers*, No. 5:18-cr-50-BJB, 2023 WL 3232605, at *14 (W.D. Ky. May 3, 2023) (noting that the asserted historical analogues "acted through similar mechanisms" as the challenged law); *Bruen*, 142 S. Ct. at 2131 ("[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century. . . [and] earlier generations addressed the societal problem . . . through materially different means, that [ ] could be evidence that a modern regulation is unconstitutional.").

16

The modern federal laws that Maryland has cited, and the historical laws allegedly supporting a tradition of prohibiting dangerous people from owning firearms, all acted through one mechanism:  punishing certain classes of supposedly "dangerous" people if they don't give up their arms or prove they are not dangerous.  *See Silvers*, 2023 WL 3232605, at *11–12 (discussing historical laws).  But that is a different mechanism than making *every* person seek the government's permission *before* they can even acquire arms.  Preemptively disarming *every* person until they can each prove that they are not dangerous burdens a far broader swath of people.

It is not our place, as a court, to judge a law's wisdom or weigh competing policy values.  After all, "[t]he Second Amendment is the very *product* of an interest balancing by the people."  *Bruen*, 142 S. Ct. at 2131 (cleaned up).  If they disapprove, then the people can draw a different balance using Article V's amendment process.  But, under the Second Amendment's current balance, Maryland's law cannot survive.  Even assuming a historical tradition of prohibiting "dangerous" people from owning firearms, Maryland chose a different mechanism, and thus imposed different burdens, from the historical analogues that it asserts.

### 2.    A historical tradition of requiring militia training does not justify Maryland's law

Maryland's second argument is that its law is justified by a historical tradition of laws requiring training for members of the militia.  For support, Maryland cites Founding-era state and federal militia laws.  *See* Appellee's Br. at 34–37.  But its argument is without merit, as these Founding-era laws placed no restrictions on acquiring or owning firearms.

17

Militia-training laws did not burden a Second Amendment right at all, and so they cannot be "relevantly similar" to Maryland's law.

Many colonies and early states required—with some exceptions—that all able-bodied men of a certain age participate in the militia. *See Hirschfeld v. ATF*, 5 F.4th 407, 428–30 (4th Cir. 2021) (discussing these militia laws), *vacated as moot by* 14 F.4th 322 (4th Cir. 2021). And they generally required members of the militia to provide their own weapons and show up for regular training. *See Hirschfeld*, 5 F.4th at 428–29 n.28. But these militia laws *never* conditioned keeping or bearing arms on participation in militia training.

Accordingly, these militia-training laws imposed no burden on the right of keeping and bearing arms. Instead, the service burden that these laws imposed was divorced from gun ownership. You could not get out of training just by ditching your weapon. (Indeed, that would open you up to even more sanctions.) And just because you owned a weapon did not mean that you had to train. If you were a woman or older man who owned arms, for instance, there was no need to appear on the parade grounds. You only had to train if you were in the militia. In other words: These laws imposed a service obligation on militiamen, not gun owners. That obligation applied regardless of whether you owned a weapon. So *none* of these militia laws placed *any* restriction on gun ownership.

Consider, for example, New Jersey, which in 1778 passed a law requiring members of the militia to "assemble, properly armed and accoutred, twice in the Year, at such Times and Place or Places as the Field-Officers, or a Majority of them, shall direct for the Purpose of Training and Exercise." 1778 N.J. Sess. Laws 42, 46 § 15. And "in case of Absence"

18

from the training, the law imposed a monetary penalty based on rank. *Id.* New Jersey's law likewise imposed a monetary penalty on militia members who failed to acquire the proper arms and ammunition. *See id.* at 45 §§ 11 & 12.

Another example is Delaware, which passed a similar militia-training law in 1782. That law provided that the militia "shall be duly exercised and instructed once in every Month," 1782 Del. Sess. Laws 1, 3 § 5, and required its members to bring their own firearms. *Id.* § 6. Like New Jersey, Delaware imposed monetary penalties on any militiaman failing to keep his arms "by him at all Times, ready and fit for Service," *id.*, and who "shall neglect or refuse to appear on the Parade . . . not having reasonable excuse." *Id.* at 4 § 7. In summary, these laws sanctioned militia members both for failing to show up for training and for failing to bring their own arms. You could not evade those sanctions if you didn't have a weapon. And just because you had one didn't necessarily subject you to them.

Thus, these militia-training laws are not a valid historical analogue justifying Maryland's law. Militia-training laws imposed no burden on the right to keep and bear arms. They did not condition possessing and carrying arms on attending militia training. Nor did they limit in any way an individual's ability to acquire a firearm. These laws placed service burdens on being in the militia, not on being a gun owner. And, because they imposed a different burden, the militia-training laws are not "relevantly similar" to Maryland's law. *See Bruen*, 142 S. Ct. at 2133.

