# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| RENO MAY, *et al.*, | Case Nos.: **SACV 23-01696-CJC (ADSx)** |
| | **SACV 23-01798-CJC (ADSx)** |
| Plaintiffs, | |
| v. | |
| | **ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION [*May* Dkt. 13; *Carralero* Dkt. 6]** |
| ROBERT BONTA, in his official capacity as Attorney General of the State of California, and DOES 1-10, | |
| Defendant. | |
| AND | |
| MARCO ANTONIO CARRALERO, *et al.*, | |
| Plaintiffs, | |
| v. | |
| ROB BONTA, in his official capacity as Attorney General of California, | |
| Defendant. | |

## I.  INTRODUCTION

We live in dangerous times.  Nearly every day, we are barraged with stories about school shootings, attacks on places of worship, and other unthinkable acts of violence and cruelty.  Nor are our society's problems limited to those acute acts of terror—daily our country faces prejudice and division of all types, economic uncertainty and poverty, a nationwide mental health crisis, and an epidemic of addiction and crime.  The only hope to find in the face of such dire circumstances is that democracy, as it has up to this point, will prevail and somehow solve the challenges we face.  But such hope is little comfort to individuals who, through no fault of their own, find themselves beset by an attacker and facing their death or that of their loved ones.

The right to self-defense and to defend one's family is fundamental and inherent to our very humanity irrespective of any formal codification.  In their wisdom, the Founders recognized the need for individual citizens to protect themselves and their loved ones from those that would do them harm—and they knew that such a right could not be vindicated without the right to bear arms.  The Second Amendment to the United States Constitution guarantees law-abiding, responsible citizens the right to keep and bear arms for self-defense in case of confrontation.

For many years, the right to bear arms, and so necessarily the right to self-defense, was relegated to second-class status.  But the United States Supreme Court made clear in its landmark decisions *District of Columbia v. Heller*, *McDonald v. City of Chicago*, and *New York State Rifle & Pistol Association, Incorporated v. Bruen* that relegation could no longer be permitted—individuals must be able to effectuate their right to self-defense by, if they so choose, responsibly bearing arms.

Some disagree with the Founders and the Supreme Court that individual citizens have a right to protect themselves and believe that the best solution to the many dangers of the modern day is to prevent law-abiding citizens from carrying handguns.  It is not this Court's place to question their judgement as to how to solve the many challenges we face.  That is up to the people and their elected representatives.  But the Constitution, by design, recognizes that some rights are so important and sacrosanct that nothing short of a constitutional amendment may take them away.  No one—not a federal judge, not a state governor or legislator, not even the President of the United States—is above the Constitution.

Nevertheless, California recently passed a law, Senate Bill 2, that limits the public places where people with concealed carry permits may carry their handguns to defend themselves and their families.  To obtain such a permit in California, a person must go through a rigorous screening process.  The process includes a lengthy application, a thorough background check involving interviews, fingerprinting, and reviewing multiple government databases, and a full-day, hands-on training course in which the person must demonstrate they can safely and proficiently use the handgun they seek to carry in public.  Even with those stringent requirements, California will not allow concealed carry permitholders to effectively practice what the Second Amendment promises.  SB2's coverage is sweeping, repugnant to the Second Amendment, and openly defiant of the Supreme Court.  The law designates twenty-six categories of places, such as hospitals, public transportation, places that sell liquor for on-site consumption, playgrounds, parks, casinos, stadiums, libraries, amusement parks, zoos, places of worship, and banks, as "sensitive places" where concealed carry permitholders cannot carry their handguns.  SB2 turns nearly every public place in California into a "sensitive place," effectively abolishing the Second Amendment rights of law-abiding and exceptionally qualified citizens to be armed and to defend themselves in public.

Plaintiffs, who are concealed carry permitholders and related organizations, brought these two lawsuits against California to challenge the constitutionality of many of SB2's "sensitive place" provisions.  They now seek a preliminary injunction enjoining California from enforcing the challenged sensitive-place provisions, asserting that many of those restrictions violate their Second Amendment rights and deprive them of their ability to defend themselves and their loved ones in public.  Plaintiffs are right.  Their motions for a preliminary injunction are **GRANTED**.

## II.    BACKGROUND

It is generally a crime to carry a firearm in public in California.  Cal. Penal Code §§ 25400, 25850.  However, a person may apply to a county sheriff or a city chief of police for a license to carry a concealed weapon, commonly referred to as a "CCW license" or a "CCW permit."  *Id.* §§ 26150, 26155.  Under existing law, to obtain a CCW permit, a person must show they are of "good moral character," which involves a background and criminal history check and fingerprinting.  *Id.* §§ 26150, 26185.  They must complete an eight- to sixteen-hour training course with instruction on firearm safety, firearm handling, shooting technique, and laws governing the permissible use of a firearm, plus live-fire shooting exercises on a firing range in which the applicant must demonstrate safe handling of, and shooting proficiency with, each firearm they seek license to carry.  *Id.* § 26165.  Licenses involve a fee and must be renewed every two years.  *See id.* §§ 26190, 26220(a).  Many licensing authorities' processes for issuing CCW permits include a police interview, and some include a psychological examination.  *See id.* § 26190(f).

The CCW permit process, with its background check and firearms training course, is "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'"  *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597

U.S. 1, 38 n.9 (2022).  Those individuals willing to go through the tedious and time-consuming process to obtain a CCW permit are overwhelmingly law-abiding and responsible.  (*See May* Compl. ¶ 82; *id.* at ¶ 76 ["Violent criminals don't bother with CCW permits and simply carry illegally."]; *May* Dkt. 13-6 [Declaration of Brian R. Marvel, President of Peace Officers Research Association of California, hereinafter "Marvel Decl."] ¶¶ 5–6.)  Nationwide, they constitute only about 26.3% of gunowners.  William English, *2021 National Firearms Survey* (Last Revised Sept. 28, 2022), Georgetown McDonough School of Business Research Paper No. 4109494, *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4109494.

Once a person has a CCW license, they may carry a concealed handgun except to certain "sensitive places."  *See D.C. v. Heller*, 554 U.S. 570, 626–27 (2008) (approving "laws forbidding the carrying of firearms in sensitive places"); *Bruen*, 597 U.S. at 30 (acknowledging the existence of "sensitive places" "where arms carrying could be prohibited consistent with the Second Amendment").  For example, since 1995 California law has prohibited possessing a firearm in a place the person knows, or reasonably should know, is a "school zone," meaning within 1,000 feet of K–12 school grounds.  Cal. Penal Code § 626.9.  It also prohibits possessing a firearm in "any state or local public building," "within the State Capitol" or on its grounds, "any legislative office, any hearing room in which any committee of the Senate or Assembly is conducting a hearing, the Legislative Office Building," the Governor's Mansion or legislature members' residences without permission, or in "any sterile area of an airport," "passenger vessel terminal" or "public transit facility."  *Id.* §§ 171b, 171c, 171d, 171.5, 171.7.

On September 12, 2023, the California legislature passed Senate Bill 2 ("SB2"), which California Governor Gavin Newsom signed into law on September 26, 2023.  (*Carralero* Compl. ¶ 4.)  SB2 adds Section 26230 to the California Penal Code and is set

to take effect on January 1, 2024.  In response to *Bruen*,[1] SB2 "would remove the good character and good cause requirements from the issuance criteria" for CCW permits. 2023 Cal. Legis. Serv. Ch. 249 (S.B. 2).  However, because it prohibits issuing a CCW permit to anyone who is "disqualified," applicants must still undergo thorough background checks.  New Cal. Penal Code § 26202(a).  Specifically, licensing authorities conduct an in-person interview with the applicant, interview at least three character references, review publicly-available information about the applicant including any published or posted statements, review the California Restraining and Protective Order System accessible through the California Law Enforcement Telecommunications System, and also obtain information from the Department of Justice.  *Id.* §§ 26202(b), 26185.  A person may not obtain a CCW permit if they are reasonably likely to be a danger to self, others, or the community at large; if they are subject to any restraining order, protective order, or other type of court order, or convicted of certain offenses; if they are currently abusing controlled substances or alcohol; or if they have any history of unlawful or reckless use, display, or brandishing of a firearm, loss or theft of multiple firearms, or failing to properly report a loss of a firearm.  *Id.* § 26202(a)(1)–(10).  A psychological assessment may be required in some instances.  *Id.* § 26190(e)(2).

SB2 also increases the length of the required training course to no less than 16 hours and adds additional subjects including safe storage, legal methods to transport firearms and secure them in vehicles, laws regarding the permissible use of lethal force in self-defense, and mental health.  *Id.* § 26165(a).  Applicants must pass a written examination to demonstrate their understanding of the covered topics.  *Id.* § 26165(a)(5).

---

[1] In a press conference announcing SB2, Governor Newsom called *Bruen* a "very bad ruling."  (*May* Compl. ¶ 79.)

