# Exhibit A

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 21-1832

_____

MADISON M. LARA; SOPHIA KNEPLEY; LOGAN D. MILLER; SECOND
AMENDMENT FOUNDATION, INC.; FIREARMS POLICY COALITION,
Appellants

v.

COMMISSIONER PENNSYLVANIA STATE POLICE

_____

On Appeal from the United States District Court
For the Western District of Pennsylvania
(D.C. No. 2-20-cv-01582)
District Judge:  Honorable William S. Stickman, IV

_____

SUR PETITION FOR REHEARING

_____

Present: CHAGARES, Chief Judge, JORDAN, HARDIMAN, SHWARTZ, KRAUSE,
RESTREPO, BIBAS, PORTER, MATEY, PHIPPS, FREEMAN, MONTGOMERY-
REEVES, CHUNG, and SMITH,* Circuit Judges

    The petition for rehearing filed by appellee in the above-entitled case having been

submitted to the judges who participated in the decision of this Court and to all the other

available circuit judges of the circuit in regular active service, and no judge who

concurred in the decision having asked for rehearing, and a majority of the judges of the

_____

    *Judge Smith's vote is limited to panel rehearing only.

circuit in regular service not having voted for rehearing, the petition for rehearing by the panel and the Court en banc, is DENIED.  Judges Shwartz, Krause, Restrepo, Freeman, Montgomery-Reeves and Chung voted to grant the petition.  Judge Krause files the attached dissent.

BY THE COURT

 s/   Kent A. Jordan
Circuit Judge

Date: March 27, 2024

cc: All counsel of record

KRAUSE, *Circuit Judge*, dissenting sur denial of rehearing *en banc*.

When they ratified the Second Amendment, our Founders did not intend to bind the nation in a straitjacket of 18th-century legislation, nor did they mean to prevent future generations from protecting themselves against gun violence more rampant and destructive than the Founders could have possibly imagined.  At a minimum, one would think that the states' understanding of the Second Amendment at the time of the "Second Founding"[1]—the moment in 1868 when they incorporated the Bill of Rights against themselves—is part of "the Nation's historical tradition of firearms regulation"[2] informing the constitutionality of modern-day regulations.

Indeed, since the Supreme Court tethered their constitutionality to the existence of historical precedent in *District of Columbia v. Heller*, 554 U.S. 570 (2008)*,* we and the other Courts of Appeals have consistently looked to Reconstruction-era, as well as Founding-era sources, and, even as the Supreme Court has acknowledged the "ongoing scholarly debate" about their relevance,[3] it too has relied on Reconstruction-era sources in each of its recent major opinions on the right to bear arms.  Notably, the Supreme Court is expected within the next few months, if not weeks, to issue its

---

[1] *See, e.g.*, Eric Foner, *The Second Founding: How The Civil War and Reconstruction Remade The Constitution* (2019); *see also Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2175 (2023) (referring to the incorporation of the Bill of Rights as "a Second Founding").

[2] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2126 (2022).

[3] *Id.* at 2138.

next seminal opinion, clarifying its historical methodology in the absence of Founding-era analogues.

Yet despite our own precedent acknowledging the relevance of Reconstruction-era sources, our recognition in an *en banc* opinion just last year that the Supreme Court relies on *both* Founding-era *and* Reconstruction-era sources,[4] and an imminent decision from the Supreme Court that may prove dispositive to this case, the panel majority here announced—over Judge Restrepo's compelling dissent—that all historical sources after 1791 are irrelevant to our Nation's historical tradition and must be "set aside" when seeking out the "historical analogues" required to uphold a modern-day gun regulations.[5] The panel majority then held—based exclusively on 18th-century militia laws and without regard to the voluminous support the statutory scheme finds in 19th-century analogues—that Pennsylvania's prohibition on 18-to-20-year-old youth carrying firearms in public during statewide emergencies is unconstitutional.[6]

The panel majority was incorrect, but more importantly, it erred profoundly in the methodology to which it purports to bind this entire Court and with far-reaching consequences. Against this backdrop, we should be granting Pennsylvania's

---

[4] *Range v. Att'y Gen.*, 69 F.4th 96, 104 (3d Cir. 2023) (*en banc*), *petition for cert. filed sub nom. Garland v. Range*, No. 23-374 (U.S. Oct. 5, 2023).

[5] *Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 134 (3d Cir. 2024).