Maryland has identified no other traditions that could serve as a historical analogue, nor has it presented any other evidence that the challenged law "is consistent with this

19

Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.  So it has

not met its burden under *Bruen*, and its law cannot survive Plaintiffs' Second Amendment

challenge.[11]

*            *            *

In Maryland, if you are a law-abiding person who wants a handgun, you must wait

up to thirty days for the state to give you its blessing.  Until then, there is nothing you can

do; the issue is out of your control.  Maryland has not shown that this regime is consistent

with our Nation's historical tradition of firearm regulation.  There might well be a tradition

of prohibiting dangerous people from owning firearms.  But, under the Second

Amendment, mechanism matters.  And Maryland has not pointed to any historical laws

that operated by preemptively depriving *all* citizens of firearms to keep them out of

---

[11] The dissent chastises us for declining to remand this case to the district court to reconsider its decision in light of *Bruen*.  But there is no reason to do so here.  To start, Maryland did not ask for a remand, and did not even address the possibility until specifically asked about it at oral argument.  *See* Oral Arg. at 17:49 – 18:42.  While remand often makes sense when additional facts are needed, *cf. Humphrey v. Humphrey*, 434 F.3d 243, 248 (4th Cir. 2006) (noting that remand is appropriate when the record permits more than one resolution of a factual issue), those kinds of factual questions are not at issue here.  *See* Oral Arg. at 19:06 – 19:30 & 37:30 – 38:23.  Similarly, though a remand might be appropriate to determine whether a statute were severable, Maryland disavowed a severability argument.  *See* Oral Arg. at 25:13 – 25:27 & 26:52–27:00.  The dissent claims that Maryland only did so because it thought the law was completely constitutional, but this is just another way of saying that the state put all its eggs in one basket—and lost.  Whether by disavowal or failure to argue, the government abandons an argument by failing to raise it on appeal.  And we will not give the state yet another chance to identify more historical analogues, especially when it has explicitly declined to ask us for it.  "Courts are [ ] entitled to decide a case based on the historical record compiled by the parties." *Bruen*, 142 S. Ct. at 2130 n.6.  The parties fully briefed the issue of historical analogues.  We will not return the parties to the district court just to push more paper around.  *Cf. id.* at 2135 n.8.

dangerous hands.  Plaintiffs' challenge thus must succeed, and the district court's contrary

decision must be

*REVERSED.*

BARBARA MILANO KEENAN, Senior Circuit Judge, dissenting:

In this facial constitutional challenge to a non-discretionary handgun permitting law, the majority fundamentally misapplies *Bruen*.[1]  The majority bases its holding on the premise that if a law affects a prospective handgun purchaser's ability to obtain a handgun "*now*," the law is presumptively unconstitutional.  This sweeping rule flies directly in the face of *Bruen's* discussion of non-discretionary "shall-issue" laws and is not supported by any Supreme Court precedent.  Simply stated, the majority's hyperaggressive view of the Second Amendment would render presumptively unconstitutional most non-discretionary laws in this country requiring a permit to purchase a handgun (permitting laws).

In defending this result, the majority attempts to pound a square peg into a round hole by treating the non-discretionary "shall-issue" law before us no differently than a discretionary "may-issue" law.  This pounding maneuver fails to account for the material differences between "may-issue" and "shall-issue" laws, distinctions that the Supreme Court warned in *Bruen* would require additional consideration in determining the constitutionality of shall-issue regimes.  By failing to incorporate into the *Bruen* framework these analytical distinctions, my colleagues reach the very result the Supreme Court cautioned against in *Bruen*, namely, casting aside a shall-issue permitting law because the statute results in some delay to a prospective buyer who wishes to purchase a handgun.

In reaching its conclusion, the majority also rushes to final judgment, bypassing the district court's fundamental role of weighing the evidence in this mixed question of law

---

[1] *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

and fact.  And, doubling down on this lack of judicial restraint, the majority strikes down an entire statute without even a passing reference to the *presumption* of severability afforded to the statute under Maryland law.  I respectfully dissent.

I.

There are at least two reasons to remand this case to the district court for application of *Bruen*.  First, *Bruen* was decided in 2022, almost one year after the district court's decision.  Lacking the benefit of this decision, the district court used the then-applicable analytical framework ultimately rejected in *Bruen*.  Moreover, in *Bruen*, the Supreme Court cautioned that shall-issue laws like the one before us fall within a category of laws analytically and factually distinct from the may-issue New York law reviewed there.  142 S. Ct. at 2138 n.9.  As a result, the district court should be required to conduct a newly tailored evidentiary inquiry and an analysis extending well beyond the bare-bones framework used by the majority.

Second, Maryland law instructs that the statute requiring the handgun qualification license (the HQL requirement) enjoys a presumption of severability, so any unconstitutional provision in one part of that statute would not necessarily affect the validity of its remaining portions.  Md. Code, Gen. Prov. § 1-210.  The district court is better situated than this Court to undertake the severability analysis in the first instance.