Finally, SB2 provides that a person granted a CCW license "shall not carry a firearm on or into" twenty-six categories of places.[2]  Plaintiffs in these cases are fourteen ordinary, law-abiding citizens with active CCW licenses and ten organizations whose members have such licenses who want to be able to continue to carry concealed weapons at places they carried them before to protect themselves and their families.  (*See May* Dkts. 13-2–5, 13-8–12, 13-14–19; *Carralero* Dkts. 6-2–6 [Plaintiffs' declarations].) They challenge SB2's provisions prohibiting CCW permitholders from carrying in the following locations:

   (7) Hospitals, mental health facilities, nursing homes, medical offices, urgent care facilities, and other places where medical services are customarily provided,

   (8) Public transportation,

   (9) Establishments where intoxicating liquor is sold for consumption on the premises,

(10) Public gatherings and special events,

(11) Playgrounds and private youth centers,

(12) Parks and athletic facilities,

(13) Department of Parks and Recreation and Department of Fish and Wildlife property, except hunting areas,

(15) Casinos and gambling establishments,

(16) Stadiums and arenas,

(17) Public libraries,

(19) Amusement parks,

(20) Zoos and museums,

(22) Churches, synagogues, mosques, and other places of worship,

(23) Financial institutions, and

---

[2] SB2's sensitive place restrictions also apply to those individuals who, as residents of counties with fewer than 200,000 people, have received a license to carry openly.  (Opp. at 3 n.3 [citing Cal. Penal Code §§ 26150(b)(2), 26155(b)(2), 26230(1)].)

(26) Any other privately owned commercial establishment that is open to the public, unless the operator clearly and conspicuously posts a sign indicating that licenseholders are permitted to carry firearms on the property.

They also seek to enjoin SB2 to the extent it makes any "parking areas" a "sensitive place." (*May* Mot. at 4; *see May* Reply at 8 [clarifying that they challenge subsection (a)(5) regarding local government buildings only "as it applies <u>to parking areas and public appurtenant areas</u> adjacent to where legislative, judicial, or other governmental business is conducted"].)

## III.    DISCUSSION

A preliminary injunction is an extraordinary and drastic remedy that may only be awarded upon a clear showing that the moving party is entitled to relief.  *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  To obtain a preliminary injunction, Plaintiffs must establish that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) the public interest favors an injunction.  *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *AK Futures LLC v. Boyd Street Distro, LLC*, 35 F.4th 682, 688 (9th Cir. 2022).  The Ninth Circuit balances these factors using a "sliding scale" approach, in which "a stronger showing of one element may offset a weaker showing of another."  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  However, Plaintiffs must "make a showing on all four prongs."  *Id.* at 1135.  "The most important among these factors is the likelihood of success on the merits."  *Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109, 1115 (9th Cir. 2023).  "This is especially true for constitutional claims, as the remaining *Winter* factors typically favor enjoining laws thought to be unconstitutional."  *Id.*

### A.    Likelihood of Success on the Merits

Plaintiffs are likely to succeed on the merits of their claim that the challenged SB2 sections violate the Second Amendment.  The Second Amendment reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  It "guarantee[s] the individual right to possess and carry weapons in case of confrontation" both inside the home and outside it.  *Heller*, 554 U.S. at 592; *Bruen*, 597 U.S. at 20.  The text's "right to 'bear arms' refers to the right to 'wear, bear, or carry upon the person or in the clothing or in a pocket, for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person.'"  *Bruen*, 597 U.S. at 32 (quoting *Heller*, 554 U.S. at 584).

To determine whether a firearm regulation is consistent with the Second Amendment, the Supreme Court has created a two-step analysis.  First, a court evaluates whether "the Second Amendment's plain text covers an individual's conduct."  *Bruen*, 597 U.S. at 17.  If it does, the regulation is presumptively unlawful unless the government can show that the regulation "is consistent with the Nation's historical tradition of firearm regulation."  *Id.*

### 1.    Step One

*Bruen*'s first step asks "whether the plain text of the Second Amendment protects [the plaintiffs'] proposed course of conduct."  *Bruen*, 597 U.S. at 17.  This step "requires a textual analysis, determining whether the challenger is part of 'the people' whom the Second Amendment protects, whether the weapon at issue is 'in common use' today for self-defense, and whether the proposed course of conduct falls within the Second Amendment."  *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) (some

quotation marks omitted); *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 101 (3d Cir. 2023) (explaining that *Bruen*'s first step looks to "whether the text of the Second Amendment applies to a person and his proposed conduct").

Plaintiffs are "ordinary, law-abiding, adult citizens," and are therefore "part of 'the people' whom the Second Amendment protects." *Bruen*, 597 U.S. at 31–32; (*May* Compl. ¶¶ 10, 13, 118; *Carralero* Compl. ¶ 6). It is undisputed that the firearms they seek to carry into SB2's listed places are "'in common use' today for self-defense." *Bruen*, 597 U.S. at 32. Indeed, to obtain their CCW permits, Plaintiffs demonstrated "safe handling of, and shooting proficiency with, each firearm" they sought to carry. Cal. Penal Code § 26165(a)(3). And the plain text of the Second Amendment unquestionably protects Plaintiffs' proposed course of conduct of carrying handguns outside the home for self-defense. *Bruen*, 597 U.S. at 10; (*see May* Compl. ¶ 12; *Carralero* Compl. ¶¶ 10–25).

*Bruen*'s first step is therefore met. *See Hardaway v. Nigrelli*, 639 F. Supp. 3d 422, 439 (W.D.N.Y. 2022) (finding step one met when ordinary, law-abiding citizens challenged law designating places of worship as sensitive places), *affirmed in part, vacated in part, and remanded by Antonyuk v. Chiumento*, 2023 WL 8518003 (2d Cir. Dec. 8, 2023); *Spencer v. Nigrelli*, 648 F. Supp. 3d 451, 467 (W.D.N.Y. 2022) (same), *affirmed in part, vacated in part, and remanded by Antonyuk v. Chiumento*, 2023 WL 8518003; *Christian v. Nigrelli*, 642 F. Supp. 3d 393, 405 (W.D.N.Y. 2022), *affirmed in part, vacated in part, and remanded by Antonyuk v. Chiumento*, 2023 WL 8518003 (same when plaintiffs challenged law criminalizing firearm possession on private property unless property holders posted sign with permission or gave express consent); *Wolford v. Lopez*, 2023 WL 5043805, at *16, *19 (D. Haw. Aug. 8, 2023) ("[T]he carrying of firearms in [public] areas is covered by the plain text of the Second Amendment," as is carrying a firearm into establishments open into the public "because those establishments are public to the extent that members of the public are invitees or licensees who may

enter those establishments during business hours, unless their invitation or license is revoked."); *Koons v. Platkin*, 2023 WL 3478604, at *18 (D.N.J. May 16, 2023) ("The Second Amendment presumptively guarantees the *Siegel* Plaintiffs' 'proposed course of conduct' of carrying handguns in public for self-defense.").

The government does not appear to dispute that step one is met except as to Section 26230(a)(26), which prohibits concealed carry at "privately owned commercial establishment[s] that [are] open to the public, unless the operator" posts a sign that such carry is allowed.  As to that provision, the government argues that "Plaintiffs' conduct does not implicate the plain text of the Second Amendment because the right to keep and bear Arms would not have been understood by Americans in 1791 or 1868 to extend to others' private property" without their consent.  (*May* Dkt. 21, *Carralero* Dkt. 20 [Opposition, hereinafter "Opp."] at 39–42; *see generally May* and *Carralero* Dkt. 25-2 [amicus brief of property law professors Ian Ayres and Fredrick Vars].)  The Court disagrees.  The regulation prohibits CCW permitholders from carrying firearms in places open to the public to defend themselves and their families.  This surely "falls within the Second Amendment right to carry firearms in self-defense outside the home."  *Antonyuk v. Chiumento*, 2023 WL 8518003, at *82 (noting in reaching this conclusion that otherwise, "because over 91 percent of land in New York state is privately held, the restricted location provision would turn much of the state of New York into a default no-carriage zone").

## 2.    Step Two

Since the relevant SB2 provisions implicate conduct the Second Amendment protects, they are presumptively unconstitutional unless the government can meet its burden to demonstrate that the provisions are "consistent with the Nation's historical tradition of firearm regulation."  *Bruen*, 597 U.S. at 24.  To carry its burden, the

government must provide "historical precedent from before, during, and even after the founding [that] evinces a comparable tradition of regulation." *Id.* at 27 (cleaned up); *see id.* at 20 (reiterating *Heller*'s statement that "*the public understanding* of a legal text in the period after its enactment or ratification" was "a critical tool of constitutional interpretation"). "[T]he most significant historical evidence comes from 1791, when the Second Amendment was adopted, and secondarily 1868," when the Fourteenth Amendment was ratified. *Duncan v. Bonta*, 2023 WL 6180472, at *20 (S.D. Cal. Sept. 22, 2023).

"[A]nalogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check," and to carry its burden to show a regulation is supported by the nation's historical tradition of firearm regulation, the government need only "identify a well-established and representative historical *analogue*, not a historical *twin*." *Bruen*, 597 U.S. at 30. "The core question is whether the challenged law and proffered analogue are 'relevantly similar.'" *United States v. Rahimi*, 61 F.4th 443, 454 (5th Cir.), *cert. granted,* 143 S. Ct. 2688 (2023) (quoting *Bruen*, 597 U.S. at 29). "In determining whether the modern regulation and the historical analogue are 'relevantly similar,' [courts] must look to the 'how and why' of the two regulations; that is, 'whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are *central* considerations when engaging in an analogical inquiry.'" *Teter v. Lopez*, 76 F.4th 938, 951 (9th Cir. 2023) (quoting *Bruen*, 597 U.S. at 29).