[6] *Id.* (discussing Sections 6106, 6107, and 6109 of Pennsylvania's Uniform Firearms Act of 1995, 18 Pa. Cons. Stat. §§ 6101–6128 (2024)).

petition for *en banc* review,[7] supported by 17 other states and the District of Columbia as *amici*, or at least holding it *c.a.v.* pending the Supreme Court's decision in *United States v. Rahimi*.[8]  But instead, over the objection of nearly half our Court, we are denying it outright.

I respectfully dissent from that denial for four reasons. First, without *en banc* review, the panel majority's pronouncement cannot bind future panels of this Court.  We have held Reconstruction-era sources to be relevant in decisions both before and after *Bruen* so, under our case law and our Internal Operating Procedures, *en banc* rehearing is necessary before any subsequent panel can bind our Court to a contrary position.[9]  Second, *en banc* review would allow us to apply the proper historical methodology, which would compel a different outcome in this case.  Third, *en banc* review is necessary for error correction: Even if we limit ourselves to Founding-era sources, the panel failed to recognize that legislatures in that era were authorized to categorically disarm groups they reasonably judged to pose a particular risk of danger, and Pennsylvania's modern-day judgment that youth under the age of 21 pose such a risk is well supported by

---

[7] *See generally* Commissioner's Petition for Rehearing, or, Alternatively, Rehearing *En banc*, *Lara*, 91 F.4th 122 (No. 21-1832), ECF No. 81.

[8] No. 22-915 (U.S. argued Nov. 7, 2023); *see* Brief of Amici Curiae Illinois et al. in Support of Defendant-Appellee's Petition for Rehearing or Rehearing *En banc*, *Lara*, 91 F.4th 122 (No. 23-1832), ECF No. 82 (explaining the wide-ranging impact of the divided panel's majority opinion for states across the country).

[9] *See* 3d Cir. I.O.P. 9.1.

evidence subject to judicial notice.  And fourth, the majority's narrow focus on the Founding era demands rehearing because it ignores the Supreme Court's recognition that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach."[10]  For each of these reasons, discussed in turn below, *en banc* review should be granted.

### A.    *En banc* Consideration Is Necessary Before Our Court Can Adopt the Panel Majority's Novel Methodology.

Confronted with 19th-century regulations supporting the constitutionality of Pennsylvania's statutory scheme, the panel majority took the position that it could simply "set aside" that evidence based on its pronouncement that "the Second Amendment should be understood according to its public meaning in 1791," rather than "according to [its] public meaning in 1868."  *Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 134 (3d Cir. 2024).  But that novel methodology, which the majority attempted to ground in a "hint" in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), and inferences from cases *outside* the Second Amendment context, *see Lara*, 941 F.4th at 133, not only contravened *Bruen* and other Supreme Court precedent within the Second Amendment context, *see infra*, but also violated our Internal Operating Procedures by purporting to overrule the holdings of prior panels without either *en banc* review or clear abrogation of our prior precedent by the Supreme Court, *see* 3d Cir. I.O.P. 9.1.

---

[10] *Bruen*, 142 S. Ct. at 2131, 2132.

For its part, the Supreme Court has cited to and relied upon Reconstruction-era sources, in addition to Founding-era sources in all of its recent Second Amendment cases—*Bruen* included. Whatever "hint[s]" the panel majority may take from *Bruen*, *Lara*, 91 F.4th at 133, the Supreme Court there recognized that states are "bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second," and proceeded to consider not just 18th-century analogues but also "[e]vidence from around the adoption of the Fourteenth Amendment," *Bruen*, 142 S. Ct. at 2137, 2150. The Supreme Court has also cited Reconstruction-era sources as relevant historical evidence in its other Second Amendment cases. *See, e.g.*, *McDonald v. City of Chicago*, 561 U.S. 742, 777 (2010) (Alito, J.) ("[I]t is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty."); *Heller*, 554 U.S. at 605 ("We now address how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century.").

Until the underlying panel opinion here, our Court, too, has followed the Supreme Court's instruction and consistently relied upon Reconstruction-era sources, alongside Founding-era sources, as relevant historic analogues in defining "the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126; *see, e.g.*, *Frein v. Pa. State Police*, 47 F.4th 247, 255 (3d Cir. 2022) ("Plus, the Fourteenth Amendment's ratifiers understood that it would stop gun seizures."); *Drummond v. Robinson Township*, 9 F.4th 217, 228 (3d Cir. 2021) ("Some Colonial and Reconstruction Era governments made it illegal to sell guns to enslaved or formerly enslaved people and members of Native American tribes."), *abrogated*

*on other grounds by Bruen*, 142 S. Ct. 2111; *Folajtar v. Att'y Gen.*, 980 F.3d 897, 905 (3d Cir. 2020) (considering statutes from "the turn of the nineteenth century"), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111.