A.

At issue here is the facial constitutionality of a Maryland law, duly enacted by the Maryland General Assembly, that allows any law-abiding, responsible person to obtain the

23

handgun qualification license required by the state.  Md. Code, Pub. Safety § 5-117.1.[2]  In the district court, the plaintiffs argued that the HQL requirement violates the Second Amendment.[3]  Faithfully applying our then-binding precedent in *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc), the district court (1) considered whether the HQL requirement imposed a burden on conduct falling within the scope of the Second Amendment and, after concluding that it did, (2) analyzed whether the government had shown that the HQL requirement was "reasonably adapted to a substantial governmental interest," as required to satisfy the intermediate scrutiny standard of review.  *See Kolbe*, 849 F.3d at 133 (citation omitted).  In a thorough and well-reasoned opinion in August 2021 applying this standard to the parties' cross-motions for summary judgment, the district court held that the HQL requirement was constitutional.

In June 2022, however, the Supreme Court in *Bruen* articulated a new analytical framework for consideration of Second Amendment challenges.  There, the Court addressed a Second Amendment challenge to a century-old New York state statute known as the "Sullivan Law."  142 S. Ct. at 2122.  Under that "public carry" law, any law-abiding, responsible person who sought a license to carry a firearm outside of his home or place of business for self-defense had to prove first that "proper cause exist[ed]" to issue the license.

---

[2] This provision was not affected by the Maryland General Assembly's recent amendments to other firearms laws.  *See* 2023 Md. Laws Ch. 651 (H.B. No. 824) (effective Oct. 1, 2023).

[3] The Second Amendment is made applicable to the states through the Fourteenth Amendment.  *See McDonald v. Chicago*, 561 U.S. 742, 791 (2010).  For consistency with the district court opinion and the majority opinion, I refer only to the Second Amendment in this dissenting opinion.

*Id.* at 2122–23.  Although "proper cause" was not defined by the statute, New York courts had interpreted the phrase as requiring "a special need for self-protection distinguishable from that of the general community."  *Id.* at 2123 (quoting *In re Klenosky*, 75 A.D.2d 793, 793 (N.Y. App. Div. 1980)).  The Supreme Court referred to this New York law, and laws in other states with similar proper-cause standards, as "may-issue" laws.  *Id.* at 2123–24.

In assessing whether New York's may-issue public carry law violated the Second Amendment, the Court rejected the two-step, means-based framework that we had applied in *Kolbe*.  Although the Supreme Court acknowledged that Courts of Appeals "had coalesced" around this means-based framework, the Court instead developed a new framework based on its interpretation of *Heller*.  *Id.* at 2125–26.  Under this new framework, a law is unconstitutional under the Second Amendment only if: (1) the plaintiff shows that the plain text of the Second Amendment protects an individual's course of conduct (step one), *and* (2) the government fails to show that the challenged regulation is "consistent with this Nation's historical tradition of firearm regulation" (step two).  *Id.* at 2129–30.

Although the plaintiffs in the present case broadly had asked the district court to consider the Second Amendment's "text, history, and tradition," the plaintiffs did not present to the court the information required under the nuanced framework outlined in *Bruen*, or the evidence that would have been necessary to apply *Bruen* to a shall-issue law. Typically, when a district court applies an analytical framework that later has been abrogated by the Supreme Court, our practice is to remand the case for the district court to consider the newly articulated framework in the first instance.  *See, e.g.*, *Firewalker-Fields*

*v. Lee*, 58 F.4th 104, 111, 121–23 (4th Cir. 2023) (remanding Establishment Clause challenge "to allow the district court to grapple with the history-and-tradition test in the first instance" under the Supreme Court's new framework); *see also Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, 982 F.3d 258, 264 (4th Cir. 2020) ("As we have said many times before, we are a court of review, not of first view." (quoting *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S. Ct. 2051, 2056 (2019))).

Here, however, my colleagues have decided not to allow this process to run its natural course.  Instead, the majority applies the new *Bruen* framework in the first instance, short-circuiting a process designed to prevent the exact type of rushed decision-making implemented here.  The majority characterizes its refusal to allow the district court to consider these issues in the first instance as an exercise in judicial efficiency.  Maj. Op., at 20 n.11 ("We will not return the parties to the district court just to push more paper around.").  But it is dangerous, not efficient, to establish precedent based on a record lacking the information necessary to answer the many questions that a district court must address under the Supreme Court's new framework.