The history and tradition inquiry involves additional nuance when it comes to sensitive-place restrictions. The Supreme Court mentioned in *Bruen* that it is "settled" that certain, "relatively few" locations are "sensitive places" "where arms carrying c[an] be prohibited consistent with the Second Amendment." *Bruen*, 597 U.S. at 30. These locations include schools, government buildings, "legislative assemblies, polling places,

and courthouses." *Id.*  The Supreme Court explained that this is so even though there are few laws evidencing a history and tradition of prohibiting firearms in those places.  *Id.* (citing David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 235–36 (2018)).  Indeed, the law review article the Supreme Court cited regarding historical support for designating these places as sensitive found a "rather short" list of "laws from the colonial period and the Founding Era" justifying such sensitive places: only two Maryland statutes forbidding carrying arms in the legislature and provisions in Delaware's constitution prohibiting them in polling places.  Kopel & Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. at 235–36.

"So where does that leave the many locations in a modern city with no obvious 18th- or 19th-century analogue? What about subways, nightclubs, movie theaters, and sports stadiums? The Court does not say." *Bruen*, 597 U.S. at 114 (Breyer, J., dissenting).  Rather, the Supreme Court stated that courts "can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* at 30.  That is what the Court is tasked to do here.

### a.    (7) Hospitals and Medical Services Facilities

Section 26230(a)(7) prohibits a CCW permitholder from carrying a firearm into "[a] building, real property, and parking area under the control of a public or private hospital or hospital affiliate, mental health facility, nursing home, medical office, urgent care facility, or other place at which medical services are customarily provided."  This provision of SB2 impermissibly denies the core Second Amendment right to carry a firearm in public for self-defense to people who have gone through a lengthy permit

application process including a thorough background check and safety and training course.

The Second Amendment guarantees an "individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592.  Self-defense—"a basic right, recognized by many legal systems from ancient times to the present day" and one that is "deeply rooted in this Nation's history and tradition"—is "the *central component* of the right itself." *Id.* at 599; *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 767–68 (2010).  This right applies to protect people from the "serious risk of lethal violence when they venture outside their homes." *Bruen*, 597 U.S. at 71 (Alito, J., concurring); *id.* at 2135 ("Many Americans hazard greater danger outside the home than in it.").

"The pertinent question" when deciding whether a regulation is consistent with the Second Amendment "is what the Founders understood the Second Amendment to mean." *Atkinson v. Garland*, 70 F.4th 1018, 1020 (7th Cir. 2023).  At a high level, the Founders "understood the right to enable individuals to defend themselves," including by "repe[lling] force by force" when "the intervention of society in his behalf, may be too late to prevent an injury." *Heller*, 554 U.S. at 594–95 (quoting 1 Blackstone's Commentaries 145–146, n. 42 (1803) and citing, among other sources, a 1769 newspaper article).[3]  "Therefore, those who sought to carry firearms publicly and peaceably in antebellum America were generally free to do so." *Bruen*, 597 U.S. at 52.

The Founders' primary concern when it came to firearms was "circumstances giving just reason to fear that [individuals carrying weapons had] purposes to make an

---

[3] The Founders would likely have studied Cicero's speech in defense of Titus Annius Milo, in which he declared, "if our life be in danger from plots, or from open violence, or from the weapons of robbers or enemies, every means of securing our safety is honorable.  For laws are silent when arms are raised, and do not expect themselves to be waited for, when he who waits will have to suffer an undeserved penalty before he can exact a merited punishment."  Kopel & Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. at 211.

unlawful use of them."  Kopel & Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. at 234.  They therefore had no concerns about "prohibit[ing] bearing arms in a way that spreads 'fear' or 'terror' among the people."  *Bruen*, 597 U.S. at 50. Indeed, in defending soldiers after the Boston Massacre, John Adams declared that "every private person is authorized to arm himself, and on the strength of this authority, I do not deny the inhabitants had a right to arm themselves at that time, *for their defence, not for offence, that distinction is material and must be attended to.*"  John Adams' Argument for the Defense: 3–4 December 1770, *available at* https://founders.archives.gov/documents/Adams/05-03-02-0001-0004-0016 (emphasis added).  Accordingly, "[t]hroughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms."  *Bruen*, 597 U.S. at 38; *see Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 334 (N.D.N.Y. 2022), *reconsideration denied sub nom. Antonyuk v. Nigrelli*, 2022 WL 19001454 (N.D.N.Y. Dec. 13, 2022), *affirmed in part, vacated in part, and remanded by Antonyuk v. Chiumento*, 2023 WL 8518003 (noting that many historical laws purportedly analogous to sensitive place restrictions "appear to have been aimed at denying the possession of guns to persons who were likely to pose a danger or disturbance to the public").

Given the nation's history and tradition of protecting the core right to carry a firearm to those wishing to defend themselves and their families in case of confrontation, it is unsurprising that the government does not offer a single historical prohibition on carrying firearms at hospitals or medical offices, much less one limiting carry by a category of people that is particularly responsible and trained and whom the government has background checked.  (*Cf. May* Dkt. 13-7 [Declaration of Clayton Cramer, hereinafter "Cramer Decl."] ¶ 66 ["The very first hospitals appear before 1791, but they are rare.  I have never seen a law restricting arms possession in such places."]); Kopel &

Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. at 289 ("It is difficult to create a rationale for extending the sensitive places doctrine to places that are not schools or government buildings" because "there are few 'longstanding' restrictions on other locations."). Other courts have similarly found such historical examples lacking. *Koons v. Platkin*, 2023 WL 3478604, at *93 ("This Court has uncovered no laws from the 18th or 19th centuries that banned firearms at hospitals, almshouses, asylums, or other medical facilities."); *Antonyuk v. Hochul*, 639 F. Supp. 3d at 318 ("[C]ertainly the medical profession existed in 18th and 19th century America; and certainly gun violence existed in 18th and 19th century America," yet "the State Defendants do not cite (and the Court has been unable to yet locate) any laws from those time periods prohibiting firearms in places such as 'almshouses,' hospitals, or physician's offices.").

Of course, "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26. But the government need not present "a historical *twin*" for a regulation to be lawful.[4] *Id.* at 30. In this vein, the government contends that SB2's ban on permitholder carry in medical facilities "fits within the Nation's tradition of sensitive place restrictions because modern health care facilities exist for scientific and educational purposes and serve a vulnerable population," citing three Reconstruction-era laws: (1) an 1870 Texas law prohibiting bringing firearms to "any school room or other place where persons are assembled for educational, literary or scientific purposes," (*May* Dkt. 22, Ex. 77), (2) an 1878 Mississippi law prohibiting "any student of any university, college or school" from carrying a concealed weapon, (*id.*, Ex. 100), and (3) an 1879 Missouri law prohibiting concealed carry in "any school room or place where people are assembled for educational, literary or social purposes," (*id.*, Ex.

---

[4] Indeed, there does not appear to be a single regulation near the founding that prohibits carrying a weapon at or near a school.

103).  (Opp. at 28.)[5]  The government argues these "laws were designed to, among other things, protect vulnerable persons who, because of their age or physical state, cannot easily escape attack, much less defend themselves."  (*Id.*)  At least one court has agreed with this reasoning, denying a preliminary injunction of a regulation prohibiting firearms in health care facilities because such facilities, "like schools, serve a vulnerable population, and their regulation is justified by the protection of that population," and because "there are representative historical statutes aimed at protecting places for educational, literary, or scientific purposes, and health care facilities clearly advance a scientific purpose."  *Kipke v. Moore*, 2023 WL 6381503, at *8 (D. Md. Sept. 29, 2023).

California's ban on CCW permitholders carrying firearms in facilities providing medical services is supported neither by any history or tradition of banning firearms in those locations nor by any analogy to "settled" sensitive places.  The government provides no evidence that the proffered analogies prohibiting firearms in places where people gather for "scientific" or "educational" purposes are well-established, representative, or consistent with a tradition of banning firearms in places like hospitals and urgent cares.  *See Bruen*, 597 U.S. at 30.  Nor are the proffered analogies "relevantly similar" because SB2, which prevents people that law enforcement has vetted and who have been trained on the carry and use of their handguns from carrying those handguns to defend themselves and their families in case of confrontation in places they visit in their everyday lives, imposes a far greater burden on the right to self-defense than the proffered historical analogues with non-comparable justifications.  *See id.* at 29 ("[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry.") (cleaned up).  Moreover, if the "settled" constitutionality of prohibiting firearms in schools is sufficiently analogous to a

---

[5] The Court focuses its analysis on the analogues specifically cited in the parties' briefing.

regulation prohibiting firearms in medical facilities, that logic is broad enough to altogether "eviscerate the general right to publicly carry arms for self-defense." *Id.* at 31. In short, designating medical facilities as "sensitive places" impermissibly "operate[s] to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose" without any persuasive analogue in historical regulation or "settled" sensitive places. *Id.* at 60.