Most recently, our *en banc* opinion in *Range* likewise acknowledged that Reconstruction-era sources are relevant. We acknowledged *Bruen*'s "emphasis on Founding *and* Reconstruction-era sources" and rejected only the notion that a statute enacted "nearly a century after the Fourteenth Amendment's ratification" could be considered "longstanding." *Range v. Att'y Gen.*, 69 F.4th 96, 104 (3d Cir. 2023) (*en banc*) (emphasis added), *petition for cert. filed sub nom. Garland v. Range*, No. 23-374 (U.S. Oct. 5, 2023). Thus, both pre- and post-*Bruen*, we—along with other Courts of Appeals[11]—have held Reconstruction-era sources to be both relevant and informative.

---

[11] As the First Circuit recently observed, while *Bruen* "indeed indicated that founding-era historical precedent is of primary importance for identifying a tradition of comparable regulation," it also "relied upon how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century" and "likewise left open the possibility that late-19th-century evidence and 20th-century historical evidence may have probative value if it does not contradict[] earlier evidence." *Ocean State Tactical, LLC v. Rhode Island*, --- F.4th ---, No. 23-1072, 2024 WL 980633, at *10 (1st Cir. Mar. 7, 2024) (internal citations and quotation marks omitted)). *See also Antonyuk v. Chiumento*, 89 F.4th 271, 305 (2d Cir. 2023) ("We therefore agree with the decisions of our sister circuits—emphasizing the understanding that prevailed when the States adopted the Fourteenth

In view of this precedent, *en banc* rehearing is required before *any* subsequent panel has authority to hold—let alone to bind this Court to a holding—that Reconstruction-era sources must henceforth be "set aside," *Lara*, 91 F.4th at 134, when interpreting the Second Amendment.  *See* 3d Cir. I.O.P. 9.1 (providing that prior panels' holdings are "binding on subsequent panels" and "no subsequent panel overrules the holding . . . of a previous panel" because "Court *en banc* consideration is required to do so.").

The only exception to this well-established rule arises when the "prior panel's holding is in conflict with Supreme Court precedent." *Karns v. Shanahan*, 879 F.3d 504, 514–15 (3d Cir. 2018) (quotation marks omitted).  But that is not the case here.  Even the *Lara* panel acknowledged it was acting on

---

Amendment—is, along with the understanding of that right held by the founders in 1791, a relevant consideration." (internal citations and quotation marks omitted)), *petition for cert. filed sub nom. Antonyuk v. James*, No. 23-910 (U.S. Feb. 20, 2024); *Ezell v. City of Chicago*, 651 F.3d 684, 705 (7th Cir. 2011) ("[T]he most relevant historical period for questions about the scope of the Second Amendment as applied to the States is the period leading up to and surrounding the ratification of the Fourteenth Amendment."), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111; *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (similar), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111; *Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018) (discussing a "comprehensive survey of the historical record," which included laws from the 19th century), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111; *see also* Brief of Amici Curiae Illinois et al., *supra* note 7, 12 (collecting cases).

what it perceived as a "hint" the Supreme Court dropped in *Bruen*, not a holding. *Lara*, 91 F.4th at 133. *Bruen*, in fact, reiterated the "methodological approach to the Second Amendment" that the Court adopted in *Heller*, including its rejection of the notion that Reconstruction-era sources were "illegitimate postenactment legislative history." 142 S. Ct. at 2127 (quotation marks omitted). It also confirmed that examination of sources from that era—including "19th-century cases," congressional and public "discourse after the Civil War," and the understanding of post-Civil War commentators—"was a critical tool of constitutional interpretation" in understanding the Second Amendment. *Id.* at 2127–28 (quotation marks omitted). And although the Court cautioned against giving postenactment history "more weight than it can rightly bear" and noted that it has "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791," the Court was explicit that it was not resolving the "debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope." *Id.* at 2137–38.