### B.

Critically, the majority fails to grapple substantively with the implications of the Supreme Court's discussion in *Bruen* of shall-issue regimes.  In *Bruen*, the Court first compared New York's may-issue public carry law to the public carry laws in other states, noting that only six other jurisdictions had may-issue regimes similar to New York's, "under which authorities have discretion to deny concealed-carry licenses even when the applicant satisfies the statutory criteria, usually because the applicant has not demonstrated

cause or suitability for the relevant license." 142 S. Ct. at 2123–24. The Court then elaborated on the distinct character of shall-issue regimes, explaining that "the vast majority of states," forty-three, are "shall[-]issue" jurisdictions in which "authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability." *Id.* at 2123. The Court continued:

> To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' "shall-issue" licensing regimes, under which "a general desire for self-defense is sufficient to obtain a [permit]." Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent "law-abiding, responsible citizens" from exercising their Second Amendment right to public carry. Rather, it appears that these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, "law-abiding, responsible citizens." And they likewise appear to contain only "narrow, objective, and definite standards" guiding licensing officials, rather than requiring the "appraisal of facts, the exercise of judgment, and the formation of an opinion"—features that typify proper-cause standards like New York's. That said, because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry.

*Id.* at 2138 n.9 (citations omitted). For ease, I refer to this passage as the "shall-issue discussion."

In the shall-issue discussion, the Court made explicit what any reader already would have discerned, namely, that the plaintiffs in *Bruen* had not challenged the constitutionality of a shall-issue law and, accordingly, that such laws would not necessarily be invalidated by the Court's holdings regarding New York state's may-issue public carry law. Moreover,

27

the Court provided explicit cautionary language, warning that the Court's opinion about may-issue regimes should not be interpreted as "suggest[ing] the unconstitutionality of . . . 'shall-issue' licensing regimes," and adding that such regimes do not "necessarily prevent 'law-abiding, responsible citizens'" from exercising their Second Amendment rights.[4]  *Id.* at 2138 n.9.

Like the shall-issue regimes contemplated by the Supreme Court in *Bruen*, the HQL requirement allows any law-abiding, responsible person who seeks to obtain a handgun qualification license to do so by completing the objective criteria outlined in the statute. The state does not retain any governmental discretion or ability to exercise judgment with regard to an individual's application for a handgun qualification license, and the state may not deny an individual a license once the statutory requirements have been satisfied.

Naturally, because of the time required to complete this application process, individuals who decide today that they want to purchase their first handgun likely will not be able to leave the store with one in hand.  Those applicants must first pay a fee, submit a set of their fingerprints, and complete certain firearm safety training requirements.  Md.

---

[4] In discussing the purpose and character of the shall-issue laws that predominate the public carry landscape in the United States, the majority in *Bruen* identified as typical components background checks and firearms safety courses.  *Id.*  In his concurring opinion, Justice Kavanaugh, joined by Chief Justice Roberts, provided additional examples of other components of generally "constitutionally permissible" shall-issue laws, including fingerprinting, mental health records checks, and training in laws regarding the use of force.  *Id.* at 2162 (Kavanaugh, J., concurring).  After he underscored the distinction drawn by the majority between shall-issue and may-issue laws, Justice Kavanaugh unequivocally stated that "the 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so."  *Id.*

Code, Pub. Safety, § 5-117.1.   But as the shall-issue discussion makes clear, these objective, non-discretionary components of a standard regulatory scheme generally are constitutionally permissible.

Indeed, in *Bruen* the Supreme Court observed that shall-issue laws "often" require that applicants complete a background check or a firearms safety course.   142 S. Ct. at 2138 n.9.   And even though compliance with these objective, non-discretionary conditions necessarily results in some delay, the Court stated that it was not "suggest[ing] the unconstitutionality of" such requirements.   *Id.*

Offering a contrasting example, the Court cautioned that it did not "rule out constitutional challenges to shall-issue regimes" for which "*lengthy* wait times . . . or *exorbitant* fees *deny* ordinary citizens their right to public carry."   *Id.* (emphasis added). The difference between a facially *permissible* shall-issue regime and a facially *impermissible* shall-issue regime thus is not whether *any* burden is imposed or *any* delay results from the regulatory measures, but whether any requirements imposed by the regime are so onerous that they operate to "deny" law-abiding, responsible individuals their Second Amendment rights.

Here, the question whether the burden imposed by the HQL requirement "infringes" the rights of law-abiding, responsible individuals requires a distinct analysis as part of *Bruen's* step-one "plain text" inquiry.   The Second Amendment provides:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, *shall not be infringed*.

U.S. Const. amend. II (emphasis added).  Consistent with the Supreme Court's guidance on the scope of the Second Amendment as it applies to shall-issue schemes, under the plain text of the Second Amendment a regulation is covered only if an individual can show that the regulation has "infringed" the individual's exercise of his Second Amendment right to keep or right to bear arms.