### b.  (8) Public Transportation

Section 26230(a)(8) prohibits a CCW permitholder from carrying a firearm into "[a] bus, train, or other form of transportation paid for in whole or in part with public funds, and a building, real property, or parking area under the control of a transportation authority supported in whole or in part with public funds."[6]  The government fails to carry its burden to show that this regulation is supported by analogy to either historical regulations or to "settled" sensitive places.

The government contends this restriction is consistent with the nation's tradition of regulating firearms because "public transit vehicles and facilities are crowded, confined spaces," and that "[i]n such densely packed spaces, the discharge of a firearm is highly likely to result in severe injury to innocent bystanders, either via a gunshot wound or due to mass panic from attempts to escape the shooter." (Opp. at 24.)  But spaces do not become sensitive simply because they are "crowded and protected generally by" the police. *Bruen*, 597 U.S. at 31.  And densely packed spaces are precisely the types of spaces that malicious criminals target for mass-shootings.  Indeed, public transportation is the type of place that may require exercising the right to self-defense.  Not everyone has the luxury of commuting in the solitary safety of a private vehicle.  (*Cf. May* Mot. at

---

[6] SB2 recognizes that "[e]xisting law prohibits a person from knowingly possessing a firearm in a sterile area of an airport, passenger vessel terminal, or public transit facility."  2023 Cal. Legis. Serv. Ch. 249 (S.B. 2).

10 ["California apparently takes the position that only those with access to private transportation and/or those who live in gated communities should retain at least some semblance of a rights to public carry."]; Marvel Decl. ¶ 8 ["The prohibition even extends to public transposition, imposing discriminatory impacts on people of lesser means and harming the environment."].)

Next, the government argues this restriction is consistent with the nation's history of firearms regulation because public transportation "serve[s] vulnerable populations, particularly children." (Opp. at 24); *see Kipke*, 2023 WL 6381503, at *10 (denying preliminary injunction on sensitive place designation of public transportation because "[l]ike schools, mass transit facilities are crowded spaces that serve vulnerable populations like children and disabled people"). But public transportation is "not densely populated by children." *Antonyuk v. Hochul*, 639 F. Supp. 3d at 330. And to conclude that public transportation may be considered a "sensitive place" by analogizing to the "settled" fact that schools are sensitive places requires accepting the false notion that any place where children may be found, under any circumstances, may be designated a sensitive place. This overbroad reasoning would impermissibly "eviscerate the general right to publicly carry arms for self-defense." *Bruen*, 597 U.S. at 31.

The government further maintains that the public transportation restriction is lawful on the basis that many public transportation hubs "are government buildings." (Opp. at 24); *see Kipke*, 2023 WL 6381503, at *10 (denying preliminary injunction as to public transportation because "some mass transit facilities, such as bus, train, or subway stations, could also be categorized as government buildings, which are established sensitive places"). This analogy fails. Historic laws protecting government buildings "were aimed at essentially protecting the operation of the three branches of government, not the regulation of a public service (such as transportation in public)." *Antonyuk v. Hochul*, 639 F. Supp. 3d at 330.

Finally, the government argues that the public transportation prohibition "is consistent with Reconstruction-era restrictions on the carry of firearms on trains." (Opp. at 25 [citing *May* Dkt. 21-9, Declaration of Dr. Brennan Rivas, ¶ 67; *May* Dkt. 21-10, Declaration of Joshua Salzmann, ¶¶ 69–77].) But the restrictions the government cites are gun-carriage policies of private rail companies, including Union Pacific and Central Pacific, North Pennsylvania Railroad, South Carolina Canal and Rail Road Company, International and Great Northern Railroad Company, and Albany Railway. (Rivas Decl. ¶ 67; *see* Salzmann Decl. ¶ 69 ["I consulted more than seventy railroad company rule books and timetables."].) A handful of private companies' rules do not establish an "enduring American tradition of state regulation." *Bruen*, 597 U.S. at 69; *cf. Antonyuk v. Hochul*, 635 F. Supp. 3d 111, 131 (N.D.N.Y. 2022) ("[G]enerally, a historical statute cannot earn the title 'analogue' if it is clearly more distinguishable than it is similar to the thing to which it is compared.").

"Analogical reasoning requires judges to apply faithfully the balance struck by the founding generation to modern circumstances." *Bruen*, 597 U.S. at 29 n.7. And the government has presented no evidence that this balance supports preventing people who have been through a thorough background check and training process to obtain a special permit to carry a concealed weapon from exercising their constitutional right to self-defense on public transportation.

c.      **(9) Places Where Liquor is Sold for On-Site Consumption**

Section 26230(a)(9) prohibits a CCW permitholder from carrying a firearm into "a building, real property, and parking area under the control of a vendor or an establishment where intoxicating liquor is sold for consumption on the premises." This regulation is also inconsistent with the Second Amendment's guarantee of an individual right to bear arms for self-defense in case of confrontation.

The government contends that this provision is "broadly consistent with the rich history and tradition of restricting firearms at social gatherings and public assemblies." (Opp. at 21.)  The first law it cites is a 1786 Virginia law prohibiting "go[ing] or rid[ing] armed by night nor by day, in fairs or markets, or in other places, in terror of the county, upon pain of being arrested." (*May* Dkt. 22, Ex. 31.)  However, there is simply no comparison between prohibiting law-abiding citizens who have completed a rigorous application process to carry a concealed weapon for self-defense at small, quiet restaurants with prohibiting a person to enter a fair or market armed "in terror of the county."  *See Bruen*, 597 U.S. at 50 (analyzing this law and noting that it and similar laws "prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among the people"); *Antonyuk v. Hochul*, 639 F. Supp. 3d at 334 ("Setting aside the fact that the armed horseback riders referenced in the Virginia law were, by definition, *brandishing* arms and not carrying them *concealed*, the modern regulation is not limited to instances in which the concealed carry licensees are 'terrorizing' others (or doing so while traveling through necessarily congested areas).  As a result, the Court must reject that analogy, and discount the weight of the 1789 Virginia law.").  Rather than supporting disarming law-abiding citizens who have been vetted and trained, this law highlights that the founding generation sought to disarm those who carried firearms for the wrong reasons and with ill-intent.  *See* Kopel & Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. at 234; *Bruen*, 597 U.S. at 50.

The government's other proffered analogues fare no better.  These are an 1816 New Orleans law prohibiting "enter[ing] into a public ballroom with any . . . weapon," and requiring that anyone possessing a weapon deposit the weapon at the entrance of the ballroom in the style of a coat check, (*May* Dkt. 22, Ex. 38), an 1853 New Mexico law requiring that any person holding a "Ball[] or Fandango[]" to "present a competent person, who shall discharge the duties of a Police Officer," who will prohibit "any person to enter said Ball or room adjoining said ball where Liquors are sold, or to remain in said

balls or Fandangos with fire arms or other deadly weapons," (*id.*, Ex. 58), and an 1882 New Orleans law prohibiting carrying arms "into any theatre, public hall, tavern, pic-nic ground, place for shows or exhibitions, house or other place of public entertainment or amusement," (*id.*, Ex. 112).  The government also argues "there is an abundance of historical laws restricting the carrying of firearms in alcohol-rich environments that reflect an understanding of the unique dangers of mixing alcohol and guns," citing colonial laws prohibiting selling alcohol to on-duty militiamen or near military training sites and an 1859 Connecticut statute prohibiting selling alcohol within one mile of a military ground or encampment.  (Opp. at 21–22.)

SB2's prohibition on CCW permitholders carrying firearms at any place where liquor is sold for on-site consumption does not "impose a comparable burden on the right of armed self-defense" that "is comparably justified" with these proffered historical regulations.  *Bruen*, 597 U.S. at 29.  Unlike the proffered historical analogues, SB2 prohibits law-abiding, responsible, ordinary citizens from carrying a firearm for self-defense even to a small, uncrowded restaurant if that restaurant sells wine to drink at the table.  This affects a person's everyday life, not just their attendance at special events. *See Koons v. Reynolds*, 649 F. Supp. 3d 14, 31–32 (D.N.J. 2023) (granting preliminary injunction of regulation prohibiting carry in "a bar or restaurant where alcohol is served, and any other site or facility where alcohol is sold for consumption on the premises" because the state failed to proffer comparable historical analogues).  The government's argument that the restriction is consistent with the nation's tradition of restricting firearms to protect "vulnerable populations (i.e., those whose judgment is impaired)," (Opp. at 21), is also unpersuasive.  *See Kipke*, 2023 WL 6381503, at *11 ("[T]he Court is unconvinced that intoxicated people qualify as a vulnerable population, like children or hospitalized individuals.").

Next, the government relies on historical regulations prohibiting intoxicated people from carrying firearms.  (Opp. at 22.)  These are plainly not comparable.  *Koons v. Reynolds*, 649 F. Supp. 3d at 32 (rejecting 1867 Kansas statute that prohibited the possession of firearms by intoxicated persons as having "no relevance here as the restriction at issue clearly does not address possession of firearms by intoxicated persons"); *Kipke*, 2023 WL 6381503, at *11 ("Those historical statutes prevented only intoxicated individuals from carrying firearms, while SB 1 bans all people present at locations selling alcohol from carrying."); *Wolford*, 2023 WL 5043805, at *18 (preliminarily enjoining similar regulation because it was broader than "a national historical tradition of regulating intoxicated individuals from carrying firearms").