Ironically, the Court appears poised to sway, if not resolve, that debate in its forthcoming decision in *United States v. Rahimi*, No. 22-915 (U.S. argued Nov. 7, 2023). The question presented there is whether prohibiting a domestic abuser from possessing a firearm, under 18 U.S.C. § 922(g)(8), violates the Second Amendment in the absence of comparable Founding-era precedent. Thus, *Rahimi* seems likely to address whether courts evaluating the constitutionality of modern-day legislation may consider developments in the law post-

ratification or are indeed constrained to Founding-era sources.[12] Why, then, are we denying Pennsylvania's petition for review, declining even to hold it *c.a.v.* for *Rahimi*'s forthcoming guidance, and ruling instead based on a supposed "hint" in *Bruen*? Hints and assumptions by the Supreme Court are not holdings, *see Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993), and neither can justify our denial of rehearing *en banc* when the novel approach of a divided panel purports to overturn our precedent.

In sum, our failure to grant *en banc* rehearing not only creates a circuit split and allows an opinion resting on an invalid premise to stand; it also means the panel majority's holding concerning Reconstruction-era sources will not bind this Court going forward. To the contrary, "where our cases conflict, the earlier is the controlling authority and the latter is ineffective as precedent." *Bracey v. Superintendent Rockview SCI*, 986 F.3d 274, 290 n.14 (3d Cr. 2021) (cleaned up) (citing 3d Cir. I.O.P. 9.1). The petition for rehearing thus should be granted to secure the uniformity of our Second Amendment

---

[12] This petition should be held *c.a.v.* for the additional reason that *Rahimi* appears likely to address one or more other dispositive issues, including who counts among "the People" protected by the Second Amendment; the contours of *Bruen*'s "history and tradition" test; the level of deference we should give legislatures in making categorical, predictive judgments about groups that pose particular risks; what, if any, findings legislatures must make to justify those judgments; and whether evidence of legislative authority to make those judgments includes consensus among the states today. *See generally* Brief for the United States, *Rahimi*, No. 22-915 (U.S. Aug. 14, 2023).

case law, or if not granted, at least held *c.a.v.* for the
forthcoming opinion in *Rahimi*.

**B.**   ***En banc* Rehearing Is Necessary Because
Under the Proper Methodology,
Pennsylvania's Statutory Scheme is
Constitutional.**

Because Reconstruction-era sources are relevant and
the panel majority disregarded them, *en banc* rehearing is the
only way to conduct the comparative analysis *Bruen* requires.
That analysis compels a different outcome.  Judge Restrepo
catalogued the historical evidence that "[a]t the Founding,
people under 21 lacked full legal personhood," so, at the first
step of the *Bruen* test, those youth are not among "the people"
protected by the text of the Second Amendment.  *Lara*, 91 F.4th
at 142 (Restrepo, J., dissenting).   He also persuasively
explained why, even if we reach *Bruen*'s second step and
determine whether the regulation is "consistent with the
Nation's historical tradition of firearm regulation," *Bruen*, 142
S. Ct. at 2126, Pennsylvania's statutory scheme is
constitutional.  Among other reasons, he observed that "at least
17 states passed laws restricting the sale of firearms to people
under 21" between 1856 and 1893.  *See Lara*, 91 F.4th at 147
(Restrepo, J., dissenting) (citing *Bruen*, 142 S. Ct. at 2129–30).

I join that conclusion and offer here some concrete
examples of ways that the "how" and "why" of those historical
statutes map onto Pennsylvania's.[13]

---

[13] Although *Bruen* eschewed a free-standing "means-end
scrutiny" or "interest-balancing inquiry" for modern-day
regulations, 142 S. Ct. at 2129, it embraced a comparative

By way of background, before the Fourteenth Amendment was ratified in 1868, a number of states treated 21 as the age of majority[14] and effectively prevented, or at least hindered, "minors" from even obtaining firearms. *See, e.g.*, 1856 Ala. Laws 17; 1859 Ky. Acts 245, § 23; 1856 Tenn. Pub. Acts 92.  Other states adopted similar regulations in the years immediately after ratification, *see, e.g.*, 1875 Ind. Acts 59; 1879 Mo. Rev. Stat. § 1274; 1878 Miss. Laws 175–76,[15] signaling that the generation that incorporated the Second Amendment against the states did not understand it to limit their ability to pass such regulations, *see Bruen*, 142 S. Ct. at 2136–37 (acknowledging that historical examples from the years immediately following ratification can, in some cases, provide evidence about the public understanding of an Amendment).  Indeed, a 19th century treatise written by "the

---

means-end analysis by directing us to look to "how" (the means) and "why" (the end) historical "regulations burden a law-abiding citizen's right to armed self-defense" and then to consider whether the "modern . . . regulation[] impose[s] a comparable burden . . . [that] is comparably justified," *id*. at 2133.