What does the word "infringed" mean in the context of the Second Amendment? The Supreme Court has not directly answered this question because the Court has never been required to do so.  In the Court's seminal Second Amendment decisions, the Court has considered only laws that banned or effectively banned individuals from possessing or carrying firearms.   In *District of Columbia v. Heller*, the Court addressed the constitutionality of a District of Columbia statutory scheme that banned handgun possession in the home.  554 U.S. 570, 628 (2008) ("The handgun ban amounts to a prohibition of an entire class of 'arms'" and "extends . . . to the home.").  In *McDonald v. Chicago*, the Court addressed the constitutionality of Chicago laws that "effectively bann[ed] handgun possession by almost all private citizens who reside in the City."  561 U.S. 742, 750 (2010).  And in *Bruen*, the Court addressed a New York law under which the state had denied the petitioners' applications for unrestricted public carry licenses, thus prohibiting the petitioners from carrying handguns in public for self-defense because they had failed to persuade a governmental official that they had a special need to do so.  142 S. Ct. at 2156.  The bans in *Heller*, *McDonald*, and *Bruen* thus did not compel a separate

inquiry regarding whether a law "infringes" a law-abiding, responsible person's right to keep and bear arms.[5]

The majority acknowledges that, under the "operative clause" of the Second Amendment, the right to keep and the right to bear arms "shall not be infringed."  Maj. Op., at 8.  But the majority wholly avoids the type of textual analysis previously used by the Supreme Court to determine the meaning of terms and phrases appearing in the Second Amendment.  *See, e.g.*, *Heller*, 554 U.S. at 579, 581, 595, 597.

In its truncated step-one inquiry, the majority fails to define the term "infringe" or otherwise to address its scope.  Instead, the majority merely asks whether the law "regulates" an individual's course of conduct.  Maj. Op., at 11.  Unsurprisingly, the answer to this question will almost always be "yes."  But the majority has not identified any basis for employing the term "regulates," which notably does not appear in the Supreme Court's *Bruen* framework, in place of the Second Amendment's term "infringe."  Nevertheless, the majority invokes this substitute terminology, summarily concluding that the government must justify the "temporary deprivation" occasioned by the HQL requirement under step two of the *Bruen* inquiry because the law prevents the plaintiff "from owning handguns *now*."  Maj. Op. at 10 (emphasis in original) & 12.

Put differently, under the majority's step-one view, the plaintiffs allege a "facially plausible Second Amendment violation" simply because compliance with the law's

---

[5] Nor did the Supreme Court's decision in *Caetano v. Massachusetts*, require an evaluation of this separate issue.  577 U.S. 411, 411 (2016) (assessing the constitutionality of a Massachusetts law prohibiting the possession of stun guns).

requirements renders it "impossible" for the plaintiffs to own a handgun "right away."  Maj. Op., at 10.  Accordingly, the majority has created a constitutional test that would render presumptively unconstitutional most, if not all, shall-issue permitting laws.[6]

In addition to its failure to analyze the plain text of the Second Amendment, the majority seeks to minimize the effect of the Supreme Court's shall-issue discussion.  First, the majority relies on a footnote in a different Supreme Court case to argue that "it would be poor judicial practice to 'read a footnote' in a Supreme Court case to 'establish the general rule' for that case."  Maj. Op., at 12 n.9 (quoting *United States ex rel. Schutte v. SuperValu Inc.*, 143 S. Ct. 1391, 1403 n.6 (2023)).  But the Court's inclusion of text in a

---

[6] I observe that many of the shall-issue public carry laws cited by the Supreme Court in *Bruen* set forth permissible processing periods either comparable to or longer than the 30-day processing period provided in the HQL requirement.  *See* Ala. Code § 13A–11–75 (Cum. Supp. 2021) (30 days); Alaska Stat. § 18.65.700 (2020) (30 days); Ariz. Rev. Stat. Ann. § 13–3112 (Cum. Supp. 2021) (75 days); Colo. Rev. Stat. § 18–12–206 (2021) (90 days); Fla. Stat. § 790.06 (2021) (90 days); Idaho Code Ann. § 18–3302K (Cum. Supp. 2021) (90 days); Ill. Comp. Stat., ch. 430, § 66/10 (West Cum. Supp. 2021) (90 days); Ky. Rev. Stat. Ann. § 237.110 (Cum. Supp. 2021) (60 days for paper application, 15 days for electronic application); Me. Rev. Stat. Ann., tit. 25, § 2003 (Cum. Supp. 2022) (30 days for resident of five years or more, 60 days for other residents and nonresidents); Mich. Comp. Laws § 28.425b (2020) (45 days); Miss. Code Ann. § 45–9–101 (2022) (45 days); Mo. Rev. Stat. § 571.101 (2016) (45 days); Mont. Code Ann. § 45–8–321 (2021) (60 days); Neb. Rev. Stat. § 69–2430 (2019) (45 days); N.D. Cent. Code Ann. § 62.1–04–03 (Supp. 2021) (60 days); Ohio Rev. Code Ann. § 2923.125 (2020) (45 days); Okla. Stat., tit. 21, § 1290.12 (2021) (60 days, if background check does not reveal any relevant records); 18 Pa. Cons. Stat. § 6109 (Cum. Supp. 2016) (45 days); S.C. Code Ann. § 23–31–215(A) (Cum. Supp. 2021) (90 days); Tex. Govt. Code Ann. § 411.177 (West Cum. Supp. 2021) (60 days); Utah Code § 53–5–704.5 (2022) (60 days); Va. Code Ann. § 18.2–308.04 (2021) (45 days); Wash. Rev. Code § 9.41.070 (2021) (30 days); W. Va. Code Ann. § 61–7–4 (2021) (45 days if background checks are completed); Wyo. Stat. Ann. § 6–8–104 (2021) (60 days); *see also* JA 125 ¶ 13 (declaration of Maryland State Police Captain Andy Johnson) (stating that, "[t]hrough the first quarter of calendar year 2018, there were no completed HQL applications pending disposition for longer than 15 days").