The closest historical analogues the government cites are an 1853 New Mexico law prohibiting carry in balls or fandangos "where Liquors are sold," (*May* Dkt. 22, Ex. 58), an 1890 Oklahoma law prohibiting carry "to any place where intoxicating liquors are sold," (*id.*, Ex. 144), and an 1870 San Antonio ordinance prohibiting carry at "any barroom [or] drinking saloon," (*id.*, Ex. 76).  (Opp. at 22.)  However, these nineteenth-century regulations from territories and localities are insufficient to demonstrate that a prohibition on CCW permitholders carrying firearms in places where liquor is sold for on-site consumption is supported by this nation's history and tradition of firearm regulation.  *See Bruen*, 597 U.S. at 66–70 (discounting weight of late-19th century regulation from the Western Territories); *see, e.g.*, *Kipke*, 2023 WL 6381503, at *11 ("The Supreme Court has already identified Oklahoma as a non-representative jurisdiction, *Bruen*, 142 S.Ct. at 2154, and thus the Court will not interpret the Oklahoma statute as evincing the nation's tradition of firearm regulation."); *Antonyuk v. Hochul*, 639 F. Supp. 3d at 323 ("Of course, to the extent the laws come from territories (i.e., Salt Lake City in 1888, Arizona in 1889, and Oklahoma in 1890), the Court affords them little weight.").

### d.    (10) Public Gatherings and Special Events

Section 26230(a)(10) prohibits a CCW permitholder from carrying a firearm into "a public gathering or special event conducted on property open to the public that requires the issuance of a permit from a federal, state, or local government and sidewalk or street immediately adjacent to the public gathering or special event but is not more than 1,000 feet from the event or gathering, provided this prohibition shall not apply to a licensee who must walk through a public gathering in order to access their residence, place of business, or vehicle."

This regulation is inconsistent with this nation's history and tradition of firearm regulation.  Indeed, "[j]ust before the ratification of the Second Amendment, six out of the thirteen original colonies required their citizens to go armed when attending . . . public assemblies." *Kipke*, 2023 WL 6381503, at *16 (granting preliminary injunction of regulation prohibiting concealed carry at public gatherings, demonstrations, or events requiring a government permit); *Koons v. Platkin*, 2023 WL 3478604, at *73 (explaining that because "[t]he colonial generation recognized that citizens attending public gatherings exposed themselves to violent attack," they "obligated their citizenry to arm themselves for protection," citing *Heller*, 554 U.S. at 601 (observing that "[m]any colonial statutes required individual arms bearing for public-safety reasons")).

The government contends that SB2's public gathering and special events regulation is justified by "the rich historical tradition of prohibiting the carry of firearms where people gather for social and entertainment purposes."  (Opp. at 26.)  It cites many of the same statutes cited in support of the restriction on carry in places where liquor is sold for on-site consumption, including the 1786 Virginia terror in fair or markets law, the 1816 New Orleans weapon coat check law, the 1853 New Mexico law relating to balls or fandangos, and the 1882 New Orleans law regulating carry in theaters, public

halls, places for shows or exhibitions, or other places of public entertainment or amusement.  (*Id.*)  But these laws are not sufficient analogues.  First, these 19th-century laws provide "less insight into the meaning of the Second Amendment when [they] contradict[] earlier evidence."  *Bruen*, 597 U.S. at 66; *see Kipke*, 2023 WL 6381503, at *16 (granting preliminary injunction regarding public demonstrations sensitive-place designation and rejecting government's citation "to several nineteenth-century statutes that prohibited firearms at public assemblies" on this basis); *see also* Kopel & Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. at 290–91 (arguing that "no 'sensitive places' precedent can be drawn from statutes that forbade bearing arms at all public assemblies or social gatherings" because "[a]lthough some of these laws were enacted long ago, none of them are longstanding, for every one of them has been repealed," as "[e]very state that had such a law has replaced it with laws allowing licensed concealed carry, or open carry, in public places, including places of public assembly or social intercourse").  Second, the laws are not relevantly similar because SB2 poses a much greater burden than the historical analogues.  While the cited analogues prohibit firearms in public gatherings like balls and fandangos for entertainment and amusement, SB2 prohibits trained and vetted CCW permitholders from carrying firearms at any public gathering or special event that requires a permit, even at religious or protest gatherings that may implicate other constitutional rights.  *See id.*; *cf.* Darrell A. H. Miller, *Constitutional Conflict and Sensitive Places*, 28 Wm. & Mary Bill Rts. J. 459, 484 (2019) (suggesting an approach in which "the public square" is a permissible sensitive place because "[t]he implication is that any balancing between safety and risks along other constitutionally inflected margins—like speech or the fundamental right to vote—have been made already in defining the exception").

### e.  (11) Playgrounds and Youth Centers

Section 26230(a)(11) prohibits a CCW permitholder from carrying a firearm into "a playground or public or private youth center, as defined in Section 626.95, and a street or sidewalk immediately adjacent to the playground or youth center."  Section 626.95(c) defines a "playground" as "any park or recreational area specifically designed to be used by children that has play equipment installed, including public grounds designed for athletic activities such as baseball, football, soccer, or basketball, or any similar facility located on public or private school grounds, or on city or county parks."  And it defines a "youth center" as "any public or private facility that is used to host recreational or social activities for minors while minors are present."

Contrary to the government's contention and other courts' conclusions,[7] this regulation is not supported by analogy to the "settled" notion that states may ban firearms in schools.  Constitutionally permissible "new and analogous sensitive places" must be similar to existing sensitive places in both how and why the government burdens the right to carry firearms for self-defense.  *Bruen*, 597 U.S. at 29–30.  Regulating firearms at schools is different than playgrounds and youth centers in key ways.  Rather than delivering children to the state (sometimes with armed officers) for protection, at playgrounds parents and caregivers remain responsible for their children's safety without any immediate support.[8]  And in contrast to the restricted grounds of a school where

---

[7] *See Siegel v. Platkin*, 653 F. Supp. 3d 136, 152 (D.N.J. 2023) (granting preliminary injunctive relief regarding playgrounds because "schools and playgrounds intersect, that is, playgrounds fall within the sphere of schools," and "[t]herefore, under *Bruen*, the Court 'can assume it settled' that playgrounds are a 'sensitive place'"); *We the Patriots, Inc. v. Grisham*, 2023 WL 6622042, at *10 (D.N.M. Oct. 11, 2023) (finding "that playgrounds are 'sensitive places'" because they "are often associated with schools and therefore the inference that they are sensitive places under *Bruen* is appropriate").

[8] Significantly, early regulation of firearms in schools applied only to students, not to faculty, staff, or other employees.  Kopel & Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. at 250 (stating that schools were "not a place where arms were forbidden to responsible adults").  Indeed, the government's own expert notes the *in loco parentis* influence on early school weapons bans.  (*May* Dkt.

unauthorized persons generally may not enter, playgrounds and youth centers are public, unrestricted spaces.  Because SB2's prohibition on CCW permitholders carrying firearms at playgrounds and youth centers eviscerates their ability to defend themselves and their children against attack, the burden it creates on the core Second Amendment right is far greater than the burden created by making schools a sensitive place.  *See Bruen*, 597 U.S. at 31.

### f.      (12) and (13) Parks and Athletic Facilities

Section 26230(a)(12) prohibits a CCW permitholder from carrying a firearm into "a park, athletic area, or athletic facility that is open to the public and a street or sidewalk immediately adjacent to those areas, provided this prohibition shall not apply to a licensee who must walk through such a place in order to access their residence, place of business, or vehicle."  And Section 26230(a)(13) prohibits them from carrying a firearm into "[r]eal property under the control of the Department of Parks and Recreation or Department of Fish and Wildlife, except those areas designated for hunting pursuant to Section 5003.1 of the Public Resources Code, Section 4501 of Title 14 of the California Code of Regulations, or any other designated public hunting area, public shooting ground, or building where firearm possession is permitted by applicable law."  These regulations are not consistent with this nation's tradition of firearm regulation.

The government argues that a historical tradition of regulating firearms in parks exists because "[b]y 1900, the carrying of firearms was prohibited in more than two dozen parks across at least ten different states," including New York's Central Park, Philadelphia's Fairmount Park, and San Francisco's Golden Gate Park.  (Opp. at 32–33 [citing *May* Dkt. 21-13, Declaration of Terence Young, ¶¶ 34–35, 37].)  It contends that

---

21-1 [Declaration of Holly Brewer] ¶ 22 [stating that university bans "reflect[ed] the degree of authority a state institution could wield over legal infants under its care"].)

earlier laws prohibiting carry in parks do not exist because "[p]ublic parks that resemble modern parks only began to emerge in the middle of the nineteenth century." (*Id.*)

But even assuming these relatively few nineteenth-century laws are persuasive historical analogies, there is no evidence that they are well-established, representative, or consistent with a national tradition of prohibiting firearms in all public parks as SB2 does. *See Siegel v. Platkin*, 653 F. Supp. 3d 136, 153 (D.N.J. 2023) ("Six cities do not speak for, what was by 1893, 44 states.  Under *Bruen*, the state's evidence is not sufficient for the broader proposition that carrying firearms can be forbidden in all public parks in the State of New Jersey.") (citation omitted); *Antonyuk v. Hochul*, 639 F. Supp. 3d at 325–26 ("In any event, even if the number and geographical origins of these city laws [prohibiting carry in public parks] (when combined with the two state laws previously mentioned) were sufficient to constitute a tradition that was *established*, they do not constitute a tradition that was *representative* of the Nation."); *Koons v. Platkin*, 2023 WL 3478604, at *85 ("That said, even if the State's mid- to -late 19th century historical laws banning firearms at parks were well-established, the laws do not appear to be representative of the entire nation. By 1890, those laws—one state law and about 25 local ordinances—governed less than 10% of the nation's entire population and thus are unrepresentative.").