[14] *See, e.g.*, *Vincent v. Rogers*, 30 Ala. 471, 473 (1857) (describing a minor as an individual "under twenty-one years of age"); *Warwick v. Cooper*, 37 Tenn. (5 Sneed) 659, 660–61 (1858) (referring to 21 as the age of majority); *Newland v. Gentry*, 57 Ky. (18 B. Mon.) 666, 671 (1857) (referring to 21 as the age of majority); 1879 Mo. Rev. Stat. § 2559 (explaining that a male is a minor until he turns 21, and a female is a minor until she turns 18).

[15] *See also Jones v. Bonta*, 34 F.4th 704, 740 (9th Cir. 2022) (collecting statutes), *vacated on reh'g*, 47 F.4th 1124 (9th Cir. 2022).

most famous" voice on the Second Amendment at the time, *Heller*, 554 U.S. at 616, explained that states "may prohibit the sale of arms to minors," Thomas M. Cooley, *Treatise on Constitutional Limitations* 740 n.4 (5th ed. 1883).

By broadly criminalizing any attempt to convey a firearm to those under the age of 21, these statutes effectively prevented young citizens not just from carrying publicly in times of emergency, but from possessing firearms at all. Thus, as to "how" these prohibitions burdened the right to bear arms, the 18th-century laws were far more onerous than Pennsylvania's, which prohibits such youth only from carrying publicly during statewide emergencies, *see* 18 Pa. Cons. Stat. §§ 6106, 6107, 6109. If the generation that incorporated the Bill of Rights against the states believed that states could constitutionally impose *more burdensome* gun regulations on this age group, *a fortiori* it would have viewed Pennsylvania's more limited prohibition as constitutional.

In terms of "why" the statutes were enacted, these Reconstruction-era laws again are comparable to Pennsylvania's statutory scheme—certainly more so than the Founding-era militia statutes on which the panel majority relied. As I discuss in greater detail in Section D, *infra*, interpersonal gun violence "was not a problem in the Founding era that warranted much attention," in large part because the firearms that our Founders possessed simply lacked the capacity of those today to inflict mass casualties in a matter of seconds.[16] By the late 19th century, however, "gun violence

_____

[16] Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 Fordham Urb. L. J. 1695, 1713 (2012).

had emerged as a serious problem in American life."[17]  This development was fueled by the mass production of firearms that began during the wave of American industrialization in the mid-19th century,[18] and it was accompanied by renewed efforts to market gun ownership to the average American consumer.[19] It was also driven by "the trauma of the [Civil War] and the enormous increase in the production of guns necessary to supply two opposing armies," which "intensified the problem posed by firearms violence and gave a new impetus to regulation."[20]

In this changed America, "interpersonal gun violence and the collective terrorist violence perpetuated by groups such

---

[17] Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. Davis L. Rev. Online 65, 69 (2021).

[18] James B. Jacobs and Alex Haberman, *3D-Printed Firearms, Do-It-Yourself Guns, & the Second Amendment*, 80 Law & Contemp. Probs. 129, 137–38 (2017); *see also* David Yamane, *The Sociology of U.S. Gun Culture*, 11 Sociology Compass 1, 2 (2017) ("The 19th century shift from craft to industrial production, from hand-made unique parts to machine-made interchangeable parts, dramatically increased manufacturing capacities, and gun manufacturing played a central role in this development.").

[19] *See* Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* xvii–xxi (2016) (explaining how gun manufacturers employed new marketing strategies to create a civilian market for firearms in the 19th century).

[20] Cornell (2021), *supra* note 17, at 69.

13

as the Ku Klux Klan" replaced the "ancient fears of tyrannical Stuart monarchs and standing armies" that preoccupied the Founding generation.[21]   Those same concerns about public safety apply to today's America, where increasingly deadly firearms are mass-produced at an unprecedented rate,[22] and have motivated states like Pennsylvania to regulate the ability of still-maturing young people to carry firearms.[23]

In short, both the "how" and the "why" of Pennsylvania's statute track those of its Reconstruction-era analogues, so *en banc* rehearing would allow us not just to correct the panel's mistaken methodology, but also its mistaken result.