footnote makes it no less a part of the Court's opinion.  And even without adopting the precise text of the Court's shall-issue discussion as a "general rule," it is sound practice for us to examine and refer to the Court's discussion of shall-issue regimes when analyzing the *Bruen* framework in the context of the HQL requirement, because the Supreme Court has provided this substantive guidance for consideration of future challenges to shall-issue statutes.[7]

The majority, however, passes over the text of the shall-issue discussion, offering another view that elevates form over substance.  According to the majority, the shall-issue discussion relates only to *Bruen's* step-two historical inquiry, because the Supreme Court inserted the footnote containing the shall-issue discussion after explaining why the New York law failed the second step of the *Bruen* framework.  Maj. Op., at 13 n.9.  The entire substance of the shall-issue discussion, however, corresponds directly with a step-one "infringement" analysis, and the Court did not refer in that discussion to any of the hallmarks of a step-two inquiry, such as the history of shall-issue laws or the question whether such laws are "relevantly similar" to historical regulations.  *See Bruen,* 142 S. Ct. at 2132–33.  Thus, it is not surprising that the Court, in the course of explaining its

---

[7] The majority acknowledges that the HQL requirement is a shall-issue law.  *See* Maj. Op., at 10 n.6.  To the extent that the majority seeks to dispense with the Supreme Court's shall-issue discussion as dicta, I observe that "we routinely afford substantial, if not controlling deference to dicta from the Supreme Court."  *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 281–82 (4th Cir. 2019) (en banc) ("[L]ower courts grappling with complex legal questions of first impression must give due weight to guidance from the Supreme Court, so as to ensure the consistent and uniform development and application of the law.").  Such consideration is especially warranted when, as here, the substantive dictum addresses the very issue before us.

33

conclusion why the may-issue New York law was unconstitutional, added this footnote to emphasize the limits of its holding.

Next, the majority attempts to frame the Supreme Court's shall-issue discussion as irrelevant because the New York law at issue in *Bruen* was a restriction on "public carry," while Maryland's law "limit[s] handgun possession altogether." Maj. Op., at 13 n.9 (emphasis omitted). But this distinction turns on a false premise, namely, that there is a difference between the Second Amendment right to keep arms and the Second Amendment right to bear arms. Neither the text of the Second Amendment nor the Supreme Court's precedent supports such a reading.[8] Thus, the majority cannot discard the language in the Court's shall-issue discussion on the basis that the Court was addressing only shall-issue public carry laws.

The majority nevertheless declines to address the detailed substance of the shall-issue discussion, perhaps because that discussion generally counsels a measured, fact-intensive approach to the consideration of constitutional challenges to shall-issue

---

[8] A permitting or public carry law may have a more direct effect on either the right to keep or the right to bear arms. The Supreme Court, however, has discussed the importance of these rights in tandem, drawing no distinction between them in establishing the applicable Second Amendment framework or the relative strength of each as a constitutional right. Under the new *Bruen* framework, a court very well may conclude under step two that the historical tradition of laws relating to the right to *possess* firearms differs from the historical tradition of laws relating to the right to *carry* those firearms in public. But this step requires the court to conduct a detailed inquiry by which the court first must identify, at a minimum, the burden a particular regulation imposes and the justification for that regulation. Only then may the court compare this burden and justification to the historical analogues identified by the parties, determining whether the burden imposed by, and the justification provided for, the modern regulation is "relevantly similar" to the historical analogues. *Bruen*, 142 S. Ct. at 2132.

regimes.  The shall-issue discussion plainly signals the Supreme Court's thinking that, going forward, successful constitutional challenges to shall-issue statutes ordinarily will be limited to challenges involving uniquely burdensome requirements such as "lengthy wait times in processing license applications" or "exorbitant fees."  *See Bruen*, 142 S. Ct. at 2138 n.9.  The majority's contrary conclusion here, invalidating an entire shall-issue statute as facially unconstitutional without any discussion whether the statute's requirements infringe every permit applicant's constitutional rights, thus runs directly against *Bruen*'s clear guidance on shall-issue regimes.  *Id.*; *see also Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (explaining that "a plaintiff can only succeed in a facial challenge" by establishing "that the law is unconstitutional in all of its applications").