Moreover, the historical laws presented are not relevantly similar to SB2 because SB2 restricts carry not at particular named parks or athletic facilities like those laws, but at all public parks and athletic facilities, of which there must be tens of thousands across California.  SB2's park restrictions are therefore extraordinarily more burdensome on the core Second Amendment right to self-defense than any of the historical analogues.  *See Wolford*, 2023 WL 5043805, at *24 ("The State fails to meet its burden to show that there is a national historical tradition prohibiting carrying firearms in parks."); *Siegel*, 653 F. Supp. 3d at 153 (D.N.J. 2023) (finding that the government "ha[d] not put forward

sufficient evidence at this juncture to justify their regulation of firearms in public parks" and "recreational facilities"). Indeed, because of the amount of land they cover, they come too close to "eviscerat[ing] the general right to publicly carry arms for self-defense." *Bruen*, 597 U.S. at 31; *see also People v. Chairez*, 104 N.E.3d 1158, 1177 (Ill. 2018) (striking down under old Second Amendment analysis prohibition on "possessing a firearm within 1000 feet of a public park" and noting that "the State conceded at oral argument that the 1000–foot firearm restriction zone around a public park would effectively prohibit the possession of a firearm for self-defense within a vast majority of the acreage in the city of Chicago because there are more than 600 parks in the city"); *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 661 (Del. 2017) ("The evisceration of the right to self-defense and defense of family in the entirety of Delaware State Parks and Forests is inconsistent with" the Delaware Constitution.).

Also unpersuasive is the government's attempt to analogize parks to existing sensitive places like schools given "the *people* who congregate there, including particularly vulnerable groups such as children, the elderly, and those suffering from illness." (Opp. at 28.) Parks and athletic facilities are frequented by adults and children, and by people in good health and poor. If public parks were similar enough to schools to qualify as a "sensitive place" by analogy, nearly any place could be categorized as sensitive and the government could effectively disarm CCW permitholders altogether.

### g.    (15) Casinos, (16) Stadiums and Arenas, and (19) Amusement Parks

Section 26230(a)(15) prohibits a CCW permitholder from carrying a firearm into "[a] building, real property, or parking area that is or would be used for gambling or gaming of any kind whatsoever, including, but not limited to, casinos, gambling establishments, gaming clubs, bingo operations, facilities licensed by the California Horse Racing Board, or a facility wherein banked or percentage games, any form of

gambling device, or lotteries, other than the California State Lottery, are or will be played."  Section 26230(a)(16) prohibits a permitholder from carrying a firearm into "[a] stadium, arena, or the real property or parking area under the control of a stadium, arena, or a collegiate or professional sporting or eSporting event."  And Section 26230(a)(19) prohibits a permitholder from carrying a firearm into "[a] building, real property, or parking area under the control of an amusement park."

The government argues that banning firearms in all three of these places is justified by "the rich historical tradition of prohibiting the carry of firearms where people gather for social and entertainment purposes."  (Opp. at 26.)  Again, it cites the 1786 Virginia terror in fair or markets law, the 1816 New Orleans "public ballroom" weapon coat check law, the 1853 New Mexico law banning firearms at "Balls or Fandangos," and the 1882 New Orleans law regulating carry in theaters, public halls, places for shows or exhibitions, or other places of public entertainment or amusement.  (*Id*. at 26–27.)  But the Virginia "terror" law and the nineteenth-century New Mexico and New Orleans laws do not reflect a well-established, representative historical tradition of preventing vetted and trained permitholders from carrying firearms for self-defense in casinos, stadiums, arenas, amusement parks, or similar locations.  *See Siegel*, 653 F. Supp. 3d at 152 ("Defendants have not come forward with strong historical evidence that the State may prohibit firearms at casinos or related facilities."); *see also B&L Prods., Inc. v. Newsom*, 2023 WL 7132054, at \*16 (C.D. Cal. Oct. 30, 2023) ("[T]here is no historical basis for a public space such as the Orange County Fairgrounds to be designated as a sensitive space.").

### h.    (17) Public Libraries, (20) Zoos, and Museums

Section 26230(a)(17) prohibits a CCW permitholder from carrying a firearm into "[a] building, real property, or parking area under the control of a public library."  And

Section 26230(a)(20) prohibits one from carrying a firearm into "[a] building, real property, or parking area under the control of a zoo or museum."

The government argues that "California's prohibition of firearms within libraries, museums, and zoos falls naturally within the Nation's historical tradition of regulating firearms in places of gathering for 'literary,' 'educational,' or 'scientific purposes,'" citing the same laws it maintains justify SB2's treatment of medical services facilities: an 1870 Texas law prohibiting firearms in "any school room or other place where persons are assembled for educational, literary or scientific purposes," (*May* Dkt. 22, Ex. 77), an 1878 Mississippi law prohibiting "any student of any university, college or school" from carrying a concealed weapon, (*id.*, Ex. 100), and an 1879 Missouri law prohibiting concealed carry in "any school room or place where people are assembled for educational, literary or social purposes," (*id.*, Ex. 103). (Opp. at 34.)  But the government fails to show that the laws it cites are well-established, representative, or consistent with a tradition of regulating firearms by preventing people with special permits who have been through background checks and training from carrying firearms to defend themselves and their families in case of confrontation at libraries, zoos, or museums. *Bruen*, 597 U.S. at 24, 31; *see Siegel*, 653 F. Supp. 3d at 154–55 (enjoining regulation prohibiting permitholder carry in "a publicly owned or leased library or museum"); *Antonyuk v. Hochul*, 639 F. Supp. 3d at 327 ("Simply stated, the Court finds that, based on the analogues provided by the State Defendants (and located by the Court thus far), this state-imposed ban in 'zoos' is disproportionately burdensome as compared to its relevant historical analogues.").  The proffered analogies are not "relevantly similar" because SB2 imposes a far greater burden on the right to self-defense than the proffered historical analogues with non-comparable justifications. *See Bruen*, 597 U.S. at 29.  Similarly, the regulation pertaining to public libraries, zoos, and museums is not justified by analogy to the "settled" sensitive place of schools.  Adults also frequent

public libraries, zoos, and museums, and when their children are present in those places, adults remain responsible for their safety.

### i.      (22) Places of Worship

Section 26230(a)(22) prohibits a CCW permitholder from carrying a firearm into "[a] church, synagogue, mosque, or other place of worship, including in any parking area immediately adjacent thereto, unless the operator of the place of worship clearly and conspicuously posts a sign at the entrance of the building or on the premises indicating that licenseholders are permitted to carry firearms on the property.  Signs shall be of a uniform design as prescribed by the Department of Justice and shall be at least four inches by six inches in size."

The parties agree that in the Founding era, there were "statutes all over America that *required* bringing guns into churches, and sometimes to other public assemblies." Kopel & Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. at 242; *id.* at 233 n.108 (collecting laws); *see Koons v. Platkin*, 2023 WL 3478604, at *21 ("[S]everal colonial governments passed laws requiring colonists to bring arms to church and public assemblies. . . ."); (Cramer Decl. ¶¶ 93–101 [collecting laws]).  They disagree, however, about the weight the Court should give these laws since they appear to have been aimed at allowing people "to defend against attacks from Native Americans and to suppress slave revolts."  *Koons v. Platkin*, 2023 WL 3478604, at *21; *see Goldstein v. Hochul*, 2023 WL 4236164, at *14 (S.D.N.Y. June 28, 2023) ("The laws cited by Plaintiffs concerning the mandatory carry of firearms in places of worship are rooted in racial supremacy, and had the reprehensible and shameful goal of preserving slavery. They should not be considered or at a minimum deserve little or no weight in the analysis of the history and tradition of the regulation of firearm carry by law-abiding citizens for self-defense."); (Cramer Decl. ¶ 102 [explaining that these laws "were in response to fear

of attack by Indians or slaves, depending on the colony and year"]).  The government contends that more appropriate historical analogues are laws from the late nineteenth century prohibiting carrying firearms to churches, religious assemblies, and places of public worship in Georgia, Texas, Missouri, Virginia, Arizona, and Oklahoma, and various localities.  (Opp. at 12–13.)