### C.   *En banc* Rehearing Is Also Necessary for Proper Consideration of Founding-Era Sources.

Even if we were to follow the majority's approach and "set aside the Commissioner's catalogue of statutes from the mid-to-late nineteenth century," *Lara*, 91 F.4th at 134, *en banc* rehearing is warranted because Pennsylvania's statutory scheme has support in Founding-era history to which we look

---

[21] *Id.*

[22] Glenn Thrush, *U.S. Gun Production Triples Since 2000, Fueled by Handgun Purchases*, The N.Y. Times (Updated June 8,                                                               2022), https://www.nytimes.com/2022/05/17/us/politics/gun-manufacturing-atf.html.

[23] *See, e.g.*, Brief for Illinois, et al. as Amici Curiae Supporting Appellee's Petition for Rehearing, *Lara v. Commissioner Pennsylvania State Police*, 91 F.4th 122 (3d Cir. 2024).

for a "match . . . in principle, not with precision." *Range*, 69 F.4th at 117 (Krause, J., dissenting).

It is by now well established that, as then-Judge Barrett put it, "founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety." *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting), *abrogated by Bruen*, 142 S. Ct. 2111 (2022). And it was the legislatures of the Founding generation that determined—consistent with the Second Amendment—which groups posed sufficient risk to justify categorical disarmament. *See Range*, 69 F.4th at 115 (Shwartz, J., dissenting) ("[U]nder *Bruen*, the relevant inquiry is why a given regulation, such as a ban based on one's status, was enacted and how that regulation was implemented."); *id.* at 119–128 (Krause, J., dissenting) (cataloguing the historical disarmament of groups that legislatures judged untrustworthy to follow the law).

Pennsylvania exercised such legislative judgment when it decided that those under 21 categorically pose a danger to public safety during times of emergency, and its judgment is entitled to deference—at least where, as here, it is supported by evidence. Modern crime statistics, of which we can take judicial notice,[24] confirm that youth under 21 commit violent

---

[24] Several of the sources that follow are drawn from the District Court record, while others may be considered under Federal Rule of Evidence 201. *See, e.g.*, *Clark v. Governor of N.J.*, 53 F.4th 769, 774 (3d Cir. 2022) (taking judicial notice of publicly available statistics); *Stone v. High Mountain Mining Co., LLC*, 89 F.4th 1246, 1261 n.7 (10th Cir. 2024) (same); *United States v. United Bhd. of Carpenters and Joiners of America, Loc. 169*,

gun crimes at a far disproportionate rate. In 2019, for example, although 18- to 20-year-olds made up less than 4% of the U.S. population, they accounted for more than 15% of all homicide and manslaughter arrests.[25] National data collected by the Federal Bureau of Investigation (FBI) also confirms that homicide rates peak between the ages of 18 and 20.[26] Indeed, that age group commits gun homicides at a rate three times higher than adults aged 21 or older.[27] And "[a]dditional studies

---

457 F.2d 210, 214 n.7 (7th Cir. 1972) (taking judicial notice of statistics from United States Bureau of Census Reports).

[25] *See* U.S. Dep't of Just., Crime in the United States, Arrests, by Age, 2019, at Table 38, https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/tables/table-38; U.S. Census Bureau, Age and Sex Composition in the United States: 2019, at Table 1, National Population by Characteristics:            2010-            2019, https://www.census.gov/data/tables/2019/demo/age-and-sex/2019-age-sex-composition.html.

[26] *See* Daniel W. Webster et al., *The Case for Gun Policy Reforms in America*, Johns Hopkins Ctr. for Gun Policy & Research 5 (last updated Feb. 5, 2014), http://web.archive.org/web/20160325061021/http://www.jhsph.edu/research/centers-and-institutes/johns-hopkins-center-for-gun-policy-and-research/publications/WhitePaper020514_CaseforGunPolicyReforms.pdf.