Shall-issue laws allow individuals with "a general desire for self-defense" to obtain a permit to possess or carry a firearm.  *Bruen*, 142 S. Ct. at 2138 n.9.  Although such laws may impose conditions that result in some delay in acquiring or bearing a firearm, they do not require a discretionary governmental determination regarding firearm possession or carry, and they generally do not prevent law-abiding, responsible individuals from exercising their Second Amendment rights.  *Id.*

The district court is best suited to conduct a *Bruen* step-one "plain text" inquiry in the first instance to determine whether any requirements imposed by a shall-issue regime "infringe" an individual's Second Amendment rights.  The Supreme Court's shall-issue discussion has provided clear guidance that an "infringement" of an individual's Second Amendment rights would require a greater impediment than a simple processing delay,

firearms training, or the imposition of an administrative fee.[9]  But like most judges, I am not a historian or a linguist capable of considering the full reach of this Second Amendment term in its historical context.  Moreover, the parties have not cited the testimony of any expert who purports to have these qualifications.  On remand, the parties should be allowed to compile, and the district court should have the opportunity to consider, the interpretive tools that the Supreme Court has relied on in other cases to determine the meaning of constitutional terms in the new framework set forth by *Bruen*, while bearing in mind the Supreme Court's warning that material differences exist between may-issue and shall-issue regimes.  *See Heller*, 554 U.S. at 579, 581, 595, 597 (referring to Founding-era dictionaries, the context in which the language was used, a comparison of other uses of similar language in the Constitution, the 18th-century meanings as compared to the modern meanings, and the use of such language in other written documents from the Founding era); *Cawthorn v.*

---

[9] Notably, some definitions from the Founding era of the term "infringe" support the construction that the Supreme Court appeared to endorse in its discussion of shall-issue regimes, namely, that a particular provision will "infringe" an individual's rights under the plain text of the Second Amendment only if the statutory condition is so burdensome that it ultimately prevents law-abiding, responsible individuals from possessing or bearing a handgun.  Samuel Johnson, 1 Dictionary of the English Language 1101 (4th ed. 1773) (hereinafter Johnson) (defining "infringe" as "[t]o violate; to break laws or contracts" or "[t]o destroy; to hinder"); N. Webster, American Dictionary of the English Language (1828) (hereinafter Webster) (same); *Heller*, 554 U.S. at 581, 584 (citing Johnson and Webster to determine the meaning of "arms" and "bear").  Particularly when compared to our modern understanding of "infringe" as a "gradual but clearly identifiable" violation of a right, these Founding era definitions seem to require a greater intrusion.  *On 'Infringe,' 'Encroach,' and 'Impinge'*, Merriam-Webster, https://www.merriam-webster.com/words-at-play/infringe-encroach-impinge-usage-difference [https://perma.cc/LE8U-PAA7]; *Infringe*, Merriam-Webster, https://www.merriam-webster.com/dictionary/infringe [https://perma.cc/234C-JT3N] (defining "infringe" as "to encroach upon in a way that violates . . . the rights of another," while noting that a secondary, "obsolete" definition is to "defeat" or "frustrate").

*Amalfi*, 35 F.4th 245, 256 (4th Cir. 2022) ("'[C]onstitutional interpretation'—like statutory construction—involves 'familiar principles' (such as 'careful examination of the textual, structural, and historical evidence put forward by the parties') that are the bread-and-butter of judicial work." (citation omitted)).

After resolving this textual inquiry, the district court next should be required to address whether any of the components of the HQL requirement rise to the level of "infringement," a fact-specific inquiry that again distinguishes this case from *Bruen*. A determination whether the shall-issue permitting law at issue here "infringes" the Second Amendment rights of law-abiding, responsible individuals likely will require consideration of several material factors, such as the extent of any delay imposed and the amount of costs incurred from compliance with the law. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."). Applying *Bruen* in this new context, the step-one inquiry is not a purely legal question but is a mixed question of law and fact requiring factual development before the district court.

For these reasons, I would remand this case to the district court for a step-one analysis under *Bruen* of the plain text of the Second Amendment in the context of shall-issue regimes, and for consideration whether any components of the HQL requirement rise

to the level of "infringement" of the plaintiffs' Second Amendment rights.[10]  Depending on the district court's analysis and resolution of these issues, the district court also may be required to conduct a step-two analysis under *Bruen*.

C.

Finally, my colleagues' analytical error under step one is compounded by their refusal to remand this case for consideration of the severability of any unconstitutional component in the HQL requirement, which consideration mandates a fact-specific, intent-driven analysis under state law.  *See Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996). Under Maryland law, "the provisions of all statutes enacted after July 1, 1973, are severable," and "[t]he finding by a court that part of a statute is unconstitutional or void does not affect the validity of the remaining portions of the statute, unless the court finds that the remaining valid provisions alone are incomplete and incapable of being executed in accordance with the legislative intent."  Md. Code, Gen. Prov. § 1-210.  Maryland law thus affords many state statutes, including the HQL requirement, a presumption of severability.