Even giving little weight to the mandatory carry laws from the Founding era, the government fails to present evidence of a history and tradition of prohibiting trained and vetted permitholders from carrying handguns for self-defense in places of worship where in this day and age they are increasingly likely to meet confrontation.[9]  *See Hardaway*, 639 F. Supp. 3d at 442 (enjoining similar law when government presented only "a handful of seemingly spasmodic enactments involving a small minority of jurisdictions governing a small minority of population" that "are far too remote, far too anachronistic, and very much outliers—insufficient, then, in the search for an American tradition").  There is no indication that these laws are well-established or representative.  *See* Brief of Amicus Curiae the Independent Institute in Support of Petitioners, *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 2021 WL 3127146, *16 ("In the late 19th century, a small handful of states experimented with broader gun-free zone legislation that sought to bar individuals from carrying firearms in churches or social gatherings.  These laws were short-lived, represented deviations from the laws of most other States, and should not provide any insight into the original meaning of the Second Amendment given their temporal distance from the Founding.").  The Second Amendment gives law-abiding individuals the right to carry firearms for self-defense outside the home, and "[n]othing in the Nation's history or traditions presumptively closes the door on that right *across every place of worship or religious observation*."  *Hardaway*, 639 F. Supp. 3d at 443; *see*

---

[9] SB2's preamble recognizes that "mass shootings motivated by religious hate" are on the rise and that evidence "suggest[s] that there are about 480 incidents of serious violence at places of worship in the United States each year."  2023 Cal. Legis. Serv. Ch. 249 (S.B. 2).

*Antonyuk v. Hochul*, 639 F. Supp. 3d at 322 (granting preliminary injunction regarding law making "any place of worship or religious observation" a sensitive place).

### j.      (23) Financial Institutions

Section 26230(a)(23) prohibits a CCW permitholder from carrying a firearm into "[a] financial institution or parking area under the control of a financial institution."  Even applying a more nuanced approach, as the government urges, this regulation is inconsistent with the Second Amendment.

The government has not cited a single historical regulation in which guns were prohibited in banks.  *See Wolford*, 2023 WL 5043805, at *25 (issuing temporary restraining order against sensitive place law regarding banks and financial institutions).  Rather, it argues that this regulation is relevantly similar to laws prohibiting carry in government buildings and schools.

Comparing to government buildings, the government argues that banks "are central to the functioning of the financial system," "are targets of armed and potentially violent robberies," and "are spaces that are particularly attractive to coordinated attacks by groups, including those with links to terrorism."  (Opp. at 14–15.)  But historical laws protecting government buildings are not relevantly similar to SB2's prohibition on CCW permitholders carrying firearms for self-defense at banks, which creates a far larger burden on the law-abiding citizen's Second Amendment right to self-defense.  While the historical laws were aimed at protecting the operation of one of the three branches of government and did so by disarming people in spaces they were not likely to frequent in their everyday lives where people stood guard at the entry to the building to ensure that no one was carrying a weapon, SB2 disarms particularly law-abiding citizens in a place

more peripherally related to democracy that they visit in the routine course and where any provided security does not ensure that visitors are not carrying a weapon.

The government's comparison to schools is an even bigger stretch.  It contends that banks are like schools because they "are frequented by vulnerable populations such as the elderly."  (Opp. at 14.)  But nonvulnerable populations are just as likely to visit banks as vulnerable populations.  Accepting a comparison between schools and banks in this context would condone eviscerating law-abiding citizens' Second Amendment right to carry a firearm in public for self-defense altogether.  *See Bruen*, 597 U.S. at 31.

### k.      (26) Privately-Owned Businesses Open to the Public

Section 26230(a)(26) prohibits a CCW permitholder from carrying a firearm into "[a]ny other privately owned commercial establishment that is open to the public, unless the operator of the establishment clearly and conspicuously posts a sign at the entrance of the building or on the premises indicating that licenseholders are permitted to carry firearms on the property.  Signs shall be of a uniform design as prescribed by the Department of Justice and shall be at least four inches by six inches in size."

To justify this provision, the government offers the following historical analogues: a 1721 Pennsylvania law making it a crime to "carry any gun or hunt on the improved or inclosed lands of any plantation other than his own, unless he have license or permission from the owner of such lands or plantation," (*May* Dkt. 22, Ex. 17), a 1722 New Jersey law providing for criminal penalties "if any Person or Persons shall presume . . . to carry any Gun, or hunt on the improved or inclosed Lands in any Plantation, other than his own, unless he have License of Permission from the Owner of such Lands or Plantation," (*id.*, Ex. 18), a 1763 New York law making it a crime to carry a "Musket, Fowling-Piece, or other Fire-arm whatsoever, into, upon, or through any . . . inclosed Land whatever . . .

without License in Writing first had and obtained for that Purpose from such Owner, Proprietor, or Possessor," (*id.*, Ex. 25), a 1771 New Jersey statutory update providing for penalties for those who "carry any Gun on any Lands not his own, and for which the Owner pays Taxes, or is in his lawful Possession, unless he hath License or Permission in writing from the Owner or Owners or legal Possessor," (*id.*, Ex. 26), an 1865 Louisiana law prohibiting "the carrying of fire-arms on premises or plantations of any citizen" without the owner's consent, (*id.*, Ex. 65), an 1866 Texas law making it unlawful "to carry firearms on the inclosed premises or plantation of any citizen, without the consent of the owner or proprietor," (*id.*, Ex. 68), and an 1893 Oregon law making it unlawful to be "armed with a gun, pistol, or other firearm, to go or trespass upon any enclosed premises or lands without the consent of the owner or possessor thereof," (*id.*, Ex. 163).

These laws are not relevantly similar to SB2's restriction on CCW permitholders carrying firearms for self-defense to private businesses open to the public.  First, at least three of the proffered analogues were "motivated by a substantially different reason (deterring unlicensed hunting) than the restricted location regulation (preventing gun violence)."  *Antonyuk v. Chiumento*, 2023 WL 8518003, at *84 (analyzing the 1721 Pennsylvania statute, 1722 New Jersey statute, and 1763 New York statute).  Indeed, the 1721 Pennsylvania law and the 1722 New Jersey law are both titled "An Act to Prevent the Killing of Deer out of Season, and Against Carrying of Guns or Hunting by Persons Not Qualified," and the 1763 New York law is titled "An Act to prevent hunting with Fire-Arms in the City of New-York."  (*Carralero* Reply at 13–14.)

More broadly, all of these analogues burdened the Second Amendment right "only on private lands *not open to the public*."  *Antonyuk v. Chiumento*, 2023 WL 8518003, at *84 (explaining that "the historical record indicates that 'land,' 'improved or inclosed land' and 'premises or plantations' would have been understood to refer to private land not open to the public").  "Given that most spaces in a community that are not private

homes will be composed of private property open to the public to which [this provision] applies, the restricted location provision functionally creates a universal default presumption against carrying firearms in public places, seriously burdening lawful gun owners' Second Amendment rights" in a way that "is entirely out of step with that imposed by the proffered analogues, which appear to have created a presumption against carriage only on private property not open to the public." *Id.* at *84.[10]

Simply put, "[t]he Nation's historical tradition is that individuals may carry arms on private property unless the property owner chooses otherwise." *Christian*, 642 F. Supp. 3d at 407 n.19.  Although private property owners have a right to forbid concealed carry on their property, "*the state* may not unilaterally exercise that right and, thereby, interfere with the Second Amendment rights of law-abiding citizens who seek to carry for self-defense outside of their own homes." *Id.* at 398; *see Koons v. Platkin*, 2023 WL 3478604, at *68 (preliminarily enjoining similar regulation); *Kipke*, 2023 WL 6381503, at *14 (same); *Wolford*, 2023 WL 5043805, at *27 ("What § 134-E does, and what cannot be constitutionally permitted, is remove the presumption of the right to carry a firearm on private property held open to the public."); *Siegel*, 653 F. Supp. 3d at 157–58 (granting TRO on similar regulation).

### l.  Parking Areas

Finally, Plaintiffs challenge SB2's sensitive-place designation of parking lots as to all of Section 26230's subdivisions.  Of course, parking areas associated with places the Court has determined are not sensitive are also not sensitive.  But there are certain places

---

[10] Notably, this provision poses a practical problem since a person may not approach the business with their firearm to get close enough to see the four-by-six-inch sign Section 26230(a)(26) requires without violating the statute.  In other words, a person must "constantly disarm" and "stop carrying for self-defense before" they "can get physically close enough to see if any 'clear and conspicuous signage' exists." *Christian*, 642 F. Supp. 3d at 400 (quoting the plaintiff's declaration).

SB2 designates as sensitive places that Plaintiffs do not challenge.  Those include preschool or childcare facilities (Section 26230(a)(2)), buildings under the control of an officer of the executive or legislative branch of the state government ((a)(3)), buildings designated for court proceedings ((a)(4)), buildings under the control of a unit of local government ((a)(5)), prisons and jails ((a)(6)), colleges and universities ((a)(14)), airports ((a)(18)), nuclear sites ((a)(21)), police stations ((a)(24)), and polling places ((a)(25)).  Plaintiffs challenge these sections only as they apply to parking areas and public appurtenant areas adjacent to those sensitive places, arguing that even truly sensitive places' "parking areas cannot also be sensitive based on mere spatial relationship, because banning public carry to and from a sensitive place would be an overbroad application of the limited, though legitimate, sensitive places doctrine."  (*May* Mot. at 4; *May* Reply at 8.)