[27] Everytown Research & Policy, Everytown for Gun Safety (last updated Mar. 1, 2022), https://everytownresearch.org/stat/eighteen-to-20-year-olds-commit-gun-homicides-at-a-rate-triple-the-rate-of-those-21-and-years-older/; *see also Jones v. Bonta*, 34 F.4th 704, 760 (9th Cir. 2022) (Stein, J., dissenting in part) (noting that 18- to

show that at least one in eight victims of mass shootings from 1992 to 2018 were killed by an 18 to 20-year-old[.]"[28]

Our understanding of *why* youth commit violent crimes has also evolved dramatically in recent decades, further reinforcing Pennsylvania's legislative judgment that young people pose a particular danger in carrying firearms during states of emergency.  We now understand, for example, that those under 21 are uniquely predisposed to impulsive, reckless behavior because their brains have not yet fully developed.[29]

---

20-year-olds "commit gun homicides at a rate three times higher than adults above the age of 21"), *vacated on reh'g*, 47 F.4th 1124 (9th Cir. 2022); *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 478 (4th Cir. 2021) (Wynn, J., dissenting) (noting that "from 2013 to 2017, young adults aged 18 to 20 committed gun homicides at a rate *nearly four times higher* than adults 21 and older") (alteration in original) (internal citations and quotation marks omitted), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021).

[28] *Jones*, 34 F.4th at 760 (Stein, J., dissenting in part) (citing Joshua D. Brown and Amie J. Goodin, *Mass Casualty Shooting Venues, Types of Firearms, and Age of Perpetrators in the United States, 1982–2018*, 108 Am. J. Pub. Health 1385, 1386 (2018)).

[29] *See also Nat'l Rifle Ass'n of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 135, 210 n. 21 (5th Cir. 2012) ("[M]odern scientific research supports the commonsense notion that 18-to-20-year-olds tend to be more impulsive than young adults aged 21 and over."), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111; *Horsley v. Trame*, 808 F.3d 1126, 1133 (7th Cir. 2015) ("The evidence now is strong that the brain does not cease to mature until the

Specifically, the prefrontal cortex, which is responsible for impulse control and judgment, is the last part of the brain to fully mature and continues to develop until a person is in their mid-20s.[30]   By contrast, the limbic system, which controls emotions like fear, anger, and pleasure, develops far earlier, and young people generally rely heavily on this region of their brains to guide their decision-making.[31]

As a result, young adults are both uniquely prone to negative emotional states[32] *and* uniquely unable to moderate their emotional impulses.  Indeed, while "a 19-year-old might possess a brain that looks 'adult-like' and that supports mature cognitive performance under calm or 'neutral' conditions, that same brain tends to look much more like that of a younger kid when evocative emotions are triggered, resulting in significantly        weaker        cognitive        performance."[33]

---

early 20s in those relevant parts that govern impulsivity, judgment, planning for the future, foresight of consequences, and other characteristics that make people morally culpable.") (citation omitted).

[30] *See, e.g.*, Mariam Arain et al*., Maturation of the Adolescent Brain*, 9 Neuropsychiatric Disease & Treatment 449, 453, 456 (2013); Elizabeth R. Sowell et al., *In Vivo Evidence for Post-adolescent Brain Maturation in Frontal and Striatal Regions*, 2 Nature Neuroscience 859, 859–60 (1999).

[31] Arain, *supra* note 30, at 453.

[32] Leah H. Somerville et al., *A Time of Change: Behavioral and Neural Correlates of Adolescent Sensitivity to Appetitive and Aversive Environmental Cues*, 72 Brain and Cognition 124, 125 (2010).

[33] *Hirschfeld*, 5 F.4th at 476 (Wynn, J., dissenting) (quoting Jason Chein, *Adolescent Brain Immaturity Makes Pending*

Unsurprisingly, this combination makes young adults especially prone to reckless and violent behavior.[34]

While the scarcity and limited lethality of their weapons gave our Founding generation little reason to fear the danger of youth gun violence, today's legislatures have good reason to do so. And because that group is especially prone to impulsive, violent behavior, Pennsylvania's legislature reasonably decided that allowing them to carry firearms in public during statewide emergencies, when emotions already run high and violence may be widespread, would pose a particular danger to public safety. That judgment reflects precisely the type of determination that led our Founders to categorically disarm other groups they deemed to be dangerous and puts Pennsylvania's statute comfortably within the Nation's historical tradition even at the "First Founding."

---

*Execution Inappropriate*, Bloomberg Law (Sept. 17, 2020 4:00 AM), https://www.bloomberglaw.com/bloomberglawnews/us-law-week/XBBCKGKK000000).