In addition, courts are required to discern whether "the legislative body would have enacted the statute or ordinance if it knew that part of the enactment was invalid."  *Cnty. Council of Prince George's Cnty. v. Chaney Enterprises Ltd. P'ship*, 165 A.3d 379, 394 (Md. 2017) (citation omitted).  Accordingly, even when a legislature expressly provides

---

[10] Under this view of the case, I do not reach step two of the *Bruen* framework, which would need to be addressed by the district court only if it found that the plaintiffs' proposed course of conduct is "infringed" by any component of the HQL requirement.

that a state statute is severable, disputes may arise regarding whether the other portions will remain valid. *See, e.g.*, *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 331 (2006).

Here, the district court rejected the plaintiffs' facial constitutional challenge to the HQL requirement, applying the two-step framework we established in *Kolbe*, 849 F.3d at 132, to determine that each component of the HQL requirement was constitutionally permissible. Because the district court upheld the constitutionality of the entire statute, the court did not need to address whether any individual component of the HQL requirement was severable.

Unsurprisingly, at oral argument before us, the government argued that it had not addressed severability in its brief because, in the government's view, the entire statute passed constitutional muster. Oral Arg., at 25:12–25:22. Thus, the record on appeal lacks any discussion by the district court or any argument from the parties regarding severability.

The Supreme Court has cautioned that "federal courts are not ideally positioned to address such a sensitive issue of state constitutional law" as severability, counseling that we "may therefore be well advised to consider certifying such a question to the State's highest court." *Carney v. Adams*, 141 S. Ct. 493, 503–04 (2020) (Sotomayor, J., concurring). And in other instances, the Supreme Court has remanded such questions "for the lower courts to determine legislative intent in the first instance." *E.g.*, *Ayotte*, 546 U.S. at 331.

These principles are even more compelling in the context of facial constitutional challenges like the one brought by the plaintiffs in this case. Such challenges "run contrary

to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law that is broader than is required by the precise facts to which it is to be applied." *United States v. Miselis*, 972 F.3d 518, 530 (4th Cir. 2020) (quoting *Wash. State Grange*, 552 U.S. at 450–51). Moreover, these challenges "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id.* (citation omitted). Since *Bruen*, the state and federal trial courts have not had "occasion to construe the [HQL requirement] in the context of actual disputes," nor to "accord the law a limiting construction to avoid constitutional questions." *Wash. State Grange*, 552 U.S. at 450. I thus part with my colleagues' decision to avoid the issue of severability,[11] and would remand this question for consideration by the district court upon its application of *Bruen*.

---

[11] The majority acknowledges that "remand might be appropriate to determine whether a statute were severable," but declines to further address the issue because, in the majority's view, the government "disavowed a severability argument." Maj. Op., at 20 n.11 (citing Oral Arg., at 25:13 – 25:27 & 26:52–27:00). The majority mischaracterizes the government's position.

At oral argument, Judge Richardson asked government counsel, "But [the HQL requirement] rises or falls together?" Oral Arg., at 25:22–25:24. Government counsel responded, "I, I think that's, I think that's . . . ." Oral Arg., at 25:25–25:27. Government counsel did not finish this sentence, and later admitted that the government was "not necessarily prepared to address severability" as "it was not something [the government had] argued." Oral Arg., at 26:52–27:00.

Contrary to the majority's interpretation, the government's decision not to address severability in its brief is not a "disavow[al]" of the severability argument. Maj. Op., at 20 n.11. Rather, this decision reflects the government's position, consistent with the district court's holdings, that the entire HQL requirement was constitutional. It is imprudent to use the government's silence on this issue to ignore the "normal rule that partial, rather than facial, invalidation is the required course." *Brockett v. Spokane Arcades, Inc.*, 472 (Continued)

II.

The district court in this case has not had the opportunity to apply the new, fact-intensive *Bruen* framework or to consider severability principles under Maryland law, and there is no legitimate reason to short-circuit the judicial process and to prevent the development of the record in the district court.  Moreover, remand is especially appropriate here, when the plaintiffs bring a facial constitutional challenge to a statute that falls into a class of laws already identified by the Supreme Court as meaningfully distinct from the firearms bans addressed in the Court's prior cases.

In sum, my colleagues turn their back on the shall-issue discussion in *Bruen*.  As a result, unable to pound a "shall-issue" law into a framework designed for a "may-issue" regime, the majority fails to produce a legally defensible and workable template for the analysis of "shall-issue" laws.  And we are left with the lingering question why the majority ignores the Court's clear guidance on the very issue before us.

---

U.S. 491, 504 (1985); *see Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 559 (2001) (Scalia, J., dissenting) ("Although no party briefed severability in *Denver Area Ed. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727 (1996), the Justices finding partial unconstitutionality considered it necessary to address the issue.").