The Court agrees that even in relation to places Plaintiffs do not challenge as sensitive, SB2's designation of parking areas as sensitive places is inconsistent with the Second Amendment.  Both *Heller* and *McDonald* describe sensitive places where carry may be prohibited using the preposition "in," not "near" or "around."  Kopel & Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. at 291–92 (citing Amy Hetzner, Comment, *Where Angels Tread: Gun-Free School Zone Laws and an Individual Right to Bear Arms,* 95 Marq. L. Rev. 359 (2011)).  And SB2's designation of parking areas as sensitive places imposes a much larger burden on law-abiding citizens' right to carry arms for self-defense in public than banning them in the sensitive places themselves.

The government argues that it may designate as sensitive parking lots associated with government buildings because "just as a private property owner may control conduct on its own land, the government holds a similar right when it operates as a proprietor." (Opp. at 11.)  But "the State is not *exempt* from recognizing the protections afforded to individuals by the Constitution simply because it acts on government property."  *Koons v.*

*Platkin*, 2023 WL 3478604, at \*51; *cf. Wolford*, 2023 WL 5043805, at \*20 (stating that the government's status as proprietor "may have been relevant when assessing Second Amendment challenges under a means-end scrutiny test," but questioning its relevance in the *Bruen* analysis).

## B.    Irreparable Harm

To obtain a preliminary injunction, a plaintiff must show that irreparable harm is likely in the absence of preliminary relief. *Winter*, 555 U.S. at 20. "The right to keep and bear arms has long been recognized as a fundamental civil right." *Rahimi*, 61 F.4th at 461 (Ho, J., concurring) (citing *Johnson v. Eisentrager*, 339 U.S. 763, 784 (1950); *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49–50 n.10 (1961)). It "is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (cleaned up); *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005) (explaining that a party seeking preliminary injunctive relief for violation of a constitutional right can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable constitutional claim); *see Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("[I]njuries to constitutional rights are considered irreparable for even minimal periods of time.") (cleaned up); *Goldie's Bookstore, Inc. v. Superior Ct. of State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984) ("An alleged constitutional infringement will often alone constitute irreparable harm."); Wright and Miller, 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed. 2019) ("When an alleged deprivation of a constitutional right is involved . . . most courts hold that no further showing of irreparable injury is necessary."); *Junior Sports Mags.*, 80 F.4th at 1120 (explaining that when a party shows a likelihood of success on the merits of a constitutional claim, "the remaining *Winter* factors favor enjoining the likely unconstitutional law"). "If a plaintiff bringing [a constitutional] claim shows he is likely to prevail on the merits, that showing will almost always

demonstrate he is suffering irreparable harm as well." *Baird*, 81 F.4th at 1042.  Because Plaintiffs have shown it is likely that the challenged SB2 provisions violate their Second Amendment rights, they have demonstrated that irreparable harm is likely without a preliminary injunction enjoining the government from enforcing those provisions.

### C.    Balance of Equities and Public Interest

Before issuing a preliminary injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 866 (9th Cir. 2017); *CTIA - The Wireless Association v. City of Berkeley*, 928 F.3d 832, 852 (9th Cir. 2019).  "When the government is a party, the last two factors merge." *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018).  "A plaintiff's likelihood of success on the merits of a constitutional claim also tips the merged third and fourth factors decisively in his favor." *Baird*, 81 F.4th at 1040.

The balance of the equities and the public interest weigh in favor of granting an injunction here.  Without a preliminary injunction enjoining enforcement of the challenged SB2 provisions, Plaintiffs will suffer harm because the government will infringe their Second Amendment rights.  "It is always in the public interest to prevent the violation of a party's constitutional rights." *Cal. Chamber of Commerce v. Council for Educ. and Research on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022) (cleaned up). Indeed, "public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution." *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005); *see Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (explaining that it is in the public interest to halt the "ongoing enforcement of the potentially unconstitutional regulations" because those regulations would infringe not only on the constitutional rights of the plaintiffs but also of the rest of

the public subject to the same regulation); *Junior Sports Mags.*, 80 F.4th at 1120 (explaining that when a party shows a likelihood of success on the merits of a constitutional claim, "the remaining *Winter* factors favor enjoining the likely unconstitutional law").

Moreover, the government "cannot suffer harm from an injunction that merely ends an unlawful practice" such as denying Californians' Second Amendment rights. *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).  The balance of the equities therefore tips in Plaintiffs' favor.  Although the government may have some valid safety concerns, legislation regulating CCW permitholders—the most responsible of law-abiding citizens seeking to exercise their Second Amendment rights—seems an odd and misguided place to focus to address those safety concerns.  *Wolford*, 2023 WL 5043805, at *32 ("Although the State raises important safety concerns, it fails to demonstrate that the public safety concerns overcome the public's interest in preventing constitutional violations. This is particularly relevant for this analysis because the challenged provisions only affect those individuals who have been granted a permit to carry firearms, either openly or concealed."); (Marvel Decl. ¶ 14 [agreeing with the California State Sheriffs' Association that "[i]nstead of focusing on a law-abiding population, efforts should address preventing gun crimes committed by those who disobey the law and holding them accountable"]); Mark W. Smith, *Enlightenment Thinker Cesare Beccaria and His Influence on the Founders: Understanding the Meaning and Purpose of the Second Amendment's Right to Keep and Bear Arms*, 2020 Pepp. L. Rev. 71 (2020) (quoting eighteenth-century Italian thinker Cesare Beccaria, who was "deeply influential on the American Founders' views of criminal law and theory, as writing, "[t]he laws that forbid the carrying of arms . . .  disarm those only who are neither inclined nor determined to commit crimes" and "make things worse for the assaulted and better for the assailants; they serve rather to encourage than to prevent homicides, for an unarmed man may be attacked with greater confidence than an armed man").

Simply put, CCW permitholders are not the gun wielders legislators should fear. *See Wolford*, 2023 WL 5043805, at *32 (noting that "the challenged provisions only impact a substantially small subset of gun owners and, thus, the State's public safety argument is not persuasive," and also that "the vast majority of conceal carry permit holders are law-abiding"). Indeed, CCW permitholders are not responsible for any of the mass shootings or horrific gun violence that has occurred in California. *See Koons v. Platkin*, 2023 WL 3478604, at *108 ("And herein lies the problem: despite ample opportunity for an evidentiary hearing, the State has failed to offer any evidence that law-abiding responsible citizens who carry firearms in public for self-defense are responsible for an increase in gun violence."). The Violence Policy Center collects statistics regarding non-self-defense killings CCW permitholders have committed since 2007. Violence Policy Center: Concealed Carry Killers, *available at* https://concealedcarrykillers.org/. In the *sixteen* years since that time, there is only evidence of *four* such incidents in California, with five total associated deaths. *Id.* at https://concealedcarrykillers.org/california/; *see Wolford*, 2023 WL 5043805, at *32 (citing Gun Owners of America amicus brief stating that Texas in 2020 had 1,441 convictions for aggravated assault with a deadly weapon but only four of those convictions were people with valid concealed carry permits – roughly 0.278% of the total); (*see May* Mot. at 31–34 [collecting similar statistics for Florida, Illinois, Minnesota, and Wisconsin]).

"The public has a significant interest in the strong sense of the safety that a licensed concealed handgun regularly provides, or would provide, to the many law-abiding responsible citizens in the state too powerless to physically defend themselves in public without a handgun." *Hardaway*, 639 F. Supp. 3d at 445. Contrary to this interest, SB2 requires that law-abiding citizens open themselves up for slaughter at the hands of people flaunting the law and creates numerous areas ripe for mass murder by ensuring there is no one there to protect people before "the intervention of society in his behalf."

*Heller*, 554 U.S. at 594–95; (*see* Marvel Decl. ¶ 7 ["[S]omeone intent on committing a mass murder will likely chose to do so in a 'sensitive' place, where he or she is less likely to encounter armed victims."]); *Hardaway*, 639 F. Supp. 3d at 445 (finding a preliminary injunction in the public interest because without one, "the challenged law creates a vulnerable population of attendees at places of worship left to the whims of potential armed wrongdoers who are uninterested in following the law in any event").

## IV.  CONCLUSION

The Second Amendment preserves a fundamental constitutional right for law-abiding citizens to keep and bear arms for self-defense.  Increasingly in modern times, with "the ubiquity of guns and our country's high level of gun violence," ordinary law-abiding people feel a need to carry handguns in public to protect themselves and their families against violence.  *Bruen*, 597 U.S. at 73 (Alito, J., concurring).  This may be because they "live in high-crime neighborhoods," or because they "must traverse dark and dangerous streets in order to reach their homes after work or other evening activities," or because they "reasonably believe that unless they can brandish or, if necessary, use a handgun in the case of attack, they may be murdered, raped, or suffer some other serious injury."  *Id.*  CCW permitholders are among the most responsible, reliable law-abiding citizens.  They have been through a vigorous vetting and training process following their application to carry a concealed handgun.  The challenged SB2 provisions unconstitutionally deprive this group of their constitutional right to carry a handgun in public for self-defense.  Therefore, those provisions must be preliminarily enjoined.

DATED:      December 20, 2023

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE

-43-