[34] Michael Dreyfuss et al., *Teens Impulsively React Rather than Retreat from Threat*, 36 Developmental Neuroscience 220, 220 (2014) ("Adolescents commit more crimes per capita than children or adults in the United States and in nearly all industrialized cultures. Their proclivity toward . . . risk taking has been suggested to underlie the inflection in criminal activity observed during this time.").

**D.**   **Without Rehearing, The Majority's Approach Will Leave States Powerless to Address One of Society's Most Pressing Social Concerns.**

Rehearing is also needed because the panel majority failed to apply the "more nuanced approach" that *Bruen* prescribes where a statute responds to "unprecedented social concerns or dramatic technological changes" beyond our Founders' ken. 142 S. Ct. at 2132. Pennsylvania's Uniform Firearms Act fits that bill.

Interpersonal gun violence, historians agree, was simply not a major concern for the Founding generation.[35] Because the "black powder, muzzle-loading weapons" in that era were "too unreliable and took too long to load," firearms "were not the weapon of choice for those with evil intent[.]"[36] And when we consider that these were "tight-knit" rural communities where "[e]veryone knew everyone else," "word-of-mouth spread quickly," and the population "knew and agreed on what acts were . . . permitted and forbidden,"[37] it is not surprising that gun violence "simply was not a problem in the Founding era that warranted much attention and therefore produced no legislation."[38]

---

[35] Cornell (2012), *supra* note 16, at 1713.

[36] *See* Saul Cornell, *Constitutional Mischiefs and Constitutional Remedies: Making Sense of Limits on the Right to Keep and Bear Arms in the Founding Era*, 51 Fordham Urb. L. J. 25, 38 (2023).

[37] *Range v. Att'y Gen.*, 69 F.4th 96, 117 (3d Cir. 2023) (Krause, J., dissenting).

[38] Cornell (2012), *supra* note 16, at 1713.

In today's America, by contrast—where firearms include automatic assault rifles and high-capacity magazines and our population is mobile, diverse, and largely urban— nearly 50,000 people die from gun-related injuries each year, and over 80% of murders involve a firearm.[39]  Horrific mass shootings have also become a daily occurrence, with over 600 such shootings in 2023 alone,[40] and 82 so far in the first three months of 2024.[41]  And as I have explained in Section C, *supra*, the phenomenon of gun violence among those between 18 and 20 presents a particularly troubling new social concern that our Founders had no reason to contemplate.

The Supreme Court anticipated this situation when it recognized in *Bruen* that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868," and it directed that state laws "implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach."  142 S. Ct. at

---

[39] *See, e.g.*, John Gramlich, *What the Data Says About Gun Deaths in the U.S.*, PEW Research Ctr. (Apr. 26, 2023), https://www.pewresearch.org/short-reads/2023/04/26/what-the-data-says-about-gun-deaths-in-the-u-s/.

[40] *See* Molly Bohannon and Ana Faguy, *U.S. Faces Second-Worst Year On Record for Mass Shootings—Nearly 650 Incidents*, Forbes (Dec. 25, 2023 9:22 AM), https://www.forbes.com/sites/mollybohannon/2023/12/25/us-mass-shootings-near-650-this-year-second-worst-total-on-record/?sh=1ef8729669e8.

[41] *See Mass Shootings in 2024*, Gun Violence Archive (last viewed Mar. 22, 2024), https://www.gunviolencearchive.org/reports/mass-shooting.

2132.  The panel majority did not heed that counsel, so considerations of federalism and comity also compel *en banc* rehearing.

\* \* \*

The Second Amendment was "intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs," *id.* at 2132 (citation omitted), not to force on modern-day legislatures the fiction that we live in 1791 or to preclude reasonable responses to problems of gun violence that were unfathomable when the Bill of Rights was ratified.  And both we and the Supreme Court have held the states' understanding of the Second Amendment when they incorporated it through the Fourteenth Amendment to be relevant and part of "the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.  The panel majority decreed the opposite in a decision that violated 3d Cir. I.O.P. 9.1, created a split with our sister circuits, and contravened Supreme Court precedent.  Our refusal to grant rehearing *en banc* in this circumstance is all the more perplexing in light of the Supreme Court's imminent opinion in *Rahimi*, which will necessarily bear on the panel's reasoning and may well abrogate it even as the panel's mandate issues.

For all of these reasons, I respectfully dissent from the Court's denial of *en banc* rehearing and, as we are declining to correct our own error, urge the Supreme Court to do so if presented the opportunity.